**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES TIESSEN, Individually and on Behalf of All Others Similarly Situated,<br><br>                                 Plaintiff,<br><br>        v.<br><br>THE TORONTO-DOMINION BANK, BHARAT B. MASRANI,  LEOVIGILDO SALOM,  KELVIN VI LUAN TRAN, and RIAZ E. AHMED<br><br>                                 Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff  James Tiessen ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges in this Complaint for violations of the federal securities laws (the "Complaint") the following based upon knowledge with respect to his own acts, and upon facts obtained through an investigation conducted by his counsel, which included, *inter alia*: (a) review and analysis of relevant filings made by The Toronto-Dominion Bank ("TD" or the "Company") with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of TD's public documents, conference calls, press releases, and stock chart; (c) review and analysis of securities analysts' reports and advisories concerning the Company; and (d) information readily obtainable on the internet.

Plaintiff believes that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to the defendants or are exclusively within their control.

**NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of all investors who purchased or otherwise acquired TD securities between February 29, 2024 to October 9, 2024, inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws (the "Class").

2.     Defendants provided investors with material information concerning the scope of the issues surrounding TD's anti-money laundering ("AML") program employed to comply with the United States Bank Secrecy Act ("BSA"), the ability for Defendants to "fix" those issues, and the punitive and remedial compliance measures likely to be imposed upon TD through the resolution of these investigations. Defendants' statements included, among other things, confidence in the Company's optimistic claims of updating and fixing the existing AML program, alleging a full understanding of the scope of the issues the program was facing, and setting aside specific provisional estimates as to the monetary impact of the punitive and compliance measures believed to be imposed.

3.     Defendants provided these overwhelmingly positive statements to investors while, at the same time, disseminating materially false and misleading statements and/or concealing material adverse facts concerning the true state of TD's AML program; pertinently, TD concealed or otherwise minimized the significance of the failures of the Company's AML program and made no indication that the imposition of an asset cap or other punitive or compliance measures would be imposed that would undermine TD's continued growth for the foreseeable future. Such statements absent these material facts caused Plaintiff and other shareholders to purchase TD's securities at artificially inflated prices.

4.      On October 10, 2024, TD unveiled the resolutions reached from the United States investigations, which included, in addition to the punitive payment of $3.09 billion, both an asset cap, preventing TD's U.S. subsidiaries from exceeding a collective $434 billion, a reflection of the Company's assets as of September 30, 2024, and further subjects TD to more stringent approval processes for its product, service, and market rollouts.  Further, the Department of Justice, in their own corresponding release, highlighted the significance of TD's failures as "the largest bank in U.S. history to plead guilty to Bank Secrecy Act program failures, and the first US bank in history to plead guilty to conspiracy to commit money laundering."

5.      The unveiling of the scope of the Company's AML failures surprised investors and analysts alike as they reacted immediately to the revelations. The price of TD's common stock declined dramatically. From a closing market price of $63.51 per share on October 9, 2024, TD's stock price fell to $59.44 per share on October 10, 2024, and further to $57.01 on October 11, 2024, a decline of more than 10% in the span of just two days.

## JURISDICTION AND VENUE

6.      Plaintiff brings this action, on behalf of himself and other similarly situated investors, to recover losses sustained in connection with Defendants' fraud.

7.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as a significant portion of TD's business, actions, and the subsequent damages to Plaintiff and the Class, took place within this District.

10.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## THE PARTIES

11.     Plaintiff purchased TD common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the Defendants' fraud. Plaintiff's certification evidencing his transaction(s) in TD is attached hereto.

12.     The Toronto-Dominion Bank is a Canadian corporation with its principal executive offices located in Toronto at Toronto-Dominion Centre Toronto, Ontario M5K 1A2. During the Class Period, the Company's common stock traded on the New York Stock Exchange (the "NYSE") under the symbol "TD."

13.     Defendant Bharat B. Masrani ("Masrani") was, at all relevant times, the Group President, Chief Executive Officer, and Director TD.

14.     Defendant Leovigildo Salom ("Salom") was, at all relevant times, the Group Head of U.S. Retail of TD and the President and Chief Executive Officer of TD, America's Most Convenient Bank.

15.     Defendant Kelvin Vi Luan Tran ("Tran") was, at all relevant times, the Group Head and Chief Financial Officer of TD.

16.    Defendant Riaz E. Ahmed ("Ahmed") was, at all relevant times, the Group Head of Wholesale Banking of TD.

17.    Defendants Masrani, Salom, Tran, and Ahmed are sometimes referred to herein as the "Individual Defendants." TD together with the Individual Defendants are referred to herein as the "Defendants."

18.    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of TD's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

19.    TD is liable for the acts of the Individual Defendants, and its employees under the doctrine of respondeat superior and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

20.    The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to TD under respondeat superior and agency principles.

## SUBSTANTIVE ALLEGATIONS

### *Company Background*

21.     TD is an international bank, operating through four segments: Canadian Personal and Commercial Banking, U.S. Retail, Wealth Management and Insurance, and Wholesale Banking.

22.     The Company offers its products and services in the US under the "TD Bank" and "America's Most Convenient Bank" brand names.

### *The Defendants Materially Misled Investors Concerning*

### *the Severity of TD's Anti-Money Laundering Program Deficits*

#### *February 29, 2024*

23.     On February 29, 2024, Defendants published their first quarter fiscal year 2024 results and conducted a corresponding earnings call to discuss the same. During that call, CEO Masrani spoke on the investigation into TD's anti-money laundering ("AML") efforts, pertinently claiming that Defendants understood the AML issues at play, stating:

> In addition, and speaking with many of you over the past quarter, ***I know there are questions relating to the bank's investments in our risk and control infrastructure including in our AML program***. We are making comprehensive enhancements. This is a priority for the bank, and we take our responsibility seriously to live up to our high standards. We will continue to mobilize the required resources to strengthen our capabilities. This includes the appointment of proven senior leaders in anti-money laundering, external advisers with deep subject matter expertise and investments in technology, process redesign and training.

