P1FLTieC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x
JAMES TIESSEN, Individually
and on Behalf of All Others
Similarly Situated,

                    Plaintiff,

          v.                              24 Civ. 8032 (AS)

THE TORONTO-DOMINION BANK,
BHARAT B. MASRANI, LEOVIGILDO
SALOM, KELVIN VI LUAN TRAN,
and RIAZ E. AHMED,

                    Defendants.
                                          Conference
------------------------------x
PEDRO GONZALEZ, Individually              New York, N.Y.
and on Behalf of All Others               January 15, 2025
Similarly Situated,                       11:00 a.m.

                    Plaintiff,
          v.                              24 Civ. 9445 (AS)

THE TORONTO-DOMINION BANK,
BHARAT B. MASRANI, KELVIN VI
LUAN TRAN, RIAZ E. AHMED,
and LEOVIGILDO SALOM,


                    Defendants.

------------------------------x

Before:

                    HON. ARUN SUBRAMANIAN,

                                          District Judge


                         APPEARANCES

LEVI & KORSINSKY, LLP
     Attorneys for Plaintiff Tiessen
BY:  ADAM APTON

                    SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300

P1FLTieC

APPEARANCES CONTINUED:

BLEICHMAR FONTI & AULD LLP
     Attorneys for Plaintiff Gonzalez
BY:  JOSEPH FONTI
     ROSS MITCHELL SHIKOWITZ

ALLEN & OVERY LLP
     Attorneys for Defendants
BY:  ADAM SELIM HAKKI
     AGNES DUNOGUE

P1FLTieC

(Case called)

MR. APTON:  Good morning, your Honor.  Adam Apton of Levi & Korsinsky for Mr. Tiessen.

THE COURT:  Good morning.

MR. SHIKOWITZ:  Good morning, your Honor.  My name is Ross Shikowitz.  I am from the law firm of Bleichmar Fonti & Auld.  I am here with my partner, Joseph Fonti, who is designated as our lead trial counsel.  We are here on behalf of plaintiff Pedro Gonzalez.

THE COURT:  Good morning.

MR. HAKKI:  Good morning, your Honor.  Adam Hakki from Allen Overy Shearman Sterling for Defendants.  I am here with my partner, Agnes Dunogue.

MS. DUNOGUE:  Good morning, your Honor.

THE COURT:  Good morning.  All right.  And so first off, I asked the plaintiffs to come in with a piece of paper that goes to at least one of the issues here, which is the contours of the relationship between counsel and the class.

And so Mr. Apton, do you have that piece of paper?

MR. APTON:  Yes, I do, your Honor.  And with your permission, I could hand it up now.

THE COURT:  All right.  Please do.

All right.  And do I have the same from Mr. Gonzalez?  Mr. Alfonti; is that right?

MR. FONTI:  Joseph Fonti.

P1FLTieC

THE COURT:  Fonti, my apologies.

MR. FONTI:  With your permission, your Honor.

THE COURT:  All right.  Very good.  And I take it there is no issue on either side with these being posted to the docket.  Is that correct?

MR. APTON:  Your Honor, I hadn't thought about it, but no, there is not.

MR. FONTI:  Same, your Honor.

THE COURT:  All right.  Good.

With that, and just so that the defendant knows what we are doing here, in case this wasn't made clear to you, I asked each side to put in a proposal as to the maximum amount of fees that, if they were selected as lead plaintiff, counsel would ask for in this litigation.  And I had each side do it blind so that we would avoid any Sherman Act violation.  And so they have done so, and I have them, and they will be posted to the docket and will be enforced by the Court in any subsequent determination of fees, depending on who is selected as lead plaintiff.

So with that, we have two lead plaintiffs.  The argument from Mr. Gonzalez -- I should say first that there was a motion to consolidate, and that motion has been granted.  There is an order that's been posted to the docket.  You may not have seen it because it was just posted this morning.  So I think with that, we can move to lead plaintiff selection.

