## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JAMES TIESSEN, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> THE TORONTO-DOMINION BANK, TD BANK, N.A., TD BANK US HOLDING COMPANY, AJAI K. BAMBAWALE, MICHAEL BOWMAN, MIA LEVINE, BHARAT MASRANI, LEOVIGILDO SALOM, and KELVIN VI LUAN TRAN, <br><br> Defendants. | Case No. 1:24-CV-8032 (AS) <br><br> **CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

**CONSOLIDATED AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

## TABLE OF CONTENTS

GLOSSARY OF TERMS ............................................................................................... vi

I.   NATURE OF THE ACTION ............................................................................. 2

II.  JURISDICTION AND VENUE ........................................................................ 7

III. PARTIES ......................................................................................................... 8

    A.   Plaintiffs .............................................................................................. 8

    B.   Defendants .......................................................................................... 8

        1.   Corporate Defendants ............................................................. 8

        2.   Individual Defendants ........................................................... 10

    C.   Relevant Non-Parties ........................................................................ 13

IV.  FACTUAL ALLEGATIONS ........................................................................... 15

    A.   Background Allegations .................................................................... 15

        1.   Regulatory Framework: The Bank Secrecy Act and the Operative
             BSA/AML Requirements .................................................... 15

        2.   TD's Global AML Program .................................................. 16

    B.   TD's Pre-Class Period AML Deficiencies ........................................ 21

    C.   TD's Class Period AML Deficiencies ............................................... 23

        1.   TD's "Flat Cost Paradigm" Sacrifices AML Compliance to Boost Profits ....... 24

        2.   During the Class Period, TD's Global AML Program Was Materially
             Deficient ............................................................................... 26

    D.   During the Class Period, Defendants Fraudulently Touted AML Compliance
        and Investments .............................................................................. 31

        1.   TD's False and Misleading Statements About the AML Program, GAML,
             Audit Committee, and Investment in Compliance ............... 31

        2.   TD Continues to Make Fraudulent Statements Touting AML Compliance
             in Connection with the FH Acquisition .............................. 32

3. Defendants Continue to Mislead Investors Regarding the Delay and Eventual Termination of the FH Acquisition ................................................... 36

E. The Truth About TD's Global AML Program Begins to Emerge in Reporting While Defendants Continue to Mislead the Investing Public ................................. 40

1. The Truth Begins to Emerge with the Publishing of an Article in *The Wall Street Journal* ........................................................................................... 40

2. *The Wall Street Journal* Further Sheds Light on the Severity of TD's AML Issues and Ties the Problems to the Laundering of Illicit Fentanyl Profits ....... 46

F. The Severity of TD's AML Failures Further Emerges as the DOJ and Regulators Disclose Criminal and Civil Sanctions ................................................ 49

G. Post Class Period Events ......................................................................................... 53

V. FORMER EMPLOYEE ALLEGATIONS ....................................................................... 56

A. Former Employee 1: TD's Senior Technical Writer AML Consultant .................. 57

B. Former Employee 2: TD's AML Specialist & Production Analyst ....................... 58

C. Former Employee 3: TD's CFO for Digital, Payments & Enterprise Innovation ............................................................................................................... 60

VI. ADDITIONAL ALLEGATIONS OF SCIENTER .......................................................... 64

A. Defendants' Role, Oversight, and Awareness of Deficiencies in the Global AML Program Supports a Strong Inference of Scienter ........................................ 65

1. The 2024 Guilty Pleas Admit and Enforcement Actions Confirm That Defendants Knew of the Deficient Global AML Program and Lack of Adequate Resources ......................................................................................... 65

2. The Mandated Oversight Role and Responsibilities of TD Bank Groups' Boards Supports a Strong Inference of Scienter ................................................ 67

B. Masrani's Lead Role on AML Issues and Admitting Responsibility for TD's AML Failures Supports a Strong Inference of Scienter ......................................... 70

C. Repeated Orders By Regulators to Fix the Deficient Global AML Program Support a Strong Inference of Scienter .................................................................. 72

D. Pervasive Criminal Conduct at TD and by TD Customers Supports a Strong Inference of Scienter ............................................................................................... 74

E. Defendants Awareness of Regulatory Scrutiny of Other Banks' AML Programs Supports a Strong Inference of Scienter ................................................. 77

F.    The Significance of the FH Acquisition Supports a Strong Inference of Scienter ....................................................................... 78

    1.   The Significance of the FH Acquisition and Regulatory Scrutiny Supports a Strong Inference of Scienter.............................. 78

    2.   Individual Defendants' Increased Compensation Tied to Securing the FH Acquisition Supports a Strong Inference of Scienter........................................ 80

    3.   TD's payout of $200 Million to First Horizon After the Failed Merger Supports a Strong Inference of Scienter ........................... 81

G.    Terminations Of TD's Board, CEO, and Senior AML Executives And Slashing Individual Defendants' Compensation Support a Strong Inference of Scienter ............................................................. 82

H.    TDBNA's Operations and AML Program Were Critical Components of TD's Business .................................................................. 82

I.    Corporate Scienter ..................................................................... 83

VII.    DEFENDANTS' SCHEME TO DEFRAUD THE MARKET ....................... 85

VIII.    ACTIONABLE FALSE AND MISLEADING STATEMENTS AND OMMISSIONS ............................................................................ 89

A.    False and Misleading Statements and Omissions Concealing the True Nature and Effectiveness of TD's Global AML Program ................... 93

    1.   The TD Statement on Anti-Money Laundering, Anti-Terrorist Financing and Sanctions ................................................ 93

    2.   False and Misleading Statements Regarding TD's GAML Department ........... 95

    3.   2023 and 2024 Proxy Statements.................................................. 95

B.    False and Misleading Statements Regarding TD's Global AML Program In Connection With the FH Acquisition ....................................... 97

    1.   March 21, 2022 Bank Merger Act Applications.............................. 97

    2.   Statements in the Merger Agreement ............................................ 98

C.    False and Misleading Statements About the Delay in Closing the FH Acquisition ............................................................................. 99

    1.   4Q22 Earnings Call on December 1, 2022 .................................... 99

    2.   February 9, 2023 Press Release .................................................. 100

3.   1Q23 Earnings Call on March 2, 2023 .......................................................... 100

4.   Annual Shareholders Meeting on April 20, 2023 ............................................. 101

D.   False and Misleading Statements Regarding Investigations of The Global AML Program ....................................................................................... 102

1.   December 1, 2022 Form 40-F ....................................................................... 102

2.   3Q23 Earnings Call on August 24, 2023 ........................................................ 104

3.   September 13, 2023 Barclays Global Financial Services Conference ............. 105

4.   November 30, 2023 Form 40-F ..................................................................... 106

5.   1Q24 Earnings Call on February 29, 2024 ...................................................... 107

6.   2Q24 Earnings Call on May 23, 2024 ........................................................... 109

E.   False and Misleading Statements Regarding TD's U.S. Retail and Corporate Accomplishments ......................................................................... 110

F.   False and Misleading Statements Regarding TD's Internal and Disclosure Controls ........................................................................................ 112

IX.   LOSS CAUSATION ................................................................................... 115

A.   May 8, 2023 ............................................................................................ 115

B.   May 25, 2023 .......................................................................................... 116

C.   August 24, 2023 ...................................................................................... 117

D.   May 2, 2024 ............................................................................................ 118

E.   August 22, 2024 ...................................................................................... 118

F.   October 9-10, 2024 .................................................................................. 119

X.      INAPPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS
        CAUTION DOCTRINE ................................................................................................ 120

XI.     PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET
        DOCTRINE ................................................................................................................ 121

XII.    CLASS ACTION ALLEGATIONS .............................................................................. 123

XIII.   CLAIMS FOR RELIEF ................................................................................................ 125

        COUNT I .................................................................................................................... 125

        COUNT II ................................................................................................................... 126

XIV.    JURY DEMAND AND PRAYER FOR RELIEF .......................................................... 128

## GLOSSARY OF TERMS

| Term | Definition |
| --- | --- |
| 2023 Proxy Statement | TD's Management Proxy Circular for the April 20, 2023 annual meeting, dated February 21, 2023 and also filed on March 14, 2023 attached to a Form 6-K |
| 2024 Proxy Statement | TD's Management Proxy Circular for the April 18, 2024 annual meeting, dated February 20, 2024 and also filed on March 12, 2024 attached to a Form 6-K |
| 2024 Guilty Pleas and Enforcement Orders | The Guilty Pleas and the Enforcement Orders, as defined below |
| ACH | Automated Clearing House, a transaction type.  According to the FinCEN Order, this refers to transfers of funds up to $1 million that use the ACH network to move money from one U.S. bank or credit union to another financial institution |
| AML | Anti-money laundering |
| Audit Committee | Audit Committee of TD's Board, which also acted as the audit committee for certain subsidiaries |
| BIU | Business Intelligence Unit |
| Board (or Board of Directors) | TD's Board of Directors |
| BSA | Bank Secrecy Act.  The OCC, Federal Reserve, FDIC, and FinCEN are responsible for prescribing regulations, conducting supervisory inspections, and pursuing civil enforcement actions to ensure compliance with the BSA |
| Class Period | February 28, 2022 to October 9, 2024, inclusive |
| CTR | Currency Transaction Report.  Financial institutions are required to file CTRs with FinCEN for any currency transaction exceeding $10,000 |
| DOJ | The Department of Justice |
| Efficiency Ratio | Non-interest expenses expressed as a percentage of revenue |
| Enforcement Orders | The FinCEN Order, OCC Order, and Federal Reserve Order, collectively |
| FDIC | The Federal Deposit Insurance Corporation |
| FFIEC | Federal Financial Institutions Examination Council, which provides a comprehensive examination manual and standardized examination procedures |
| Federal Reserve | The Board of Governors of the Federal Reserve System |
| Federal Reserve Bank Merger Act Application | TD, TDGUS and TDBUSH's March 21, 2022 application for the FH Acquisition |
| Federal Reserve Order | The "Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent, Pursuant to the Federal Deposit Insurance Act, as Amended," issued by the Federal Reserve, dated October 9, 2024, executed by TD, TDGUS, TDBUSH, and the Federal Reserve |

| Term | Definition |
|---|---|
| FH Acquisition | TD's proposed $13.4 billion acquisition of Tennessee-based First Horizon |
| FinCEN | Financial Crimes Enforcement Network, which is a bureau of the U.S. Department of the Treasury, and has statutory authority to impose civil money penalties on financial institutions and individuals for willful violations of the BSA |
| FinCEN Order | Consent Order Imposing Civil Money Penalty on TDBNA and TD Bank USA, NA, released October 10, 2024 |
| FIU | Financial Intelligence Unit, which carried out the identification and reporting of suspicious activity at TD |
| Flat Cost Paradigm | Also known as the "zero expense growth paradigm," this mandate, imposed in 2014, that set expectations that all budgets, including the AML budget, would not increase year over year |
| GAML Department (or Global AML Department) | TD's department responsible for implementing the Global AML Program throughout TD Bank Group |
| Global AML Program | TD's AML Program, which TD applied enterprise-wide across the global bank, including TDBUSH and TDBNA |
| Global Systemically Important Bank | A financial institution whose failure could trigger a global financial crisis due to their size, interconnectedness, and complexity, and thus faces increased scrutiny |
| Guilty Pleas | The October 10, 2024 TDBNA and TDBUSH guilty plea agreements with the DOJ |
| Merger Agreement | The "Agreement and Plan of Merger," dated February 27, 2022, signed by TD, TDBUSH and First Horizon |
| NYSE | New York Stock Exchange |
| OCC | The Office of the Comptroller of the Currency.  Under federal law and delegated authority from FinCEN, the OCC conducts regular examinations and issues reports assessing a bank's compliance with the BSA and other requirements |
| OCC Bank Merger Act Application | TDBNA's March 21, 2022 application for the FH Acquisition |
| OCC Order | Consent Order to TDBNA and TD Bank USA, N.A., released October 10, 2024 |
| RPL | Reasonable Possible Loss, which is a contingency where the chance of a future event confirming a loss is more than remote but less than likely, requiring disclosure of the nature of the contingency and an estimate of the possible loss or range of loss |
| SAR | Suspicious Activity Report |
| TD | Toronto-Dominion Bank, headquartered in Canada and global parent of TDGUS, TDBUSH, and TDBNA |
| TD Bank Group | TD and its subsidiaries TDGUS, TDBUSH, and TDBNA. |
| TDGUS | TD Group US Holdings LLC, as U.S. holding company wholly owned by TD |

| Term | Definition |
|---|---|
| TDBUSH | TD Bank U.S. Holding Company, the U.S. parent of TDBNA, and wholly owned by TDGUS |
| TDBNA | TD Bank, N.A., a federally regulated national bank in the U.S., also does business as TD, America's Most Convenient Bank |

Court-appointed Lead Plaintiff Pedro Gonzalez ("Gonzalez" or "Lead Plaintiff"), and Named Plaintiffs Joel Kopstein and Edward Patterson (together "Plaintiffs") by and through their counsel, bring this action asserting securities claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") on behalf of themselves and all others similarly situated who purchased or otherwise acquired Toronto-Dominion Bank ("TD" or the "Company") common shares on the New York Stock Exchange ("NYSE") or in otherwise domestic transactions between February 28, 2022 and October 9, 2024, inclusive (the "Class Period"), and were damaged thereby.[1] Excluded parties are listed in the Class Action Allegations, Section XII.

The allegations are based upon personal knowledge of Plaintiffs as to Plaintiffs' own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Counsel. Lead Counsel's investigation included, among other things, a review and analysis of (i) TD's filings with the Securities and Exchange Commission ("SEC"); (ii) transcripts of TD's public conference calls; (iii) press releases issued by TD; (iv) news and media reports concerning the Company; (v) research reports issued by financial analysts; (vi) the criminal informations, plea agreements, consent orders, and press releases issued in October 2024 by the U.S. Department of Justice ("DOJ"), Office of the Comptroller of the Currency ("OCC"), and the Financial Crimes Enforcement Network ("FinCEN") concerning TD's deficient anti-money laundering ("AML") controls; (vii) other publicly available information; (viii) information provided by consulting experts; and (ix) interviews with Former Employees of TD conducted in Lead Counsel's investigation. Plaintiffs believe that, after a reasonable opportunity for discovery,

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed in the Glossary of Terms provided herein.

substantial additional evidentiary support will be available for trial that further supports the allegations in this Complaint.

## I.      NATURE OF THE ACTION

1.      This case arises from Defendants' false and misleading statements and omissions that concealed TD had a wholly inadequate, if not non-existent, AML compliance program.  In reality, during the Class Period, TD violated federal law and allowed criminals to funnel hundreds of millions—if not billions—of dollars through TD's banking networks.  Contrary to Defendants' statements, and unbeknownst to investors, TD deliberately underinvested in its AML compliance efforts, ignoring known deficiencies in favor of reducing costs in what was known internally as the "Flat Cost Paradigm."  This resulted in a willfully deficient AML program.  In the face of these crimes, TD's U.S. retail banking operation became the largest bank in U.S. history to plead guilty to Bank Secrecy Act ("BSA") violations, and the first U.S. bank in history to plead guilty to conspiracy to fail to maintain an adequate AML program and to commit money laundering.  In addition, regulators imposed a monitor and asset cap, and the government forced TD to pay over $3 billion in criminal and civil fines and penalties.  When these facts came to light, billions of dollars in shareholder value were wiped out.

2.      TD is a federally regulated financial institution that is an anchor of the global banking infrastructure.  As such, TD is subject to extensive statutory and regulatory AML requirements, designed to detect and prevent terrorists, drug dealers, human traffickers, and other criminals from financing their illicit activities.  Foundational among these statutes is the BSA, which requires among other things, that TD maintain a system reasonably designed to assure and monitor compliance with regulatory requirements.

3.      To appear in compliance with these critical rules and regulations, TD touted a purported "Global AML Program" through which the Company claimed to implement AML

compliance across TD's global operations, including in the U.S.. Repeatedly, before and during the Class Period, Defendants fraudulently claimed that TD's Global AML Program had in place certain controls required by the BSA—such as "customer due diligence," "[o]ngoing monitoring to detect and report suspicious transactions," and "[r]egulatory reporting of prescribed transactions." Likewise, Defendants fraudulently assured investors that the Global AML Program had "adequate resources;" was structured so that "the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated;" and was "routinely" updated to reflect changes to TD's business and legal requirements.

4.    When questioned about AML, TD's CEO, Defendant Masrani, misrepresented that "[w]e are working hard to enhance our programs," "learn new things from our ongoing internal monitoring and … our regulators, and look for opportunities to enhance our controls whenever that situation [] arises." He also specifically claimed that "enhancing … our businesses, controls, is an ongoing exercise at TD," and expressly dispelled that particular events like regulatory investigations are the "only time we make those investments."

5.    Chief among Defendants' motivations to conceal the truth was Defendants' aggressive pursuit of U.S. expansion by acquisition of smaller regional banks. Toward this end, at the start of the Class Period, on February 28, 2022, TD announced a $13.4 billion acquisition of Tennessee-based First Horizon Corporation (the "FH Acquisition"), which would make TD the sixth-largest U.S. bank. In order for TD to consummate the transaction and obtain the necessary regulatory approvals, Defendants represented that TD and its subsidiaries "***have complied with … the Bank Secrecy Act***," and claimed that the Global AML Program was designed to "meet the five pillars requirements," which are the BSA's core requirements for every bank's AML program. To further their pursuit of the FH Acquisition, Defendants claimed that TD's "comprehensive" Global

AML Program was administered by "qualified, dedicated personnel" who "appropriately identified and mitigated" AML risks.

6.      Unbeknownst to investors, TD's AML failures had become the focus of the regulators reviewing the FH Acquisition.  In fact, Defendants doubled down on their fraudulent statements as the FH Acquisition failed to secure timely regulatory approvals from the Federal Reserve Board of Governors ("Federal Reserve") and OCC, forcing TD to twice delay the closing date.  In the face of the delays, Defendants fraudulently reassured investors, "we are confident we'll get the closing," and when asked whether regulators "are [] taking a closer look at anything," TD's CEO flatly denied it, stating, "No, I'm not aware of anything."  In particular, and no less than five times at TD's April 20, 2023 Annual Shareholder Meeting, Defendant Masrani insisted that TD was in "discussions" with First Horizon to "extend" the timeline for the FH Acquisition. This too was false.

7.      In truth, Defendants had engineered a years-long scheme to conceal their willful AML failures.  At the heart of Defendants' fraud was their Flat Cost Paradigm that secretly mandated that TD would not—and did not—make the required AML investments.  Specifically, as admitted in the Guilty Pleas and confirmed by TD's former employees, the Flat Cost Paradigm a/k/a "zero expense growth paradigm," froze TD's budget for AML compliance so that the budget could not increase year-over-year, despite consistent growth in TD's revenue.  Defendants' Flat-Cost Paradigm resulted in known, long-standing deficiencies that Defendants actively concealed, but have now been forced to admit, including:

      a.  <u>Willful violation of the BSA and all five BSA pillars</u>:  As admitted in the Guilty Pleas, Defendants were, in fact, ***willfully violating the BSA***, and their "staggering" and "long-term, pervasive, systemic deficiencies" "spanned all pillars of TD Bank's AML program."

      b.  <u>Transactions not monitored</u>:  Defendants failed to monitor 92% of ***all transactions*** and 74% of transaction value, which corresponded to over

14.6 billion unmonitored transactions and over $18.3 trillion in unmonitored transaction value.

c.  <u>Failure to address new risk</u>: Defendants added new products and services and failed to address the associated AML risks. For example, Defendants never monitored P2P platforms—such as PayPal, and Venmo—resulting in their "knowingly fail[ure] to appropriately monitor over $100 billion" in transactions. Similarly, Defendants' customers transferred over $75 billion in Zelle transactions, which was almost entirely unmonitored.

d.  <u>Failure to file appropriate reporting</u>: Defendants consistently failed to file Currency Transaction Reports (CTRs) and Suspicious Activity Reports (SARs). For example, FinCEN alone "identified thousands of suspicious transactions totaling approximately one and a half billion dollars for which TD Bank failed to timely and accurately file a SAR."

*Infra* Section IV.C.

8.      These failures have been corroborated by certain TD Former Employees. As alleged herein, Former Employees explained that, even after the criminal probes were underway throughout 2024, TD simply lacked even basic AML systems, and did not have the systems, technology, or staffing to timely and effectively detect and report criminal conduct. These deficiencies were so fundamental that efforts to mitigate the AML issues that the government investigations exposed were futile. Additionally, Defendants Masrani, Tran, and Salom were personally involved in a rigorous annual budgeting process designed to enforce the Flat Cost Paradigm on every aspect of TD's business. *Infra* Section V.

9.      Critically, TD's Global AML Program deficiencies were widespread and well-known to TD's senior leadership, as was the impact of those deficiencies on regulatory approval of the FH Acquisition. As further detailed in Section VI, these deficiencies include:

a.  As admitted in the Guilty Pleas, the deficiencies in TD's Global AML Program were "knowing" and "willful" throughout the Class Period, and "high-level executives" and "senior executive management" knew of these "long-term, pervasive, systemic deficiencies" in the Global AML Program.

b.  As admitted in the Guilty Pleas, before and during the Class Period, "the OCC, FinCEN, TDBNA Internal Audit, and third-party consultants have

repeatedly identified TDBNA's transaction monitoring program as an area of concern" and that the TD Bank Group "senior executive leadership and boards of directors"—which included Defendants Masrani and Salom— were informed, but never addressed these AML deficiencies and "failed to effectively or substantively adapt its transaction monitoring system."

c.   TD's Global AML Program was structured to provide Defendants Masrani, Salom, and Bambawale, regular updates through TD Bank Group's boards of directors and audit committees and direct contact with AML leadership, including Defendants Bowman and Levine.

d.   By November 2022, TD's senior executives were directly informed that multiple federal agencies had found such significant failures in TD's AML practices and that the DOJ had launched a formal criminal investigation into the Global AML Program for violations of federal law, eviscerating the prospects for regulatory approval of the FH Acquisition.

10.    The truth began to emerge through piecemeal revelations.  On May 8, 2023, after TD abruptly announced the termination of the FH Acquisition, *The Wall Street Journal* reported that TD's "anti-money-laundering practices proved to be the biggest obstacle" to the OCC's and Federal Reserve's approval.  TD further revealed on May 25, 2023 that it would record a "reasonably possible loss" of $1.27 billion.  Yet, Defendants continued to lie to investors.  They now insisted that the FH Acquisition was terminated because TD made a voluntary decision to "walk away."   The also insist that the DOJ and regulatory investigations were an entirely "separate" matter directed at just "one instance," or in an "unfortunate" few "instances, [TD's] program fell short" because "some procedural weaknesses in the U.S. that caused bad actors to exploit us."

11.    Further revelations would emerge over the next year until after the close of trading on October 9, 2024, investors learned that Defendants were engaged in a criminal conspiracy that the DOJ brought down in a coordinated investigation with federal regulators.  TD's U.S. banking operation pled guilty to criminal charges, and TD was forced to pay a record-breaking $3.09 billion in penalties and was subjected to monitorship and an asset cap on its U.S. retail banking operations.

In announcing the plea, then-Attorney General Merrick Garland explained that "TD Bank chose profits over compliance with the law," and "[b]y making its services convenient for criminals, TD Bank became one."  As a result of the plea, TD Bank became the largest bank in U.S. history to plead guilty to BSA program failures, and the first U.S. bank in history to plead guilty to conspiracy to commit money laundering and to fail to maintain an adequate AML program.

12.    Upon these revelations, the price of TD common shares plummeted 6.4% before the close of trading on October 10, 2024, wiping out billions of dollars in shareholder value.  And in the weeks and months following these revelations, TD cleaned house, terminating senior employees with oversight of AML and drastically cutting their compensation.  TD also finally invested in the remediation that had for years been blocked by the Flat Cost Paradigm.  Indeed, TD reported that its U.S. retail net income for the first quarter of 2025 was ***down an astounding 79%*** compared with the first quarter of 2024, which reflected, in part "governance and control investments including the Company's U.S. BSA/AML remediation program."

## II.    JURISDICTION AND VENUE

13.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa).  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5 (17 C.F.R. §240.10b-5).  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §1331.

14.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of national securities exchanges, including the NYSE.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa).  In addition, venue is proper pursuant to 28 U.S.C. §1391.  Many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District.

## III.    PARTIES

### A.    Plaintiffs

16.     Court-appointed Lead Plaintiff, Pedro Gonzalez, is an individual residing in Sudbury, Ontario, Canada.  As set forth in Schedule A of the Certification attached as Exhibit A to this Complaint, Gonzalez purchased TD common shares on the NYSE during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.

17.     Plaintiff Joel Kopstein is an individual residing in San Diego, California.  As set forth in Schedule A of the Certification attached as Exhibit B to this Complaint, Kopstein purchased TD common shares on the NYSE during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.

18.     Plaintiff Edward Patterson is an individual residing in Preston, Maryland.  As set forth in Schedule A of the Certification attached as Exhibit C to this Complaint, Patterson purchased TD common shares on the NYSE during the Class Period and was damaged by Defendants' violations of the federal securities laws alleged herein.

### B.    Defendants

#### 1.    Corporate Defendants

19.     Defendant Toronto-Dominion Bank ("TD") is a Canadian multinational banking and financial services corporation. The Company maintains its Global corporate headquarters in Toronto, Canada and its United Sates headquarters in Cherry Hill, New Jersey.  TD common shares trade on the NYSE under the ticker symbol "TD."  As of March 28, 2025, TD had 1,751,700,000 shares outstanding on the NYSE.  In each of its Forms 40-F filed with the SEC during the Class

Period, TD refers to itself and its subsidiaries, including TDBNA and TDBUSH (as defined below), "collectively" as "TD Bank Group ('TD' or the 'Bank')."

20.     Defendant TD Bank, N.A. ("TDBNA"), which operated under the brand name "TD Bank, America's Most Convenient Bank," throughout the Class Period, is one of the ten largest banks in the U.S. and during the Class Period operated at more than 1,100 locations throughout the Northeast, Mid-Atlantic, Metro D.C., the Carolinas and Florida.  TDBNA is a wholly owned and controlled subsidiary of TD.  During the Class Period, certain members of TD's Board of Directors sat on TDBNA's Board, including Alan MacGibbon, Amy Brinkley, and Mary Winston.  On October 10, 2024, the DOJ announced that TDBNA pleaded guilty to conspiring to: fail to maintain an AML program that complies with the BSA; fail to file accurate CTRs; and launder monetary instruments.

21.     Defendant TD Bank US Holding Company ("TDBUSH") is a non-bank holding company and the direct parent of TDBNA.  TDBUSH is a wholly owned and controlled subsidiary of TD.  On October 10, 2024, the DOJ announced that TDBUSH pleaded guilty to a two-count criminal Information charging TDBUSH with causing TDBNA to fail to maintain an AML program and causing TDBNA to fail to file accurate CTRs.  Together, the October 10, 2024 TDBNA and TDBUSH guilty plea agreements are referred to as the "Guilty Pleas."