> We are accelerating investments in our risk and control environment, hiring hundreds of colleagues in these areas across the enterprise over the past 2 quarters. ***In short, we know what the AML issue is, and we are making progress in fixing it every day. I look forward to providing further updates as soon as I can.***

(Emphasis added).

24.    Defendants reiterated their claimed understanding of the material AML issue during the subsequent question-and-answer portion of the call during the following pertinent exchanges:

<Q: Ebrahim Huseini Poonawala – BofA Securities – MD of US Equity Research & Head of North America Banks Research> And just a separate question in terms of the AML issue, not about the specifics, but what happened there? Again, for those of us who follow TD for a long time, it's -- the assumption is always TD is ahead of the curve in terms of management, risk control investments. What do you think happened there? And does that cause you to kind of reevaluate the rest of the bank, if there are any other issues that could emerge?

<A: Bharat B. Masrani> Ebrahim, as you know, I can't talk more about the specific issue, but I can tell you -- what I can tell you is, we know what the issue is. We are working very hard to fix it and it will get fixed. And when I'm in a position to give you more information, I'd be happy to do that.

As far as our control infrastructure, we -- this is an ongoing situation for TD or any big bank and the environment changes and as we hear improvements from others, including our regulators, what the industry is doing, we want to keep up with it and where appropriate, be ahead of it. So it's an ongoing process, and I'm happy as to know how we are making progress.

. . .

<Q: Sohrab Movahedi – BMO Capital Markets – MD of Financials Research> Okay. I appreciate that clarification. Bharat, I mean the good news is, **_I think you've made it clear that the AML issues are understood_**, I suppose, and progress is being made fixing them. Are you in a better position now versus a few quarters ago to give you a sense of how long do you think that will take? And how much do you think it will cost?

<A: Bharat B. Masrani> I wish I could, Sohrab. And I'm hoping that I'll be able to in the near term. But suffice it to say, as I said in my prepared remarks, we know what the issues are. We are working hard to improve and enhance our processes, and I'm confident that I've been with the bank many years that when we get on to a particular issues we find, we get on to those and fix them. And so this is, from my perspective, something that we are doing. And when I'm in a position to give you more information, I too am waiting to do that, and I will certainly attempt to do that as quickly as I'm able to.

<Q: Sohrab Movahedi> Okay. But you don't think -- like what -- the information you're awaiting Bharat, will it have potential impact of more restructuring charges or less of the benefits of the restructuring charges taken to date being falling to the

bottom line? Or would it -- do you wonder or is it possible it will necessitate a review of the expense program versus what you've kind of laid out for us currently?

<A: Bharat B. Masrani> Well, I think Kelvin laid out our expense profile for the year at the end of Q4. We -- Kelvin did say that our core expense growth are expected to be. These are forecast, of course, things can change based on market conditions. Core increase should be in the 2% range, if you add on the additional risk and control improvements that we said we will undertake, that takes that number to mid-single digits. So I think that kind of gives you some sense as to how we are thinking about this. I think you also had indicated Kelvin is sitting on my left. If I'm wrong, please correct me. That some of these expenses will be in the Corporate segment because we expect those to sometime in the future, disappear.

And some will be -- the running of some of these programs will be in the segments. And that will mean at least for a little while, the corporate segment expenses (sic) [ total adjusted net losses ] will be higher by about -- approximately double than what you've seen in previous years. So I think that gives you some sense, or, but I don't think I can give you any more.

(Emphasis added).

### *March 26, 2024*

25.     On March 26, 2024, Defendant Salom presented on behalf of TD at National Bank's 22nd Annual Financial Services Conference. During the presentation, the discussion turned to the regulatory investigation into the Company's AML program. In pertinent part, the following conversation took place:

<Q: Gabriel Dechaine – National Bank Financial, Inc. – Analyst> Sticking to the regulatory/political theme AML issues have obviously been topical with TDU over the past year or so. I understand that the costs of addressing these -- this issue is being borne by the corporate segment. I'm wondering what's the impact on your business as far as day-to-day operations and more compliance people running around that type of thing.

<A: Leovigildo Salom> Yes certainly. But just to maybe take a step back before I answer where the expenses are. I do want to make a very important point. ***This remediating our AML program is a top priority for the bank. It's a top priority***

*for me personally. We are -- we take any sort of breach in our governance and control processes very seriously.*

*And so this is getting maximum attention inside the organization. And we've made significant progress already on our program*. We've added significant talent and leadership to our AML organization. We've added hundreds of individuals, both in terms of analysts, investigators as well as supporting program management architects to be able to invest and enhance our program. We're investing in our data infrastructure.

We're investing in technology, in other words, we know what we need to do, and we're at it. We're going to fix it. We believe it's manageable, but it is a top priority for the bank. That said, from an expense standpoint, the expenses that are related to the transformation. So some of the infrastructure changes are in fact being carried at the center. And the logic there is that those transformational program changes will not only impact the U.S. but they'll form the basis, those platforms will be the basis of our global program.

With regards to run rate expenses, those that are much more recurring in nature those are still reflected at the local level. So we do have a bit of a split along the lines of what the future carry run rate cost will look like.

. . .