P1FLTieC

I guess I should ask first. I don't see anyone. There are only a couple people in the courtroom. I will ask if there are any other applicants for lead plaintiff.

Hearing nothing, we will proceed with Mr. Tiessen and Mr. Gonzalez. And so we have two applications. The argument from Mr. Gonzalez is that he has the greatest loss here. The argument from Mr. Tiessen is that that's only based on a longer time period that is the product of gamesmanship.

And so I will hear from you, Mr. Apton, briefly, and then we will hear from Mr. -- let me make sure I get this right -- Shikowitz.

MR. SHIKOWITZ: Perfect.

THE COURT: And then the Court will make its decision.

MR. APTON: Thank you, your Honor. It's not just gamesmanship. It actually subjects the class to a greater, deeper risk of vulnerabilities that the shorter class period does not. If the longer class period is pursued based on the misrepresentations that we see currently before the Court, there is a break in the causation between the alleged false statements and the damages. Mr. Gonzalez is incentivized to pursue that longer class period, notwithstanding the vulnerabilities it creates for the class, and that is a real problem.

So with that and what's in the papers, your Honor, I think that's the sum and substance of the argument.

P1FLTieC

THE COURT:  OK.  And how am I supposed to prejudge those before there is a motion to dismiss and further litigation in this case?

I mean, you are aware that there are a number of cases that say when these issues come up, usually you defer to the longer time period.  You don't try to adjudicate whether the longer time period or the shorter time period is appropriate. The reason being that we don't have briefing from both sides. We don't have an idea of whether the longer time period or the shorter time period would be appropriate.  And it is hard for an applicant for lead plaintiff to argue against the interests of the larger class because you may have to make arguments that would seem to at least be intentioned with representing that class.

So how do we deal with that?

MR. APTON:  So, your Honor, typically when these arguments come up, they come up because there is an additional complaint filed earlier in the 60-day notice period, not, you know, ten days before.  But when this argument comes up and when it is given due attention by the Court, it's because there is something that's patently deficient with the additional complaint, the longer class period, that is able to allow the Court to make this decision, notwithstanding the absence of discovery, motion to dismiss briefing.

Here, we have that indicia of a serious problem for

P1FLTieC

the class if the longer class period is used.  Not just the longer class period, but the theory of liability that's conveyed in the longer class period.  The first misrepresentation in the longer class period is March of 2022, which happens to be about a week or two before Mr. Gonzalez invested in TD Bank.  That initial misrepresentation is simply about the, I guess it would be, the nondisclosure of AML, the anti-money laundering regulatory compliance issues.

Those compliance issues are disclosed in 2023.  It's known news.  And when we look at the corrective disclosure at the end of the class period, both class periods, you see that the focus, the new information, according to analysts, which serve as a proxy for the reasonable investor, the new information is the asset cap that was imposed on TD Bank, not that TD Bank was having AML regulatory compliance issues.  So if we tie this case to a concealment of regulatory issues or some less than absolute faithful adherence to a compliance policy, the case is not likely to be successful.

Here, we have a carefully pleaded initial class period that has a corrective disclosure and misrepresentations that are causally related.  That's what the case is meant to be. That's what it should proceed upon going forward.

THE COURT:  OK.  I understand, Mr. Apton.

Mr. Shikowitz.

MR. SHIKOWITZ:  Thank you, your Honor.

P1FLTieC

Just to begin with your initial question, your Honor, I believe, is exactly correct. It's too early to prejudge the merits of the competing class periods at this stage. And we cite cases in our papers that explain that point. And to put a more fine point on it, and it is a point that we mention in our briefs, to just annunciate more clearly, Mr. Tiessen's arguments, his claims of implausibility here, they are really premature, fact-intensive merits arguments that are typically considered after -- not only after a motion to dismiss, but after discovery is completed, after class certification, and even at trial. While he frames the arguments in terms of implausibility, what he is really saying, what the claims really are is that the claims fail as a matter of fact and law, which is detrimental to the interests of the class, and Mr. Tiessen's cited authority is illustrative of this point.