22.     TD is the ultimate parent bank of all subsidiaries, including TDBNA, TDBUSH, and TDGUS (defined below).  As part of the Guilty Pleas, TDBNA and TDBUSH "expressly agree[d] that it shall not, through present or future parents, subsidiaries, affiliates, attorneys, officers, directors, employees, agents, or any other person ... make any public statement, in litigation or otherwise, contradicting ... the facts described in the Information and Statement of

Facts" and that TD and TDGUS "shall not make or cause to be made … any public statement contradicting or excusing any statement of fact contained in the Statement of Facts."

23.     Furthermore, TD admitted in its 2024 Form 40-F that, with respect to the Guilty Pleas, "[t]he Bank [defined therein as TD and its subsidiaries] will not make any public statement, in litigation or otherwise, contradicting its acceptance of responsibility or the facts described in the Information or Statement of Facts."   TD further admitted in the 2024 Form 40-F that the FinCEN Consent Order "requires the Bank [defined therein as TD and its subsidiaries] not to make any public statement that contradicts the admissions or acceptance of responsibility or any terms of the Order."

24.     Consistent with the Company's SEC filings, Defendants TD, TDBNA, and TDBUSH are collectively referred to as "TD Bank Group" or the "TD Corporate Defendants."

### 2.    Individual Defendants

25.     Defendant Ajai K. Bambawale ("Bambawale") is current Group Head and Chief Risk Officer ("CRO") at TD, a role he has held since February 2018.  As Risk Management Group Head, Defendant Bambawale is responsible for setting strategy, ensuring compliance, and managing the risks associated with TD Bank Group's operations, including financial, operational, and regulatory risks.  In this role, Bambawale reported to Defendant Masrani.  Prior to his current role, Bambawale was Executive Vice President at TD, and CRO of TD's U.S. subsidiaries from September 18, 2014 to January 31, 2018.  According to the Company, his career at TD Bank Group spans more than 25 years having previously held the roles of Chief Operating Officer for TD Securities, Head of Credit Risk for the Investment Bank, and the Managing Director and Country Head, India.  Defendant Bambawale made false and misleading statements on conference calls with investors and analysts as alleged herein.

10

26.     Defendant Michael Bowman ("Bowman") served as Global Head of AML Compliance for TD (also known as "Chief AML Officer") from 2019 until November 2023.  From November 2023 to March 2024, Bowman was TD's Senior Financial Crime Risk Management Advisor.  Bowman departed from TD in March 2024.  Prior to 2019, Defendant Bowman shared these Chief AML Officer responsibilities as the Global Co-Head of AML Compliance since approximately 2017.  Before holding that role, Defendant Bowman was the Head of Global AML Operations and Chief Sanctions Officer since approximately 2013.  On information and belief, based on media reports and public records searches of job titles and tenures, Defendant Bowman is referred to as "Individual-1" in the Guilty Pleas.

27.     Defendant Mia Levine ("Levine") served as the Bank Secrecy Act Officer ("BSA Officer") and Head of U.S. Anti-Money Laundering in the Global AML function at TD Bank Group from May 2019 to May 2023.  In this capacity, Defendant Levine was appointed by, and reported to, the TDGUS, TDBUSH, and TDBNA boards of directors with respect to TD's Global AML Program.  Defendant Levine also reported to Chief AML Officer Bowman.  Prior to her role as BSA Officer, Levine was Senior Vice President and Deputy Head of U.S. AML from November 2017 to May 2019.  From January 2014 to October 2017, Defendant Levine was Senior Vice President and Head of U.S. Financial Intelligence Unit.  On information and belief, based on media reports and public records searches of job titles and tenures, Levine is referred to as "Individual-2" in the Guilty Pleas.

28.     Defendant Bharat Masrani ("Masrani") became TD's President and CEO in 2014 and served in these positions throughout the Class Period.  Masrani was also a director on TD's Board since April 2014, which received reports on the Global AML Program throughout the Class Period from the Global Head of AML Compliance.  Masrani previously served as TD COO from

2013 to 2014, the President and CEO of TDBNA from September 2006 to June 2013, and before that was Chief Risk Officer of TD from 2005 to 2006.  On September 19, 2024, only weeks before the Company publicly disclosed the Guilty Pleas, TD announced that Masrani intended to retire on April 10, 2025.  On January 17, 2025, following public disclosure of the Guilty Pleas and the full extent of TD's Global AML Program failures, TD announced that Masrani's departure would be accelerated to February 1, 2025.  In addition to false and misleading statements on conference calls with investors and analysts as alleged herein, Defendant Masrani signed and certified TD's false and misleading reports filed on Forms 40-F with the SEC in 2022 and 2023 (the "2022 Form 40-F" and the "2023 Form 40-F").

29.    Defendant Leovigildo Salom ("Salom") has served as (i) TD's Group Head, U.S. Retail, (ii) the President, CEO, and board member of TDBUSH, and (iii) President, CEO, and board member of TDBNA since January 1, 2022.  In this capacity, he reported to Defendant Masrani.  Prior to serving in that role, Salom was Group Head, Wealth Management & TD Insurance from approximately 2017 to January 2022.  He also served as Executive Vice President, Wealth Management from approximately 2013 to 2017, and Executive Vice President Advice Businesses, TD Wealth from approximately 2011 to 2013.  As part of his role during the Class Period, Salom served on the boards of TDBNA and TDBUSH, which regularly received reports on U.S. AML from BSA the Officer and the Chief AML Officer.  In addition to false and misleading statements on conference calls with investors and analysts as alleged herein, Defendant Salom signed certifications on behalf of TDBNA for the Federal Reserve Bank Merger Act Application and the OCC Bank Merger Act Application, and on behalf of TDBUSH signed the Agreement and Plan of Merger, dated February 27, 2022, by and among TD, TDBUSH and First Horizon Corporation (the "Merger Agreement").

30.    Defendant Kelvin Vi Luan Tran ("Tran") has served as TD's Group Head and Chief Financial Officer ("CFO") since September 2021.  Tran has been employed by TD in various roles since January of 2021.  Prior to becoming CFO of TD, he was the Head of Enterprise Finance from March to August 2021, the CFO of the U.S. retail group from approximately 2019 to 2021, Head of Accounting from January to August 2019, and Chief Auditor from July 2015 to December 2018. Defendant Tran signed and certified TD's false and misleading 2022 Form 40-F and 2023 Form 40-F filed with the SEC.

31.    Defendants Masrani, Tran, Salom, Bambawale, Bowman, and Levine are collectively referred to as the "Individual Defendants."  The Individual Defendants, because of their positions with the TD Corporate Defendants, and their conduct alleged herein, possessed the power and authority to approve and control the contents of the TD Corporate Defendants' reports to the SEC, press releases, presentations, and other public statements alleged herein to be false and misleading.  The Individual Defendants were provided copies of the TD Corporate Defendants' reports, press releases, and presentations alleged in this Complaint to be false and misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Further, the Individual Defendants, as corporate insiders, with direct involvement in day-to-day affairs, at the entity issuing the fraudulent statements are liable for those statements under the group pleading doctrine.

### C.    Relevant Non-Parties

32.    TD Group US Holdings LLC ("TDGUS"), the intermediate holding company and ultimate parent holding company in the U.S., is the direct parent of TDBUSH as well as the indirect parent of TDBNA.  TDGUS is a wholly owned subsidiary of TD.

33.    Riaz Ahmed ("Ahmed") was Group Head and Chief Financial Officer, of Defendant TD from January 2016 to September 2021.  In that capacity, Ahmed signed TD's 2019

Form 40-F and 2020 Form 40-F.  In September 2021, Ahmed became President and CEO of TD Securities and Group Head of Wholesale Banking for TD Bank Group.

34.     Amy Brinkley ("Brinkley") has been a member of the Board and TDBNA Board of Directors since 2010.  She serves on TDBNA's audit committee.  She is set to retire this year.

35.     Ellen Glaessner ("Glaessner") served as General Counsel of TD from November 2017 to February 2024.  She currently holds the role of Head of Sustainability & Corporate Citizenship, Senior Advisor to CEO, EVP.  Glaessner described her General Counsel role as being a "key advisor to the US CEO and the US Management Committee."  Prior to serving as General Counsel, Glaessner held other roles at TD since approximately 2013, including Senior Vice President and Managing Counsel, US Retail Businesses, Senior Vice President and Managing Counsel, Retail and Wealth, and Senior Counsel, TD Wealth.  Glaessner is listed as TDBNA's contact person in the March 21, 2022 OCC Bank Merger Act Application.

36.     Colleen Johnston ("Johnston") served as TD's CFO from 2005 through 2015, when she was succeeded in that position by Ahmed.

37.     Alan N. MacGibbon ("MacGibbon") became Chair of the Board on February 1, 2024.  He has served as a Board member since 2014 and as Chair of the Audit Committee since 2020.  He has also a been a director at TDBNA since 2014 and serves on TDBNA's audit committee.

38.     Mary A. Winston ("Winston") sat on the boards of multiple TD Bank Group entities, including TD and TDBNA, since at least 2021.  She has served on the TD Audit Committee since 2022 and is chair of TDBNA's audit committee.

**IV.    FACTUAL ALLEGATIONS**

    **A.    Background Allegations**

        **1.    Regulatory Framework: The Bank Secrecy Act and the Operative BSA/AML Requirements**

39.    Throughout the Class Period, TD Bank Group was subject to a series of U.S. AML laws and regulations designed to detect and prevent terrorists, drug dealers, human traffickers, and others from financing their illicit activities.  Regulators consider banks to be the first line of defense against criminals who use money-laundering schemes to conceal, clean, or "launder" the sources of illegally obtained or stolen funds.  Terrorists and human traffickers employ money-laundering techniques to fund their operations, threatening public safety, national security, and the U.S. financial system.

40.    During the Class Period, these laws and regulations required TD Bank Group to operate a functional AML program that was written and approved by the Board of Directors.  Chief among these were regulations enacted pursuant to the BSA that require that "[e]ach bank shall develop and provide for the continued administration of a program reasonably designed to assure and monitor compliance with the recordkeeping and reporting requirements," and that "[t]he compliance program must be written, approved by the bank's board of directors, and reflected in the minutes of the bank."  (12 C.F.R. §21.21).

41.    At its core, the BSA imposes five pillars that set forth certain minimum requirements TD's Global AML program needed to satisfy.  These include (i) internal policies, procedures, and controls designed to guard against money laundering; (ii) an individual or individuals responsible for overseeing day-to-day compliance with BSA and AML requirements; (iii) an ongoing employee training program; (iv) an independent audit function to test compliance

programs; and (v) a risk-based approach for conducting ongoing customer due diligence. (31 U.S.C. §5318(h); *see also* 31 C.F.R. §1020.210.)

42.    For financial institutions of TD Bank Group's size and sophistication, a well-designed transaction monitoring system is an essential component of an effective AML program compliant with the BSA's five pillars.  An effective transaction monitoring system uses criteria, called "scenarios," to detect suspicious activities or patterns that could indicate potential money laundering, terrorist financing, or other illicit activity.  These "scenarios" are predefined patterns and behaviors in financial transactions used to detect and investigate such illicit activity.  This includes, for example, unusually large transactions, transactions to high-risk countries, or patterns inconsistent with a customer's profile.

43.    When a transaction (or series of transactions) meets scenario parameters, the system generates an alert.  Bank employees then review the alerts to determine whether they represent suspicious activity that warrants a report to regulators.  In general, when a bank identifies an activity or transaction with indicia of criminality it is required to promptly file a SAR; and when a customer executes a currency transaction exceeding $10,000, it is required to promptly file a CTR. BSA regulations set out stringent requirements for deadlines by which SARs and CTRs must be filed with FinCEN, and for the verification and identification of transaction information that must be included in such reports.

### 2.    TD's Global AML Program

44.    To appear in compliance with these foundational regulations, TD purported to have in place a group-wide AML program for itself and its subsidiaries during the Class Period called the Global AML Program.  Specifically, TD's Board members serving on its Audit Committee and other senior executives, including Defendant Bambawale, oversaw, monitored, and directed TD's Global AML Program through TD's Global Anti-Money Laundering Department ("GAML

Department").   Among other things, the GAML Department established the Global AML Program's policies and procedures regarding internal controls, independent testing, monitoring, and reporting; allocated AML budgeting and staffing across TD Bank Group; and oversaw "shared services" groups that served both the U.S. and Canadian AML programs.

**a.      TD's Board's Audit Committee's Oversight of the Global AML Program**

45.     Throughout the Class Period, TD's Board of Directors (the "Board") was responsible for, among other things, oversight of TD's public reporting; TD Bank Group's legal and regulatory compliance; and the operations and governance of TD's enterprise-wide network of subsidiaries and operating units.  Specifically, the Board's Charter included, but was not limited to, the following:

   a.   "Disclosure of Reliable and Timely Information to Investors": "[the Board] must be satisfied that the Bank is providing its investors with accurate and balanced information in a timely manner."

   b.   "Tone at the Top": "The Board relies on and holds Senior Management accountable for implementing and enforcing the Board-approved policies, setting the tone at the top as it relates to integrity and culture, status, incentives, talent, and communicating and reinforcing the compliance culture throughout the Bank."

   c.   "Risk Management": "Overseeing the [TD Bank Group's] risk culture and approving and overseeing strategies, frameworks and policies designed to protect the assets of the Bank and its continued viability. The Board is also responsible for overseeing the timely identification and monitoring of the top and emerging risks affecting the Bank's businesses, and satisfying itself that appropriate policies, procedures and practices are in place for the effective and independent management of these risks in accordance with the Bank's Enterprise Risk Framework."

   d.   "Internal Controls and Management Information Systems": "Overseeing and monitoring the integrity and effectiveness of the Bank's internal controls and management information systems. The Board is also responsible for overseeing adherence to applicable legal, audit, compliance, regulatory, accounting and reporting requirements."

17

    e.   "Oversight of Subsidiaries": "Overseeing the governance and activities of all subsidiaries enterprise-wide. For certain U.S. subsidiaries, this includes overseeing the selection by the Bank's senior management (acting in the role as shareholder) of the directors of the boards of TD Group US Holdings LLC, its subsidiary TD Bank US Holding Company ('TDBUSH') and TDBUSH's subsidiaries TD Bank, N.A. and TD Bank USA, N.A. (and any successors thereto) (collectively, the 'TD U.S. Boards')."

    f.   "General": "Monitoring the effectiveness of the Bank's corporate governance practices and approving any necessary changes, as required. The Board is responsible for establishing general Bank policies and performing other tasks required by law and regulations, including ensuring minutes and other records of meetings and activities of the Bank are kept."

46.     The Audit Committee of TD's Board (the "Audit Committee") was entirely composed of Board Members and specifically responsible for overseeing and monitoring the establishment, maintenance, and ongoing effectiveness of the Global AML Program. According to the Audit Committee's Charter, appended to each of TD's annual reports, its main responsibilities included, among other things:

    a.   "receiving reports from the shareholders' auditor, chief financial officer, chief auditor, chief compliance officer, and chief anti-money laundering officer, and evaluating the effectiveness and independence of each";

    b.   "overseeing the establishment and maintenance of policies and programs reasonably designed to achieve and maintain the Bank's compliance with the laws and regulations that apply to it"; and

    c.   "acting as the audit committee for certain subsidiaries of the Bank that are federally regulated financial institutions."

47.     As it relates to the Global AML Program specifically, the Audit Committee's Charter stated that it was required to "oversee and monitor the establishment, maintenance and ongoing effectiveness of the [Global AML Program] that is designed so that the Bank is in compliance with the laws and regulations that apply to it as well as its own policies." Specifically, the Audit Committee: (i) "review[ed] with management the Bank's compliance with applicable regulatory requirements;" (ii) "review[ed] an annual report from the Chief Anti-Money

Laundering Officer regarding the assessment of the effectiveness of the AML Program, and follow[ed] up with management on the status of recommendations and suggestions, as appropriate;" and (iii) "review[ed] the opinion of the Chief Auditor on the effectiveness of the AML Program every two years and follow[ed] up with management on the status of recommendations and suggestions, as appropriate."

48.     The Audit Committee closely oversaw the performance and activities of the GAML Department.  As set forth in TD's Forms 40-F filed during the Class Period, the Audit Committee's oversight required it to, among other things:

    a.  "review and approve the Global AML Department's annual plan, including its budget and resources, and any significant changes to the annual plan;"

    b.  "consider and approve the AML Program Framework, including Enterprise AML and Sanctions policies;"

    c.  "at least annually assess the effectiveness of the Global AML Department;"

    d.  "review the results of an independent effectiveness review of the AML Program conducted periodically;"

    e.  "periodically review the results of a benchmarking of the Global AML Department conducted with the assistance of an independent third party;"

    f.  "annually review and approve the mandate of the Global AML Department and the mandate of the Chief Anti-Money Laundering Officer;"

    g.  "confirm the appointment and dismissal of the Chief Anti-Money Laundering Officer;"

    h.  "annually convey its view of the performance of the Chief Anti-Money Laundering Officer to the Chief Executive Officer as input into the compensation approval process;"

    i.  "regularly review and discuss reports prepared by the Chief Anti-Money Laundering Officer for the Committee, including with regard to reports by supervisory authorities related to the AML Program, on the Bank's compliance or non-compliance with applicable laws and regulations and on the design and operation of the AML Program, the adequacy of resources (people, systems and budget), and any recommendations thereto, and follow-up on any outstanding issues including proactive consideration of whether deficiencies in one area may be present in other areas; and provide

> a forum for the Chief Anti-Money Laundering Officer to have unfettered access to the Committee to raise any compliance issues or issues with respect to the relationship and interaction among the Global AML Department, management and/or regulators."

49.     Throughout the Class Period, the Audit Committee met at least four times annually. As set forth in TD's Forms 40-F, at each regularly scheduled quarterly meeting, the Audit Committee met separately with Defendant Masrani (as CEO), Defendant Tran (as CFO), General Counsel Glaessner, Chief Auditor, Defendant Bambawale (as CRO), Chief Compliance Officer, Defendant Bowman (as Chief AML Officer), and shareholders' auditor in addition to meeting on its own without members of management or the shareholders' auditor.

### b.     The GAML Department Operated TD's Enterprise-Wide Global AML Program

50.     From at least January 2014 through October 9, 2024, TD's GAML Department operated the Global AML Program that applied enterprise-wide across the global bank, including TDBUSH and TDBNA.  From prior to the Class Period through November 2023, Chief AML Officer Bowman led the GAML Department.  BSA Officer Levine and other senior AML executives reported to Chief AML Officer Bowman.  At all times throughout the Class Period, Chief AML Officer Bowman reported to Defendant Bambawale, who was the Group Head and CRO of TD.

51.     As Chief AML Officer, Bowman was responsible for TD's Global AML Program, which included establishing the annual global AML budget, setting GAML priorities, spearheading GAML's strategic planning, and regularly briefing the TD and TDBNA boards of directors on AML compliance matters.  Defendant Bowman also had specific oversight responsibilities related to AML operations in the U.S. (referred to in the Guilty Pleas as "US-AML"), including oversight of BSA Officer Levine; oversight of AML technology services, which was shared between the U.S. and Canada; and shared oversight, with the BSA Officer, of the U.S.

Financial Intelligence Unit ("FIU") which carried out the identification and reporting of suspicious activity.

52.     Prior to the Class Period through May 2023, Defendant Levine served as both TD's BSA Officer and TD's Deputy Global Head of AML Compliance.  As BSA Officer, Levine was responsible for US-AML, including establishing the budget and managing staffing, assessing TDBNA's AML risk, approving policies and procedures, and presenting to the TDBNDA and TDBUSH boards of directors.  As BSA Officer, Levine reported to the Chief AML Officer, Defendant Bowman, and was required to obtain Bowman's approval for any material decisions relating to US-AML.

**B.    TD's Pre-Class Period AML Deficiencies**

53.     Prior to the Class Period, TD's Global AML Program suffered material deficiencies, including those that allowed customers to perpetrate multi-billion-dollar Ponzi schemes that resulted in significant regulatory sanctions by OCC, SEC, and FinCEN.  TD also ignored repeated red flags prior to the Class Period that left material deficiencies unremediated and free to fester until the issues came to a head with the criminal and regulatory sanctions in October 2024.

54.     In 2013, the OCC issued a consent order against TDBNA for deficient transaction monitoring.  Among other things, the consent order required that TDBNA develop transaction monitoring policies and procedures to ensure the systematic and prompt development of automatic monitoring scenarios or manual processes that could address emerging environmental and market-based risks.  TDBNA's management and directors acknowledged these shortcomings and committed to remediate them, but nevertheless failed to do so as reported in the Guilty Pleas.

55.     In 2015, the OCC instructed TDBNA to enhance its transaction monitoring program for high-risk customers, which were subject to the same scenarios and thresholds as the

rest of TDBNA's customers despite their higher risk profiles.    This too Defendants left unremediated.

56.    In 2018, the OCC deemed TDBNA's planning, delivery, and execution of AML technology systems and solutions to be insufficient.    The OCC highlighted the delays in implementing multiple AML technology projects and found that these delays directly affected many outstanding AML Program issues.    US-AML leadership represented to the OCC during its examinations in 2017, 2018, and 2019 that these projects were in development.    However, they were never implemented.    TD's lack of compliance was not revealed until the 2024 Guilty Pleas and Enforcement Orders.

57.    Defendants failed to update TD's AML Program even when they knew that it suffered deficiencies for which regulators penalized other banks.    In some cases, Defendants actually implemented illegal AML cost-cutting *after* learning about sanctions against a competitor. For example, in February 2018, another U.S. bank entered into a negotiated resolution with the DOJ for AML failures, including failures to file SARs and failure to have adequate threshold testing.    As later admitted in the Guilty Pleas, TD's senior US-AML executives "were aware of this resolution and understood that banks must monitor their transactions for suspicious activity," and BSA Officer Levine specifically explained to the AML Oversight Committee how the other U.S. bank "either ignored or discontinued [] below the line threshold testing" for particular scenarios that generated SARs.    Despite Defendants knowledge that this conduct was illegal, and had resulted in sanctions from regulators, by 2018, "US-AML, along with its GAML technology partners, effectively stopped conducting threshold testing on its scenarios due to competing priorities and limited resources," as admitted in the Guilty Pleas.    As a result, from 2018 through

2022, TDBNA conducted threshold testing—also called "quantitative tuning"—on only one of its approximately forty U.S. transaction monitoring scenarios.

58.    Defendants also admittedly ignored third-party consultants who identified fundamental weaknesses in the Global AML Program, which were reported to GAML leadership. As admitted in the Guilty Pleas, in 2018, one consultant found that "increased volumes and regulatory requirements" would put pressure on AML operations to meet demands and deadlines, yet staffing was not increased.  In 2019, another consultant found that TDBNA had "sub-optimal [transaction monitoring] scenarios" due, in part, to "outdated parameters," but TD did not update its parameters.  That same consultant found that the GAML Department had a limited "ability to focus on high risk customers and transactions," but TD did not reprioritize its efforts in contravention of the BSA's requirement that AML programs be risk based.  In 2021, a third consultant also identified numerous limitations in the Global AML Program's transaction monitoring program, including technology barriers to developing new scenarios or adding new parameters to existing scenarios.  None of these facts were publicly known until they were admitted in the Guilty Pleas.

59.    Despite awareness of these pervasive AML issues, Defendants did not fix the problems during the Class Period.  Instead, as described below (*see* Sections IV.D & VIII), they repeatedly assured investors that the Global AML Program accorded with legislative and regulatory requirements, knowing that it did not.

### C.    TD's Class Period AML Deficiencies

60.    Before and throughout the Class Period, Defendants knowingly failed to maintain an AML program that complied with the BSA.  Instead, Defendants prioritized the Flat Cost Paradigm whereby they deliberately withheld the resources necessary for the Global AML Program to function.  As a result, TD's Global AML Program was deficient in four material

aspects: (i) it severely limited the types of activity it screened, thereby failing to monitor large swaths of transactions such that *only 8%* of transactions at TDBNA were monitored; (ii) it failed to implement any new transaction monitoring scenarios or make any substantive changes to the parameters of its existing transaction monitoring scenarios, despite significant unaddressed risks, and intentionally reduced the universe of its active scenarios; (iii) it added new products and services but failed to address the associated AML risks; and (iv) it consistently failed to file CTRs and SARs.

### 1.    TD's "Flat Cost Paradigm" Sacrifices AML Compliance to Boost Profits

61.    In 2013, TD announced that Defendant Masrani would be named its new CEO. Masrani assumed that role on November 1, 2014 at a time when TD faced a challenging environment of near-zero interest rates.  Referring to his predecessor Edmund Clarke, Masrani conceded that he had "big shoes to fill" and set out to fill those shoes by artificially inflating TD's profits by willfully withholding funding required for the AML Program, in violation of federal law.

62.    Unbeknownst to investors, at Masrani's direction beginning in 2014, TD implemented the Flat Cost Paradigm.  This paradigm meant that leading up to and during the Class Period, the budgets of the GAML Department and Global AML Program, "would not increase year-over-year," despite consistent growth in TD's revenue during the same period.  This had a material impact on the Global AML Program because the GAML Department's budget—which was reviewed and approved each year by TD's Audit Committee—significantly restricted its decisions about projects, hiring, staffing, and technology enhancements throughout the Class Period.  As such, TD "vastly underinvested in its AML compliance efforts," resulting "in a willfully deficient AML program" that violated federal law and allowed money laundering

networks, terrorists, and human traffickers to transfer hundreds of millions of dollars. This has been corroborated by FE-3, who explained that the impacts of the Flat Cost Paradigm began to appear in TD's internal budget process in 2015, the year following Masrani's start as CEO. (*See infra* Section V.C.) Ultimately, in 2024, this scheme came to light. Defendant Masrani was summarily fired and his compensation cut. And ***TD's U.S. Retail net income dropped an astounding 79% in one fiscal quarter*** when TD was forced to start making the AML investments that Defendants had unlawfully withheld during the Class Period.

63.     Consistent with this single-minded focus on keeping costs down, the GAML Department's base and project expenditures on US-AML were less in fiscal year 2021 than they were in fiscal year 2018. These amounts were not sufficient to address AML deficiencies, including addressing the substantial backlogs of suspicious activity alerts across multiple workstreams, and were not proportionate to TDBNA's approximately 26% increase in profits during the same period. During regulatory investigations, GAML and US-AML employees explained to regulators that budgetary restrictions led to systemic deficiencies in the transaction monitoring program and exposed the Company to potential legal and regulatory consequences.

64.     As admitted in the Guilty Pleas, Defendants postponed or cancelled critical improvements to the transaction monitoring program, often to reduce AML costs. For instance, in August 2019, several US-AML and GAML executives, including BSA Officer Levine, met to discuss the fiscal year 2020 budget and identified several transaction monitoring projects to postpone, referring to them as "opportunities to reduce expenses for 2020/Opportunity to push out to future years." The group postponed a project designed to "Enhance Functionality and Scenario Development for U.S." because "new scenario development means new data and a lot of work effort." The group also postponed a project related to "Manual Monitoring," finding that it would

require "new data feeds" and "scenarios" and there was "no capacity to do this." Defendants never completed either of these postponed projects.

65.    TD's senior bank executives faithfully implemented this Flat Cost Paradigm. Defendants Bowman and Levine admittedly touted in their self-assessments to management their abilities to operate within the "flat cost paradigm without compromising risk appetite" and achieve the Flat Cost Paradigm within the Global AML Program. Bowman even brazenly referred to TD's "historical underspend" on compliance in an email to a senior TD executive responsive for AML budgeting.