<Q: Gabriel Dechaine> One question I get asked, and I mean it's -- I don't know to what extent you can address it. *But when we look at regulatory oversight in the U.S. in the past, there have been examples where the regulator the OCC or the Fed says, okay, you guys have had some issues. We kind of cap your growth for a while and come up recently, actually. Is that even a worthy consideration for TD in the U.S.?*

<A: Leovigildo Salom> Gabe, I really can't respond. *I wouldn't want to speculate with regards to what the discussions we're having with any of our regulators.* What I would say is I'd ask you to just take a look at what we've been doing. I mean we've got an exceptionally strong franchise. We've got a leading retail deposit business across the country. We're a leading small business lender. We've got a strong community bank offering commercial services right across our East Coast footprint.

We've been able to scale our corporate franchise businesses. So we've already got a significant foothold on the East Coast. And we continue to invest in areas like cards, our wealth business, our mid-market business. So in many ways -- and if you would have seen our first quarter, you see some of that operating momentum very much present. *So I would expect us to make the requisite investments we need to make in our regulatory environment and certainly our governance and control*

***environment. But I would expect to still responsibly, sustainably grow our
franchise in the U.S.***

(Emphasis added).

<u>April 30, 2024</u>

26.    On April 30, 2024, TD issued a press release announcing the Company took "an
initial provision of US$450 million" in relation to the ongoing "regulatory and law enforcement
investigations of TD's U.S. Bank Secrecy Act (BSA)/anti-money laundering (AML) program."
The release further cautioned the potential for additional "potential monetary penalties or any non-
monetary penalties." The Company further admitted fault in accordance with the investigations,
noting "TD's AML program was insufficient to effectively monitor, detect, report, and respond to
suspicious activity."

<u>May 3, 2024</u>

27.    On May 3, 2024, the Company issued another press release, this time responding
to media coverage and speculation regarding TD's AML program. In the release, CEO Masrani
reiterates the Defendants' fault in failing to keep the bank's AML program compliant, pertinently
stating: "I regret that there were serious instances where the Bank's AML program fell short and
did not effectively monitor, detect, report, or respond. This is unacceptable and not in line with our
values."

<u>June 6, 2024</u>

28.    On June 6, 2024, Defendant Ahmed presented on behalf of Company at TD
Cowen's 8th Annual Future of the Consumer Conference, during which a brief exchange took
place regarding the AML investigation's potential ramifications:

<Q: Mario Mendonca – TD Securities Equity Research – Former MD and Research
Analyst> I want to flip over now. Look, I focused so far on things that feel good

about TD Securities, and there's plenty to feel good about. But recently, there have been a few things that don't feel that good about being a TD bank and the most important of which is the AML investigation.

I'm not going to ask you to provide an outlook on that. But what would be helpful for me to understand and for everybody listening in is, how has -- can the AML issue, can it affect the dealer? Can it affect TD Securities? Can affect TD Cowen? Or should we think of this as an issue isolated to U.S. banking?

<A: Riaz E. Ahmed> Yes. I think, Mario, look, I do understand everybody's desire to want to know more. And to your point, I really don't have much to add other than what [ Barrett ] has said to date about this matter. And I think just to reiterate his continual messaging to not only the Street but all our employees as well to say that, look, we are overhauling the program, cooperating with the regulators, bringing people to accountability that need to.

But also that the -- our program, in some respects, did not do its job. And we're overhauling that. And I know people are looking for that conclusion of the regulatory and the investigations, and we are working hard to bring that to -- bring that certainty to everybody as soon as we can.

Now as far as TD Securities, look, at all the growth journey that I mentioned has been primarily driven within businesses that we are already in and that we've been good at and we're continuing to be very good at them and strengthening our platforms in order to gain more market share.

So we're doing much better in debt capital markets. We're doing much better in cash equities. And now we have an entire U.S. cash equity platform to add to that. We're doing much better in equity capital markets, where we were really nowhere prior to the TD Cowen acquisition in the United States. And now with the addition of the technology and the health care banking franchises, we're participating and earning very decent shares and revenue in that. We're much better in syndicated and leverage plans. We have strengthened our investment banking capability.

***So we are growing this business and continue to expect to be able to grow it quite nicely within the swim lanes that we're already in. And so I don't expect that it should really interfere with our ability to just continue to grow organically and with that -- with the market share that -- gains that we've been able to capture.*** And I would say that, as Ajai mentioned on Q2 call with the U.S. -- overhaul of the U.S. AML program, we are paying very close attention to what aspects of that program that we need to also continue to add to the best practices that -- at TD Securities and participating in that journey in order to just continue to make sure that we are in a good position with respect to that in TD Securities.

***But as has been indicated here, too, before, we don't really know what the final monetary and nonmonetary penalties will look like. We're trying to bring***

> ***conclusion to that fairly quickly. And to be able to have better visibility into how and where we go from here. But I think that the journey that TD Securities has been on can continue smartly.***

(Emphasis added).

<u>*August 21, 2024*</u>

29.    On August 21, 2024, TD issued a press release to "Update on U.S. AML Matters."

In pertinent part, the release disclosed the following:

> In anticipation of a global resolution, which will include monetary and non-monetary penalties, ***the Bank has taken a further provision of US$2.6 billion in its third quarter financial results to reflect the Bank's current estimate of the total fines related to these matters***. The Bank expects that a global resolution will be finalized by calendar year end.

(Emphasis added).

30.    The following day Defendants conducted an earnings call corresponding to the publication of their third quarter fiscal year 2024 results. During the call, Defendants spoke to their update on the AML investigation and apparent efforts to raise capital, stating in pertinent part:

> Before I get into the details, I want to spend a few minutes on the announcement we made late yesterday. We continue to actively pursue a resolution of our AML matters. Discussions have been productive, and while we are not through the tunnel yet, we can see the light at the end of this journey.