Mr. Tiessen cites only two cases that reject the application of a broader period, which I believe are *Abiomed* and *Centerline*. And in those two cases, what actually happened was the start date of the class period was expanded back earlier in time such that the start date of the class period actually preceded any allegation of misconduct. Those are the instances where courts will reject the application of a broader class period, because it's clear that's an artificially -- that it is a patently frivolous or implausible construct.

Here, that's not the case here. We have

P1FLTieC

misrepresentations alleged in March of 2022 that are directly tied to the corrective disclosures in May of 2024, which Mr. Tiessen does not mention, and also at the end of the class period in October 2024, such that there is no break in causation.

THE COURT:  What about the disclosures that were made in 2023?  I think Mr. Tiessen's argument is that by expanding the class period in the way that you did, you run into this issue that the disclosure -- or the omission that you claim in 2022 is basically negated by the disclosure in 2023, and the real issue was not AML compliance, but rather, this asset cap. And so by expanding the allegations, you are hurting the class because you are trying to make this case about something it should not be about.

What's your response to that?

MR. SHIKOWITZ:  Your Honor, so the disclosure that Mr. Tiessen points to in August 2023 is a general disclosure that the bank was subject to an investigation.  That in no way cleared up the complete truth, which is that the bank was intentionally -- the allegation is, was intentionally not monitoring its AML transactions, that 92 percent of the transactions were unmonitored, and the scope and significance of the misconduct were still concealed.  And there are continuing misrepresentations after that time with respect to the bank's controls and priority on the AML compliance which

P1FLTieC

further negate any suggestion that the full truth was disclosed in August 2023.

The fact that the full truth was disclosed in August 2023 is also negated by the fact that there is a corrective disclosure that we pleaded in Gonzalez in May 2024 with respect to the Wall Street Journal article where there is a 6 percent stock drop on news that federal investigators uncovered that TD -- that the investigation centered on money laundering involving hundreds of millions of dollars from criminals in China laundering proceeds from the sales of fentanyl. So there is also a corrective disclosure in that respect as well. This is also an extremely fact-intensive argument that is typically resolved at trial, your Honor.

And then one point I also want to make too is that this argument that Mr. Tiessen is making with respect to the AML violations, it also undermines claims about the asset cap. That same passage that Mr. Tiessen cites as to clearing up all the issues, at the end of that passage, it says -- TD discloses, Oh, by the way, we also may have to pay penalties; nonmonetary, monetary penalties.

So under that same reasoning, Defendants would argue, to the extent that the disclosure cleared up any issues about the AML problems by virtue of a simple investigation, Defendants would claim that that same disclosure about the potential for monetary or nonmonetary penalties would have

P1FLTieC

cleared up the issues about the asset cap, which is what Mr. Tiessen claims the crux of this case is about.

Now, we obviously do not agree with those arguments, but the defendants are here, and they are very smart, and those claims and that reasoning would be held against Mr. Tiessen throughout the duration of the litigation if he is appointed lead plaintiff.

THE COURT:  Let me just try to break this down into lay speak, which is, this is all sort of one thing.

MR. SHIKOWITZ:  Yes.

THE COURT:  And it's getting worse over time.  And they may have said some things in 2023 and in early 2024, but they really didn't disclose the full gravity of the situation. And so to treat these things as discreet different items would be a disservice to the class.  I mean, that's your position?

MR. SHIKOWITZ:  Precisely.

THE COURT:  OK.  Anything further?

MR. SHIKOWITZ:  Not unless there is anything further from you, your Honor.

THE COURT:  All right.  So Mr. Hakki, you don't have a dog in this fight.  Maybe you do.  You can tell me if you do. But if there is anything that you wanted to say, I am happy to hear you.

MR. HAKKI:  Well, your Honor, we really have nothing to add.  I mean, as is customary in these lead plaintiff

applications, we are not taking a position, but needless to say, we have extensive views on both complaints and the merits and what would happen on a motion to dismiss.  But, you know, it's not our place to raise those now, in my view.