66.    The impact of this paradigm is also evidenced by TD's "Efficiency Ratio"—an important measure for banks that indicates how much of a bank's income is spent on operating expenses. While deliberately underinvesting in AML before and during the Class Period, TD reported an industry-leading efficiency ratio. But as the regulators began to uncover TD's wrongdoing and TD has been forced to finally incur costs to remediate its longstanding AML failures, its efficiency ratio has ballooned. As reported by *American Banker*, Defendant Masrani's replacement at CEO "must reckon with the reality that TD Bank's industry-leading operating efficiency was in part padded for years by flatlining funding for its U.S. anti-money-laundering program while peer banks were spending more" and that he "will have no choice but to increase operating costs more than peer banks going forward as TD plays catch-up."

### 2.    During the Class Period, TD's Global AML Program Was Materially Deficient

67.    The Flat Cost Paradigm's restrictions created and exacerbated material deficiencies in TD's Global AML Program during the Class Period.

68.    First, and principally, throughout the Class Period, the Global AML Program admittedly had in place a wholly deficient transaction monitoring system that failed to monitor the

vast majority of suspicious transactions.  As admitted in the Guilty Pleas, despite representing that it "appropriately identified and mitigated" money laundering and terrorist financing, Defendants did not monitor any domestic Automated Clearing House ("ACH") activity, most check activity, internal transfers between accounts at its North American subsidiaries, or numerous other transaction types.  The problems were so severe that TDBNA and TDBUSH would eventually admit in the Guilty Pleas that, between January 1, 2018, and April 12, 2024, TD's automated AML monitoring system failed to monitor ***92% of all transactions*** and 74% of transaction value, which corresponded to over 14.6 billion unmonitored transactions and over $18.3 trillion in unmonitored transaction value.

69.    These deficiencies were not only known, but they were also deliberately left in place.  For example, as admitted in the Guilty Pleas, after conducting a risk assessment in 2012, TDBNA elevated the AML risk of domestic ACH transactions because TD was not monitoring them.  When personnel in the U.S. AML department proposed adding transaction monitoring scenarios to identify potentially suspicious domestic ACH activity, a "GAML executive" admittedly rejected the proposal.  The elevated rating remained in place through at least October 2023.  As further admitted in the Guilty Pleas, "senior leadership" within GAML were aware of this lack of domestic ACH and check monitoring, yet did nothing.

70.    Second, as admitted in the Guilty Pleas, from at least 2014 to late 2022, TDBNA failed to implement any new transaction monitoring scenarios or make any substantive changes to the parameters of its existing transaction monitoring scenarios, despite significant unaddressed risks.  For example, TDBNA did not have any scenarios to monitor changes and anomalies in customer transaction behavior—which is an important indicator of suspicious activity—or use scenarios to monitor customers it internally deemed to be higher risk, such as issuers of bearer

shares, foreign casinos, money services businesses, and precious metals dealers. And although TDBNA did have different scenarios for personal accounts and business accounts, it did not apply different standards to different business accounts. In other words, a major corporation was subject to the same scenario thresholds as a sole proprietorship, even though those types of businesses engage in materially different transactional activity. This means, for example, that the transaction monitoring system would only flag a small business's activity as suspicious if it rose to the type or volume that would be suspicious on the scale of a major corporation.

71.    Once again, even when gaps in scenario monitoring were escalated to the GAML Department, they were ignored. As admitted in the Guilty Pleas, AML employees in the U.S. escalated known gaps in the transaction monitoring system to the GAML Department and AML management in the U.S. and proposed new or enhanced scenarios to address those risks. These warnings were admittedly ignored. And as FinCEN found, from August 2023 to February 2024, there were at least four presentations to executives that compared the coverages between TD's existing system and potential new system that would have flagged a monthly increase of "$220 billion of transactions (123% increase)," mostly from checks and wire payments. However, after concluding that they would need to incur the cost of almost tripling its AML staff to handle the projected volumes in the future, Defendants did not initiate any remediation efforts until after regulators became aware of the gaps.

72.    To make matters worse, scenarios were *removed* from the Global AML Program's transaction monitoring protocols. In fact, as admitted in the Guilty Pleas, any changes to scenario testing between 2014 and October 2023 *intentionally reduced* the universe of alerts being generated and thereby lowered the associated cost of their review. As admitted, at least nine such scenarios were removed during that period. For example, prior to the Class Period, Defendants

admittedly decommissioned several scenarios targeting large cash activity by businesses and other non-personal customers with the purported intention to test and recalibrate the scenario thresholds, identify potentially new parameters, and redeploy the scenarios. But the scenarios never went back online. This was particularly detrimental because, as described below, criminal enterprises utilized Defendants' systems throughout the Class Period to launder millions of dollars through large cash deposits.

73.    Likewise, as admitted in the Guilty Pleas, the Global AML Program did not effectively monitor transactions from "high-risk countries," as required by the "five pillars" of the BSA. Instead, it monitored transactions only for a subset of so-called "high high risk countries," which subset was admittedly not updated after 2013, regardless of any changes to TD Bank Group's internal list of high-risk countries, updates to a list of high-risk countries provided by the Financial Action Task Force (an international policy-making and standard-setting body), or other global events. Instead, the Global AML Program omitted numerous countries from its monitoring scenarios, and admittedly approved only those changes that would reduce alerts and reduce costs.

74.    Third, Defendants introduced new products and services without addressing the AML risks associated with those products. For example, Defendants never monitored P2P (*i.e.*, person-to-person) platforms—like Apple Cash, Block (formerly Square), Cash App, Facebook Pay, Google Pay, Google Wallet, PayPal, and Venmo—resulting in it "knowingly fail[ing] to appropriately monitor over $100 billion" in transactions.

75.    Defendants likewise admittedly failed to monitor transactions involving the Zelle platform. TDBNA began offering Zelle to customers in 2017, but failed to screen any Zelle activity through its transaction monitoring despite knowing of the money laundering risk. When TD finally added Zelle to its transaction monitoring system in March 2020, it only added two

irrelevant scenarios for activity that could not occur on Zelle, thus leaving Zelle effectively unmonitored.  This contradicted US-AML's July 2021 representations to the OCC that TDBNA had added two scenarios and was conducting "scenario based monitoring" of Zelle.  One employee noted that, "because we haven't been able to write a net new scenario," suspicious Zelle activity "gets lost in the much bigger $ wire category."  Several US-AML employees continued to advocate to mid-level management for the implementation of appropriately calibrated scenarios to alert on suspicious Zelle activity, but GAML put the Zelle scenario project on hold in late 2021 because it was not "an exposed risk or regulatory need."  The result was that "TDBNA individual customers transferred over $75 billion in Zelle transactions, which was almost entirely unmonitored."

76.    Fourth and finally, as admitted in the Guilty Pleas, Defendants failed to appropriately file SARs and CTRs, thereby allowing money laundering networks to exploit Defendants' systems and collectively transfer hundreds of millions of dollars through TD bank accounts.  For example, as admitted, Da Ying "David" Sze alone laundered over half a billion dollars for drug dealers and other criminals.  Over 500 times TD failed to file the CTRs required under the BSA for transactions exceeding $10,000, and the few CTRs that were filed lacked fundamental information required by the BSA, including the identity of the person conducting the transaction.  David later told investigators that Defendants "had by far the most permissive policies and procedures."

77.    Similarly, FinCEN found that Defendants' deficient AML monitoring allowed another large Ponzi scheme to operate from 2018 to 2023.  Specifically, FinCEN found that during that period, Defendants processed over 3,000 transactions with an aggregate value of more than $300 million.  These transactions related to fraudulent investments in a purported real estate company.  FinCEN found that Defendants only began filing SARs on this activity after receiving

a law enforcement inquiry in 2021, and even then, Defendants' reporting covered only approximately 1% of the suspicious activity. Defendants finally reported approximately 98% of the transactions in 2024, more than six years after the activity began. Notably, FinCEN further found that half of the 3,000 transactions totaling approximately $40 million were conducted via check and thus completely unmonitored because TD did not monitor check activity.

### D. During the Class Period, Defendants Fraudulently Touted AML Compliance and Investments

78.    As part of their concerted efforts to conceal their decision to implement the "flat-cost paradigm" and the resulting known material deficiencies described above, Defendants falsely assured investors throughout the Class Period that the Global AML Program had sufficient resources and was appropriately assessing and mitigating risk. Even when reports came out that Defendants' compliance issued jeopardized the FH Acquisition, Defendants continued to knowingly mislead investors. These false and misleading statements and omissions are set forth fully in Section VIII below.

#### 1. TD's False and Misleading Statements About the AML Program, GAML, Audit Committee, and Investment in Compliance

79.    First, for the entirety of the Class Period, Defendants touted TD's Global AML Program on TD's website. For instance, in each year of the Class Period, TD published on its website the "TD Bank Statement On Anti-Money Laundering, Anti-Terrorist Financing and Sanctions" that fundamentally misrepresented TD's AML Program. While the wording changed slightly each year (*see* Section VIII.A.1 below), TD falsely asserted, among other things, that the Global AML Program accorded "with legislative and regulatory requirements," and imposed specific "requirements"—such as "customer due diligence," "[o]ngoing monitoring to detect and report suspicious transactions," and "[r]egulatory reporting of prescribed transactions." Of course, none of this was true, given the deficiencies outlined above.

80.     Similarly, TD falsely and misleading claimed that the GAML Department and the Audit Committee were fulfilling their responsibilities to ensure adequate AML compliance.  For instance, in its 2022 and 2023 Forms 40-F, Defendants stated that the GAML "appropriately identified and mitigated ... money laundering and terrorist financing risks."  And in TD's 2023 Proxy Statement, Defendants stated, among other things, that the Audit Committee "[r]eceived updates ... to satisfy itself that there are adequate resources with experience and knowledge in each of the key oversight functions" and "[o]versaw the execution and ongoing effectiveness of the" Global AML Program.  (*See* Section VIII.A.2 below.)  Defendants repeated the latter again in TD's 2024 Proxy Statement.  Again, these fraudulent statements concealed the deficiencies above.

81.     Strikingly, Defendants also repeatedly assured investors that TD had invested in the Global AML Program and GAML Department, despite TD's secret Flat Cost Paradigm, which specifically precluded such spending.  For instance, when Defendants Masrani and Salom were questioned during the 3Q23 Earnings Call on August 24, 2023, Masrani insisted that "enhancing … our businesses, controls" was "an ongoing exercise at TD," and Salom claimed that TD "first and foremost [] ensur[es] that we've got a strong control platform to be able to operate," investments into its control platform are "the first things that we lean into"; and that "[we] make sure that those investments are addressed."

### 2.     TD Continues to Make Fraudulent Statements Touting AML Compliance in Connection with the FH Acquisition

82.     On February 28, 2022, TD announced the $13.4 billion FH Acquisition.  Defendants placed great importance on the transaction, lauding that it would make it the sixth-largest retail bank in the U.S. with about $614 billion in assets, operating in 22 states.  Under the Merger Agreement, the FH Acquisition was scheduled to close within a year, by February 27, 2023.

83.    In the U.S., federal bank mergers like the FH Acquisition require regulatory approvals from both the Federal Reserve and the OCC.  Specifically, the Federal Reserve, as regulator of all bank holding companies, must approve the merger under the Bank Holding Company Act, while the OCC, as the primary regulator of the surviving insured depository institution, must approve the merger under the Bank Merger Act.  In turn, one of the most crucial factors these regulators focus on when determining whether to approve a bank merger is the effectiveness of the acquiring bank's AML controls.

84.    From the announcement of the merger, analysts questioned whether TD would face challenges with respect to obtaining regulatory approval of the FH Acquisition.  For example, a February 28, 2022 Bank of America report noted that "the new regulatory regime" in recent years was less friendly toward M&A activity, and a March 1, 2022 Cormark report likewise noted that regulatory delays were "a key risk right now in the U.S." with respect to larger bank mergers.

85.    With the market focused on the regulatory issues, Defendants promptly began making false and misleading statements about their AML compliance in order to assuage investors' concerns surrounding regulatory approval.

86.    First, on March 21, 2022, TD and TDBUSH submitted executed the Federal Reserve Bank Merger Act Application) and the OCC Bank Merger Act Application, with Defendant Salom certifying in both that the information provided was "true, correct, complete, and [] current" and "contains no misrepresentations or omissions."  Among other things, these Merger Act Applications stated that "TDBNA … ha[s] comprehensive anti-money laundering and sanctions programs that are reasonably designed to ensure compliance with the Bank Secrecy Act," that TDBNA "has qualified, dedicated personnel who are responsible for administering such programs," and that "the AML team members from TD used a risk based approach to review and

assess key risks related to AML."  These applications certified by Salom further emphasized that TD's Global AML Program is "currently designed to meet the five pillars requirements [of the BSA]," and "designed to detect and report suspected money laundering and terrorist financing and activity prohibited by sanctions."

87.    Analysts took TD's assurances to heart.  A March 30, 2022 analyst report noted that Bank of America's investor meetings with Masrani and Salom "highlighted management's sound understanding of the execution risks."  Bank of America also noted that TD "[m]anagement remains confident that it can close the deal before the deadline next year."

88.    Further, the FH Merger Agreement stated at Section 4.7(b) that the TD Bank Group "ha[s] complied with and are not in default or violation under any applicable law, statute, order, rule, regulation, policy and/or guideline ... including … the Bank Secrecy Act."  The Merger Agreement further represented that the TD Bank Group "established and maintain a system of internal controls designed to ensure compliance ... with applicable financial recordkeeping and reporting requirements of applicable money laundering prevention laws."  As alleged in detail herein, this was not true, and Defendants were willfully violating the BSA and aware that, if uncovered by regulators, it would preclude regulatory approval for the FH Acquisition.

89.    Then, on TD's May 26, 2022 earnings call, a Bank of America analyst noted that "the U.S. regulatory process has become a little more prolonged over the last year," and that "[o]ne of the concerns" the analyst had was that TD was "uniquely the G-SIB—or Global Systemically Important Bank.  In light of TD's importance to the global banking system, the analyst asked Masrani what his "conviction level" was "in terms of getting the deal through the regulatory sort of finish line."  In response, Masrani emphatically and unequivocally asserted that TD was "very

comfortable" because the Company had purportedly entered the transaction on the basis that "it meets all the requirements of all the regulators."

90.     Defendant Masrani and Salom's statements spurred optimism among analysts that covered TD.  After the call, a May 26, 2022 Canaccord Genuity report noted that TD "Management stated their First Horizon acquisition is on track to close in Q1/2023."  The same day, analysts from BMO Capital Markets stated "[w]e expect First Horizon to close at the end of fiscal Q1/23," and a National Bank Finance analyst report noted that the "acquisition remains 'on track', with TD still expecting the deal to close by the end of calendar 2022."

91.     During an investor call on August 2, 2022, an analyst again directly asked Masrani about TD's prospects for obtaining regulatory approval of the FH Acquisition—and specifically, if Masrani had "[a]ny reason" to believe that the deal may not close, or knowledge of any "regulatory or other issues that may delay the deal."  Masrani responded with a flat and emphatic "No":

> No, I have no reason to believe that ... Just following its normal process within the U.S. regulatory requirements.  And we obviously cannot talk about our conversations with regulators.  We feel comfortable that [it] is proceeding at the pace we expected ....

92.     Bank analysts repeatedly relied on TD's assurances of confidence in the FH Acquisition.  For example, an August 2, 2022 Bank of America report noted that "the announcement suggests that mgt does not see any material headwinds with regards to closing the FHN transaction."  A follow-up report by Bank of America on August 25 reiterated "management expressed comfort that it would close [on] First Horizon per its original timeline" and expressed Bank of America's own resultant confidence, "[w]e continue to believe that TD should be able to secure regulatory approval."  An August 25 Desjardin report concurred, reporting that the FH Acquisition "is moving along as expected."  Further, a September 14, 2022 Barclays report

parroted Defendant Salom's statements that TD was "more excited about First Horizon (FHN) now than it was back in February when the deal was first announced"—and that TD was "extremely confident in approval of the deal."

### 3. Defendants Continue to Mislead Investors Regarding the Delay and Eventual Termination of the FH Acquisition

93.    Unbeknownst to the investing public, as early as October 2022, the OCC had completed a confidential supervisory examination of TD that revealed serious AML deficiencies, quickly followed by senior OCC officials meeting with TD's top executives on no less than four separate occasions the next month.  By November 2022, TD's senior executives were directly informed that multiple federal agencies had found such significant failures in TD's Global AML Program that the DOJ had already launched a formal investigation for violations of federal law, eviscerating the prospects for regulatory approval of the FH Acquisition, as later reported by *Capitol Forum*.

94.    Despite these serious regulatory developments, Defendants did not disclose to investors TD's pervasive AML failures, the formal DOJ investigation, or the impact of these developments on the FH Acquisition.  To the contrary, Defendants concealed these issues and continued to falsely reassure investors, often in response to pointed questions, that there was nothing to worry about.

95.    During TD's 4Q22 Earnings Call on December 1, 2022, a National Bank Financial analyst followed up with Masrani about the delay of the close of the FH Acquisition, asking, "Last quarter, you were expecting to close in fiscal Q1, now first half.  What's prompting the delayed expectation of closing?"  Defendant Masrani responded:

> So we're already in December.  And we don't control the timing of all the regulatory approvals, but we are confident we'll get closing within the timeline that we have put out.

96.     The analyst replied, asking, "I mean are they taking a closer look at anything?"
Masrani flatly denied that there was any inquiry or investigation:

> *No, I'm not aware of anything of the sort you're mentioning*.

97.     The analysts covering TD, once again, believed Defendants' assurances.  For
example, a December 1, 2022 Morningstar report noted their view that the delay "isn't entirely
surprising, and we still think it is likely that TD will be able to close this acquisition eventually."
Analysts at Cormark believed Masrani's denial of an inquiry or investigation, interpreting his
"timing" comments in a December 2, 2022 report as "suggesting that the reasoning for the
extended closing period was due to the timing of all the regulatory approvals rather than any other
concessions/issues." The same day, Bank of America noted that "mgmt. did not rule out the
likelihood that the deal could close within the original timeline and noted that the regulatory
approval process was moving forward as expected," and identified TD as "well-positioned for
outperformance" because "synergies offered by the pending acquisitions should combine to deliver
superior EPS growth and returns."

98.     On February 9, 2023, TD issued a joint press release with First Horizon announcing
that "they have mutually agreed to extend the outside date of their proposed transaction from
February 27 to May 27, 2023."  Not only did Defendants continue to conceal the regulatory
holdups, the press release further stated, "TD and First Horizon are fully committed to the merger
and continue to make significant progress in planning for the closing and the integration of the
companies."

99.     However, in reality and unbeknownst to investors, the investigations continued to
intensify as regulators uncovered additional evidence of TD's AML violations—despite
Defendants' ongoing, years-long admitted efforts to conceal them from regulators.  On February
22, 2023, the OCC's Head of Large Bank Supervision and Senior Examiner scheduled a highly

unusual confidential meeting with Defendant Masrani, General Counsel Glaessner, and TD's outside counsel for March 9, 2023—a clear sign the merger was nearly dead.   As *Capitol Forum* later reported, such meetings are scheduled "only when matters are very serious" and, according to industry leaders, the meeting was likely a desperate plea by Masrani for regulators to abandon their investigations—a plea that was summarily rejected.

100.    Despite the active and ongoing investigation that Defendants knew would imperil the FH Acquisition, Defendants continued to mislead investors.  During the 1Q23 Earnings Call on March 2, 2023, Defendant Masrani in his opening remarks stated:

> As you know on February 9, we mutually agreed with First Horizon to extend the close day to May 27 as provisioned in our contract.  Since then, we've come to believe that the deal is not expected to receive regulatory approval in time to close the transaction by that date.  Regulatory approval is not within the bank's control.
>
> So we are doing what is prudent and appropriate.  We've opened discussions with First Horizon about a potential additional extension.  I cannot speculate on when we will receive approval. I can tell you that we are fully committed to the transaction….  This is a great transaction that offers scale and new capabilities to our U.S. franchise.

101.    During questioning, Defendant Masrani reiterated:

> [W]e are really excited about this transaction.  We worked very hard to date and continue to work very, very hard.  And our planning for integration continues.  We've set up an integration management office…. So really excited about what this transaction does for our U.S. franchise.

102.    And later, on the same call, Masrani stated:

> But we looked at when we announced the deal, the structure we have put in place to make sure that we've got more than adequate retention, and we feel happy about that. First Horizon as a franchise continues to perform in line with expectations as I shared during the acquisition announcement in February of '22.  We are very happy with the transaction and continue to work hard to get it over the closing over the finish line.

103.    Analysts, again, believed Defendants' assurances.  A Barclays report from the same day emphasized that "TD reiterated its commitment to closing the FHN deal and is working

towards extending the agreement again."  Similarly, an analyst report published by Canaccord Genuity on the same day parroted the line from Masrani that "TD remains fully committed to the FHN transaction."  The "[b]ottom line" according to analysts at Evercore was that "the likelihood of the deal closing is greater than a termination – particularly given today's seemingly firm reiteration by TD."

104.    Contrary to what Defendants told investors, willful, longstanding failures in TD's Global AML Program precluded regulatory approval.  Specifically, TD and Masrani had known "the deal is not expected to receive regulatory approval" long before February 2023; the AML failures that precluded "[r]egulatory approval" were, in fact, "within the bank's control"; "integration" and "get[ting] [the FH Acquisition] over the closing over the finish line" was not feasible in view the failures of the Global AML Program; Defendants had not "opened discussions with First Horizon about a potential additional extension"; and Masrani knew or should have known that closing the FH Acquisition with a "potential additional extension" was not feasible given that, among other things, the DOJ had already launched a formal investigation into the Global AML Program for violations of federal law.

105.    Finally, just two weeks before TD announced the termination of the FH Acquisition, Masrani used TD's Annual Shareholders Meeting, on April 20, 2023, to reassure investors that TD could still close the FH Acquisition.  Remarkably, no fewer than five times Masrani claimed that TD was is in extension negotiations with First Horizon.  The same day, *The Globe and Mail* published an article about the meeting, headlined "TD Bank CEO reaffirms commitment to stalled takeover of First Horizon," and reported Masrani's assertion that the Company was "continuing to engage in discussions with First Horizon and U.S. regulators."  However, as *The Wall Street Journal* reported just two weeks later, on May 4, according to First

Horizon's CEO Bryan Jordan, "TD and First Horizon *didn't discuss extending the timeline for the deal,* lowering the price, or changing its structure."

106.    Defendants continued to conceal the truth even after TD and First Horizon announced that they entered into a mutual agreement to terminate their merger on May 4, 2023. In a statement posted on TD's website, Defendants indicated that they had "informed First Horizon that TD does not have a timetable for regulatory approvals to be obtained for reasons unrelated to First Horizon."  The Company further stated that, "[b]ecause there is uncertainty as to when and if these regulatory approvals can be obtained, the parties mutually agreed to terminate the merger agreement."

### E.    The Truth About TD's Global AML Program Begins to Emerge in Reporting While Defendants Continue to Mislead the Investing Public

107.    Although TD publicly expressed that that they had called off their merger with First Horizon, TD did not indicate that issues with AML compliance had led to the termination of the FH Acquisition, only citing vague roadblocks to "regulatory approvals."  It was not until *The Wall Street Journal* reported that it was AML issues that had killed the FH Acquisition that the truth about the problems at the Company began to emerge.

#### 1.    The Truth Begins to Emerge with the Publishing of an Article in *The Wall Street Journal*

108.    On May 8, 2023, *The Wall Street Journal* published an article entitled, "Concern Over TD Anti-Money-Laundering Practices Helped Scuttle First Horizon Deal."  The article indicated that while TD had "cit[ed] uncertainty over whether and when they could receive regulatory approvals, without being more specific[,] [t]he reluctance by the Office of the Comptroller of the Currency and the Federal Reserve to give TD a clean bill of health on its anti-money-laundering practices proved to be the biggest obstacle."

40

109.    On news that AML-related compliance issues had killed the FH Acquisition, the price of TD common shares dropped 1.8% between the release of *The Wall Street Journal* article and the close of trading on May 8, 2023.

110.    TD rushed to respond to the significant media coverage and obscure the truth: TD had a willfully deficient Global AML Program that caused, what FinCEN referred to as, actual and material harm to the U.S. financial system, that precluded the FH Acquisition and made TD the subject of one of the largest criminal investigations in U.S. banking history.  TD, through a spokesperson, issued statements to *Bloomberg* and *The Wall Street Journal*, which appeared in those publications on May 8, 2023, that:

> TD works diligently to prevent criminals from using the bank for illegal activity, to strengthen its risk management programs on an ongoing basis, and to protect the interests of our customers, the bank, and the financial system.

111.    TD's spokesperson also stated to *Bloomberg*:

> Risk management has always been core to TD's business, and we work collaboratively with our regulators on all such matters.

112.    Analysts accepted TD's denials and downplaying of the AML issues.  For example, a Bank of America report on May 9, 2023 analyzed TD's statement and noted that the article stated that "TD had pledged to [US] regulators that it would make its anti-money-laundering policies more comprehensive and timely, but it wasn't enough to win approval for the [FH Acquisition] deal."  Bank of America added that "***[t]his implies to us that TD mgmt viewed the issue as addressable in normal course of business***."  In actuality, the issues were serious, wide reaching, and would eventually lead to a criminal conviction and massive penalties.

113.    Less than three weeks later, on May 25, 2023, the Company for the first time disclosed reasonably possible losses ("RPL") of $1.27 billion.  In disclosing the RPL in the Legal and Regulatory Matters section of its Form 6-K, TD noted "[i]n the ordinary course of business,

the Bank and its subsidiaries are involved in various legal and regulatory actions, including but not limited to civil claims and lawsuits, regulatory examinations, investigations, audits, and requests for information by governmental, regulatory and self-regulatory agencies and law enforcement authorities in various jurisdictions." However, the Company, still, did not disclose the existence of the DOJ investigation, or the reasons behind the RPL. On this news, the price of TD common shares dropped 4.39% between the close of trading on May 24, 2023 and the close of trading on May 25, 2023.

114.   Once again, analysts took TD at its word as Defendants consistently downplayed the severity of the investigations. A May 25, 2023 Bank of America report noted "Mgmt. appears underestimated the impact on expenses due to potential compliance related investments that may be necessary in order to resolve regulatory issues in the U.S," and a June 9, 2023 CIBC report noted that TD's comments had made clear to CIBC "that the company is working to resolve its issues with U.S. regulators." Similarly, a June 12, 2023 Canaccord Genuity report included as "takeaways" from Masrani's comments that investigations were "unrelated to good faith dealings with customers" and that TD "expressed confidence that [] TD will resolve the matter."

115.   Then, on August 24, 2023, TD filed its Form 6-K and for the first time, confirmed the existence of an investigation by government regulators into its AML Program. In addition to increasing TD's RPL by $20 million to $1.29 billion, TD indicated that:

> The Bank has been responding to formal and informal inquiries from regulatory authorities and law enforcement concerning its Bank Secrecy Act/anti-money laundering compliance program, both generally and in connection with specific clients, counterparties or incidents in the US, including in connection with an investigation by the United States Department of Justice. The Bank is cooperating with such authorities and is pursuing efforts to enhance its Bank Secrecy Act/anti-money laundering compliance program. While the ultimate outcomes of these inquiries and investigations are unknown at this time, the Bank anticipates monetary and/or non-monetary penalties to be imposed.