> In our release, we noted that it is our expectation that a global resolution can be achieved by the end of the calendar year. The USD 2.6 billion provision we just announced, combined with the USD 450 million provision announced last quarter, represents our current estimate of the total fines to be paid related to these matters.

> I also want to spend a minute on the remediation program itself. This is important work and the remediation program is well underway. In May, we updated you on our progress. We've advanced on all fronts since then. We've onboarded leadership with deep subject matter expertise supported by increased staffing resources.

> We've hired from other banks regulators, government and even law enforcement. We've invested in data and technology to enable improved transaction monitoring and data analytics capabilities. And we've implemented new cross-functional procedures for preventing, detecting and reporting suspicious activity.

While there's still much work ahead, we are pleased with the progress we've made. This is a priority. Our U.S. business is an important part of the bank and of our future. We must focus on the work required to meet our obligations and responsibilities and build their future on stronger foundations. As I've said before, the failures were serious. We own it. We know what the issues are, and we are fixing them. I look forward to providing additional clarity as soon as I can.

. . .

As of quarter end, the bank's CET1 ratio was 12.8%, reflecting the impact of the AML investigations provisions and shares bought back during the quarter, partially offset by organic capital generation. ***The sale of 40.5 million shares of Schwab, which brings our holding to approximately 10.1%***, further strengthens our capital ratio, ensuring the bank stays well above regulatory requirements after taking this provision.

(Emphasis added).

31.     During the question-and-answer segment of the call, Defendants confidently

defended their estimate of the total fines associated with the AML investigation, in pertinent part:

<Q: Meny Grauman – Scotiabank Global Banking and Markets – MD of Financial Services Equity Research & Analyst> ***I want to talk about capital. And specifically, it's not clear to me why you needed to sell down your Schwab stake to shore up capital***, especially -- or even if I take into account the guidance on operational RWA coming in Q4. So if you could help me understand sort of the thought process there? ***It seems like there's something else going on here in terms of other considerations. Again, and especially in the context of buying back $1 billion in shares in the quarter as well.*** So hopefully, you could help me understand that.

<A: Bharat B. Masrani> Meny, this is Bharat. You know that traditionally and historically, the ***bank likes to be well capitalized and frankly, like to carry more capital than what may generally be necessary***. In line with that, we think it's prudent to have capital. There is still a lot of volatility and economic conditions are not as predictable as one would like, so this is just to be prudent and it makes sense. That's the capital framework we use, and we think it made sense to have the capital levels that we are projecting for the next quarter.

<Q: Meny Grauman> ***So with this sort of capital stance -- conservative capital stance signal that AML signs could end up being larger -- materially larger?***

<A: Bharat B. Masrani> We announced $2.6 billion yesterday. Additionally, we had announced $450 million in the second quarter. And ***together, this is the current estimate we have on what it will take to put these matters behind us***. That's how

we follow this where the accounting rules are very clear on this. ***So our current estimate is that this is the amount it will take to move forward.***

. . .

<Q: Gabriel Dechaine – National Bank Financial, Inc. – Analyst> Okay. And then look, I get you don't want questions on this regulatory matter, but the press release clearly outlined what your estimate of total penalties would be, and I don't dispute that number at all. But there's also mentioned in nonmonetary penalties. ***What are you thinking of there? Is an asset cap on the table for the U.S. business?***

<A: Bharat B. Masrani> ***Nonmonetary means anything that is nothing to do with money***. So we said the [ $2.6 billion ] that is monetary. So anything that doesn't fit into that category is nonmonetary. I can't speculate. We're in the middle of our negotiations. We are making progress and it's not appropriate to speculate what the final deal would be.

And we -- as we put out in our press release, we expect to come to a resolution by calendar year-end. So I think best here is to remain patient. And when we have more to say, we'll be happy to engage.

<Q: Gabriel Dechaine> Right. ***But nonmonetary can involve financial impacts, so you can agree on that, correct?***

<A: Bharat B. Masrani> ***I don't want to speculate. There might be compliance requirements, it can be various other requirements. It's hard to speculate. We are in the middle of this negotiations, investigations. And so we just want to make sure that we give you a fulsome disclosures when it is appropriate rather than speculating what it may or may not be.***

. . .

<Q: Nigel R. D'Souza – Veritas Investment Research Corporation – Senior Investment Analyst> I wanted to turn to your disclosure on reasonably possible losses. I noticed that the high end of that range is still at around $1.3 billion and is a little change from last quarter. So trying to understand why that hasn't come down given the AML provision you've taken this quarter? ***Are there any other legal or regulatory matters outside from AML that could lead to outsized fines or penalties?***

<A: Kelvin Vi Luan Tran> It's Kelvin. We don't comment on RPLs. I mean there's a lot of puts and takes in the RPL, and we continuously make an assessment what's the appropriate amount and update it accordingly.

<Q: Nigel R. D'Souza> Okay. And then ***on Schwab. You talked about capital, but was liquidity a consideration in the decision to sell those Schwab's shares?*** Could you have sourced liquidity from other avenues other than selling your equity stake

in Schwab? You have the securities portfolio, are the unrealized losses there preventing you from, I guess, selling back [indiscernible] to crystallize? just trying to understand, ***is liquidity at all one of the considerations here?***

&lt;A: Kelvin Vi Luan Tran&gt; It's Kelvin. ***The answer is no***.

(Emphasis added).