THE COURT:  All right.  Thank you.

All right.  So this will be reflected in an order to come out from the Court after this hearing, but the Court will appoint Mr. Gonzalez as lead plaintiff in this case.

Mr. Apton, if you are right, and if for any reason Mr. Gonzalez, because of the nature of the allegations and motion practice in this case, is at some subsequent point not an adequate lead plaintiff for this case, I understand Mr. Tiessen would be willing to step in at that point.

MR. APTON:  Sure, your Honor.  Yes.  Absolutely.

THE COURT:  OK.  All right.  Good.

So Mr. Gonzalez will be appointed lead plaintiff.

Mr. Shikowitz, the proposals I received were almost identical.  You proposed a 23 percent cap on any fee. Mr. Tiessen proposed a structured cap that is 22.5 percent on any amount equal to or less than 100 million, 20 percent between 100 million and 250 million, and 17.5 percent on any amount equal to or greater than 250 million.

Is there any reason why you would not be able to adhere to that structured cap on fees?

MR. FONTI:  Your Honor, if I may address that.

P1FLTieC

THE COURT:  Yes.

MR. FONTI:  We believe it's proper to set the cap at an upper limit.  Any recovery that is obtained at that juncture will obviously present to your Honor for ultimate decision.  I think the facts and circumstances at that time will dictate the reasonableness of the fee.  So we think it's appropriate to set the cap as we did, and then to determine, you know, what the recovery is, how long it takes us to get it, how that measures relative to damages in the case, at what juncture does that happen in views of decades of precedent in this district and elsewhere and the academic research to support the fee.  So we would --

THE COURT:  I understand that.  I mean, I think everything you are saying sounds reasonable and appropriate in light of the standards that the Court is using, but I don't think that's in conflict with either of the proposals that I received.  The only difference is that that upper limit is different depending on the size of the recovery.

Do you have any issue with what I just explained, which is that it's essentially the same up to 100 million, but then it goes down slightly for amounts above 100 million?

MR. FONTI:  Understood, your Honor.

THE COURT:  Look, I am not, like, finally adjudicating this.  I am just trying to understand your position at this time.

P1FLTieC

MR. FONTI:  Our position, in consultation with our client, is that we set the upper limit, and then all those factors should be considered in a case-specific way and not prejudged at this early juncture, to set a limit, lower based on recovery, because there are enumerable factors that go into a result and to whatever we end up asking for.  Obviously, we will take this under consideration, but we --

THE COURT:  But you are prepared at least to adhere to the 23 percent cap, right?

MR. FONTI:  We are, your Honor.

THE COURT:  OK.  And it would be fair for the Court to consider, and then you could make whatever arguments you want, the proposal that was provided by Mr. Tiessen, correct?

MR. FONTI:  We certainly will.

THE COURT:  OK.  All right.  So Mr. Gonzalez, how long do you need for a consolidated amended complaint?

MR. SHIKOWITZ:  Your Honor, we have not yet met and conferred with the defendants on this yet.  We have a schedule that provides us with 14 days from the entry of the order to meet and confer with the defendants to propose to the Court a schedule.  We are prepared to do that, but if your Honor would like, we could -- if I could just confer briefly --

THE COURT:  No, that's fine.  If you are going to get it done in short order, then that would be very good.

All right.  Mr. Apton or Mr. Shikowitz, anything

P1FLTieC

further to address at this stage?

MR. APTON:  No, none from us.  Thank you.

MR. SHIKOWITZ.  Same, your Honor.  Thank you.

THE COURT:  Mr. Hakki, anything from the defendants?

MR. HAKKI:  No, your Honor.  Thank you.

THE COURT:  All right.  Well, thank you very much for coming in.  We will look forward to the scheduling order, and we will -- if there is anything that comes up in the meantime, please let us know.  Thank you very much.

(Adjourned)