On this news, the price of TD common shares dropped 3.45% between the close of trading on

August 23, 2023 and the close of trading on August 24, 2023.

116.    On the same day that TD announced the existence of the probe, analysts and news

outlets began expressing concerns and questioning the implications of the investigation, even to

TD CEO Masrani himself.  But still, Masrani did not fully disclose the extent of wrongdoing.  For

example, on an earnings call the same day that TD filed the Form 6-K, a Scotiabank analyst asked

a question on TD's disclosure related to the inquiries from U.S. regulatory authorities and law

enforcement:

> You highlight anticipated monetary and/or nonmonetary penalties. On the
> monetary side, just curious, what you've provisioned or have you
> provisioned anything for this potential monetary charge or anticipated
> monetary charge, I should say.

Masrani responded:

> As you know, I can't comment on our ongoing discussions with our
> regulators. What I can say regarding the disclosure and as we've shared in
> the disclosure, we are pursuing efforts to enhance our U.S. AML
> compliance program. We have a strong and disciplined risk management
> culture and are focused on continuously improving our programs. So I just
> wanted to emphasize that, Meny. With respect to what amounts and all that,
> I really can't comment on that because that I don't think would be
> appropriate. And regarding our accounting policies, when it is appropriate,
> we will certainly let you know what it has cost or not cost us.

117.    Analysts once again believed Defendant Masrani.  An August 24, 2023 Bank of

America analyst report noted that "[w]ork to enhance [TD's] procedures [was] underway, but

mgmt. stayed away from detailing any financial impact (expense, fines) or a resolution timeline."

Parroting Defendant Masrani's comments, the report noted Bank of America's belief that "TD's

strong regulatory track record suggests to us that this issue should be manageable and unlikely to

have a lasting impact on the franchise."  An August 24, 2023 CIBC analyst report went so far as

to say "[w]e think there was an overreaction to the AML update" and a report from Scotiabank on

the next day noted that while the "US government probe into [TD's] AML control is capturing headlines,… we don't see it as impacting our core numbers."  The truth behind the AML issues had yet to be revealed.

118.    Even once the investigation was disclosed, TD did not reveal the full extent of the probe, and misled investors on the investigations' impact on the FH Acquisition.  On September 13, 2023 at the Barclays Global Financial Services Conference, an analyst proposed whether the "reason that [TD] couldn't close First Horizon … might have evolved around regulatory concerns about AML and KYC."  Defendant Salom claimed:

> Let me separate the 2 items for a moment. Our decision to walk away from First Horizon was really predicated on the fact that we just did not have regulatory certainty with regards to time. And we felt that as time elapsing, the best thing we could do, given that uncertainty was to walk away from the transaction. And I assure you that was not an easy decision. Separately, last quarter, we did make a disclosure saying that we are in discussions with both the DOJ and our regulators about a specific matter at hand. So I don't want to [conflate]² the two."

In truth, they were not "separate," and U.S. regulators had rejected the FH Acquisition for the same willful and longstanding AML failures for which Defendants later pled guilty and admitted in October 2024.

119.    Over the course of the next 8 months, analysts continued to inquire about the AML issues at TD, and TD continued to make materially false and misleading statements.   TD's November 30, 2023 Form 40-F misrepresented TD's non-compliance and challenges by regulators as mere possibilities that "may" or "could" happen, when in fact Defendants knew that the OCC, Federal Reserve, and DOJ were **already** taking action against them for their willfully deficient Global AML Program.  Specifically, TD claimed:

---

² While the word "complete" appears in the transcript of the conference published by Refinitiv Streetevents, the audio recording of Salom's remarks indicates that he actually used the word "conflate."  The audio recording is available from Refinitiv Eikon and can be provided the Court on request.

>*Regulatory Oversight and Compliance Risk*
>
> ….
>
> [W]hile the Bank devotes substantial compliance, legal, and operational business resources to facilitate compliance with these developments by their respective effective dates, and also to the consideration of other Bank regulator expectations, it is possible that: … (ii) the Bank may not be able to develop or enhance the platforms, technology, or operational procedures and frameworks necessary to comply with, or adapt to, such rules or expectations in advance of their effective dates; or (iii) regulators and other parties could challenge the Bank's compliance. Also, it may be determined that the Bank has not adequately, completely or timely addressed regulatory developments or other regulatory actions, such as enforcement actions, to which it is subject, in a manner which meets Bank regulator expectations.

120.    During the February 29, 2024 1Q24 Earnings Call, a Bank of America Securities analyst asked "in terms of the AML issue … what happened there," noting that "for those of us who follow TD for a long time, it's – the assumption is always TD is ahead of the curve in terms of management, risk control investments."  Defendant Masrani responded:

> As far as our control infrastructure, we – this is an ongoing situation for TD or any big bank and the environment changes and as we hear improvements from others, including our regulators, what the industry is doing, we want to keep up with it and where appropriate, be ahead of it.

121.    Later in the same 1Q24 Earnings Call, a BMO Capital Markets analyst asked: "Bharat, I mean the good news is, I think you've made it clear that the AML issues are understood, I suppose, and progress is being made fixing them. Are you in a better position now versus a few quarters ago to give a sense of how long do you think that will take? And how much do you think it will cost?"  Defendant Masrani replied:

> [S]uffice it to say, as I said in my prepared remarks, we know what the issues are. We are working hard to improve and enhance our processes, and I'm confident that I've been with the bank many years that when we get on to a particular issues we find, we get on to those and fix them.

2. ***The Wall Street Journal*** **Further Sheds Light on the Severity of TD's AML Issues and Ties the Problems to the Laundering of Illicit Fentanyl Profits**

122.     Although TD had disclosed the existence of the AML probe in August 2023, the Company downplayed the severity of the investigation for over eight months.  It was not until May 2, 2024, when news broke tying TD's AML problems to drug trafficking, including illicit fentanyl profits, that the severity TD's failures began to emerge.

123.     On May 2, 2024, *The Wall Street Journal* published an article entitled "TD Bank Probe Tied to Laundering of Illicit Fentanyl Profits; The Canadian bank is contending with three other U.S. probes into its anti-money-laundering controls."  The article reported that TD had allowed a criminal operation in New York and New Jersey to "launder[] millions of dollars in proceeds from illicit narcotics." The article further explained the DOJ's investigation into an operation run by Chinese money-brokers that laundered over $653 million through TD and other banks for the benefit of Mexican drug cartels in the business of trafficking fentanyl.

124.     On news that TD's AML probe was related to the laundering of profits from illicit drug sales, the price of TD common shares dropped 5.89% between the close of trading on May 2, 2024 and close of trading on May 3, 2024.

125.     Analysts were stunned by the news. A May 2, 2024 report by National Bank of Canada warned investors to put "greater weight on worst-case scenarios for the stock." A May 6, 2024 Bank of America report speculated that this could "compar[e] to Wells Fargo where issues were deeply embedded and tied to the [] culture", but noted that TD still "trie[d] to draw a line between lapses in TD's AML program vs. any intentional wrongdoing."

126.     Again, Defendants downplayed the true nature of their criminality which would only be exposed with the criminal plea deal and civil enforcement actions on October 10, 2024.

For example, during a May 23, 2024 Earnings Call, in his opening remarks, Defendant Masrani stated:

> Before I get into the details, I want to spend a minute on our U.S. AML program. As you read in the news release we issued on May 3, there were serious instances where the bank did not effectively monitor, detect, report and respond to suspicious activity. Criminals are regularly targeting financial institutions, and these cases, TD did not effectively thwart their activity. This is unacceptable. TD has been cooperating closely with the authorities to help them prosecute these criminals.

127.    Later in the call, Defendant Masrani stated:

> And the reports you hear, what you read does not reflect who we are, our values of what the bank stands for. And we made that very clear. I mean we get targeted all the time. And unfortunately, in these instances, our program fell short. And we know what those shortcomings are, we are on it, and we are fixing them.
>
> ….
>
> We strive to be a well-run bank. Our risk management reputation goes back many decades. And it's unfortunate that in this one instance, we're well short.

128.    A Bank of America Securities analyst followed up, asking "Going back to what Bharat said, decades of like reputational risk management, I would have thought TD is leading the judge on best-in-class AML. Why did that not happen? Is this isolated? Or is that a systemic issue at the bank?" Defendant Bambawale responded:

> [W]e always endeavor to be best-in-class in every risk area. But yes, from time to time, we find we've fallen behind in a particular area. And we're out there owning the issue that we fell behind in our program, and our program did not pick up things it should have picked up. But really, if I go right to the root cause of what happened, there were some procedural weaknesses in the U.S. that caused bad actors to exploit us.
>
> And we were also disappointed that some of our colleagues didn't follow our code of ethics, like those would be the 2 things I'd call out, and that's specific to the U.S. This is not a problem here at the enterprise level.

129.    Analysts, again, credited TD's attempts to downplay the AML issues.  A May 23, 2024 Jefferies analyst report said "we firmly believe that TD is doing everything in its power to mitigate the implications" and highlighted that "[m]anagement noted that the AML issues stemmed from the U.S." The same day, a Bank of America analyst report opined that "[m]anagement's comments suggest to us that this is primarily a US AML compliance lapse with a low probability of [] graduating into an enterprise-level issue."

130.    Even though the full truth had not been revealed, the impact to TD's business from the disclosure of the AML probes and their relation to Chinese drug traffickers who banked at TD was devastating.  On August 22, 2024, TD reported its first loss in over two decades after setting aside an extra $2.6 billion to cover expected fines from the regulators.  On this news, the price of TD common shares dropped an additional 2.19% between the close of trading on August 21, 2024 and the close of trading on August 22, 2024.

131.    Analysts were disappointed with this news and the way it was conveyed to investors. Bank of America wrote that TD "[s]tock reacted negatively" to the news and that "messaging [] during the earnings call was not confidence inducing as investors try to handicap the eventual impact from the US AML issue."  Scotiabank predicted that the news was "[n]ot the end of TD's AML issues."  Morningstar noted that "[a]nti-money laundering losses continue to stack up" as the "anti-money laundering provisioning … increase was more than we expected." While Canaccord Genuity complained that managements explanations were insufficient, "TD's AML tidbits leave investors hungry for more" and "[f]urther clarity required on non-monetary penalties."

F.      **The Severity of TD's AML Failures Further Emerges as the
        DOJ and Regulators Disclose Criminal and Civil Sanctions**

132.    TD's house of cards finally collapsed in October 2024.  After the close of trading

on October 9, 2024, *The Wall Street Journal* reported that TD's U.S. banking operations would

plead guilty to criminal charges that it failed to build proper AML systems, that the Company

faced $3 billion in penalties for its misconduct, and that the OCC was expected to impose an asset

cap on TD's U.S. banking operations that would bar the Company from growing above a certain

level in the U.S.

133.    The next day, October 10, 2024, TD published a press release disclosing that it had

entered into consent orders with the OCC, the Federal Reserve Board, and FinCEN, and entered

into plea agreements with DOJ related to its inadequate AML controls.  TD further revealed that

under the terms of the 2024 Guilty Pleas and Enforcement Orders the Company would, among

other requirements, pay a total of $3.09 billion in fines and penalties (consisting of $1.9 billion in

forfeitures and criminal fines to DOJ and a $1.3 billion fine imposed by FinCEN), retain an

independent compliance monitor for three years  to oversee an independent, end-to-end review of

TD's Global AML Program, and consent to the OCC's imposition of an asset cap on the

Company's U.S. banking subsidiaries.  In the press release, Defendant Masrani stated, "[w]e have

taken full responsibility for the failures of our U.S. AML program and are making the investments,

changes and enhancements required to deliver on our commitments."

134.    Also on October 10, 2024, DOJ, FinCEN, the Federal Reserve, and the OCC

published press releases announcing their respective actions, which revealed the incredible scope

of Defendants' years-long willful AML failures.  Indeed, Attorney General Merrick Garland

confirmed that "TD Bank ... became the largest bank in U.S. history to plead guilty to Bank Secrecy

Act program failures, and the first US bank in history to plead guilty to conspiracy to commit

money laundering."  FinCEN confirmed that its "$1.3 billion settlement is the largest penalty against a depository institution in U.S. Treasury and FinCEN history."

135.    The civil and criminal actions also fully exposed the breadth of wrongdoing and AML deficiencies that persisted at TD throughout the Class Period.  Not only did TDBNA and TDBUSH admit that the serious and longstanding deficiencies outlined in the Guilty Pleas existed from January 2014 to October 2023, they also "expressly agree[d] that it shall not, through present or future parents, subsidiaries, affiliates, attorneys, officers, directors, employees, agents, or any other person ... make any public statement, in litigation or otherwise, contradicting ... the facts described in the Information and Statement of Facts."

136.    Among other things, these indisputable admissions include:

a.   That "high-level executives" and "senior executive management" knew of "long-term, pervasive, systemic deficiencies" in the AML program.

b.   That the boards of directors of Defendants TD, TDBNA, and TDBUSH were regularly briefed by the Global Chief AML Officer on AML compliance matters.

c.   That before and during the Class Period, "senior executive leadership and boards of directors" of TDBNA, TDBUSH, and TD, among others, were made aware of concerns about the Global AML Program's transaction monitoring program by OCC, FinCEN, TDBNA's Internal Audit team, and third-party consultants.

d.   That "senior executives" repeatedly and willfully prioritized the "customer experience" over AML compliance and enforced a budget mandate, referred to internally as a "flat cost paradigm" that set expectations that the AML budget (among other budgets) would not increase year over year.

e.   That as part of the Flat Cost Paradigm, the Global AML Program's "base and project expenditures on US-AML were less in fiscal year 2021 than they were in fiscal year 2018 and were not sufficient to address AML deficiencies" despite profits increasing approximately 26% in that same period.

f.   That Defendants willfully failed to substantively update its automated transaction monitoring system from at least 2014 through 2022 despite

increases in the volume and risk of its business and significant changes in the nature of the risk of transactional activity.

g.   That Defendants failed to monitor 92% of *all transactions* and 74% of transaction value, which corresponded to over 14.6 billion unmonitored transactions and over $18.3 trillion in unmonitored transaction value.

h.   That Defendants consistently, and with the purpose to evade transaction reporting requirements, failed to file CTRs and SARs.

137.   FinCEN also found long-standing deficiencies in TD's Global AML program that were known before and during the Class Period by senior AML officers, including Defendants Bowman and Levine.  Specifically, FinCEN found, among other things:

a.   That Defendants willfully failed to establish an adequate AML program, including failing to devote sufficient resources to BSA compliance, and failing to invest in improvements to address material gaps because they did not want to incur the cost.

b.   That Defendant Levine as BSA Officer and AML management failed to seek sufficient resources across budget, personnel, and technology.

c.   That Defendants Bowman and Levine congratulated themselves for "develop[ing] [the AML] program within a flat cost paradigm without compromising risk appetite."

d.   That by 2019, a senior executive suggested to Defendant Bowman that the review of potential suspicious activity was not "adequately resourced/managed," and that Bowman's response to the senior executive was, in part, to "identify opportunities to scale back review or investigative rigor" and reduce analyst time to investigate potentially suspicious activity, instead of remediating the underlying issue.

e.   That Defendants failed to properly file reports for suspicious activity, specifically identifying thousands of suspicious transactions totaling approximately one and a half billion dollars for which TD Bank failed to timely and accurately file a SAR.

f.   That Defendants failed to adequately train employees on filing CTRs, including that employees were authorized to file "CTRs without recording all of the individuals present for transactions" and instead only recorded the accountholder, even in cases where the accountholder was not physically present; "risk-related information was not linked to the related customer records … result[ing] in the Bank failing to integrate accurate information necessary for proper risk monitoring."

g. That Defendants failed to implement and maintain appropriate risk-based customer due diligence and "failed to sufficiently collect and review information required to develop an adequate risk profile and identify high-risk accounts," "miss[ed] blatant disparities between customers' actual activity and what would reasonably be expected based on available information"; and further, "numerous and longstanding issues with its customer risk rating system led to significant deficiencies in the ongoing monitoring of high-risk customers"; "millions of high-risk customers to remain unscored" without any risk rating; and the "highest risk customers … were not subject to comprehensive transactional reviews to assess whether [their] use of the Bank's products and services was consistent with TD Bank's risk profile for that customer."

i. In one deeply troubling episode, FinCEN found that in 2019, the Global AML Program's failures had permitted it to process over $3 million in suspicious transactions for a co-conspirator in the 1993 World Trade Center bombings—despite the admission they were "indicative of terrorist financing"—without categorizing this customer relationship as "high-risk," performing enhanced due diligence, or filing a timely SAR.

138.    Additionally, the OCC also found significant lapses in TD's Global AML Program including, but not limited to, deficiencies related to TD's internal controls and risk management practices.  Among other things, the OCC found that:

a. "The Bank failed to develop and provide for the continued administration of a BSA/AML Program reasonably designed to assure and monitor compliance with the BSA and its implementing regulations."

b. "Deficiencies in the Bank's BSA/AML Program included deficiencies related to: internal controls and risk management practices; risk assessments; customer due diligence; customer risk ratings; suspicious activity identification, evaluation, and reporting; governance; staffing; independent testing; and training, among others."

c. "The Bank had significant, long-standing, systemic breakdowns in its transaction monitoring program," including that "[s]ince at least 2020, the Bank processed hundreds of millions of dollars worth of transactions with clear indicia of highly suspicious activity."

139.    Analysts were stunned by the news. RBC titled its October 11, 2024 report "Adjusting to the worst-case scenario," significantly lowered its stock price target, and wrote that "it will be difficult for TD to outperform its peers over the medium term" as a result of the

"resolution on its U.S. BSA/AML issues." Bank of America wrote in its October 21, 2024 report that "[i]ncoming leadership needs a new playbook," "things are not alright," described the penalties levied against TD as "unprecedented," and complained that "despite … unprecedented nature of the crime and regulatory penalties [] the board has not played an active role in allaying investor concerns." BMO observed in its October 14, 2024 report that "it may get a little worse before it gets better for TD stock."

140.    On October 11, 2024, *The Wall Street Journal* remarked that TD's Global AML Program was "basically static for over 10 years. They didn't update it with new typologies. They were aware that it wasn't picking up a lot of things, but they weren't doing anything about it." Commentators from *The Wall Street Journal* also emphasized the gravity of the Guilty Pleas, stating that the action was "very significant for [TD]…. It's rare for regulators to do this…. TD was pursuing a pretty aggressive strategy of acquiring banks in the US to grow its business here, and this is a pretty sharp turn in its fortunes."

141.    With the full truth revealed to the market, the price of TD common shares dropped 6.4% between the close of trading on October 9, 2024 and the close of trading on October 10, 2024, depleting over a billion dollars in market cap based on the shares traded on the New York Stock Exchange alone.

### G.    Post Class Period Events

142.    TD acknowledged the role of the Individual Defendants, the TD Board, and other senior TD executives in the willful AML failures by terminating them or securing resignations and slashing their compensation. As the Guilty Pleas became inevitable, TD began to clean house. For example:

a.    In September 2024, after the truth began to emerge, TD announced Defendant Masrani's retirement effective April 10, 2025. But once the

Guilty Pleas became public, TD expedited his departure to February 1, 2025.

b. On September 19, 2024, TD announced the departure of former CFO Ahmed, effective at the end of January 2025. Ahmed was TD CFO from January 2016 to September 2021 and had signed certain of the SEC filings during that time period.

c. On September 19, 2024, TD announced that Alan MacGibbon, would step down as Chairman of TD's Board, and would retire as a director by December 31, 2025. MacGibbon had been the Chair of the Board's Audit Committee from 2016 through February 1, 2024 and also served on TDBNA's board.

d. The same day TD also announced that TD Directors Amy Brinkley, Colleen Goggins, Karen Maidment, Claude Mongeau, and Brian Ferguson would step down from TD's Board effective April 10, 2025. Brinkley also served on TDBNA's board.

e. TD secretly terminated Chief Compliance Officer Monica Kowal in 2024. Despite Defendants reporting publicly that she was involved in remediation efforts at the Company, *Reuters* reported on July 5, 2024, that a June 2024 internal TD memo revealed that she had been fired.

f. TD's Global Head of AML Operations Kristie DeMarco was terminated effective December 2024, after more than 26 years at the Company.

g. Defendant and former Chief AML Officer Bowman separated from TD in March 2024 in the midst of his cooperation with DOJ prosecutors.

h. Chief AML Officer Herbert Mazariegos was hired to supposedly revamp TD's risk and compliance team, but on January 23, 2024, TD announced that Mazariegos would depart from the Company immediately.

i. Defendant and former BSA Officer Levine separated from TD in November 2023 in the midst of her cooperation with DOJ prosecutors.

143. As far as compensation, TD drastically cut compensation for Defendants Masrani, Tran, Salom, and more than three dozen other senior executives, which TD specifically admitted was "to reflect the seriousness of the U.S. AML failures, the associated costs to the bank and the limitations imposed on the U.S. retail business." Masrani's 2024 compensation was cut by 89%, from C$13.3 million ($9.2 million) in 2023 to C$1.5 million ($1 million). Notably, Masrani received no cash incentive or equity awards for the year, a decision TD attributed to the gravity of

its compliance failures. Other senior executives also faced significant pay cuts, with variable compensation reduced by at least 25%. TD admitted that the "reductions reflect the seriousness of the U.S. AML failures, the associated costs to the Bank, and the limitations imposed on the U.S. retail business."

144.    On March 4, 2025, *The Globe and Mail* reported that TD had "swept clean its board of directors and slashed its executive compensation to address investor concerns over accountability for the failings that weighed on the bank's stock." Reporting on TD's Board overhaul on January 17, 2025, a Jefferies analyst observed that "risk management and compliance have become mission critical for TD." That same day, a CIBC analyst described these changes, as well as reductions in executive compensation, as "a call to accountability."

145.    TD has also been forced to incur substantial expenses to remediate its willfully deficient Global AML Program and make up for the decade of deliberate underinvestment from the Flat Cost Paradigm. TD announced on February 27, 2025, that it had spent $86 million on AML remediation efforts in the first quarter of 2025 alone. TD further reported that it expected to spend $500 million on further remediation efforts during the remainder of fiscal year 2025, with additional efforts planned for 2026 and 2027.

146.    TD also admitted that it knew its Global AML Program was deficient at least as of October 2023. Specifically, TD reported in its Form 40-F, filed with the SEC on December 6, 2024, that "[t]he Bank is undertaking several improvements to the Bank's enterprise-wide AML/Anti-Terrorist Financing and Sanctions Programs.... These improvements are made in the context of the Bank's 2023 annual assessment of its Enterprise AML Program, *which was rated unsatisfactory as of October 31, 2023*." Notably, TD did not inform investors of this "unsatisfactory" rating in its Form 40-F, filed with the SEC on November, 30, 2023.

147.    These efforts to remediate TD's long-standing AML failures have directly impacted the Company's bottom line.  For instance, TD reported that its net income for the first quarter of 2025 was ***down an astounding 79%*** compared with the first quarter of 2024.  TD said this "primarily reflect[ed] the impact of balance sheet restructuring activities, governance and control investments including the Company's U.S. BSA/AML remediation program."

148.    The belated AML investments has also had a significant impact on TD's once-industry-leading efficiency ratio.  As TD has now been forced to make up for its longstanding and deliberate investment in its Global AML Program, its efficiency ratio has ballooned.  The link between TD's efficiency ratio and its years of underinvestment was not lost on industry commentators.  Writing about TD's new CEO, *American Banker* reported that "[Raymond Chun] must reckon with the reality that TD Bank's industry-leading operating efficiency was in part padded for years by flatlining funding for its U.S. anti-money-laundering program while peer banks were spending more. Mr. Chun will have no choice but to increase operating costs more than peer banks going forward as TD plays catch-up."

149.    Finally, compliance with the asset cap imposed by the DOJ required TD to significantly downsize, slowing plans for U.S. expansion.  Since the Class Period, TD has initiated the closure of 38 U.S. branches and sold three buildings on TDBNA's main corporate campus in Cherry Hill, New Jersey.  TD plans to close dozens more stores and lay off additional employees on top of the terminated executives.

## V.    FORMER EMPLOYEE ALLEGATIONS

150.    Together with the allegations attributed to the Former Employees (or "FEs") herein, this section provides an overview of the basis for the FEs' personal knowledge and the basis for the allegations herein.

A.    **Former Employee 1:  TD's Senior Technical Writer AML Consultant**

151.    FE-1 was hired by the Head of AML at TDBNA as Senior Technical Writer AML Consultant from approximately February 2024 through May 2024.  Prior to that, FE-1 had significant experience updating and implementing AML procedures in the banking industry, including for Bank of America, Wells Fargo, Citigroup, and many other U.S. and international banks.

152.    In February 2024, FE-1 was hired to write and update AML procedures, including with respect to transaction monitoring.  At the time, FE-1 confirmed that TD had outdated AML procedures that had not been updated for a significant period of time.  TD's AML procedures "needed a lot of work," explained FE-1.  FE-1's impression was that TD was updating its AML procedures in response to law enforcement and regulatory investigations.

153.    FE-1 was unable to make any progress in remediating the outdated AML procedures, however, because TD did not have the systems and technology in place necessary for FE-1 to do so.  Most significantly, TD tried, unsuccessfully, to implement an Oracle system for the U.S. AML procedures.  The Oracle system was supposed to track AML investigations and facilitate AML processes in the U.S, but the Oracle system did not actually have these capabilities and never functioned properly during FE-1's tenure.  As a result, it was impossible to update TD's AML procedures to properly reflect changes to TD's business activities, as well as applicable supervisory standards and legal requirements.

154.    FE-1 worked closely with TD's AML staff in Canada and in the U.S. to understand the AML procedures that were in place and try to plan for the updates that needed to be made.  In these interactions, FE-1 regularly heard TD's U.S. AML staff complain that they were "overworked" and were "having a hard time doing all the work that was required," due to

understaffing.  It was also difficult to get the U.S. AML employees on the phone due to their unmanageable workload.  Even though TD was "behind" on updating procedures, FE-1 reported, TD AML staff "did not have the time to do what was required."  As such, TD did not allocate adequate resources to AML compliance in terms of systems, technology, or staffing, which prevented TD from making the necessary updates to its outdated AML procedures.  TD was "wasting money" with FE-1 "sitting around," FE-1 said, so, the "project was canceled." Ultimately, FE-1 left TD after only a few months because there was no indication of when TD would secure the resources necessary to update and remediate its outdated AML procedures.

    **B.**    **Former Employee 2:  TD's AML Specialist & Production Analyst**

155.    FE-2 was hired to work as an AML specialist and production analyst on a contract basis for TD Bank Group from approximately March 2024 through October 2024.  FE-2 worked alongside more than three hundred other TD AML investigators in Atlanta, Georgia to review, investigate, and respond to potentially suspicious and illegal activity involving TD accounts or customers, including preparing SARs.