32.    The above statements in Paragraphs 23 to 31 were false and/or materially misleading. Defendants created the false impression that they possessed reliable information pertaining to the scope of the Company's AML program failures and the associated cost of the penalties that would be imposed on them as a result, while also minimizing not only the true scope of the Company's failures, but the potential impact of additional punitive measures and compliance efforts on Defendants future projected revenue outlook and anticipated growth. In truth, TD's optimistic claims of updating and fixing the Company's AML program, alleging a full understanding of the scope of the issue, and further setting aside a significant provision of approximately $3 billion claimed to cover the anticipated monetary impact of the resolutions fell well short of any level of appropriate transparency towards its investors; in reality, the Defendants efforts to minimize the Company's oversight and compliance failures forced investors and analysts alike to be surprised by the significance of both failures and the resulting punitive and disciplinary resolutions when they were finally unveiled.

### *The Truth Emerges during TD's Announcement of the*
### *Resolution of AML Investigations*
#### *October 10, 2024*

33.    On October 10, 2024, TD issued a press release and "announced that, following several years of active cooperation and engagement with authorities and regulators, it has reached

a resolution of previously disclosed investigations related to its U.S. Bank Secrecy Act (BSA) and

Anti-Money Laundering (AML) compliance programs."

34.    The release detailed the punitive measures, requirements, and limitations placed on

the Company both by the consent orders issued by the Office of the Comptroller of the Currency

("OCC"), the Federal Reserve Board ("FRB"), and the Financial Crimes Enforcement Network

("FinCEN") and by plea agreements TD entered with the Department of Justice ("DOJ") and the

United States Attorney's Office for the District of New Jersey:

Details of the resolution include:

- A total payment of approximately US$3.09 billion, largely covered by previous provisions of US$3.05 billion.

- Requirements to remediate the Bank's U.S. AML program, broadly aligned to its existing remediation program, which is progressing steadily under the direction of its new U.S. AML leadership team.

- Requirement to prioritize the funding and staffing of the remediation, which is already in place.

- Formal oversight of the AML remediation through a Monitorship.

- ***The total assets of TD's two U.S. banking subsidiaries (TD Bank, NA and TD Bank USA, NA) ("US Bank") cannot exceed US$434 billion (total assets as at September 30, 2024)***; the limitation does not apply to TD Securities, or any of the Bank's Canadian or other global businesses.

- ***The U.S. Bank is subject to more stringent approval processes for new bank products, services, markets, and stores*** to ensure the AML risk of new initiatives is appropriately considered and mitigated.

(Emphasis added).

35.    Speaking on the resolution of the AML investigation, CEO Masrani stated:

We have taken full responsibility for the failures of our U.S. AML program and are making the investments, changes and enhancements required to deliver on our commitments. This is a difficult chapter in our Bank's history. These failures took place on my watch as CEO and I apologize to all our stakeholders.

36.    A special call was held by Defendants later that same day to elaborate further on

the resolution and the associated punitive and remedial measures. In pertinent part, Defendants

reiterated and discussed the impact of the ongoing limitations placed upon TD's United States arm

by the consent orders and plea agreements:

> [T]oday, we announced that TD has reached a resolution of the previously disclosed U.S. AML investigations. The resolutions with the  includes plea agreements. The monetary penalties are largely in line with TD's previous disclosure. The bank will pay a total of USD 3.09 billion. We do not expect any further monetary penalties related to the U.S. AML investigations.

> **The OCC Consent Order includes an asset cap applicable to TD's 2 U.S. banking subsidiaries. The total assets of these 2 subsidiaries cannot exceed USD 434 million -- billion, the total assets as of September 30.** The asset cap does not apply to TD Securities or any of the bank's Canadian or other global businesses.

> The **OCC Consent Order also includes more stringent approval processes for new bank products, services, markets and stores in the U.S. to ensure the AML risk of these new initiatives is appropriately considered and mitigated**. Each of the OCC, FRB, FinCEN and DOJ have imposed remediation requirements with respect to TD's U.S. AML Program. There is significant overlap in these requirements. We continue to work with the regulators to ensure there is coordination to enable the bank to fulfill the remediation requirements efficiently and effectively.

> . . .

> Earlier in the presentation, Bharat described the asset cap included in the OCC Consent **Order. TD AMCB will restructure its balance sheet to enable us to comply with the asset cap,** while creating loan capacity to continue to serve and support our customers' financial needs as they evolve, deepening relationships over time.

> **We will manage down non-scalable and niche portfolios that do not fit our focused strategy or that have a lower return on investment**. To that end, we intend to sell portions of our residential jumbo mortgages, correspondent lending and Exim lending portfolios. We will also selectively reduce our commercial auto dealer lending portfolio and other niche portfolios with a strategic focus on our retail and commercial clients.

> In addition, investment maturities on our sizable investment securities portfolios are expected to provide additional balance sheet capacity. If I can ask you to turn to Page -- to Slide 7.

> **Fiscal 2025 will be a transition year for U.S. Retail as we undertake a balance sheet restructuring to comply with and maintain a buffer to the asset cap**. These actions will also enable us to operate within the requirements while continuing to meet our customers' needs.

***We will reduce assets by approximately 10%***, which will include managing down our selling certain loan portfolios. We expect the P&L impact to be substantially offset by the repositioning of our bond portfolio as we sell lower yielding investment securities and reinvest the proceeds. The sizing and security selection will depend on market conditions.

(Emphasis added).

37.     During the question-and-answer segment of the call that followed, Defendants fielded multiple questions about the new revelation of the asset cap in the following pertinent exchanges:

<Q: Gabriel Dechaine – National Bank Financial, Inc. – Analyst> Yes, I just want to follow up on these -- some of these numbers on Slide 7. Firstly, the asset reduction, you're saying USD 200 million to USD 225 million hit in 2025, you'll offset through higher reinvestment yields from some assets you're going to be selling or have sold already, I don't know.