156.    When work began, FE-2 and FE-2's hundreds of colleagues were instructed to start working through "thousands" of backlogged cases, which were transactions or activity that had triggered an alert for being potentially suspicious.  TDBNA was backlogged by six months, FE-2 estimated.  TD Bank was "definitely trying to catch up" because they "did not have adequate AML processes," FE-2 said.

157.    TD did not have a unified AML system.  Instead, AML investigators had to access between seven and ten different systems during the process of investigations, which added to the delay because FE-2 and other investigators had to log in and out of so many different systems to complete a case.  The systems FE-2 used included SAS, Ovation, and Fidelity, which contained

information such as customer records and transaction details, as well as third-party databases, such as Lexis Nexis, to review background information about customers who were being investigated. After AML analysts like FE-2 completed their evaluations, they wrote up their findings, either in the form of a SAR or in notes that were included in an electronic file.

158.    The systems that TD AML investigators needed to investigate suspicious alerts were frequently not functioning and often crashed during the course of their work.  "It was frustrating," FE-2 explained, because FE-2 and other investigators sometimes lost all the work they had done for hours on a given investigation when the systems crashed, requiring them to start all over on the investigation.  For example, TD's Ovation system alone crashed in the range of 10 to 15 times during FE-2's roughly six-month contract stint.  FE-2 recalled instances when the Ovation system crashed at 9:00 a.m. or 10:00 a.m., and was down for the rest of the workday, which prevented the investigators from working the rest of the day.  Moreover, even when available and functioning, the systems were slow and cumbersome, which further delayed case completion.

159.    To make matters worse, there were also discrepancies in the information between different systems at TD.  For example, TD's Fidelity system was used to check occupation codes, verify the type of job a customer performed, and match and confirm the customer's date of birth, address, and length of time as a TD Bank customer.  But TD's Ovation also had similar information, in addition to account history, ACH statements, and digital transaction details, which investigators used to complete "Know Your Customer" procedures.  FE-2 observed that it was "common" that there were disparities between the information in the Fidelity system and the Ovation system, which further prevented the efficient handling of suspicious activity alerts.

160.    Due to these many deficiencies, FE-2 and other investigators were typically only able to complete the investigation of one or two suspicious activity alerts per day.  FE-2 emphasized that investigators could "not get more than two" investigations completed in a day given the state of TD's processes and systems.  Nonetheless, TD was putting considerable pressure on the investigation team to clear the backlogs and supervisors thus instructed FE-2 and the other investigators to "just push them out," even if that meant releasing alerts without complete vetting.  Additionally, FE-2 had to mark some cases as pending, which FE-2 did in the SAS system, because additional follow up was required.  In such cases, FE-2 generally required additional information from TD banking personnel, which they were slow to send because they were overworked and understaffed.  FE-2's colleagues who had worked in the AML space much longer than FE-2 complained that TD Bank was the "most disorganized AML job that they ever had."

161.    In October 2024, FE-2 and the entire team of contractors were abruptly terminated.  At that time, they were informed that there was a "new CEO" and "he did not want to pay contractors" to do the AML work.

## C. Former Employee 3:  TD's CFO for Digital, Payments & Enterprise Innovation

162.    FE-3 worked at TD at its Toronto headquarters for more than two decades.  FE-3 was TD's CFO of Digital, Payments & Enterprise Innovation from November 2017 through June 2023.  Before that, FE-3 held several other positions, including Manager then Senior Manager, Finance Enterprise Decision Support from 2007 to 2009 and 2009 to 2011, respectively; and Senior Manager then AVP, Finance Digital Channels from 2011 to 2013 and 2013 to 2017, respectively.  As CFO, Digital, Payments & Enterprise Innovation, FE-3 was a member of TD's corporate finance team, had responsibility for managing annual budgeting, forecasting, planning, and day-to-day financials, and was the "lead finance person" for the Digital business, among other duties.

FE-3 reported to an SVP who, in turn, reported to Defendant CFO Tran (and prior to that, his predecessor CFO Ahmed).

163.    FE-3 explained that TD oversaw and had authority over the budgeting for the entire TD Bank Group enterprise.  FE-3 further explained that in April or May each year, TD's Enterprise Decision Support group (also called "EDS") circulated by email an EDS document (the "EDS Guidance Document")—generally in the form of a PDF, sometimes with supporting documents as well—that announced enterprise-wide directives on budgeting and planning for the upcoming year.  TD's CFO was copied on emails distributing the annual EDS Guidance Document.  The EDS Guidance Document reflected the priorities and instructions of TD's CEO and CFO.  For example, while a member of EDS from 2007-2011, FE-3 worked with then-CEO Ed Clark and then-CFO Colleen Johnston to prepare the annual EDS Guidance Document and ensure that it reflected the CEO and CFO priorities and directives for the upcoming year.

164.    In 2015, FE-3 explained, TD took a new approach and the EDS Guidance Document began emphasizing that, enterprise wide, TD Bank Group must adhere to the Flat Cost Paradigm, or zero expense growth paradigm.  Whereas, prior to 2015, TD business units that grew revenue or anticipated revenue growth were permitted to increase expenses needed to support that revenue growth, FE-3 recalled.  Beginning in 2015, TD instead focused on tightening expenses. FE-3 emphasized that the Flat Cost Paradigm was a "clear directive" coming "straight from the top," and reinforced as a "headline" priority in the annual EDS Guidance Document distributed across the TD enterprise every year.  Additionally, FE-3 observed, in performance reviews every TD Bank Group executives at the EVP level or higher were measured against meeting Flat Cost Paradigm financial targets.

165.    FE-3 said that the Flat Cost Paradigm created conflict across the organization, as executives struggled to comply with the mandate from CEO Masrani and CFO Tran (and before him, CFO Ahmed and CFO Johnston) to never increase the expense base of the Company in any material way.  In at least one year, according to FE-3, business units were forced to actually *decrease* annual expenses, meaning business units were instructed to deliver year-over-year *negative* expense growth.

166.    The Flat Cost Paradigm also created serious problems in the Digital portion of TD's business, where, as CFO of Digital, Payments & Enterprise Innovation, FE-3 was the lead finance executive responsible for approving any major undertaking in that area.  FE-3 explained that by 2017 and 2018, the Digital business—which included P2P platforms like Zelle and Venmo— started to take off, and this accelerated during the COVID-19 pandemic, with TD seeing a significant spike in individuals using digital networks and P2P platforms.  The massive growth in digital platforms and payments added significant operational cost to deal with the additional TD customers and transaction volume.  For example, Venmo charged TD a fee for every transaction, which significantly increased expenses as usage increased.  FE-3 explained that under the Flat Cost Paradigm, the significantly increasing operational costs meant that Digital business had to funnel money to those expenses instead of regulatory and compliance issues.  As such, the additional expenditures that would have been necessary to add transaction monitoring and other regulatory compliance measures were not possible.

167.    FE-3 said that certain TD executives objected that the Company needed to invest more in compliance, risk management, and implementing proper controls.  For example, TD's SVP and Head of the Financial Crimes & Fraud Management Group objected every year during budgeting meetings that the risk and compliance functions required additional investment.  These

objections were overruled due to the Flat Cost Paradigm, and if any of the Finance leaders of the budgets were not at zero percent expense growth, they were "forced to go back" and create a budget that did meet the zero percent expense growth requirement, FE-3 explained.

168.    Every year from 2017 to 2023, as CFO of Digital, Payments & Enterprise Innovation, FE-3 received the EDS Guidance Document attached to an email sent by an executive in EDS to FE-3 and other representative for dozens of finance businesses across the Company, and copying Defendant CFO Tran (and, before that CFO Ahmed), which contained a clear directive that the TD Bank Group must continue to operate under the Flat Cost Paradigm. These materials governed the annual budgeting process and were circulated widely. For example, FE-3 said, the EDS Guidance Document was also received by TDBNA's CFO who would then send it to Defendant Salom.

169.    Upon receiving the EDS Guidance Document in April or May, FE-3, and the senior finance executives for each respective business unit, respectively, began to prepare financial and investment plans to comply with the Flat Cost Paradigm. This budgeting was a very collaborative process that involved working across groups and companies within TD Bank Group.

170.    As part of this process, every year from at least 2017 through June 2023, FE-3 had many meetings and discussions with TDBNA's senior leadership, culminating in a final video call in or around August. FE-3 confirmed that the August video meeting was attended by Defendant Salom personally, as well as direct reports to Salom, and several SVPs and EVPs from corporate, finance, and digital. In these annual meetings, FE-3 presented to Salom the proposed budget, costs, and investments for the upcoming year, and was expected to explain how the proposals complied with the Flat Cost Paradigm. Salom scrutinized the budgeting for compliance with the Flat Cost Paradigm and pushed FE-3 and FE-3's colleagues to look for ways to cut more costs.

FE-3 recalled specifically that Defendant Salom justified demanding additional cuts beyond what FE-3 proposed on the grounds of adhering to TD's Flat Cost Paradigm.

171.    FE-3 said that after the financial plan and budgeting was approved by TDBNA CEO Salom, it was presented for consideration by TD's Board of Directors in a meeting in approximately October of each year, also attended by CEO Masrani and CFO Tran (and Ahmed and Johnston before him).  CEO Masrani and CFO Tran (and CFO Ahmed and CFO Johnston before him) reviewed the consolidated financial plan with TD's Board, which included KPIs and metrics, coupled with a "more strategic plan."  FE-3 described the budgeting process as long, difficult, and time-intensive, and that through this process TD's senior leadership further enforced the Flat Cost Paradigm throughout TD Bank Group.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

172.    Set forth below is a summary of the key allegations, which together with the allegations herein, support a strong inference of scienter; namely, that during the Class Period, Defendants knew, or were reckless in not knowing, that (i) TDBNA admittedly conspired to (a) fail to maintain an adequate AML program, (b) fail to file accurate CTRs and (c) launder monetary instruments; (ii) TD's Global AML Program had long-term, pervasive, systemic deficiencies, including willful non-compliance with the five pillars required by the BSA; (iii) TD Bank Group did not invest adequate resources in its AML compliance efforts, including Defendants' decision to impose the Flat Cost Paradigm, whereby the GAML and AML budget would not increase year-over-year, despite introducing new products and services and constant growth in TD's revenue; (iv) the AML issues had delayed and ultimately prevented U.S. regulatory approval of the FH Acquisition; and (v) since at least November 2022, U.S. regulators and law enforcement had raised serious lapses in AML controls as an impediment to the permitting consummation of the FH

Acquisition, and the DOJ had launched a formal investigation of TD's Global AML Program for violations of federal law.

> ### A. Defendants' Role, Oversight, and Awareness of Deficiencies in the Global AML Program Supports a Strong Inference of Scienter

173. TD Bank Groups' boards, including the boards of TD, TDBNA, and TBUSH, knew, or were reckless in not knowing, the AML deficiencies at TD given the specific instances where the boards were informed of the AML deficiencies as well as the reporting structure and responsibilities of the boards.

> ### 1. The 2024 Guilty Pleas Admit and Enforcement Actions Confirm That Defendants Knew of the Deficient Global AML Program and Lack of Adequate Resources

174. As revealed by the 2024 Guilty Pleas and Enforcement Orders, the boards of TDBNA, TDBUSH, TDGUS, and TD were made aware of many of the AML deficiencies during the Class Period. For example, the boards were aware of many of the concerns identified by regulators and auditors identified during the Class Period. Defendants Masrani (as a member of TD's Board) and Salom (as a member of TDBNA's and TDBUSH's boards) received this information directly during the Class Period.

175. Moreover, further to the Sentencing Recommendations in the Guilty Pleas, it was admitted that an "individual within high-level personnel of the organization participated in, condoned, or was willfully ignorant of the offense." As defined in Section 8A1.2 of the U.S. Sentencing Guidelines, "high level personnel of the organization" means "individuals who have substantial control over the organization or who have a substantial role in the making of policy within the organization. The term includes: a director; an executive officer; an individual in charge of a major business or functional unit of the organization, such as sales, administration, or finance; and an individual with a substantial ownership interest."

176.     Indeed, as admitted in the Guilty Pleas, "[o]ver the past eleven years, the OCC, FinCEN, TDBNA Internal Audit, and third-party consultants have repeatedly identified TDBNA's transaction monitoring program as an area of concern" and "[t]he senior executive leadership and boards of directors of TDBNA, TDBUSH, TDGUS, and TD Bank Group [defined therein as TD] were made aware of certain of the concerns identified by these regulators and auditors."  Still Defendants "failed to effectively or substantively adapt [the] transaction monitoring system." Moreover, as also admitted in the Guilty Pleas, "high-level executives" and "senior executive management" knew of "long-term, pervasive, systemic deficiencies" in the AML program.  The Guilty Pleas also included admissions that "senior executives" repeatedly and willfully prioritized the "customer experience" over AML compliance and enforced a budget mandate, referred to internally as a "flat cost paradigm" that set expectations that the AML budget (among other budgets) would not increase year over year.  Indeed, as FE-3 confirms, Defendants Masrani, Tran, and Salom, as well as TD's Board, oversaw and enforced compliance with the Flat Cost Paradigm by each component of the TD Bank Group business.

177.     As further admitted in the Guilty Pleas, in September 2021, Defendant Levine informed the boards of directors for TD, TDGUS, and TDBUSH, including Defendants Masrani and Salom, that, "included within GAML's responsibilities is to have an appropriate framework in place to identify and monitor both emerging and evolving risk."  Yet Defendants did not adapt its transaction monitoring system.

178.     Meanwhile, FinCEN found that, shortly before the Class Period, Defendant Levine reported to the boards of TDBUSH and TDBNA (which included Defendant Salom and TD Board members Alan MacGibbon, Amy Brinkley, and Mary Winston) and the AML Oversight Committee that the Global AML Program had significant backlogs and therefore was unable to

timely monitor transactions.  Indeed, the report indicated AML teams were in "red" status, indicating significant backlogs of suspicious transactions.  While TD's Board was specifically informed about the issue, the OCC found that the Board did not act in a timely manner, despite mounting evidence that the issues were not resolved for years.

179.    As FinCEN further found, from 2017 to 2019, numerous reports about a potential upgrade of TD's transaction monitoring went to AML senior management and TDBNA's and TDBUSH's Board (which, as noted above, included Defendant Salom and members of TD's Board, such as MacGibbon), indicating that the Global AML Program was not on target to update its transaction monitoring program, yet the Board failed to take action.  For example, in 2018 Levine reported to the AML Oversight Committee that the status of the upgrade was "yellow due to overspent approved funding," thus suggesting the need for additional resources to complete the project.  The resourcing issues continued to persist, and the upgrade was further delayed.  In 2019, Levine "presented to the Audit Committee an AML Technology Portfolio Readiness Assessment, which found that given a 'reliance on a limited pool of people, leadership, and infrastructure to support the full portfolio of work'" at the Bank, there was a "'lack of sufficiently dedicated and capable resources across all streams of work'" as well as a "'historical siloed portfolio management approach.'"    The FinCEN Order further confirmed that the TDBUSH's board knew that "inadequate staffing levels" and the root causes of AML deficiencies that persisted at TD.  The 2024 Guilty Pleas and Enforcement Orders show that Defendants knowingly failed to take steps to update its transaction monitoring system to comply with the BSA until late 2023.

### 2.    The Mandated Oversight Role and Responsibilities of TD Bank Groups' Boards Supports a Strong Inference of Scienter

180.    The aforementioned specific instances of knowledge highlight the extent to which the roles and responsibilities of the TD Bank Group's boards were apprised of AML issues.  As

set forth in TD's Charter, TD's Board was responsible for the supervision of TD Bank Group overall including disclosing reliable and timely information to investors, managing enterprise risk, overseeing internal controls, overseeing the governance and activities of all subsidiaries, and "setting the tone at the top as it relates to integrity and culture ... and communicating and reinforcing the compliance culture throughout the [Group]."  This gave TD's Board access to information regarding TD's deficient Global AML Program both directly and through TD's Audit Committee.  Additionally, according to the TD AML Statements published throughout the Class Period, there is "Board and Senior Management oversight of the Global AML Program," and, as admitted in the Guilty Pleas, Defendant Bowman regularly briefed the boards of directors of TD and TDBNA on AML compliance matters.

181.    As to TD's Audit Committee specifically, as described herein, it was responsible for overseeing and monitoring the Global AML Program and received regular recommendations, updates, and reports—including from the Chief AML Officer, the Chief Auditor, and the internal audit, finance, compliance and anti-money laundering functions—showing that TD's Global AML Program was ineffective, lacked adequate resources, and that TD was not following the law.

182.    Specifically, TD admitted in its 2023 and 2024 Proxy Statements, filed with the SEC appended to Forms 6-K, that its "Audit Committee," comprised of TD Board members, is "particularly focused" on "Anti-Money Laundering/Terrorist Financing," including that it "[o]versaw the … AML program, including the related risk assessment," "[r]eviewed and approved the bank's AML department annual plan, including the bank's AML strategic priorities," "[r]eceived regular updates on the effectiveness of key controls, status of key initiatives, operational performance, top and emerging risks and regulatory developments," and "[r]eceived regular updates from the bank's chief anti-money laundering officer and key executives from the

project team."  The Proxy Statements further confirms that, during the Class Period, the Audit Committee's "main responsibilities" included "receiving reports from the … chief anti-money laundering officer [Defendant Bowman], and evaluating [their] effectiveness and independence," and that the Audit Committee "me[t] regularly without members of management present, and separately with … chief anti-money laundering officer [Defendant Bowman]."

183.    In addition to TD's Board, the boards of TDBNA and TDBUSH had oversight responsibilities with respect to AML at those U.S. subsidiaries.  Notably, several directors on TD's Board also sat on the boards of TDBNA, including MacGibbon, Winston, and Brinkley.  Further, Defendant Salom similarly sat on the boards of TDBNA and TDBUSH, was President and CEO of TDBNA and TDBUSH, and frequently spoke on behalf of TD at earnings calls and investor conferences.

184.    Federal regulations mandated that TDBNA's Board familiarize itself with TD's AML procedures, which further supports the inference of scienter.  Indeed, "[p]rocedures for monitoring Bank Secrecy Act (BSA) compliance" regulation requires that "[e]ach bank shall develop and provide for the continued administration of a program reasonably designed to assure and monitor compliance with the recordkeeping and reporting requirements," and that "***[t]he compliance program must be written, approved by the bank's board of directors, and reflected in the minutes of the bank***."  (12 CFR § 21.21).  As such, Defendant Salom and certain members of TD's Board (including Alan MacGibbon, Amy Brinkley, and Mary Winston), as members of TDBNA's Board, were personally involved in the development of—and approved—the AML compliance admitted to be willfully deficient in the Guilty Pleas.

185.    As part of her responsibilities as BSA Officer, Levine also regularly presented on AML related issues to the TDBUSH Board, which included Defendant Salom.

186. Additionally, the Federal Financial Institutions Examination Council ("FFIEC") BSA/AML Examination Manual used by the OCC requires that any AML compliance deficiencies be reported directly to TDBNA's senior management and its Board of Directors. As such, each of the AML compliance deficiencies, including the AML failings raised by the OCC in November 2022, as reported by *Capitol Forum*, were required to be reported directly to Defendant Salom and TD Board members MacGibbon, Winston, and Brinkley, all of whom sat on TDBNA's board.

187. As such, TD Directors MacGibbon, Winston, and Brinkley, as well as Defendant Salom also knew, or were reckless in not knowing, of the willfully deficient Global AML Program by virtue of their roles on the TDBNA and TDBUSH boards.

**B.     Masrani's Lead Role on AML Issues and Admitting Responsibility for TD's AML Failures Supports a Strong Inference of Scienter**

188. As CEO and a member of TD's Board since 2014, Masrani was responsible for managing risk. TD's previous CEO, Clark, told *The Globe and Mail* in 2014 that he took responsibility for shepherding Masrani's career so that "[t]he man has touched nearly every aspect of TD's far-flung operation." Masrani had received training in the U.S. and made it a goal to expand TD Bank Group's footprint in America. Further, as TD's former CRO from 2005 to 2006 and CEO of TDBNA from 2006 to 2013, Masrani was intimately familiar with AML laws and requirements. For example, in September 2013, (i) the OCC issued a consent order against TDBNA for deficient transaction monitoring and ordered remediation; and (ii) the OCC and FinCEN assessed a $37.5 million civil monetary penalty for willful violation of the BSA, after TD's Global AML Program failed to recognize the suspicious activity and file SARs. Although Masrani left TDBNA in June 2013, these failures existed during his tenure at TDBNA CEO, were never addressed, and became longstanding deficiencies identified a decade later in the 2024 Guilty Pleas and Enforcement Orders.

189.    During his tenure as CEO of TD, Masrani spoke frequently about AML issues and TD's Global AML Program.  For example, during TD's 3Q23 Earnings Call on August 24, 2023, Masrani specifically discussed TD's "U.S. AML compliance program" and claimed that TD had "a strong and disciplined risk management culture and our focus on continuously improving our programs."  And during TD's 4Q23 Earnings Call on November 30, 2023, Masrani discussed the details of supposed improvements to TD's "U.S. AML program," which he noted would "include people, training, data, technology, et cetera, because there are sort of the evolving areas, and we got to make sure that we're keeping up with what is expected of a very large bank in the domestic business in the United States."

190.    Masrani was so deeply involved in AML issues that he engaged directly with regulators as they uncovered TD's long-standing deficiencies.  As reported by *Capitol Forum*, on February 22, 2023, Bryan Heath, the OCC examiner in charge of TD Bank, and Tim McDonald, head of Large Bank Supervision at the OCC, scheduled a private Zoom meeting for March 9, 2023 with Defendant Masrani, General Counsel Glaessner, and TD's outside counsel, Simpson Thacher & Bartlett.  As later reported, and according to former bank regulators and industry insiders, this high-level, secret meeting was unusual, indicated that matters were serious, and did not bode well for approval of the deal.  The involvement of both Masrani and TD's outside counsel strongly indicated that the meeting was a last-ditch attempt by TD to avoid criminal prosecution.

191.    Once the truth began to emerge, Defendant Masrani consistently and readily admitted that the Global AML Program's violation of AML laws and regulations were his responsibility as CEO of TD.  In May 2024, after reports that Chinese crimes groups had used TD to launder money from U.S. fentanyl sales, Masrani admitted to his and TD's role in the AML failures in a memo to TD employees that was provided to *The Globe and Mail*.  He conceded,

"[w]e did not meet our expectations or our regulatory obligations to monitor, detect, report and respond to suspicious activity."

192.    In the following months, Masrani continued to admit his responsibility for the Global AML Program's AML deficiencies.  For example, on September 4, 2024, at the Scotiabank Financials Summit, Masrani said, "I'm the CEO of the bank, I'm responsible, I own it."  Also highlighting his integral role in the Global AML Program, on September 10, 2024, Masrani said in a corporate conference call with investors, "I would acknowledge that as we've stated previously, TD's US AML deficiencies were serious and a significant remediation work is underway.  This took place on my watch as CEO, and I take full responsibility.  As I've said before, AML remediation is my top priority."  The same day, Masrani admitted in a press release that, "[t]he anti-money laundering challenges we face took place on my watch as CEO and I take full responsibility."

**C.    Repeated Orders By Regulators to Fix the Deficient Global AML Program Support a Strong Inference of Scienter**

193.    For more than a decade, TD was consistently instructed by regulators to fix deficiencies in the TD Global AML Program, and willfully failed to do so, which supports a strong inference that Defendants knew, or were reckless in not knowing, that TD's Global AML Program had long-term, pervasive, systemic deficiencies and failed to comply with the BSA.

194.    For example, in 2010 and 2011, while Defendant Masrani was Group Head, US Personal and Commercial Banking and CEO of TDBNA, the OCC and TD's Canadian regulator both identified deficiencies with TD's Global AML Program in examinations associated with TD's rapid expansion into the U.S.

195.    As noted above, in 2013, the OCC and FinCEN assessed a $37.5 million civil monetary penalty against TDBNA and found a willful violation of the BSA, after TD's Global

AML Program failed to recognize the suspicious activity and file SARs on nearly $1 billion in suspicious Ponzi scheme transactions in a customer's accounts for 17 months.  As such, Defendants were necessarily aware of significant gaps in the Global AML Program for recognizing suspicious activity and timely filing SARs since at least 2010—over a decade before the same regulators, FinCEN and the OCC, along with the DOJ and others would flag the same failures in the 2024 Guilty Pleas and Enforcement Orders.

196.    In 2013, the OCC also determined that TDBNA needed to develop transaction monitoring policies and procedures to ensure systematic and prompt responses to mitigate emerging risks.  The Guilty Pleas confirmed that Defendants never implemented this in the Global AML Program.  Indeed, in 2024, FE-1 and FE-2 observed that TD still did not have a unified AML system as of 2024, and that TD's lack of resources in terms of systems, technology, or staffing, prevented TD from making the necessary updates to its outdated AML procedures.

197.    Between 2013 and 2019, the OCC identified additional AML failures that Defendants never remediated during the Class Period.  For example, in 2015, after Defendant Masrani became CEO, the OCC instructed TDBNA to enhance its transaction monitoring program for high-risk customers, which were subject to the same scenarios and thresholds as the rest of TDBNA's customers despite their higher risk profile.  Then, in 2018, the OCC deemed TDBNA's planning, delivery, and execution of AML technology systems and solutions as insufficient. Specifically, the OCC highlighted the delays in implementing multiple AML technology projects and found that these delays directly affected many outstanding Global AML Program issues. Although US-AML leadership informed the OCC during its examinations in 2017, 2018, and 2019 that these scenarios were in development, they were never implemented, as FE-1 and FE-2 further

corroborated through their personal experiences in 2024. Likewise, TD's lack of compliance was not revealed until the 2024 Guilty Pleas and Enforcement Orders.

198.    By no later than November 2022, TD's top executives were aware that multiple federal law enforcement agencies had found such serious lapses in the Global AML Program that the authorities were poised to reject the FH Acquisition, and that the DOJ had launched a formal investigation of TD's Global AML Program for violations of federal law, as *Capitol Forum* reported. As further reported, "officials from both the Fed and OCC … discussed the alleged AML failings openly with TD Bank executives in November 2022" and, at that time, had already determined that TD's failings "go back many years" and were indicative of "systemic" problems.

199.    Defendants' failure to heed regulators for well over a decade and fix its seriously deficient Global AML Program was the result of a deliberate refusal to do so. As set out in the FinCEN Order, "[w]hen confronted with the reality that TD Bank's pennywise, pound-foolish approach caused the Bank to violate the BSA, ***the Bank refused to make the requisite investments to prevent future violations until … after the investigations resulting in this Consent Order and parallel resolutions were underway***."

### D.    Pervasive Criminal Conduct at TD and by TD Customers Supports a Strong Inference of Scienter

200.    For nearly twenty years, criminals have utilized the deficiencies in TD's Global AML Program to perpetrate crimes such as fraud and money laundering. This known and pervasive conduct further evidences that Defendants knew, or were reckless in not knowing, the deficiencies in TD's Global AML Program. As noted in the Guilty Pleas, despite awareness of this conduct, Defendants repeatedly and willfully did not remediate the AML deficiencies, which confirms and corroborates that, during the Class Period, the long-term, pervasive, systemic deficiencies in TD's Global AML Program were identified to Defendants.