It says accretive to NII over the next 2 to 3 years, but in the brackets that says, positive USD 300 million to USD 500 million in 2025. Is that just for perspective? Or is this actually going to happen in 2025?

<A: Leovigildo Salom> Gabe, this is Leo again. Just to give you a sense, what we want to do with the investment bond portfolio is we have an opportunity to sell up to about USD 50 billion nominal amount of low-yielding securities. We're looking to sell those and reinvest the proceeds into a similar composition of assets but obviously yielding at a higher rate. The loss upfront associated with that will accrue back into our P&L over the next 3 years with a slightly weighted first and second year profile.

That trade, which I know a number of our competitors have also implemented, we feel that will give us some short-term profitability that will offset some of the costs that we will be incurring both in loan repositioning costs as we exit portfolios that we deem to be less strategic, as well as we invest the balance of the proceeds in our regulatory program.

So it's our way of being able to improve the near-term financial profile while taking the necessary steps that we need to make in terms of repositioning the bank to operate within the asset cap.

<Q: Gabriel Dechaine> Okay. So the accretive NII stuff is going to be coming in over the 2- to 3-year period this USD 300 million to USD 500 million is some sort of a recovery from the USD 1.5 billion loss for whatever reason?

<A: Leovigildo Salom> Correct, in any way.

. . .

<Q: Gabriel Dechaine> Okay. And then just on the -- so I'll wrap up here. *I saw at the end of June in your U.S. call reports, you had total assets have just over USD 400 billion. And then the asset cap in your press release and the OCC, it's based on a USD 434 billion number. So in the span of 3 months, USD 30 billion of assets were added to the U.S., I'm wondering how that happened?*

And then I guess, given that you do have U.S. -- I'm thinking about loan growth here, the composition of your balance sheet, you've got a lot of excess deposits. You're capped, but could you just reduce your loan-to-deposit ratio and still grow?

<A: Leovigildo Salom> There's maybe two questions there. So let me take each one very quickly. *First, from a liquidity standpoint, you'll see on Page 7, we did say that we increased our available cash liquidity. We thought that was simply prudent given the fact that we took a large reserve in last quarter or just a few months ago. And now we came out with the global resolution, we felt that it was prudent to keep a higher level of liquidity, and we borrowed to raise cash against some of our HQLA investments.* So that explains the sort of asset level.

To your broader question, and I think it is a very important question. So I'm just going to spend a moment on it. What we're trying to do is create a capacity within the balance sheet. So by reducing total assets by 10%. *We want to be able to do two things: one, strictly comply with the asset cap.*

*We want to give ourselves a buffer so that we can honor our obligation to regulators under the consent order, but also critically important.* We want to make sure that we can continue to serve our existing clients as their needs evolve, as well as be able to continue to serve the needs of our communities where we serve up and down the East Coast.

Both of those are critically important. So by doing the things that we've talked about here that will give us the flexibility to be able to do that in the short term.

In addition, I think your point that you're raising is a valid one. Our total investment -- cash and investment portfolio as a percent of total assets is 45%. That would be higher than what you'll find at most other institutions, that investment portfolio does give us some flexibility in the future as well above and beyond what we're doing with this initial 10% reduction in terms of total assets.

So a long-winded way of saying, I think there is flexibility to continue to serve our clients, and respect the actual asset cap commitment that we have.

<Q: Gabriel Dechaine> Okay. Just to give me like a real-world example here, then maybe like thinking along the lines of the assets that you're getting out of the loans, you might be getting out of, there might be single product customers. You want to -- you give yourself some room for, say, a commercial client that you have that's borrowing $20 million today that might grow and need $50 million in the future. Do you want to -- do you have enough capacity for that decline? Is that it?

<A: Leovigildo Salom> That's exactly right. We're -- we have either niche portfolios, portfolios that are not at scale and are not as profitable or to your point, where we have pockets of portfolios that are not truly franchised, and they don't represent an element of our core strategy going forward. ***Those -- we have been -- I should say, we have been acting to reduce exposures in those areas. But with the asset cap, we want to be much more deliberate.***

I do want to come back to one thing though. I'm stressing the flexibility because it's important to us. We've served over 10 million clients, including [ 70,000 ] commercial clients in the U.S. for the better part of 2 decades. And it's important for us to be able to continue to do that.

But I don't want to round the corner on one simple point, which is getting this remediation done and getting it done completely comprehensively is my first priority. Nothing else matters if we can't do that and so that will have my might complete attention over the next few months and quarters.

. . .

<Q: Lemar Persaud – Cormark Securities Inc. – Research Analyst> I want to start off with a question on Slide 7 here. And just those three bullets from the balance sheet restructuring. So I'm wondering if you could just talk like obviously, you have the negative impact of the USD 200 million to USD 225 million from reducing assets, raising liquidity, and presumably that's a negative impact there.

And then repositioning the U.S. portfolio, that's I think what you're suggesting there is a positive pickup. So what's the net-net impact of those 3 items? Is it expected to be relatively neutral to NII or negative? Just trying to understand this a little better.

<A: Leovigildo Salom> Thank you very much, Lemar, for the question. I would say that ***we think of 2025 as a transition year. We're going to use the year to be able to make the significant moves to be able to create that asset capacity to be able to comply with the asset cap and continue to serve our clients***. So I would expect that on balance, this would be a slight drag to earnings in 2025. But it will allow us to be able to produce a stable earnings profile in subsequent periods.

(Emphasis added).