201.    As noted above, in 2013, the OCC and FinCEN assessed a $37.5 million civil monetary penalty against TDBNA for willfully violating the BSA during Masrani's tenure as CEO, after TD's Global AML Program failed to recognize the suspicious activity and file SARs on nearly $1 billion in suspicious Ponzi scheme transactions.

202.    Another example is the Colombian ATM Typology scheme.  Beginning no later than 2018 and continuing through October 2023, TDBNA failed to adequately thwart a method of money laundering, known as the Colombian ATM Typology, whereby funds were deposited into TD accounts in the U.S. and withdrawn as cash at ATMs in Colombia.  Defendants were already on notice regarding this money laundering method because FinCEN had designated it as a risk for the financial industry.  However, as admitted in the Guilty Pleas, TD executives knew that criminals used TDBNA for this purpose.

203.    As admitted in the Guilty Pleas, in or around April 2019, TDBNA became aware of the Colombian ATM Typology after the Business Intelligence Unit ("BIU") analyzed a series of accounts being used to funnel money to Colombia.  This analysis likened the Colombian ATM activity to the FinCEN advisory noted above and provided recommendations and next steps for addressing this money laundering scheme.  A version of this analysis was shared with the highest levels of GAML and US AML.  On July 29, 2019, TD's BSA Officer Levine received this analysis and the proposed recommendations.

204.    In September 2019, a similar presentation was provided to the GAML Senior Executive Team, which was led by Bowman (who regularly updated the TD, TDBNA, and TDBUSH boards on AML compliance matters) and included Levine.  That same month, several mid-level US-AML executives convened to discuss the Colombian ATM Typology, during which they acknowledged that peer banks had instituted policies and safeguards that were closing the bad

actors out of these banks and resulting in them seeking to use TDBNA, and agreed that the only way to prevent TDBNA from being used for this type of money laundering was for US-AML to influence retail policy change. Further highlighting her awareness of the Deficiencies, TDBNA and TDBUSH admitted in the Guilty Pleas that Levine and her direct reports discussed potential changes to retail policies and procedures with business-side personnel. However, Defendants abandoned these changes due to the potential impact on the "customer experience" and the associated increased staffing requirements and costs.

205.    The 2021 arrest of David Sze and associated criminal and regulatory proceedings, including Sze's 2022 admission and guilty plea, further put Defendants on notice that TD's Global AML Program had long-term, pervasive, systemic deficiencies and failed to comply with the BSA. Throughout 2020, Levine regularly received reports that aggregated and analyzed CTR and monetary instrument activity. Within those reports, the extraordinary volume and value of Sze's official bank check activity were repeatedly highlighted as substantial outliers. The February 2020 report called out two of the companies reflected in Sze's activity for purchasing $8.5 million in official bank checks—the highest amount of official bank checks at two different TDBNA stores— with nearly all of them purchased with cash. Business and personal accounts linked to Sze's activity were singled out in subsequent reports to Levine throughout 2020 for outlier activity. As admitted in the Guilty Pleas, the reports did not initiate any additional investigation concerning Sze's activities.

206.    As another example also admitted in the Guilty Pleas, from March 2021 through March 2023 a money laundering organization maintained accounts for at least five shell companies at TDBNA and used those accounts to move approximately $123 million in illicit funds through TDBNA. Since their account-openings in 2021, TDBNA knew that these shell companies were

connected because they shared the same account signatories. As admitted in the Guilty Pleas, employees submitted two UTRs highlighting the suspicious nature of the organizations activity, including that the cash deposits were "excessive for their type of industry." Despite these red flags, TDBNA did not file a SAR until law enforcement later alerted TDBNA to the criminal organization.

207.    The government's investigation of Sze and other criminals who exploited the Global AML Program's weaknesses further supports a strong inference that these issues were known at the highest level of TD's organization. As reported by *Bloomberg* on March 19, 2025, as the U.S. Attorney's Office in New Jersey—the same office that subsequently prosecuted claims against TD—was investigating Sze in early 2021, it discovered Sze's ties to TD as well as the fact that TD was involved in two other "massive cases" under investigation by the government. According to *Bloomberg*, that "left TD itself in the investigation's crosshairs," and indeed, "TD had been fielding requests from federal investigators for about eight months" by the time it announced the FH Acquisition in February 2022.

###    E.    Defendants Awareness of Regulatory Scrutiny of Other Banks' AML Programs Supports a Strong Inference of Scienter

208.    Defendants knew of instances where other banks were penalized by TD Bank Group's regulators for deficiencies also present in TD's Global AML Program. That Defendants failed to update TD's Global AML Program even when they were aware it suffered deficiencies for which regulators penalized other banks and, some cases, actually implemented illegal AML cost-cutting *after* learning about sanctions against a competitor, supports a strong inference that Defendants knew, or were reckless in not knowing, that TD's Global AML Program had long-term, pervasive, systemic deficiencies and failed to comply with the BSA.

209.    For instance, in February 2018, another U.S. bank entered into a negotiated resolution with the DOJ for its programmatic AML failures and failure to file SARs, the former of which was predicated, in part, on the bank's cessation of transaction monitoring scenario threshold testing.  As later admitted in the Guilty Pleas, TD's Senior US-AML executives "were aware of this resolution and understood that banks must monitor their transactions for suspicious activity," and BSA Officer Levine specifically explained to the AML Oversight Committee how the other U.S. bank "either ignored or discontinued [] below the line threshold testing" for particular scenarios that generated SARs.  Despite Defendants knowing that this conduct was illegal, and had resulted in sanctions from regulators, by 2018, "US-AML, along with its GAML technology partners, effectively stopped conducting threshold testing on its scenarios due to competing priorities and limited resources."  As a result, from 2018 through 2022, TDBNA only conducted threshold testing—also called "quantitative tuning"—on only one of its approximately 40 U.S. transaction monitoring scenarios.

### F.    The Significance of the FH Acquisition Supports a Strong Inference of Scienter

210.    Three additional elements surrounding the FH Acquisition further support a strong inference of scienter: (i) the FH Acquisition was highly significant to TD's strategy to achieve U.S. expansion and Defendants knew of regulatory scrutiny regarding TD's Global AML Program in connection with the merger; (ii) the Individual Defendants' increased compensation was tied to securing the FH Acquisition; and (iii) TD was forced to  pay $200 million to First Horizon after the failure of the FH Acquisition.

#### 1.    The Significance of the FH Acquisition and Regulatory Scrutiny Supports a Strong Inference of Scienter

211.    TD's proposed $13.4 billion FH Acquisition was the largest and most transformative transaction in the 70-year history of the Company.  Given the Individual

Defendants' direct and extensive roles in both the efforts to close the FH Acquisition and the DOJ and regulatory investigations, it is implausible that Defendants were not contemporaneously aware of (i) the critical failure in TD's Global AML Program that were the basis for the FH Acquisition termination and DOJ and regulatory investigations, (ii) the contemporaneous status of TD's lengthy efforts to obtain regulatory approval for the largest deal in TD's history, and (iii) the contemporaneous status of the lengthy governmental investigations that resulted in the biggest AML penalty in U.S. banking history.

212.    Defendants Masrani, Salom, Bambawale, and TD's senior officers spoke at length about the FH Acquisition and responded to repeated analyst questions about the prospects and progress of the transaction.   Indeed, Defendants characterized the deal as a "tremendous opportunity" for TD that was "strategically compelling" precisely because it would provide "leadership positions" in "some of the fastest-growing markets across the U.S.," catapulting TD into becoming the sixth largest bank in the U.S. that would compete against the likes of JPMorgan and Citibank.   On a conference call discussing the FH Acquisition with analysts, Defendant Masrani stated that "We have been talking about expanding in the Southeast [U.S.] for a few years."   As *The Wall Street Journal* reported on February 28, 2022, "[t]he deal is Mr. Masrani's first major acquisition in the U.S. since he became CEO seven years ago, and the largest transaction TD has ever done."   Further, meeting records show that Masrani personally met with the OCC— including Bryan Heath, the OCC examiner in charge of TDBNA, and Tim McDonald, head of Large Bank Supervision at the OCC—in the months before TD officially terminated the FH Acquisition due to its inability to secure regulatory approval.

213.    Further, Defendants were especially aware of the status of regulators' assessments of TD's Global AML Program during 2022 and 2023 given that it was central to securing the

necessary approval for the FH Acquisition.  The FH Acquisition required Federal Reserve and OCC approval, and it was well-known that (i) these regulators emphasized AML compliance when evaluating such acquisitions, and (ii) if the regulators found serious deficiencies in TD's Global AML Program, that would preclude the FH Acquisition.  Indeed, FDIC's Application Procedures Manual provides that for a bank merger to be approved, the bank's most recent supervisory examination must indicate that a satisfactory BSA/AML program has been implemented—and that any "[s]ignificant unresolved BSA/AML deficiencies, or an outstanding or proposed formal or informal enforcement action that includes provisions related to BSA/AML, will generally preclude" merger approval.

### 2.    Individual Defendants' Increased Compensation Tied to Securing the FH Acquisition Supports a Strong Inference of Scienter

214.    During TD's Annual Meeting held on April 20, 2023—just two weeks before investors would learn that the FH merger was dead—Masrani, Tran, and Salom successfully convinced TD's shareholders to approve millions of dollars in additional compensation for their purported success in securing the FH Acquisition.

215.    Specifically, with respect to Defendant Masrani, the Proxy for the April 2023 shareholder meeting, stated that "[u]nder Mr. Masrani's leadership, the bank made excellent progress on its strategic priorities and delivered for its stakeholders," listing as a "[k]ey highlight[]" the FH Acquisition "strategic transaction[]" that, "once closed, will add scale, new capabilities, talented colleagues, and over one million customers and clients to the bank."  On this basis, Masrani was paid an additional $1,964,000 in compensation above his target for 2022, and his total direct compensation target was increased to $15,000,000 for 2023.

216.    Following the revelations in the Guilty Pleas, commentators from *The Wall Street Journal* remarked on Defendants' aggressive U.S. acquisition strategy, saying that the Guilty Pleas

were "very significant for [TD].... It's rare for regulators to do this.... TD was pursuing a pretty aggressive strategy of acquiring banks in the US to grow its business here, and this is a pretty sharp turn in its fortunes."

### 3. TD's payout of $200 Million to First Horizon After the Failed Merger Supports a Strong Inference of Scienter

217.    TD's payout of $200 million to First Horizon when the FH Acquisition was terminated is further indicative of Defendants' scienter. While the Merger Agreement required that, under certain circumstances, TD pay FH an amount equal to $25 million to reimburse FH and its affiliates for fees and expenses, the Merger Agreement did not provide for any payout representing multiples of that amount— and there was no reason for TD to make any such payout, let alone one of this magnitude. The only plausible explanation is that TD knew that it needed to do so to avoid or resolve claims threatened by First Horizon concerning the reasons the FH Acquisition was terminated, *i.e.*, TD's severe AML failures.

218.    Specifically, TD had made a series of representations and warranties in the Merger Agreement claiming that TD Bank Group, including TDBUSH and TDBNA had "complied with … the Bank Secrecy Act" and other AML requirements. These representations were false: TD Bank Group was willfully violating the BSA, and, as subsequently reported, U.S. regulators refused to approve the FH Acquisition for this exact reason. The enormous $200 million payment is most plausibly a settlement payment to First Horizon for TD's false representation that proved fatal to the FH Acquisition and supports the inference that TD's senior management knew, or were reckless in not knowing, that its AML representations in the Merger Agreement (see Section VIII.B.2) and other statements regarding TD's Global AML Program in connection with the FH Acquisition (Section VIII.B), as well as the statements about the delay in closing the FH

Acquisition (Section VIII.C), were false and misleading when made and omitted and concealed the truth.

### G. Terminations Of TD's Board, CEO, and Senior AML Executives And Slashing Individual Defendants' Compensation Support a Strong Inference of Scienter

219. TD acknowledged the role of the Individual Defendants, the TD Board, and its senior AML executives in the willful AML failures by terminating them or securing resignations, which supports a strong inference of scienter. As described above in Section IV.G, this includes CEO Masrani, CFO Ahmed, CCO Kowal, Global AML Head DeMarco, Chief AML Officer Bowman, Chief AML Officer Mazariegos, BSA Officer Levine, and well as the Chairman of TD's Board of Directors plus five additional TD Board members. These highly unusual terminations of a vast number of senior officials is virtually unprecedented, and supports a strong inference of their knowledge of, or at a minimum reckless disregard, of the true facts.

220. Additionally, the dramatic and highly unusual reductions in compensation for Defendants Masrani, Tran, Salom, and more than three dozen other senior executives, supports a strong inference of scienter. As described above in Section IV.G, Defendant Masrani's compensation was cut an astounding **89%**. Moreover, TD specifically admitted that it slashed Defendants' compensation "to reflect the seriousness of the U.S. AML failures."

### H. TDBNA's Operations and AML Program Were Critical Components of TD's Business

221. TDBNA was a critical component of TD's business, which further supports a strong inference of scienter. For starters, executive positions at TDBNA were effectively a stepping stone to positions at TD. Masrani went from CEO of TDBNA to CEO of TD; Bambawale went from Chief Risk Officer of TD's U.S. subsidiaries to CRO of TD; Tran went from CFO of U.S. Retail to CFO of TD; and Salom served concurrently as CEO of TDBNA, and Group Head of U.S. Retail

banking.  These career paths reflect not only the Individual Defendants' actual knowledge of AML failures and wrongdoing occurring at the U.S. retail bank before and during the Class Period, but also the significance the U.S. retail bank held in the organizational structure as a whole.

222.    The importance is also borne out in the numbers.  As reported in TD's Forms 40-F, the U.S. Retail business segment (which operates as TDBNA) comprised 31% of TD's total assets as of October 31, 2022, and approximately 29% of TD's total assets as of October 31, 2023.  Similarly, the U.S. Retail segment accounted for approximately 32% of TD's total net income for the year ended October 31, 2022, and approximately 52% of TD's total net income for the year ended October 31, 2023.

223.    TDBNA's AML program was also critical to TD's operations.  As indicated above, the Global AML Program had direct control over and involvement in the US-AML operations.  Moreover, for years prior to the Class Period, TD faced scrutiny and sanctions concerning its compliance with U.S. AML laws and regulations, which dictated how TD's Global AML Program and US AML compliance was structured.  There is therefore a strong inference of scienter that Defendants would have been aware of the AML issues present at its most scrutinized banking unit.

## I.    Corporate Scienter

224.    The Corporate Defendants TD, TDBNA, and TDBUSH independently possessed scienter for four additional reasons.

225.    First, TDBNA and TDBUSH admitted to knowing and willful criminal acts as to: money laundering, failures to implement adequate AML procedures, and failure to file accurate transaction reports.  These acts were committed by and/or known by individuals sufficiently senior in the TD management structure, such that their knowledge and admissions are imputed to TD.  This includes, among others, Defendant Salom (CEO and President of TDBNA and TDBUSH, and TD's Group Head, U.S. Retail), Defendant Bowman (Global Head of AML Compliance for

TD), and Defendant Levine (BSA Officer and Head of U.S. Anti-Money Laundering in the Global AML function at TD Bank Group). In fact, Salom's senior role in TD is also sufficient to impute the admitted misconduct conducted by TDBNA and its employees to TD, as is the knowledge and awareness of TD's senior management (including Defendant Masrani) and the board of directors regarding the long-standing AML deficiencies. Finally, as set forth above, TD's GAML Department oversaw and controlled TDBNA's AML program through TD's Global AML Program before and during the Class Period, and as such TDBNA's admitted knowledge and misconduct can be imputed to TD.

226. Second, Defendants Masrani (CEO of TD), Bambawale (CRO of TD), Tran (CFO of TD), and Salom (CEO and President of TDBNA and TDBUSH, and TD's Group Head, U.S. Retail), who acted with scienter as set forth above, had binding authority over the Corporate Defendants and acted within the scope of their apparent authority in making the misstatements and omissions at issue. The scienter of these individuals is imputed to the Corporate Defendants.

227. Third, certain allegations herein establish the Corporate Defendants' corporate scienter based on (i) the state of mind of employees whose intent can be imputed to the Company, and/or on (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature. It can be strongly inferred that senior executives at the TD Corporate Defendants possessed scienter such that their intent can be imputed to the Company. For instance, during the Class Period, certain members of TD's Board also sat on the Board of TDBNA, including Alan MacGibbon, Amy Brinkley, and Mary Winston, and were made aware of the AML failings, as alleged herein and as set forth in the Guilty Pleas and FinCEN Order. Also, Defendants Bowman (TD's Global Head of AML Compliance) and Levine (TD Bank Group's BSA Officer) were directly responsible for the day-to-day management of TD's

Global AML Program and were aware of and failed to remediate the long-standing deficiencies that persisted before and during the Class Period, as alleged herein.

228.    Given the scope of AML deficiencies that are set forth in the 2024 Guilty Pleas and Enforcement Orders, the regulatory framework that existed before and during the Class Period, and above stated additional allegations of scienter, there is a strong inference that additional executives unknown at this time and sufficiently senior to impute their scienter to the Corporate Defendants likewise (i) knew of the misstatements alleged herein, and (ii) approved the false statements despite knowing of their false and misleading nature.

229.    Fourth, as explained in Section VI.A.2 above, the indisputable structure and lines of reporting for TD's AML program, and the mandates of applicable federal regulations, required that the AML failings during the Class Period be reported directly to Defendant Masrani and other TD Board members, including MacGibbon, Winston, and Brinkley, as well as to the TDBNA and TDBUSH boards, which included Defendant Salom.

230.    Fifth, as noted above, the Federal Financial Institutions Examination Council ("FFIEC") BSA/AML Examination Manual used by the OCC requires that any AML compliance deficiencies be reported directly to TDBNA's senior management and its Board of Directors.  As such, each of the AML compliance deficiencies identified, including the AML failings raised by the OCC in November 2022, as reported by *Capitol Forum*, were required to be reported directly to Defendant Salom and TD Board members MacGibbon, Winston, and Brinkley, all of whom sat on TDBNA's board.

## VII.    DEFENDANTS' SCHEME TO DEFRAUD THE MARKET

231.    Throughout the Class Period, in addition to the dissemination of materially false and misleading statements as described herein, Defendants also engaged in a scheme to defraud investors and engaged in inherently deceptive acts in furtherance of their scheme to defraud in

violation of SEC Rule 10b-5(a) and (c). Namely, Defendants, including Defendants Bowman and Levine, knowingly and recklessly engaged in conduct that concealed the true state of TD's deficient Global AML Program from the government and the investing public, which inflated TD's stock price.

232. In furtherance of this scheme to defraud, Defendants engaged in numerous deceptive or manipulative acts. First, Defendant TDBNA and its employees, which included Defendants Salom, Levine, and Bowman, engaged in a conspiracy to (i) fail to maintain an adequate AML program, (ii) fail to file Currency Transaction Report, and (iii) commit money laundering. As part of that, TDBNA admitted that through its employees it entered an agreement knowing and intending to cause such acts. This undisclosed conspiracy was inherently deceptive and furthered the fraudulent scheme of deceiving investors about the state of TD's AML compliance program.

233. As part of the conspiracy, Defendants engaged in the following acts among others, which have been admitted in the Guilty Pleas and are indisputable:

    a. That "high-level executives" and "senior executive management" knew of "long-term, pervasive, systemic deficiencies" in the AML program.

    b. That the boards of directors of Defendants TD, TDBNA, and TDBUSH were regularly briefed by the Global Chief AML Officer on AML compliance matters.

    c. That before and during the Class Period, "senior executive leadership and boards of directors" of TDBNA, TDBUSH, and TD, among others, were made aware of concerns about the Global AML Program's transaction monitoring program by OCC, FinCEN, TDBNA's Internal Audit team, and third-party consultants.

    d. That "senior executives" repeatedly and willfully prioritized the "customer experience" over AML compliance and enforced a budget mandate, referred to internally as a "flat cost paradigm" that set expectations that the AML budget (among other budgets) would not increase year over year.

e. That as part of the Flat Cost Paradigm, the Global AML Program's "base and project expenditures on US-AML were less in fiscal year 2021 than they were in fiscal year 2018 and were not sufficient to address AML deficiencies" despite profits increasing approximately 26% in that same period.

f. That Defendants willfully failed to substantively update its automated transaction monitoring system from at least 2014 through 2022 despite increases in the volume and risk of its business and significant changes in the nature of the risk of transactional activity.

g. That Defendants failed to monitor 92% of *all transactions* and 74% of transaction value, which corresponded to over 14.6 billion unmonitored transactions and over $18.3 trillion in unmonitored transaction value.

h. That Defendants consistently, and with the purpose to evade transaction reporting requirements, failed to file Currency Transaction Reports (CTRs) and Suspicious Activity Reports (SARs).

234.    Second, Defendants implemented the Flat Cost Paradigm, which as noted, froze TD's AML budget year over-the-year.  The Flat Cost Paradigm, which was in place before and during the Class Period, was implemented at the behest of Defendant Masrani in order to keep costs down, and was faithfully implemented by senior bank executives.  Chief among these senior executives were Defendants Bowman and Levine, who, as admitted in the Guilty Pleas, touted their abilities to operate within the "flat cost paradigm without compromising risk appetite" and brazenly referred to TD's "historical underspend" on compliance.  In fact, as further admitted in the Guilty Pleas, Bowman halted a project in 2017 to develop new high-risk customer scenarios partly due to cost.

235.    The Flat Cost Paradigm had an inherently deceptive impact on investors.  As a result of the budget freeze, Defendants were able to artificially inflate the Company's operating income and profits because it was not spending the money necessary for a compliant AML program.  This also allowed TD to report highly favorable cost-efficiency ratios.  In fact, when TD was finally forced by regulators to remediate its long-standing failures, TD's net income for the

U.S. retail segment (which included TDBNA and TDBUSH) for the first quarter of 2025 dropped 79%, and, for the first time since at least 2019, TD reported the worst efficiency ratio among its peer banks.

236. Third, Defendants willfully minimized the scope of TD's transaction monitoring in order to reduce the number of alerts generated and thus reduce the perception that TD suffered AML failures. For example, as admitted in the Guilty Pleas, AML employees in the U.S. escalated known gaps in the transaction monitoring system to GAML and AML management in the U.S. and proposed new or enhanced scenarios to address those risks. These warnings were admittedly ignored. Similarly, as admitted in the Guilty Pleas, any changes to scenario testing between 2014 and October 2023 ***intentionally reduced*** the universe of alerts being generated and thereby lowered the associated cost of their review. As admitted, at least nine such scenarios were removed during that period. The same was true of TD's monitoring of high-risk countries. As admitted in the Guilty Pleas, GAML executives—which would include Defendant Bowman—removed numerous countries from TD's monitoring system, and admittedly approved only those changes that would reduce alerts and reduce costs.

237. Fourth, Defendants actively suppressed known AML risks before and during the Class Period, which again concealed that TD was facing significant risks. For example, in 2019, Defendants Bowman and Levine received reports concerning the Colombian ATM Typology scheme referenced above, and although they discussed potential changes to respond to this risk, abandoned the changes due to the potential impact on the "customer experience" and the associated increased staffing requirements. Defendant Levine also received reports in 2020 regarding the David Sze money laundering scheme. Again, these reports were suppressed in order not to shine a light on TD's AML failures.

238.    Fifth, Defendants repeatedly and consistently failed to file SARs and CTRs. These reports are designed to help establish a paper trail for law enforcement to identify large currency transactions, recreate financial transactions, and identify conductors and beneficiaries.  However, Defendants' admitted and willful failure to file CTRs "subverted the purpose of the CTR form and impeded law enforcement's ability to identify and prevent money laundering," which prolonged the disclosure of TD's AML deficiencies.  For example, from March 2021 through March 2023 a money laundering organization maintained accounts for at least five shell companies at TDBNA and used those accounts to move approximately $123 million in illicit funds through TDBNA. Since their account-openings in 2021, TDBNA knew that these shell companies were connected because they shared the same account signatories.  But as admitted in the Guilty Pleas, despite known red flags, SARs were not filed until after law enforcement had begun inquiries.

239.    Sixth, Defendants misled regulators in order to conceal AML deficiencies from the government and the public.  As admitted in the Guilty Pleas, Defendants concealed the deficiencies in TD's AML program during OCC examinations in at least 2017, 2018, 2019, and 2021.  Indeed, AML executives, which given their positions would have included Defendants Bowman and Levine, lied to OCC examiners by indicating that enhancements to the transaction monitoring program were underway, and told examiners in July 2021 that TD was conducting scenario based monitoring of Zelle activity when it was not.

## VIII.    ACTIONABLE FALSE AND MISLEADING STATEMENTS AND OMMISSIONS

240.    Before and throughout the Class Period, Defendants made numerous repeated false and misleading statements that concealed the truth.  These false and misleading statements and omissions, broadly speaking relate to six categories of Defendants' fraudulent conduct, as organized in this section:

a.  False Statements Regarding the Global AML Program:  These statements falsely indicated that TD's Global AML Program complied with applicable law and contained specific requirements regarding due diligence, record-keeping, detecting and reporting suspicious transactions, risk assessment, and independent testing, and concealed that Defendants were willfully violating the BSA and adhered to the Flat Cost Paradigm that precluded adequate AML resources.

b.  False Statements Regarding the Global AML Program in Connection With the FH Acquisition:  These statements in connection with the FH Acquisition falsely indicated that TD, TDBNA, and TDBUSH "have complied with … the Bank Secrecy Act," "appropriately identified and mitigated" money laundering and terrorist financing risks, and that the Global AML Program was administered by "qualified, dedicated personnel."

c.  False Statements Regarding Delay in The Closing of the FH Acquisition: These statements concealed regulators' unwillingness to approve the FH Acquisition as a result of the willful deficiencies in TD's Global AML Program that precluded approval of the FH Acquisition.

d.  False Statements Regarding Investigations of the Global AML Program: These statements misrepresented the nature of the regulators' investigations into TD's Global AML Program and concealed that by at least November 2022, Defendants had been made aware that the regulators had found significant lapses in TD's programs and that TD would face significant penalties.

e.  False Statements Regarding TD's U.S. Retail and Corporate Accomplishments:  These statements falsely indicated that Defendants managed risks prudently and invested strategically to support business growth and enhance governance and risk management practices, and that the Company focused on developing and implementing regulatory controls.

f.  False Statements Regarding TD's Internal and Disclosure Controls: These statements concealed the "deficiencies in the U.S. Bank's BSA/AML Program," included as to (among other things) internal controls and risk management practices; risk assessments; and customer due diligence. These statements also concealed that Defendants' disclosure controls failed to prevent the concealment of these issues from investors.