38.    On the same day as TD's press release, the Department of Justice issued their own press release, covering TD's guilty pleas in more significant detail. In pertinent part, the DOJ highlighted the following:

> *Today, TD Bank also became the largest bank in U.S. history to plead guilty to Bank Secrecy Act program failures, and the first US bank in history to plead guilty to conspiracy to commit money laundering*. TD Bank chose profits over compliance with the law — a decision that is now costing the bank billions of dollars in penalties. Let me be clear: our investigation continues, and no individual involved in TD Bank's illegal conduct is off limits.
>
> For years, TD Bank starved its compliance program of the resources needed to obey the law. *Today's historic guilty plea, including the largest penalty ever imposed under the Bank Secrecy Act, offers an unmistakable lesson*: crime doesn't pay — and neither does flouting compliance.
>
> . . .
>
> Throughout this time, TD Bank intentionally did not automatically monitor all domestic automated clearinghouse (ACH) transactions, most check activity, and numerous other transaction types, *resulting in 92% of total transaction volume going unmonitored from Jan. 1, 2018, to April 12, 2024. This amounted to approximately $18.3 trillion of transaction activity. TD Bank also added no new transaction monitoring scenarios and made no material changes to existing transaction monitoring scenarios from at least 2014 through late 2022*; implemented new products and services, like Zelle, without ensuring appropriate transaction monitoring coverage; failed to meaningfully monitor transactions involving high-risk countries; instructed stores to stop filing internal unusual transaction reports on certain suspicious customers; and permitted more than $5 billion in transactional activity to occur in accounts even after the bank decided to close them.

(Emphasis added).

39.    The following day, on October 11, 2024, the OCC similarly published their findings with respect to TD's significant failures. In pertinent part, the OCC listed the following findings:

> The Comptroller finds, and the Bank neither admits nor denies, the following:
>
> (1) The Bank failed to develop and provide for the continued administration of a BSA/AML Program reasonably designed to assure and monitor compliance with the BSA and its implementing regulations, in violation of 12 C.F.R. § 21.21. Deficiencies in the Bank's BSA/AML Program included deficiencies

related to: internal controls and risk management practices; risk assessments; customer due diligence; customer risk ratings; suspicious activity identification, evaluation, and reporting; governance; staffing; independent testing; and training, among others.

(2) The Bank had significant, long-standing, systemic breakdowns in its transaction monitoring program.

(3) Since at least 2020, the Bank processed hundreds of millions of dollars worth of transactions with clear indicia of highly suspicious activity, creating a potential for significant money laundering, terrorist financing, or other illicit financial transactions. The Bank repeatedly failed to take appropriate and timely corrective action to address the highly suspicious activity and failed to properly emphasize BSA/AML compliance.

(4) The Bank had a systemic breakdown in its policies, procedures, and processes to identify and report suspicious activity, and a pattern or practice of noncompliance with the SAR filing requirement, resulting in numerous violations of 12 C.F.R. § 21.11 (suspicious activity report violations).

(5) The Bank violated 31 C.F.R. § 1010.312 (currency transaction report violations) on numerous occasions.

(6) The Bank failed to implement appropriate risk-based procedures for conducting ongoing customer due diligence in violation of 31 C.F.R. § 1020.210(a)(2)(v).

(7) The Bank recklessly engaged in unsafe or unsound practices related to the Bank's BSA/AML Program.

(8) The Bank's violations and recklessly unsafe or unsound practices were part of a pattern, and caused and are likely to cause more than a minimal loss to the Bank.

40.    The aforementioned press releases and statements made by the Individual Defendants or otherwise about the Company are in direct contrast to statements they made during the February 29, 2024, March 26, 2024, April 30, 2024, May 3, 2024, June 6, 2024, and August 21, 2024 press releases and shareholder calls. On those releases and calls, Defendants continually touted their efforts to remedy the Company's AML setbacks, claiming a full understanding of the scope of "the AML issue," and set aside provisional figures which Defendants claimed covered their estimate of the "monetary" penalties, while continually minimizing the significance, scope, and willfulness of TD's compliance failures as well as the potential financial impact of undisclosed

punitive or otherwise remedial measures likely to be taken by the OCC, FRB, FinCEN, and DOJ on the Company's future profitability.

41.    Investors and analysts reacted immediately to TD's revelation. The price of TD's common stock declined dramatically. From a closing market price of $63.51 per share on October 9, 2024, TD's stock price fell to $59.44 per share on October 10, 2024, and further to $57.01 on October 11, 2024, a decline of more than 10.23% in the span of just two days.

42.    A number of well-known analysts who had been following TD lowered their price targets in response to TD's disclosures. For example, RBC Capital Markets, while downgrading their rating to "Sector Perform" and cutting their price target, captured analyst and investor surprise at the imposition of an asset cap and the significance of it on TD's future. In pertinent part, the analyst noted,

> TD reached a resolution on its U.S. BSA/AML issues, which included both monetary and non-monetary penalties, of which *the most pertinent in our view is the asset cap that will restrain TD's growth efforts in the U.S. for a long time to come.*
>
> . . .
>
> *We did not believe that TD would have an asset cap imposed*, and *discovering the magnitude of TD's lapses has altered our view. The scope and scale of the lapses were significant, as were the charges to which TD pleaded guilty. Management's credibility and reputation have been harmed, in our view, and will likely be reflected in a discounted valuation versus its peers for years to come.*
>
> The asset cap is indefinite, and our sense is that there is a minimum period of five years at best (the longest period of monitoring we heard from the U.S. Department of Justice briefing). *This is a significant reduction in future potential earnings power.*

(Emphasis added).