241.  Defendants' statements alleged in this section were false and misleading and omitted and concealed the truth before and during the Class Period for the reasons set forth herein, including, because, among other things:

90

a.  TD's Global AML Program willfully failed to comply with the BSA and had "staggering" and "long-term, pervasive, systemic deficiencies," willful failures that "spanned all pillars of TD Bank's AML program," and "systemic failures" that "caused actual and material harm to the U.S. financial system," as set out in the 2024 Guilty Pleas and Enforcement Orders.

b.  TDBNA admittedly conspired to (i) fail to maintain an adequate AML program, (ii) fail to file accurate CTRs and (iii) launder monetary instruments.

c.  TD's Global AML Program failed to monitor 92% of ***all transactions*** and 74% of transaction value, which corresponded to over 14.6 billion unmonitored transactions and over $18.3 trillion in unmonitored transaction value as set out in the 2024 Guilty Pleas and Enforcement Orders. This included, among other things:

    i.  From at least 2014 to late 2022, no "new transaction monitoring scenarios" were implemented in the Global AML Program, and no substantive changes were made "to the parameters of its existing transaction monitoring scenarios, despite significant unaddressed risks," as admitted in the Guilty Pleas.

    ii.  "TDBNA severely limited the types of activity it screened through its transaction monitoring system," and "did not monitor *any* domestic ACH activity, most check activity, internal transfers between accounts at TDBNA, or numerous other transaction types," as admitted in the Guilty Pleas.

    iii.  "TDBNA individual customers transferr[ing] over $75 billion in Zelle transactions, which was almost entirely unmonitored." The GAML put the "Zelle scenario project on hold in later 2021," even though "US-AML employees continued to identify Zelle as a gap in TDBNA's transaction monitoring program," as admitted in the Guilty Pleas.

d.  TD's Global AML Program failed to conduct appropriate customer due diligence, including, but not limited to, by failing to "collect and review information required to develop an adequate customer risk profile and identify high-risk accounts," as set out in the 2024 Guilty Pleas and Enforcement Orders.

e.  TD's Global AML Program "failed to adequately monitor, detect, and timely report suspicious activity," and FinCEN alone "identified thousands of suspicious transactions totaling approximately one and a half billion dollars for which TD Bank failed to timely and accurately file a SAR," as set out in the 2024 Guilty Pleas and Enforcement Orders.

f.   Since implementing the Flat Cost Paradigm in 2014, "TD Bank vastly underinvested in its AML compliance efforts, with TD Bank knowingly spending an order of magnitude less than its peers" and, for over a decade, "consistently chose to address" the "host of significant AML compliance issues [that] arose" during this time "in the least costly way possible, even if it meant ignoring failures and refusing to meaningfully remediate issues and prevent recurrences," as set out in the FinCEN Order, and as corroborated by FE-3.

g.   As later admitted in the Guilty Pleas, "[o]ver at least the past eleven years, the OCC, FinCEN, TDBNA Internal Audit, and third-party consultants have repeatedly identified TDBNA's transaction monitoring program as an area of concern" and that TD's "senior executive leadership and boards of directors" of TD, TDBNA, and TDBUSH were informed, but never addresses these AML deficiencies and "failed to effectively or substantively adapt its transaction monitoring system."

h.   As set out in the FinCEN Order, "[w]hen confronted with the reality that TD Bank's pennywise, pound-foolish approach caused the Bank to violate the BSA, the Bank refused to make the requisite investments to prevent future violations until … after the investigations resulting in this Consent Order and parallel resolutions were underway."

i.   By at least November 2022, Defendants were made aware that government officials were investigating TD's long-standing AML failures and that such failures would impact TD's ability to close the FH Acquisition.

j.   As TD later admitted in its 2024 Form 40-F, "deficiencies in the U.S. Bank's BSA/AML Program included deficiencies in the U.S. Bank's BSA/AML Program included deficiencies related to: internal controls and risk management practices; risk assessments; customer due diligence; customer risk ratings; suspicious activity identification, evaluation, and reporting; governance; staffing; independent testing; and training, among others" and that there was a systemic breakdown in the policies, procedures, and processes to identify and report suspicious activity.

242.    For the avoidance of doubt, all the affirmative statements alleged to be actionably false and misleading when made are set out in this Section VIII.

A.    **False and Misleading Statements and Omissions Concealing the True Nature and Effectiveness of TD's Global AML Program**

243.    Throughout the Class Period, Defendants made actionable misstatements and omissions concerning the Global AML Program, including its specific requirements, that it was assessed and updated on a regular basis, and that it was adequately resourced.

1.    **The TD Statement on Anti-Money Laundering, Anti-Terrorist Financing and Sanctions**

244.    Throughout the Class Period, TD maintained and promoted an annual "TD Bank Statement on Anti-Money Laundering, Anti-Terrorist Financing and Sanctions" (the "TD AML Statement").  During the Class Period, TD published three versions of the TD AML Statement on the Company's website, and included in TD's Forms 6-K filed with the SEC.

245.    The TD AML Statement posted on the Company's website from March 2022 through March 2023 (the "2022 TD AML Statement") and included in TD's February 14, 2023 Form 6-K, stated in part:

> In accordance with legislative, regulatory and procedural requirements, TD's Global AML Program and supporting policies set out requirements that include: …
>
> 2. Documented policies and procedures that address both enterprise policy and applicable AML/ATF and Sanctions legislative and regulatory requirements;
>
> 3. Identification of customers and customer due diligence measures. Enhanced due diligence measures are applied for customers that present a higher risk…;
>
> 4. Customer and transaction record-keeping;
>
> 5. Ongoing monitoring to detect and report suspicious transactions or activities; …
>
> 7. Regulatory reporting of prescribed transactions, including cash transactions, international electronic funds transfers, as well as terrorist and other frozen property and rejected transactions; …

9. Assessment of money laundering, terrorist financing and sanctions risks; and

10. Independent testing of AML, ATF and Sanctions control effectiveness.

246.    The TD AML Statement posted on the Company's website from March 2023 through March 2024 (the "2023 TD AML Statement") and included in TD's February 5, 2024 Form 6-K, repeated the 2022 TD AML Statement, except added references to "policy" requirements, requirements set out in "standards and processes," and revised point "3" to state that the TD Global AML Program requires "[i]dentification of customers and customer due diligence measures *by referring to documents or data or information in accordance with obligations*."

247.    The TD AML Statement posted on the Company's website since March 2024 (the "2024 TD AML Statement"), repeated the 2023 TD AML Statement, except removed the reference to "enterprise policy" and revised point "3" to state that the TD Global AML Program requires "Identification ***and verification*** of customers and customer due diligence measures by referring to documents or data or information in accordance with *AML, ATF and sanctions and reporting of suspected money laundering, terrorist financing and activity prohibited by sanctions*."

248.    All TD AML Statements during the Class Period also stated:

The Global AML Program is routinely evaluated, updated and enhanced in order to reflect changes to TD's business activities, as well as applicable supervisory standards and legal requirements.

249.    The TD AML Statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reasons: (i) TD's Global AML Program willfully violated the BSA; (ii) TD's Global AML Program did not require the specific measures enumerated in TD AML Statements; and (iii) TD adhered to the Flat Cost Paradigm rather than routinely updating the Global AML Program to reflect changes to TD's business and applicable law.  Moreover, as TD's

Senior Technical Writer AML Consultant reported, TD did not allocate adequate resources to AML compliance in terms of systems, technology, or staffing, which prevented TD from making the necessary updates to its outdated AML procedures to properly reflect changes to TD's business activities, as well as applicable supervisory standards and legal requirements, as also corroborated by FE-1 and FE-2.

### 2.    False and Misleading Statements Regarding TD's GAML Department

250.    TD's Forms 40-F for 2022 and 2023 contained false and misleading statements that the GAML Department appropriately identified and mitigated AML risks.  They stated:

> GAML is responsible for oversight of TD's regulatory compliance with Anti-Money Laundering (AML), Anti-Terrorist Financing, Economic Sanctions, and Anti-Bribery/Anti-Corruption regulatory compliance and broader prudential risk management across the Bank in alignment with enterprise AML policies so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated.

251.    The foregoing statement was materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reasons: money laundering and terrorist financing risks were not "appropriately identified and mitigated" because TD "willfully failed to maintain an adequate AML program at the Bank" and "created an environment that allowed financial crime to flourish," as admitted in the Guilty Pleas.

### 3.    2023 and 2024 Proxy Statements

252.    TD's Management Proxy Circular for the April 20, 2023 annual meeting, dated February 21, 2023 ("2023 Proxy Statement"), and also filed on March 14, 2023 attached to a Form 6-K, and TD's Management Proxy Circular for the April 18, 2024 annual meeting, dated February 20, 2024 ("2024 Proxy Statement"), and also filed on March 12, 2024 attached  to a Form 6-K, contained a "Report of the Audit Committee" that stated that the Audit Committee (a) "is satisfied

that it has fulfilled its responsibilities for fiscal [2022/2023]," which include "overseeing … the effectiveness of … compliance and anti-money laundering" and "overseeing the establishment and maintenance of policies and programs reasonably designed to achieve and maintain the bank's compliance with the laws and regulations that apply to it"; and (b) "[o]versaw the execution and ongoing effectiveness of the anti-money laundering/anti-terrorist financing/economic sanctions/anti-bribery and anti-corruption program (AML program), including the related risk assessment."

253.    The 2023 Proxy Statement also stated that the Audit Committee (c) "[r]eceived updates from the internal audit, finance, compliance and anti-money laundering functions to satisfy itself that there are adequate resources with experience and knowledge in each of the key oversight functions…."

254.    These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reasons: (i) TD had willfully deficient AML "policies and programs" not "reasonably designed to achieve and maintain the Bank's compliance with the laws and regulations," that willfully failed to comply with the BSA, as admitted in the Guilty Plea; (ii) rather than "adequate resources with experience and knowledge in each of the key oversight functions," in truth, as FinCEN found, "TD Bank willfully failed to establish or maintain an adequate AML program" and the "effects of the Bank's persistent under-resourcing and understaffing reverberated throughout every aspect of its AML program," resulting in "extensive, persistent, and prolonged backlogs within the AML function"; and (iii) TD's Global AML Program was not "effective and properly resourced," had "ineffective oversight and management of TD Bank's compliance obligations," "ineffective monitoring for potentially suspicious activity," "ineffective"

"governance of its transaction monitoring system," "ineffective monitoring of Zelle activity," "ineffective" monitoring of "High-Risk Jurisdictions," and an "ineffective" "independent testing function."

**B.    False and Misleading Statements Regarding TD's Global AML Program In Connection With the FH Acquisition**

**1.    March 21, 2022 Bank Merger Act Applications**

255.    On March 21, 2022, Defendant Salom executed Bank Merger Act Applications, on behalf of TDBNA, to the Federal Reserve (the "Federal Reserve Bank Merger Act Application") and the OCC (the "OCC Bank Merger Act Application").  In the Federal Reserve Bank Merger Act Application, Defendant Salom executed a "Certification" stating that "I certify that the information contained in this application has been examined carefully by me and is true, correct, complete, and is current as of the date of this submission to the best of my knowledge and belief." Similarly, in the OCC Bank Merger Act Application, Defendant Salom executed a "Certification" stating that "to the best of [his] knowledge, it contains no misrepresentations or omissions."  The Federal Reserve Bank Merger Act Application and the OCC Bank Merger Act Application stated:

> **Anti-Money Laundering and Sanctions Compliance**
>
> TDBNA … ha[s] comprehensive anti-money laundering and sanctions programs that are reasonably designed to ensure compliance with the Bank Secrecy Act …, and all applicable regulations and regulatory guidance, as well as compliance with requirements administered by [OFAC].   In addition, each bank has qualified, dedicated personnel who are responsible for administering such programs.  During the due diligence process, the AML team members from TD used a risk based approach to review and assess key risks related to AML. Both programs are currently designed to meet the five pillars requirements….
>
> **_TDBNA_**
>
> .... The AML Program aligns with enterprise AML policies so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated.

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reasons: (i) TDBNA's AML program willfully failed to comply with the BSA, including "long-term, pervasive, systemic deficiencies," and willful failures that "spanned all pillars of TD Bank's AML program"; (ii) rather than "administering" the Global AML Program by "qualified, dedicated personnel," FinCEN found that the "heads of the AIU and AML Operations … oversaw critical AML processes without any previous AML experience," and lacked the "skills and expertise necessary to support the timely identification, monitoring, reporting, and management of a bank's illicit financial activity risks"; and (iii), as FinCEN found, "TD Bank failed to adequately monitor, detect, and timely report suspicious activity," and there were "thousands of suspicious transactions totaling approximately one and a half billion dollars for which TD Bank failed to timely and accurately file a SAR."

### 2.    Statements in the Merger Agreement

256.    On April 12, 2022 and April 22, 2022, First Horizon filed proxy statements with the SEC in connection with the FH Acquisition (the "FH Proxy Statements").  Attached as Annex A to the FH Proxy Statements is the 2022 Merger Agreement.

257.    The Merger Agreement stated at Section 4.7(b):

> Except as would not, either individually or in the aggregate, have a Material Adverse Effect on Parent [Toronto-Dominion], Parent, Holdco [TDBUSH] and each of their Subsidiaries have complied with and are not in default or violation under any applicable law, statute, order, rule, regulation, policy and/or guideline of any Governmental Entity relating to Parent, Holdco or any of their Subsidiaries, including … the Bank Secrecy Act … and any other law, policy or guideline relating to bank secrecy, discriminatory lending, financing or leasing practices, consumer protection, money laundering prevention, foreign assets control, U.S. sanctions laws and regulations…. Parent, Holdco and their Subsidiaries have established and maintain a system of internal controls designed to ensure compliance by Parent, Holdco and their Subsidiaries with applicable financial recordkeeping and reporting requirements of applicable money laundering

> prevention laws in jurisdictions where Parent, Holdco and their Subsidiaries conduct business.

This statement was materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reasons: (i) at that time, TDBUSH and TDBNA were willfully violating the BSA, as they later admitted in their Guilty Pleas; and (ii) the "design[]" of the Global AML Program prevented TD Bank Group from meeting "reporting requirements of applicable money laundering prevention laws," including by deliberate underinvestment pursuant to the Flat Cost Paradigm, lack of automated transaction monitoring, persistent and prolonged backlogs in investigating potentially suspicious activity, and failure to monitor P2P platforms like Venmo and Paypal, which were known deficiencies but willfully left unremediated.

### C.    False and Misleading Statements About the Delay in Closing the FH Acquisition

#### 1.    4Q22 Earnings Call on December 1, 2022

258.    During the 4Q22 Earnings Call, a National Bank Financial analyst followed up with Masrani about the delay of the close of the FH Acquisition, asking "Last quarter, you were expecting to close in fiscal Q1, now first half. What's prompting the delay[]?"  Defendant Masrani responded:

> So we're already in December. And we don't control the timing of all the regulatory approvals, but we are confident we'll get the closing within the timeline that we have put out.

259.    The analyst replied, asking "I mean are they taking a closer look at anything?" Masrani responded:

> No, I'm not aware of anything of the sort you're mentioning.

260.    Masrani's statements on the 4Q22 Earnings Call were materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in

¶241 and herein, and also for the following additional reasons: (i) TD's U.S. regulators were, in fact, scrutinizing TD's AML and taking a closer look at the systemic and widespread failures in the Global AML Program; (ii) willful, longstanding failures in TD's Global AML Program precluded regulatory approval; and (iii) by November 2022, TD's senior executives were directly informed that the OCC and Federal Reserve had found such significant failures in TD's AML practices that the DOJ had already launched a formal investigation into the Global AML Program for violations of federal law.

### 2.    February 9, 2023 Press Release

261.    On February 9, 2023, TD issued a joint press release with First Horizon announcing that "they have mutually agreed to extend the outside date of their proposed transaction from February 27 to May 27, 2023."  The joint press release also stated:

> TD and First Horizon are fully committed to the merger and continue to make significant progress in planning for the closing and the integration of the companies.

This statement was materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reasons: (i) "the closing and the integration of the companies" was not feasible in view of the willful and longstanding failures in TD's Global AML Program; and (ii) by November 2022, TD's senior executives were directly informed that the OCC and Federal Reserve had found such significant failures in TD's AML practices that the DOJ had already launched a formal investigation into the Global AML Program for violations of federal law.

### 3.    1Q23 Earnings Call on March 2, 2023

262.    During the 1Q23 Earnings Call, Defendant Masrani in his opening remarks stated:

> As you know on February 9, we mutually agreed with First Horizon to extend the close day to May 27 as provisioned in our contract. Since then, we've come to believe that the deal is not expected to receive regulatory

approval in time to close the transaction by that date. Regulatory approval is not within the bank's control.

263.    During questioning, Defendant Masrani reiterated:

> [W]e are really excited about this transaction. We worked very hard to date and continue to work very, very hard. And our planning for integration continues. We've set up an integration management office.

264.    Masrani's statements on the 1Q23 Earnings Call were materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reasons: (i) the willful, longstanding failures in TD's Global AML Program that precluded regulatory approval were, in fact, "within [TD]'s control"; and (ii) by November 2022, TD's senior executives were directly informed that the OCC and Federal Reserve had found such significant failures in TD's AML practices that the DOJ had already launched a formal investigation into the Global AML Program for violations of federal law.

### 4.    Annual Shareholders Meeting on April 20, 2023

265.    During the Annual Shareholders Meeting, Masrani claimed no fewer than five times that TD is in extension negotiations with FH.  In his opening remarks, Defendant Masrani stated:

> As previously disclosed, we've come to believe that the deal is not expected to close by the May 27 expiry date. We have opened discussions with First Horizon about a possible extension, and we will update our shareholders when we can.

266.    During questioning, a shareholder asked directly "one, are you currently in discussions with FHN to extend the [M]erger [A]greement that you referred to earlier in your presentation?"  Masrani responded:

> We've initiated extension arrangements or negotiations with FHN, yes.

267.    Masrani again reiterated three more times, stating:

[O]ur belief is that we will not be able to get approvals by the merger expiry date of May 27, and therefore, we've initiated negotiations to extend our agreement with FHN.

…

We disclosed in March that our belief is that we will not be able to get approvals to close the transaction by the merger expiry date of May 27 of this year. And we have initiated extension negotiations with First Horizon to extend that date.

….

We see the benefits of the merger. We've outlined them very clearly, and I've said that many times before. And so that's why we are into extension discussions with First Horizon.

268.    Masrani's statements at the Annual Shareholders Meeting were materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reason: as the WSJ reported just two weeks later on May 4, 2023, according to First Horizon CEO Bryan Jordan, "TD and First Horizon didn't discuss extending the timeline for the deal, lowering the price, or changing its structure."

### D.    False and Misleading Statements Regarding Investigations of The Global AML Program

#### 1.    December 1, 2022 Form 40-F

269.    TD's 2022 Form 40-F stated:

***Regulatory Oversight and Compliance Risk***

….

Governments and regulators around the world have demonstrated an increased focus on conduct risk; … and money laundering, terrorist financing and economic sanctions risks and threats. ….

The Bank monitors and evaluates the potential impact of applicable regulatory developments (including enacted and proposed rules, standards, and regulatory guidance). However, while the Bank devotes substantial compliance, legal, and operational business resources to facilitate compliance with these developments by their respective effective dates, and also to the consideration of other governmental and regulator expectations,

> ***it is possible that***: … (ii) the Bank ***may not*** be able to develop or enhance the platforms, technology, or operational procedures and frameworks necessary to comply with, or adapt to, such rules or expectations in advance of their effective dates; or (iii) regulators and other parties ***could*** challenge the Bank's compliance. This ***could*** require the Bank to take further actions or incur more costs than expected and ***may*** expose the Bank to litigation, enforcement and reputational risk. Regulatory change will continue to increase the Bank's compliance and operational risks and costs. In addition, ***if governments or regulators take formal enforcement action against the Bank***, the Bank's operations, business strategies and product and service offerings may be adversely impacted, therefore impacting financial results.
>
> …
>
> ***The Bank may incur greater than expected costs associated with enhancing its compliance*** … which ***could*** also lead to negative impacts on the Bank's financial performance, operational changes including restrictions on offering certain products or services or on operating in certain jurisdictions, and its reputation.

This statement was materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reasons: (i) TD did not "devote[] substantial … resources to facilitate compliance" with "applicable regulatory developments," especially as to "money laundering" and "terrorist financing," as evidenced by the longstanding, pervasive, systemic and willful failures in TD's Global AML Program; (ii) the risk that "the Bank ***may not*** be able to develop or enhance the platforms, technology, or operational procedures and frameworks necessary to comply with" regulations and expectations of government and regulators, had already materialized by virtue of TD's willfully deficient Global AML Program that violated the BSA and as already indicated to Defendants by the OCC, Federal Reserve, and DOJ; (iii) TD's failure to comply with such rules and regulators challenging Defendants' non-compliance were not possibilities that "may" or "could" happen—the OCC and Fed had repeatedly identified these problems for many years, including the prior month in November 2022, but Defendants refused to make the requisite investments until after the investigations resulting in the 2024 Guilty Pleas and Enforcement

Orders were underway; (iv) "governments or regulators tak[ing] formal enforcement action against the Bank" was not a mere possibility, it in fact already happened, in November 2022, when TD's senior executives were directly informed that multiple federal agencies had found such significant failures in the Global AML Program that the DOJ had launched a formal investigation for violations of federal law; and (v) TD "incur[ring] greater than expected costs associated with enhancing its compliance … lead[ing] to negative impacts on the Bank's financial performance," were not mere possibility that "may" or "could" happen because the deliberate underinvestment in AML pursuant to the Flat Cost Paradigm would necessarily require substantial additional costs to remediate AML compliance failures.

### 2.    3Q23 Earnings Call on August 24, 2023

270.    During the 3Q23 Earnings Call, a BMO Capital Markets analyst asked, "how long it may take to resolve the issues around compliance program with money laundering."  Defendant Masrani responded:

> [W]e are working hard to enhance our programs. That is the TD way. We learn new things from our ongoing internal monitoring and management and through engagement with various stakeholders, including our regulators, and look for opportunities to enhance our controls whenever that situation arise, arises. And I think you know us well, as you'd expect from TD.

271.    The analyst replied and asked for "additional clarity …. Are we starting to see some of the likely expense implications of the enhancement program in the numbers right now? Or is that still to come?"  Defendant Masrani responded:

> [T]he only point I'd make is enhancing any of our businesses, controls, is an ongoing exercise at TD. It is not that a particular event takes place, and that's the only time we make those investments.

272.    Defendant Salom then stated that "governance and control is one of our important elements and pillars of our overall investment process," and that:

> [E]very year, we have a very disciplined process. We sit down and we look at the opportunities that we want to fund to be able to continue to transform, transform the business. Obviously, first and foremost is ensuring that we've got a strong control platform to be able to operate. And so those are the first things that we lean into to make sure that those investments are addressed."

273. The statements by Defendants Masrani and Salom at the 3Q23 Earnings Call were materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reasons: since 2014, "the TD way" had not been "to learn new things from our ongoing internal monitoring" or adhere to a "disciplined process," but instead to implement the Flat Cost Paradigm, pursuant to which TD vastly underinvested in its AML compliance efforts, knowingly spending an order of magnitude less than its peers," and "consistently cho[o]s[ing] to address" the "host of significant AML compliance issues [that] arose" during this time "in the least costly way possible, even if it meant ignoring failures and refusing to meaningfully remediate issues and prevent recurrences," as set out in the 2024 Guilty Pleas and Enforcement Orders.

### 3.    September 13, 2023 Barclays Global Financial Services Conference

274. At the Barclays Global Financial Services Conference, an analyst proposed whether the "reason that you couldn't close First Horizon … might have evolved around regulatory concerns about AML and KYC."  Defendant Salom responded:

> Let me separate the 2 items for a moment. Our decision to walk away from First Horizon was really predicated on the fact that we just did not have regulatory certainty with regards to time. And we felt that as time elapsing, the best thing we could do, given that uncertainty was to walk away from the transaction. And I assure you that was not an easy decision. Separately, last quarter, we did make a disclosure saying that we are in discussions with both the DOJ and our regulators about a specific matter at hand. So I don't want to complete [conflate] the two."

This statement was materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional

reasons: TD's failure to close the FH Acquisition was not a considered, voluntary decision to "walk away" due to "uncertainty" about regulatory approval, and termination of the FH Acquisition and the DOJ and regulatory investigations were not "separate"; they had the same cause: U.S. regulators had rejected the FH Acquisition for the same willful and longstanding AML failures for which Defendants later pled guilty and admitted in October 2024.

### 4.    November 30, 2023 Form 40-F

275.    TD's 2023 Form 40-F stated:

> ***Regulatory Oversight and Compliance Risk***
>
> ….
>
> Bank regulators around the world have demonstrated an increased focus on … conduct risk and … control frameworks across the three lines of defence; and money laundering, terrorist financing and economic sanctions risks and threats. ….
>
> The Bank monitors and evaluates the potential impact of applicable regulatory developments (including enacted and proposed rules, standards, public enforcement actions, consent orders, and regulatory guidance). However, while the Bank devotes substantial compliance, legal, and operational business resources to facilitate compliance with these developments by their respective effective dates, and also to the consideration of other Bank regulator expectations, ***it is possible that***: … (ii) the Bank ***may*** not be able to develop or enhance the platforms, technology, or operational procedures and frameworks necessary to comply with, or adapt to, such rules or expectations in advance of their effective dates; or (iii) regulators and other parties ***could*** challenge the Bank's compliance. Also, it may be determined that the Bank has not adequately, completely or timely addressed regulatory developments or other regulatory actions, such as enforcement actions, to which it is subject, in a manner which meets Bank regulator expectations.

This statement was materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reasons: (i) TD did not "devote[] substantial … resources to facilitate compliance" with "applicable regulatory developments," especially as to "money laundering" and "terrorist

financing," as evidenced by the longstanding, pervasive, systemic and willful failures in TD's Global AML Program; (ii) TD's failure to comply with such rules and regulators challenging Defendants' non-compliance were not possibilities that "may" or "could" happen—the OCC and Fed had repeatedly identified these problems for many years, but Defendants refused to make the requisite investments until after the investigations resulting in the 2024 Guilty Pleas and Enforcement Orders were underway; and (iii) TD was at the time experiencing a substantial increase in AML-related costs and risks and inability to continue to maintain its Flat Cost Paradigm as a result of the materialization of the risks concealed by Defendants, and indeed concealed from investors that "the Bank's 2023 annual assessment of its Enterprise AML Program" rated it as *"unsatisfactory as of October 31, 2023*."

### 5.    1Q24 Earnings Call on February 29, 2024

276.    During the 1Q24 Earnings Call, a Bank of America Securities analyst asked "in terms of the AML issue … what happened there," noting that "for those of us who follow TD for a long time, it's – the assumption is always TD is ahead of the curve in terms of management, risk control investments."  Defendant Masrani responded:

> As far as our control infrastructure, we – this is an ongoing situation for TD
> or any big bank and the environment changes and as we hear improvements
> from others, including our regulators, what the industry is doing, we want
> to keep up with it and where appropriate, be ahead of it.

This statement was materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reasons: (i) the "staggering" and "long-term, pervasive, systemic deficiencies" that "spanned all pillars of TD Bank's AML program," and caused "actual and material harm to the U.S. financial system" later revealed were not comparable to the improvements in "control infrastructure" that are "an ongoing situation for … any big bank"; (ii) TD was not "keep[ing] up with"—let alone

"ahead of"—these regulatory issues, improvements in control infrastructure, or "what the industry is doing" in this respect; and (iii) rather than "want[ing] to keep up with it and where appropriate, be ahead" of regulatory issues and "what the industry is doing" in terms of control infrastructure and AML, Defendants approach was instead to adhere to a Flat Cost Paradigm, whereby "TD Bank vastly underinvested in its AML compliance efforts, with TD Bank knowingly spending an order of magnitude less than its peers" and, for over a decade, "consistently cho[o]s[ing] to address" the "host of significant AML compliance issues [that] arose" during this time "in the least costly way possible, even if it meant ignoring failures and refusing to meaningfully remediate issues and prevent recurrences," as set out in the FinCEN Order.