43.    Similarly, Desjardins highlighted the surprise of the implementation of an asset cap, stating, in pertinent part:

> What's new? TD's US retail operation is subjected to an asset cap of US$434b
> (level as of September 30, 2024) and must comply by March 31, 2025. There is
> also a more stringent approval process for new bank products, services, markets
> and US stores. This cap will remain in place until removed by the OCC.

UBS in their analyst commentary on the matter, also spoke to the unexpected asset cap, pertinently

stating,

> The more surprising news came with the implementation of an asset cap barring
> TD's growth beyond total assets as of September 30, 2024 . . . While there was
> hope that the announcement of a global resolution would provide some relief to the
> stock, the reality of an asset cap is likely to continue to weigh on the valuation over
> the near-term.

44.     The fact that these analysts, and others, discussed the surprise implementation of

an asset cap on TD's U.S. subsidiaries as well as the much more significant failures of TD's AML

program suggests the public placed significant weight on TD's prior statements of confidence in

both understanding the scope of the Company's AML failures and the potential monetary impact

of punitive and compliance measures. The frequent, in-depth discussion of TD's failures and

unexpected restraints on the Company's growth efforts confirms that Defendants' statements

during the Class Period were material.

***Loss Causation and Economic Loss***

45.     During the Class Period, as detailed herein, Defendants made materially false and

misleading statements and engaged in a scheme to deceive the market and a course of conduct that

artificially inflated the price of TD's securities and operated as a fraud or deceit on Class Period

purchasers of TD's securities by materially misleading the investing public. Later, Defendants'

prior misrepresentations and fraudulent conduct became apparent to the market, the price of TD's

securities materially declined, as the prior artificial inflation came out of the price over time. As a

result of their purchases of TD's securities during the Class Period, Plaintiff and other members

of the Class suffered economic loss, *i.e.*, damages under federal securities laws.

46.     TD's stock price fell in response to the corrective event on October 10, 2024, as alleged *supra*. On October 10, 2024, Defendants disclosed information that was directly related to their prior misrepresentations and material omissions concerning TD's forecasting processes and growth guidance.

47.     In particular, on October 10, 2024, TD announced the resolution of the investigations into its U.S. Bank Secrecy Act and Anti-Money Laundering compliance programs, unveiling the significant penalties and compliance requirements imposed by various institutions on the Company's ability to grow, as well as the significance of the infractions which led to such punitive measures.

### Presumption of Reliance; Fraud-On-The-Market

48.     At all relevant times, the market for TD's common stock was an efficient market for the following reasons, among others:

(a)     TD's securities met the requirements for listing and was listed and actively traded on the NYSE during the Class Period, a highly efficient and automated market;

(b)     TD communicated with public investors via established market communication mechanisms, including disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(c)     TD was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace; and

(d)     Unexpected material news about TD was reflected in and incorporated into the Company's stock price during the Class Period.

49.     As a result of the foregoing, the market for TD's securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in TD's stock price. Under these circumstances, all purchasers of TD's securities during the Class Period suffered similar injury through their purchase of TD's securities at artificially inflated prices, and a presumption of reliance applies.

50.     Alternatively, reliance need not be proven in this action because the action involves omissions and deficient disclosures. Positive proof of reliance is not a prerequisite to recovery pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security.

### *No Safe Harbor; Inapplicability of Bespeaks Caution Doctrine*

51.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint. As alleged above, Defendants' liability stems from the fact that they provided investors with revenue projections while at the same time failing to maintain adequate forecasting processes. Defendants provided the public with forecasts that failed to account for this decline in sales and/or adequately disclose the fact that the Company at the current time did not have adequate forecasting processes.

52.     To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements"

when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

53.     Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of TD who knew that the "forward-looking statement" was false. Alternatively, none of the historic or present-tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

## CLASS ACTION ALLEGATIONS

54.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired TD's securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

55.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, TD's securities were actively traded on the NYSE.

While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by TD or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. As of July 31, 2024, there were approximately 1.7483 billion shares of the Company's common stock outstanding. Upon information and belief, these shares are held by thousands, if not millions, of individuals located throughout the country and possibly the world. Joinder would be highly impracticable.

56.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

57.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

58.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of TD;

(c)    whether the Individual Defendants caused TD to issue false and misleading financial statements during the Class Period;

(d)    whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)    whether the prices of TD's common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(f)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

59.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### *Against All Defendants for Violations of*

### *Section 10(b) and Rule 10b-5 Promulgated Thereunder*

60.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

61.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

62.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon. Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of TD securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire TD's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

63.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to

influence the market for TD's securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company.

64.     By virtue of their positions at the Company, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

65.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control. As the senior managers and/or directors of the Company, the Individual Defendants had knowledge of the details of TD's internal affairs.

66.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of the Company. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to TD's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of

TD's common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning the Company which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired TD's common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

67.    During the Class Period, TD's securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of TD's common stock at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of TD's securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of TD's securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

68.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

69.    As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### *Against the Individual Defendants*

### *for Violations of Section 20(a) of the Exchange Act*

70.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

71.    During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about TD's misstatements.

72.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by TD which had become materially false or misleading.

73.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which TD disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause TD to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of TD's common stock.

74.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause TD to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

75.    By reason of the above conduct, the Individual Defendants and/or TD are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demand judgment against defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 22, 2024                              Respectfully submitted,

                                                    **LEVI & KORSINSKY, LLP**

                                                    */s/ Adam M. Apton*
                                                    Adam M. Apton
                                                    33 Whitehall Street, 17th Floor
                                                    New York, New York 10004
                                                    Tel.: (212) 363-7500
                                                    Fax: (212) 363-7171
                                                    Email: aapton@zlk.com

                                                    *Attorneys for Plaintiff*