277.    During the 1Q24 Earnings Call, a BMO Capital Markets analyst asked:  "Bharat, I mean the good news is, I think you've made it clear that the AML issues are understood, I suppose, and progress is being made fixing them. Are you in a better position now versus a few quarters ago to give a sense of how long do you think that will take? And how much do you think it will cost?"  Defendant Masrani responded:

> [S]uffice it to say, as I said in my prepared remarks, we know what the issues are. We are working hard to improve and enhance our processes, and I'm confident that I've been with the bank many years that when we get on to a particular issues we find, we get on to those and fix them.

This statement was materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reasons: rather than "working hard to improve and enhance our processes" pertaining to AML and "fix" the "particular issues we find" pertaining to AML, TD adhered to its Flat Cost Paradigm whereby it "vastly underinvested in its AML compliance efforts, with TD Bank knowingly spending an order of magnitude less than its peers" and, for over a decade, "consistently chose to address" the "host of significant AML compliance issues [that] arose" during this time "in the least

costly way possible, even if it meant ignoring failures and refusing to meaningfully remediate issues and prevent recurrences," as set out in the FinCEN Order.

### 6.    2Q24 Earnings Call on May 23, 2024

278.    During the 2Q24 Earnings Call, a Bank of America Securities analyst asked about TD's AML deficiencies, and whether "this is a very specific U.S. AML issue … [o]r could it be that a few weeks from now, we start getting headlines around other risk gaps at TD?"  Defendant Masrani responded:

> And the reports you hear, what you read does not reflect who we are, our values of what the bank stands for. And we made that very clear. I mean we get targeted all the time. And unfortunately, in these instances, our program fell short. And we know what those shortcomings are, we are on it, and we are fixing them.
>
> ….
>
> …. We strive to be a well-run bank. Our risk management reputation goes back many decades. And it's unfortunate that in this one instance, we're well short.

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reasons: rather than merely "one instance," or an "unfortunate" few "instances, our program fell short," the ongoing DOJ, OCC, FinCEN, and Federal Reserve investigations were the result of the, "willful," "staggering," "long-term, pervasive, systemic deficiencies" in TD's Global AML Program.

279.    The analyst followed up, asking "Going back to what Bharat said, decades of like reputational risk management, I would have thought TD is leading the judge on best-in-class AML. Why did that not happen? Is this isolated? Or is that a systemic issue at the bank?"  Defendant Bambawale responded:

> [W]e always endeavor to be best-in-class in every risk area. But yes, from time to time, we find we've fallen behind in a particular area. And we're out there owning the issue that we fell behind in our program, and our program did not pick up things it should have picked up. But really, if I go right to the root cause of what happened, there were some procedural weaknesses in the U.S. that caused bad actors to exploit us.
>
> And we were also disappointed that some of our colleagues didn't follow our code of ethics, like those would be the 2 things I'd call out, and that's specific to the U.S. This is not a problem here at the enterprise level.

These statements were materially false and misleading when made and omitted and concealed the truth for the reasons specifically alleged in ¶241 and herein, and also for the following additional reasons: (i) TD did not "endeavor to be best-in-class in every risk area," particularly in terms of AML; (ii) the "root cause" was not simply "some procedural weaknesses in the U.S. that caused bad actors to exploit us"; (iii) rather than a "procedural" issue where "our program did not pick up things it should have picked up," the Global AML Program had willful "long-term, pervasive, systemic deficiencies" that "spanned all pillars of TD Bank's AML program"; and (iv) the AML problems were, in fact, "at the at the enterprise level" of the GAML and Global AML Program.

### E.    False and Misleading Statements Regarding TD's U.S. Retail and Corporate Accomplishments

280.    In TD's Forms 40-F for the years 2022 and 2023, Defendants made actionable misstatements and omissions concerning the Company's purported "keys to profitability," which they claimed included managing risks prudently and investing strategically to support business growth and enhance governance and risk management practices.  Defendants also made false and misleading statements about the Company's corporate accomplishments, which they claimed included a focus on developing and implementing regulatory controls.  These statements were false and misleading because unbeknownst to investors Defendants were aware that the Global AML Program was willfully deficient and that Defendants had implemented the Flat Cost Paradigm that prevented strategic investments or prudent management of risk.

281.  In TD's 2022 and 2023 Forms 40-F, Defendants stated:

The keys to profitability [for the U.S. Retail business] continue to be ... managing risk prudently.

In [2022/2023], the Corporate segment continued to support the Bank's business segments by executing on enterprise and regulatory initiatives.

Corporate segment will also maintain its focus on development and implementation of processes, systems, technologies, enterprise and regulatory controls to enable the Bank's businesses to operate efficiently and effectively and in compliance with applicable regulatory requirements.

282.  In TD's 2022 Form 40-F, Defendants also stated that "U.S. Retail will maintain its disciplined approach to expense management, while continuing to invest strategically to support business growth."

283.  These statements were false and misleading when made and omitted and concealed the truth for the reasons alleged in ¶241 and herein, and also for the following additional reasons: far from managing risk prudently or "investing strategically," Defendant concealed from investors that they had willfully ignored an admittedly deficient AML program, allowed large volumes of high-risk transactions to go unmonitored, including 92% of all transactions between January 1, 2018, and April 12, 2024, and adhered to a "flat cost paradigm" that precluded the investments necessary to support business growth or appropriately manage risk.  Likewise, the Corporate segment (defined as all TD operations other than Canadian Personal and Commercial Banking, U.S. Retail, Wealth Management and Insurance, and Wholesale Banking), through the Flat Cost Paradigm willfully prevented the development and implementation of processes designed to enable compliance with regulatory requirements and allowed TD's deficient Global AML Program to persist.

F.    **False and Misleading Statements Regarding TD's Internal and Disclosure Controls**

284.    In TD's 2022 and 2023 Forms 40-F, Defendants Masrani and Tran executed Certifications Pursuant to Section 302 of the U.S. Sarbanes-Oxley Act of 2002 (the "SOX Certifications"), which, among other things, certified certain information concerning TD's disclosure controls and internal controls over financial reporting.

285.    SEC Rule 13a-15 (17 C.F.R. § 241.13a-15) states that issuers like TD must "maintain disclosure controls and procedures ... and ... internal control over financial reporting." The Rule states that "disclosure controls and procedures means controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the Act (15 U.S.C. §78a *et seq.*) is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms." (*Id*. §13a-15(e).)  The Rule further states that "internal control over financial reporting is defined as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes." (*Id*. §13a-15(f).)

286.    The Committee of Sponsoring Organizations of the Treadway Commission (COSO) issues a framework that is designed to be used by organizations to assess the effectiveness of their systems of internal controls.  Among other things, the 2013 COSO Framework identifies the major components of effective internal controls as "Risk Assessment" (*e.g.*, identifying and managing risks, and identifying and assessing changes that could significantly impact the system of internal controls); "Control Activities" (*e.g.*, transaction monitoring and fraud detection); and

"Control Environment" (*e.g.*, tone from the top).  Defendants Masrani's and Tran's statements were made in the context of these principles.

287.    Specifically, Defendants Masrani and Tran said the following in the SOX Certifications:

> Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

> Disclosed in this report any change in the issuer's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the issuer's internal control over financial reporting;

> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the issuer, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> Evaluated the effectiveness of the issuer's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation.

288.    TD's 2022 Form 40-F also stated that:

> Management has assessed the effectiveness of the Bank's internal control over financial reporting as at October 31, 2022, using the framework found in Internal Control ‐ Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission 2013 Framework. Based upon this assessment, management has concluded that as at October 31, 2022, the Bank's internal control over financial reporting is effective.

> An evaluation was performed under the supervision and with the participation of the Bank's management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Bank's disclosure controls and procedures, as defined in the rules of the SEC and Canadian Securities Administrators, as of October 31, 2022. Based on that evaluation, the Bank's management, including the Chief Executive Officer and Chief Financial Officer, concluded that the Bank's disclosure controls and procedures were effective as of October 31, 2022.

289.   TD's 2023 Form 40-F also stated that:

Management has assessed the effectiveness of the Bank's internal control over financial reporting as at October 31, 2023, using the framework found in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission 2013 Framework. Based upon this assessment, management has concluded that as at October 31, 2023, the Bank's internal control over financial reporting is effective.

An evaluation was performed under the supervision and with the participation of the Bank's management, including the Chief Executive Officer and Chief Financial Officer, of the effectiveness of the Bank's disclosure controls and procedures, as defined in the rules of the SEC and Canadian Securities Administrators, as of October 31, 2023. Based on that evaluation, the Bank's management, including the Chief Executive Officer and Chief Financial Officer, concluded that the Bank's disclosure controls and procedures were effective as of October 31, 2023.

290.   In the 2022, 2023, and 2024 Charters of TD's Board of Directors, published in February of those years, the Board made an identical false and misleading statement related to internal controls at TD.  Specifically, the Board stated:

"Internal Controls and Management Information Systems:" "Overseeing and monitoring the integrity and effectiveness of the Bank's internal controls and management information systems. The Board is also responsible for overseeing adherence to applicable legal, audit, compliance, regulatory, accounting and reporting requirements."

291.   These statements were false and misleading when made and omitted and concealed the truth for the reasons alleged in ¶241 and herein, and also for the following additional reasons: TD's internal controls, including risk management, transaction monitoring, control environment and fraud detection, were deficient inasmuch as TD was willfully not monitoring the vast majority of transactions, prioritizing reduced costs over AML compliance, and repeatedly ignoring red flags and known deficiencies.  Indeed, TD's 2024 Form 40-F admitted that "deficiencies in the U.S. Bank's BSA/AML Program included deficiencies related to: internal controls and risk management practices; risk assessments; customer due diligence; customer risk ratings; suspicious activity identification, evaluation, and reporting; governance; staffing; independent testing; and

training, among others" and that there was a systemic breakdown in the policies, procedures, and processes to identify and report suspicious activity. Likewise, Defendants' disclosure controls were deficient, in addition to the above-stated reasons, because Defendants concealed material information from investors as set forth in ¶241 and in this section.

## IX.    LOSS CAUSATION

292.    As alleged herein, Defendants' conduct, misstatements, and omissions of material facts directly and proximately caused Plaintiffs and the Class to suffer substantial losses. Those losses were a result of Plaintiffs' and the Class's purchases of TD common shares during the Class Period at prices artificially inflated or maintained by Defendants' misstatements and omissions.

293.    When the false and misleading nature of Defendants' statements started to become known to the market in piecemeal fashion, beginning on May 8, 2023 and continuing on additional disclosure dates, including those identified below (May 25, 2023, August 4, 2023, May 2, 2024, August 22, 2024, October 9-10, 2024), the price of TD common shares substantially declined.

294.    No single disclosure was sufficient to fully dissipate the artificial inflation present in the prices of TD common shares because each single disclosure only partially revealed the truth concerning the misrepresentations at issue in this Action. Further additional relevant disclosures may arise through discovery and expert analysis.

### A.    May 8, 2023

295.    On May 8, 2023, *The Wall Street Journal* published an article entitled, "Concern Over TD Anti-Money-Laundering Practices Helped Scuttle First Horizon Deal." The article indicated that while TD had "cit[ed] uncertainty over whether and when they could receive regulatory approvals, without being more specific. The reluctance by the Office of the Comptroller of the Currency and the Federal Reserve to give TD a clean bill of health on its anti-money-laundering practices proved to be the biggest obstacle."

296.    On news that it was AML related compliance issues that killed the FH Acquisition, the price of TD common shares dropped 1.8% between the release of *The Wall Street Journal* article and the close of trading on May 8, 2023.

297.    On May 9, 2023, analysts at Bank of America commented, "[y]esterday the *WSJ* reported that TD's handling of suspicious customer transactions was among the biggest reason behind the refusal by US regulators (OCC/FED) to approve the First Horizon (FHN) acquisition.… It is unclear to us whether this issue will be limited to the US or could extend to the Canada franchise…. Unsurprisingly, the stock fell on the news."

**B.    May 25, 2023**

298.    On May 25, 2023, TD disclosed for the first time reasonably possible losses ("RPL") of $1.27 billion.  In disclosing the RPL in the Legal and Regulatory Matters section of its Form 6-K, TD Bank noted "[i]n the ordinary course of business, the Bank and its subsidiaries are involved in various legal and regulatory actions, including but not limited to civil claims and lawsuits, regulatory examinations, investigations, audits, and requests for information by governmental, regulatory and self-regulatory agencies and law enforcement authorities in various jurisdictions."  However, TD still did not disclose the existence of the DOJ investigation, or the reasons behind the $1.27 billion RPL.

299.    On the news of an RPL of $1.27 billon, the price of TD common shares dropped 4.39% between the close of trading on May 24, 2023 and the close of trading on May 25, 2023.

300.    On this news, analysts at Bank of America commented that "Mgmt. appears [to have] underestimated the impact on expenses due to potential compliance related investments that may be necessary in order to resolve regulatory issues in the U.S." And numerous analysts lowered their price targets on TD common shares in response to the news, including Cormark, Barclays, CIBC, Credit Suisse, and Scotiabank.

C.    **August 24, 2023**

301.    On August 24, 2023, TD filed its Form 6-K and for the first time, confirmed the existence of an investigation by government regulators related to TD's AML program. An updated Legal and Regulatory Matters section of its Form 6-K, TD, in addition to increasing TD's RPL to $1.29 billion, revealed that:

> The Bank has been responding to formal and informal inquiries from regulatory authorities and law enforcement concerning its Bank Secrecy Act/anti-money laundering compliance program, both generally and in connection with specific clients, counterparties or incidents in the US, including in connection with an investigation by the United States Department of Justice. The Bank is cooperating with such authorities and is pursuing efforts to enhance its Bank Secrecy Act/antimony laundering compliance program. While the ultimate outcomes of these inquiries and investigations are unknown at this time, the Bank anticipates monetary and/or non-monetary penalties to be imposed.

302.    On this news that regulatory and law enforcement authorities had launched a formal investigation in TD's BSA and AML program, the price of TD common shares dropped 3.45% between the close of trading on August 23, 2023 and the close of trading on August 24, 2023.

303.    Analysts at Scotiabank wrote that the "[n]ew disclosure… [of] a US government probe into its AML controls is capturing headlines." Other analysts immediately linked this news to the termination of the FH Acquisition. Bank of America noted that "[t]his likely caused the termination of the First Horizon (FHN) acquisition earlier this year." Cormark agreed, "When the First Horizon deal was terminated in May, it was speculated that the deal fell apart due to AML concerns. This quarter we learned that the DOJ is actively carrying out an investigation in the bank's AML practices." Morningstar said it was "more clear that issues with the bank's anti-money laundering/Bank Secrecy Act compliance likely played a role in regulators withholding approval of the acquisition."

**D.    May 2, 2024**

304.    On May 2, 2024, at 3:25 p.m. ET, *The Wall Street Journal* published an article providing further details about the probes that TD had failed to disclose to the investing public. *The Wall Street Journal* article, entitled "TD Bank Probe Tied to Laundering of Illicit Fentanyl Profits; The Canadian bank is contending with three other U.S. probes into its anti-money-laundering controls," highlighted that the DOJ investigation into TD's AML compliance focused on how Chinese crime groups and drug traffickers used the Canadian lender to launder money from U.S. fentanyl sales.

305.    On this news that regulatory and law enforcement authorities were investigating TD's ties to Chinese crime groups and drug traffickers who laundered fentanyl profits through TDBNA, the price of TD common shares dropped 5.89% between the close of trading on May 2, 2024 and close of trading on May 3, 2024.

306.    In response to this news, analysts at National Bank of Canada reduced their price target on TD common shares by almost 9% and advised investors to "put greater weight on worst-case scenarios for the stock"; raised the specter of a "larger than expected fine" and, even, "regulator-imposed limitations on [TD's] business activities"; and put a figure to a potential fine - "total penalty amount of $2 bln is realistic."

**E.    August 22, 2024**

307.    On August 22, 2024, TD reported its first loss in over two decades after setting aside an extra $2.6 billion to cover expected fines from the regulators.

308.    On the news that TD's AML deficiencies were so severe that TD would be required to set aside several billion dollars to pay penalties and remediate the issue, the price of TD common shares dropped an additional 2.19% between the close of trading on August 21, 2024 and the close of trading on August 22, 2024.

309.     Analysts were disappointed with the news and the way it was conveyed to investors. Bank of America wrote that TD "[s]tock reacted negatively" to the news and that "messaging [] during the earnings call was not confidence inducing as investors try to handicap the eventual impact from the US AML issue." Scotiabank predicted that the news was "[n]ot the end of TD's AML issues." Morningstar noted that "[a]nti-money laundering losses continue to stack up" as the "anti-money laundering provisioning… increase was more than we expected." While Canaccord Genuity complained that management's explanations were insufficient, "TD's AML tidbits leave investors hungry for more" and "[f]urther clarity required on non-monetary penalties."

310.     Many analysts reduced their price targets on TD common shares, including Cormark, RBC, and Jefferies.

**F.     October 9-10, 2024**

311.     After the close of trading on October 9, 2024, *The Wall Street Journal* reported that TD would plead guilty to criminal charges that it failed to build proper AML systems, that the Company faced $3 billion in penalties for its misconduct, and that the OCC was expected to impose an asset cap on TD that would bar the Company from growing above a certain level in the U.S.

312.     The next day, October 10, 2024, TD published a press release disclosing that it had entered into consent orders with the OCC, the Federal Reserve, and FinCEN, and entered into plea agreements with DOJ related to its inadequate AML controls. TD further revealed that under the terms of the consent orders and plea agreements the Company would, among other requirements, pay $3.09 billion in fines and penalties, and that the OCC had imposed an asset cap on the Company's U.S. banking subsidiaries. In the press release, Defendant Masrani stated, "[w]e have taken full responsibility for the failures of our U.S. AML program and are making the investments, changes and enhancements required to deliver on our commitments.

313.    Also on October 10, 2024, DOJ, FinCEN, and the OCC published press releases announcing their respective actions against TD.  Among other things, Attorney General Merrick Garland confirmed that "TD Bank ... became the largest bank in U.S. history to plead guilty to Bank Secrecy Act program failures, and the first US bank in history to plead guilty to conspiracy to commit money laundering."  And FinCEN confirmed that its "$1.3 billion settlement is the largest penalty against a depository institution in U.S. Treasury and FinCEN history."

314.    With the Guilty Pleas and enforcement actions revealed to the market, the price of TD common shares dropped 6.4% between the close of trading on October 9, 2024 and the close of trading on October 10, 2024.  As a result of these revelations, TD's share price decline eliminated billions of dollars in market capitalization based on the shares traded on the New York Stock Exchange alone.

315.    Analysts were blown away by the news. RBC titled its report "Adjusting to the worst-case scenario", significantly lowered its price target on TD common shares, and wrote that "it will be difficult for TD to outperform its peers over the medium term" as a result of the "resolution on its U.S. BSA/AML issues." Bank of America wrote that "[i]ncoming leadership needs a new playbook", "things are not alright", described the penalties levied against TD as "unprecedented", and complained that "despite… unprecedented nature of the crime and regulatory penalties [] the board has not played an active role in allaying investor concerns." BMO noted that "it may get a little worse before it gets better for TD stock."

## X.    INAPPLICABILITY OF STATUTORY SAFE HARBOR OR BESPEAKS CAUTION DOCTRINE

316.    The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue or misleading statements alleged herein.  The statements complained of herein concerned then-present or

historical facts or conditions that existed or were purported to exist at the time the statements were made.

317.    To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures TD or other Defendants may have made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of TD who knew that the statement was untrue or misleading when made.

## XI.    PRESUMPTION OF RELIANCE AND FRAUD ON THE MARKET DOCTRINE

318.    Plaintiffs and the Class are entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine.  At all relevant times, the market for TD common shares was an efficient market for the following reasons, among others:

    a.  TD common shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

    b.  The average weekly trading volume of TD common shares was significant;

    c.  As a regulated issuer, TD filed periodic public reports with the SEC;

    d.  TD regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    e.  TD was followed by many securities analysts employed by major brokerage firms who wrote reports that were published and distributed.

319.    As a result of the foregoing, the market for TD common shares promptly digested current information regarding TD from all publicly available sources and reflected such information in the price of TD common shares.  Under these circumstances, all purchasers of TD common shares during the Class Period suffered similar injury through their purchase of TD common shares at artificially inflated prices, and the presumption of reliance applies.

320.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded, in part, on Defendants' omissions of material fact.

## XII.    CLASS ACTION ALLEGATIONS

321.    Plaintiffs bring this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and all others similarly situated who purchased or otherwise acquired TD common shares on the New York Stock Exchange or in otherwise domestic transactions between February 28, 2022 and October 9, 2024, inclusive (the "Class Period"), and were damaged thereby.

322.    Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of TD and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. §229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) TD's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity in the preceding categories.

323.    The Class is so numerous that joinder of all members is impracticable.  Plaintiffs believe that the Class members number at least in the thousands.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Throughout the Class Period, TD common shares had an average daily volume on the NYSE of approximately 2,415,197 shares.  As of March 28, 2025, TD had 1,751,700,000 shares outstanding.

324.    Plaintiffs' claims are typical of the claims of Class members.  All Class members are similarly situated in that they sustained damages as a result of transacting in TD common shares at prices that were artificially inflated or deflated, as applicable, by the wrongful conduct complained of herein.

325.    Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs have retained counsel competent and experienced in class action and securities litigation.  Plaintiffs have no interests that conflict with those of the Class.

326.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  The questions of law and fact common to the Class include, but are not limited to, the following:

a.    Whether Defendants' conduct violated the federal securities laws, as alleged herein;

b.    Whether Defendants made any untrue statements of material fact or omitted to state any material facts required to be stated therein or necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

c.    Whether Defendants acted with scienter under Section 10(b) of the Exchange Act;

d.    Whether the Individual Defendants were controlling persons of TD under Section 20(a) of the Exchange Act;

e.    Whether and to what extent the prices of TD common shares were artificially inflated during the Class Period due to the misstatements and omissions complained of herein;

f.    Whether reliance may be presumed under the fraud-on-the-market doctrine;

g.    Whether Defendants' conduct caused the members of the Class to sustain damages; and

h.    Whether and to what extent Class members have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

327.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable. Additionally, the damages suffered by some individual Class members may be small relative to the burden and expense of individual litigation, making it practically impossible for such members to redress individually the wrongs done to them.

328.    There will be no difficulty in the management of this action as a class action.

329.    Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail and by publication, using a form of notice similar to that customarily used in securities class actions.

## XIII.   CLAIMS FOR RELIEF

### COUNT I
### For Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5
### Against All Defendants

330.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

331.    During the Class Period, Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts required to be stated therein or necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

332.    During the Class Period, Defendants also committed deceptive or manipulative acts in furtherance of a scheme to defraud investors, which they knew or were reckless in not knowing would act as a fraud on investors.

333.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

a.    Employed devices, schemed, and artifices to defraud;

b.    Made untrue statements of material fact or omitted to state material facts required to be stated therein or necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c.    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their transactions in TD common shares during the Class Period.

334.    Plaintiffs and other members of the Class suffered damages in connection with their purchases of TD common shares.  In reliance on the integrity of the market, Plaintiffs and the Class transacted in TD common shares and experienced losses when the artificial inflation was removed from the common shares and the prices of the common shares declined.  Plaintiffs and the Class would not have purchased TD common shares at the prices they paid, or at all, if they had been aware that the market prices of those securities had been artificially inflated or deflated, as applicable, by Defendants' false and misleading statements and omissions and/or by Defendants' deceptive and manipulative acts in furtherance of their scheme to defraud.

335.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their transactions of TD common shares during the Class Period.

## COUNT II
### For Violation Of Section 20(a) Of The Exchange Act
### Against The Individual Defendants

336.    Plaintiffs incorporate all paragraphs above by reference as if fully set forth herein.

337.    During the Class Period, the Individual Defendants acted as controlling persons of the TD Corporate Defendants, within the meaning of §20(a) of the Exchange Act.  By reason of their positions of control and authority as officers of the TD Corporate Defendants, the Individual Defendants had the power and authority to direct the management, policies, and activities of the TD Corporate Defendants and their employees, including their decision-making process, and to cause the TD Corporate Defendants to engage in the wrongful conduct complained of herein.  The Individual Defendants were able to and did influence and control, directly and indirectly, the content of the public statements made by the TD Corporate Defendants during the Class Period, including their materially false and misleading statements and omissions concerning the adequacy,

effectiveness, and functioning of the Global AML Program, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

338.    In their capacity as senior corporate officers of the TD Corporate Defendants, the Individual Defendants had direct involvement in the day-to-day operations and oversight of the TD Corporate Defendants.  Each of the Individual Defendants signed certain of the Company's SEC filings during the Class Period and/or otherwise publicly made false and misleading statements and omissions during the Class Period on behalf of the TD Corporate Defendants, and the Individual Defendants were directly involved in providing false information and certifying and approving the false statements disseminated by the TD Corporate Defendants during the Class Period.

339.    Given the Individual Defendants' senior corporate positions at the TD Corporate Defendants and involvement in their day-to-day operations and key strategic decisions, and access to material non-public information regarding the TD Corporate Defendants, the Individual Defendants acted as controlling persons of the TD Corporate Defendants and influenced and controlled their decision-making process.  As a result of the foregoing, the Individual Defendants are controlling persons of the TD Corporate Defendants within the meaning of Section 20(a) of the Exchange Act.

340.    As set forth above, the TD Corporate Defendants violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

341.    By virtue of their positions as controlling persons of the TD Corporate Defendants and as a result of their aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the TD

Corporate Defendants are liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Plaintiffs and the other members of the Class.

342.    As a direct and proximate result of the Individual Defendants' conduct, Plaintiffs and the other members of the Class suffered damages in connection with their transactions in TD common shares.

## XIV.    JURY DEMAND AND PRAYER FOR RELIEF

343.    Plaintiffs, on behalf of themselves and the Class, hereby demand a trial by jury.

344.    WHEREFORE, Plaintiffs pray for relief and judgment as follows:

a.   Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.   Awarding Plaintiffs and the Class damages, including interest;

c.   Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and experts' fees; and

d.   Granting such other and further relief as the Court may deem just and proper.

Dated:  March 31, 2025                    Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

 _/s/  Joseph A. Fonti_
Joseph A. Fonti (Lead Trial Counsel)
Benjamin F. Burry
George A. Bauer
Joseph W. Baier
Alessandra J. Slayton

300 Park Avenue, Suite 1301
New York, New York 10022
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com
bburry@bfalaw.com
gbauer@baflaw.com
jbaier@bfalaw.com

sslayton@bfalaw.com

Adam C. McCall
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone: (212) 789-2303
Facsimile: (212) 205-3960
amccall@bfalaw.com

*Counsel for Lead Plaintiff Pedro Gonzalez,
Named Plaintiffs Joel Kopstein and Edward
Patterson, and Lead Counsel for the
Putative Class*