**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JAMES TIESSEN, Individually and on Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br> v.<br><br>THE TORONTO-DOMINION BANK, TD BANK, N.A., TD BANK US HOLDING COMPANY, AJAI K. BAMBAWALE, MICHAEL BOWMAN, MIA LEVINE, BHARAT MASRANI, LEOVIGILDO SALOM, and KELVIN VI LUAN TRAN,<br><br>    Defendants. | Cons. C.A. No. 1:24-cv-08032-AS<br><br>ORAL ARGUMENT REQUESTED |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION**
**TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

Adam S. Hakki (Lead Trial Counsel)
Agnès Dunogué
Jeffrey D. Hoschander
**ALLEN OVERY SHEARMAN STERLING US LLP**
599 Lexington Avenue
New York, NY 10022
Tel.: (212) 848-4000

*Attorneys for Defendants The Toronto-Dominion*
*Bank, TD Bank, N.A., TD Bank US Holding*
*Company, Ajai K. Bambawale, Bharat Masrani,*
*Leovigildo Salom, and Kelvin Vi Luan Tran*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT..................................................................................................1

BACKGROUND ......................................................................................................................3

      A.     TD and Its Subsidiaries..................................................................................3

      B.     TD Pursues the FH Transaction Until the Parties Mutually Agree To
              Terminate the Merger Agreement.................................................................5

      C.     TD Discloses It Is Subject to AML Investigations and Further Discloses
              Substantial Reserves as the Investigations Progress...................................7

      D.     TD Discloses a Global Resolution to the AML Investigations.....................10

APPLICABLE HEIGHTENED PLEADING STANDARDS .......................................................12

ARGUMENT ...........................................................................................................................12

I.      Plaintiffs Fail To Plead Any Actionable False or Misleading Statements.........................12

      A.     Plaintiffs Fail Adequately To Plead That Statements About TD's AML
              Program Were Actionably False or Misleading.............................................13

      B.     Plaintiffs Fail Adequately To Plead That Statements In Connection With The
              FH Transaction Were Actionably False or Misleading .................................16

             1.     Statements About TD's AML Program In Connection With FH
                     Transaction...................................................................................16

             2.     Statements About FH Closing Delay..............................................17

      C.     Plaintiffs Fail Adequately To Plead That Statements About Investigations of
              the AML Program Were Actionably False or Misleading.................................20

      D.     Plaintiffs Fail Adequately To Plead That Statements About TD's U.S. Retail
               and Corporate Accomplishments Were Actionably False or Misleading..............21

      E.     Plaintiffs Fail Adequately To Plead That Statements About TD's Internal and
              Disclosure Controls Were Actionably False or Misleading ................................22

II.     Plaintiffs Fail To Plead a Strong Inference of Scienter .....................................................23

      A.     Plaintiffs Engage in Impermissible Puzzle-Pleading...........................................24

      B.     Plaintiffs Plead No Cognizable Motive for Defendants to Commit Fraud............26

      C.     Plaintiffs Do Not Plead Conscious Misbehavior or Recklessness.........................26

      D.     The Non-Fraudulent Inference is Far More Compelling .....................................32

III.    Plaintiffs Fail To Adequately Plead Scheme Liability .......................................................36

IV.    Plaintiffs Fail To Plead Loss Causation.............................................................................38

V.     Plaintiffs Fail To Plead Control Person Liability Under Section 20(a)..............................41

CONCLUSION.........................................................................................................................42

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acito v. IMCERA Grp. Inc.*,
47 F.3d 47, 53 (2d Cir. 1995)..................................................................................................20

*In re Alstom S.A. Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)......................................................................................42

*Ark. Pub. Emps.Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ......................................................................................................3

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................................12

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)....................................................................................................3, 41

*In re Barclays Bank PLC Sec. Litig.*,
756 F. App'x 41 (2d Cir. 2018) ...............................................................................................20

*In re BISYS Sec. Litig.*,
397 F. Supp. 2d 430 (S.D.N.Y. 2005)......................................................................................31

*Boguslavsky v. Kaplan*,
159 F.3d 715 (2d Cir. 1998)......................................................................................................42

*In re CarLotz, Inc. Sec. Litig.*,
2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) ....................................................................38, 39

*In re CarLotz, Inc. Sec. Litig.*,
2024 WL 3924708 (S.D.N.Y. Aug. 23, 2024).............................................................35, 36, 37

*Castillo v. Dean Witter Discover & Co.*,
1998 WL 342050 (S.D.N.Y. June 25, 1998) ............................................................................38

*In re CCIV/Lucid Motors Sec. Litig.*,
110 F.4th 1181 (9th Cir. 2024) .................................................................................................16

*C.D.T.S. v. UBS AG*,
2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013) .........................................................................27

*In re Citigroup Sec. Litig.*,
2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) .....................................................................12, 22

*City of N. Miami Beach Police Officers' and Firefighters' Ret. Plan v. Nat'l Gen.*
  *Hldgs. Corp.*,
  2021 WL 212337 (S.D.N.Y. Jan. 21, 2021) ...............................................................26

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)........................................................................... *passim*

*Damri v. LivePerson, Inc.*,
  2025 WL 863322 (S.D.N.Y. Mar. 19, 2025) ...........................................................22

*Davidoff v. Farina*,
  2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005)..........................................................39

*In re DDAVP Direct Purchaser Antitrust Litig.*,
  585 F.3d 677 (2d Cir. 2009)....................................................................................29

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
  2017 WL 4049253 (S.D.N.Y. June 28, 2017) ...................................................14, 16

*ECA, Loc. 134 IBEW Joint Pension Td. of Chi. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)........................................................................16, 23, 26, 34

*In re Express Scripts Hldgs. Co. Sec. Litig.*,
  773 F. App'x 9 (2d Cir. 2019) ................................................................................20

*Foley v. Transocean Ltd.*,
  861 F. Supp. 2d 197 (S.D.N.Y. 2012).....................................................................28

*Frankfurt-Trust Inv. Luxemburg AG v. United Techs.*,
  336 F. Supp. 3d 196 (S.D.N.Y. 2018)............................................................ *passim*

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011)................................................................31, 32

*Gonzales v. Nat'l Westminster Bank PLC*,
  847 F. Supp. 2d 567 (S.D.N.Y. 2012)........................................................................3

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020)............................................................................ *passim*

*In re JP Morgan Chase Sec. Litig.*,
  363 F. Supp. 2d 595 (S.D.N.Y. 2005)......................................................................16

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001)...............................................................................26, 30

*Kempen Int'l Funds v. Syneos Health, Inc.*,
  2024 WL 1805011 (S.D.N.Y. Apr. 25, 2024)...............................................1, 12, 25

iv

*Kempen Int'l Funds v. Syneos Health, Inc.*,
  2025 WL 949576 (S.D.N.Y. Mar. 28, 2025) ...................................................................1, 12, 25

*Lachman v. Revlon, Inc.*,
  487 F. Supp. 3d 111 (E.D.N.Y. 2020) ........................................................................................22

*Lentell v. Merrill Lynch & Co.*,
  396 F.3d 161 (2d Cir. 2005) ..........................................................................................38, 39, 41

*In re Liberty Tax, Inc. Sec. Litig.*,
  828 F. App'x 747 (2d Cir. 2020) ................................................................................................14

*In re Longtop Fin. Techs. Sec. Litig.*,
  939F. Supp. 2d 360 (S.D.N.Y. 2013) ...........................................................................................3

*In re Lululemon Sec. Litig.*,
  14 F. Supp. 3d 553 (S.D.N.Y. 2014) ..........................................................................................27

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
  26 F. Supp. 3d 278 (S.D.N.Y. 2014) ..........................................................................................32

*Malin v. XL Cap. Ltd.*,
  499 F. Supp. 2d 117 (D. Conn. 2007) .........................................................................................31

*McIntire v. China MediaExpress Hldgs, Inc.*,
  927 F. Supp. 2d 105 (S.D.N.Y. 2013) .........................................................................................33

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
  54 F.4th 82 (2d Cir. 2022) ..........................................................................................................16

*Monroe Cnty. Emps' Ret. Sys. v. YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014) .....................................................................................40, 41

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) ......................................................................................................34

*North Collier Fire Control v. MDC Partners, Inc.*,
  2016 WL 5794774 (S.D.N.Y. Sept. 30, 2024) .............................................................................33

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) .................................................................................................20, 23

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010) .......................................................................................................40

*Pac. Inv. Mgmt. Co. LLC v Mayer Brown LLP*,
  603 F.3d 144 (2d Cir. 2010) .......................................................................................................37

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*,
694 F. Supp. 2d 287 (S.D.N.Y. 2010)..................................................................33

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Danske Bank*,
2020 WL 4937461 (S.D.N.Y. Aug. 24, 2020).....................................................14

*In re PXRE Grp., Ltd. Sec. Litig.*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009)..................................................................23

*Rombach v. Chang.*,
355 F.3d 164 (2d Cir. 2004)..................................................................................17

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977)...............................................................................................27

*Stoneridge Inv. Partners, LLC v. Sci.Atlanta*,
552 U.S. 148 (2008)...............................................................................................36

*Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap.*,
531 F.3d 190 (2d Cir. 2008)..................................................................................32

*In re Telefonaktiebolaget LM Ericsson Sec. Litig.*,
675 F. Supp. 3d 273 (E.D.N.Y. 2023) ..................................................................14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..............................................................................23, 32, 34, 35

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)..................................................................................15

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022).......................................................27, 28, 37

*In re Veon Ltd. Sec. Litig.*,
2025 WL 66444 (S.D.N.Y. Jan. 10, 2025) ..........................................................40

*In re Y-mAbs Therapeutics, Inc. Sec. Litig.*,
2024 WL 451691 (S.D.N.Y. Feb. 5, 2024)..................................................... *passim*

**Statutes, Rules & Regulations**

12 C.F.R. § 261.2(b)(1).......................................................................................4, 35

12 C.F.R. § 4.32(b) .............................................................................................4, 35

12 C.F.R. § 4.36 ..................................................................................................4, 35

15 U.S.C. § 78u-4(b)....................................................................................... *passim*

18 U.S.C. § 641 ..........................................................................................................................5

Fed. R. Civ. P. 9(b) ................................................................................................................1, 12

Fed. R. Civ. P. 12(b)(6) ..............................................................................................................13

Fed. R. Evid. 201(b) ....................................................................................................................3

## TABLE OF ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| AML | Anti-money laundering |
| BSA | The Bank Secrecy Act, 31 U.S.C. § 5311, *et seq.* |
| CAC | The Consolidated Amended Complaint in this action (as corrected, ECF No. 70) |
| Defendants | TD, TDBNA, TDBUSH, Ajai K. Bambawale, Bharat Masrani, Leovigildo Salom, and Kelvin Vi Luan Tran, who submit this memorandum in support of their motion to dismiss |
| DOJ | The U.S. Department of Justice |
| FH | First Horizon Corporation |
| FH Transaction | The proposed acquisition of FH by TD pursuant to the Merger Agreement |
| FinCEN | The Financial Crimes Enforcement Network of the U.S. Department of Treasury |
| FRB | The Board of Governors of the Federal Reserve System |
| FRB Merger Application | TDBNA's March 21, 2022 application to the FRB for approval of the FH Transaction |
| Individual Defendants | Bharat Masrani, Kelvin Vi Luan Tran, Ajai Bambawale, and Leovigildo Salom |
| Merger Agreement | The Agreement and Plan of Merger by and among TD, TDBUSH, FH, and Falcon Holdings Acquisition Co., dated as of February 27, 2022 |
| NYSE | The New York Stock Exchange |
| OCC | The Office of the Comptroller of the Currency |
| OCC Merger Application | TD, TDGUS and TDBUSH's March 21, 2022 application to the OCC for approval of the FH Transaction |
| Orders | Collectively, the October 9, 2024 Consented to Cease and Desist Order Imposed by the FRB ("FRB Order"), the October 9, 2024 Consent Orders Imposed by the OCC ("OCC Orders"), and the October 10, 2024 Consent Order Imposed by FinCEN ("FinCEN Order") |
| Pleas | The October 10, 2024 plea agreements entered into by TDBNA and TDBUSH in *United States v. TD Bank, N.A.*, No. 2:24-cr-00667 (D.N.J.) ( "TDBNA Plea") and *United States v. TD Bank US Holding Company,* No. 2:24-cr-00668 (D.N.J.) ( "TDBUSH Plea") |
| PSLRA | The Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, *et seq.* |
| Rule 10b-5 | SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 |
| Section 10(b) | Securities Exchange Act of 1934, § 10(b), 15 U.S.C. § 78j(b) |
| Section 20(a) | Securities Exchange Act of 1934, § 20(a), 15 U.S.C. § 78t(a) |
| TD | Defendant The Toronto-Dominion Bank |
| TDBNA | Defendant TD Bank, N.A. |
| TDBUSH | Defendant TD Bank US Holding Company |
| TDGUS | Non-Party TD Group U.S. Holdings LLC, a wholly owned subsidiary of TD |
| TD Group | Defendant TD and its subsidiaries |
| *WSJ* | The *Wall Street Journal* |

Defendants TD, TDBNA, TDBUSH, Ajai K. Bambawale, Bharat Masrani, Leovigildo Salom, and Kelvin Vi Luan Tran ("Defendants") respectfully submit this memorandum in support of their motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the PSLRA.

**PRELIMINARY STATEMENT**

This case confuses and conflates AML compliance failures with securities fraud. There is no dispute that there were significant problems in TD's AML program for which it accepted responsibility. But the AML plea agreements and regulatory orders on which Plaintiffs principally rely say nothing about securities disclosure—let alone securities *fraud*—and cannot substitute for the rigorous pleading the PSLRA requires. Despite apparently extensive efforts, Plaintiffs could not find any sources of particularized facts to support their assertion of securities fraud. Consequently, Plaintiffs hurl an assortment of theories against the wall, hoping that one will stick. None does.

*First*, Plaintiffs engage in exactly the sort of "puzzle-pleading" this Court recently held warranted dismissal of two successive complaints in *Kempen Int'l Funds v. Syneos Health, Inc.*, 2024 WL 1805011 (S.D.N.Y. Apr. 25, 2024) and 2025 WL 949576 (S.D.N.Y. Mar. 28, 2025). Among other things, Plaintiffs do not connect their falsity allegations with their entirely separate (and independently insufficient) scienter allegations. Plaintiffs thus cannot adequately plead the requirement that each Defendant who supposedly made a challenged statement knew of its falsity when made.

*Second*, as to each of the statements they challenge, Plaintiffs fail to offer particularized allegations of falsity or that the statements were of an actionable nature. Plaintiffs simply ignore Second Circuit law in alleging that Defendants' general statements about the AML program were actionably false or misleading. Section 10(b) is limited to statements that are "sufficiently specific

for an investor to reasonably rely on that statement as a *guarantee* of some concrete fact or outcome." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014) (emphasis added).  The CAC does not come close to identifying such a statement.

*Third*, as to scienter, Plaintiffs are unable to point to any plausible motive for Defendants to engage in a purported multi-year effort to defraud investors.  Similarly, Plaintiffs' "conscious misbehaviour or recklessness" allegations fail at the most basic level.  Plaintiffs do not plead particularized facts establishing *what* specific conflicting information the purported maker of each statement had, and *when* and *how* they knew or had access to it.  As one example, the CAC relies heavily on the plea agreements, but those documents simply do not show that any Individual Defendant—at the specific time any challenged statement was made—had knowledge or recklessly disregarded facts establishing that the statement was false or misleading.  Instead, the CAC attempts to ascribe fraudulent intent by way of generalized "group pleading," which is plainly impermissible.  Similarly, Plaintiffs' scienter allegations are replete with references to what certain *entities—e.g.*, TD, TDBNA, TDGUS, TDBUSH, and TD Bank Group—supposedly stated, knew, had access to, admitted, or pleaded guilty to.  But an *entity's* scienter can only be imputed from a particular *individual* and only scienter allegations specific to that individual are germane.

Moreover, taking Plaintiffs' allegations in the required "holistic" manner only underscores that nonculpable explanations are far more cogent.  In Plaintiffs' telling, the Individual Defendants would have been well aware of the potentially dire consequences of plunging ahead with an alleged multi-year fraud without any plausible motive to do so.  It is vastly more plausible and cogent to infer that Defendants (a) focused on understanding and fixing the AML issues as they emerged, (b) timely disclosed the existence of government investigations and the potential for penalties, and (c) otherwise chose not to speculate (which they were not required to do, as a matter of law) about

2

the contours of the problems and their potential consequences while their grasp of them was still evolving and subject to bank regulatory feedback they were legally forbidden from disclosing.

*Fourth*, recognizing the failings of their misrepresentation-based claims, Plaintiffs try to salvage their case by recasting their allegations as a scheme liability claim. But that effort is equally unavailing because Plaintiffs do not (and cannot) adequately plead either reliance or scienter.

*Fifth*, all of Plaintiffs' claims fail for the independently dispositive reason that Plaintiffs' loss causation allegations are fundamentally defective. The CAC does not plead *which* purported "corrective disclosures" revealed to the market the falsity of *which* challenged statement, even though the Second Circuit has instructed that loss causation cannot be pleaded where the nexus between a corrective disclosure and the challenged statement is "attenuated." Plaintiffs' allegations as to alleged corrective disclosures also suffer from additional deficiencies—including the lack of connection, under Plaintiffs' allegations, between the disclosure of an increase in reasonably possible losses for the bank as of April 30, 2023 and problems with the AML program.

Accordingly, for multiple independent reasons, the CAC should be dismissed.

## BACKGROUND[1]

### A.     TD and Its Subsidiaries

The TD Group Corporate Defendants:  TD is a Canadian bank subject to supervision by

---

[1] Citations to "¶__" refer to the allegations of the CAC, which Defendants cite solely for purposes of this motion. Defendants do not concede the accuracy of any such allegations and specifically reserve their rights to contest the truth of any allegations. In reviewing a motion to dismiss, the court considers the complaint as a whole, including the documents incorporated by reference, and matters of which judicial notice may be taken. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); Fed. R. Evid. 201(b). Judicial notice is appropriately taken of, among other things, "public documents required to be filed with the SEC," *In re Longtop Fin. Techs. Sec. Litig.*, 939 F. Supp. 2d 360, 374 (S.D.N.Y. 2013); "news articles" and "public documents," *Gonzales v. Nat'l Westminster Bank PLC*, 847 F. Supp. 2d 567, 569 (S.D.N.Y. 2012); "transcripts of companies' earnings calls," *Frankfurt-Trust Inv. Luxemburg AG v. United Techs.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018); and "analyst reports," *Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 352 (2d Cir. 2022). Citations to "Ex. __" refer to the exhibits to the accompanying Declaration of Agnès Dunogué, each of which is incorporated by reference in the CAC, subject to

Canadian financial and banking regulators.  TD's shares trade on the Toronto Stock Exchange and the NYSE. TD Group, consisting of TD and its subsidiaries, offers a range of financial products and services—including banking, investment, and insurance services—to nearly 30 million individual and business customers in the U.S. and Canada and employs approximately 100,000 people globally.[2]

Among TD's subsidiaries are TDBUSH and TDBNA.[3]  TDBNA is a U.S. bank.  It holds a federal charter from the OCC and is a member of the Federal Reserve System.  TDBNA is subject to extensive regulation, oversight, and supervision by U.S. regulators,[4] including annual examinations by the OCC covering compliance with AML regulations.[5]  As federal regulators have observed, money laundering is endemic in the financial system, and impacts a wide array of financial services firms, including banks.[6]   OCC and FRB examinations and related communications constitute confidential supervisory information (or "CSI"), which by law cannot be disclosed without the regulators' permission,[7] and with unauthorized disclosure punishable by

_____

judicial notice, or both.

[2] Ex. 1, 2024 Annual Report (Form 40-F/A) at 3 (Dec. 9, 2024).

[3] *Id.* at 96 (listing more than 60 significant subsidiaries).

[4] *Id.* at 63 (disclosing regulatory regimes).

[5] Ex. 2, OCC Large Bank Supervision Handbook, at 29 (Mar. 2022).

[6] *E.g.*, Ex. 3, Dep't of Treasury, 2024 National Money Laundering Risk Assessment, at 96 (Feb. 2024) ("[M]oney laundering threats and vulnerabilities have become more significant and pernicious over the past two years," resulting in "an evolved 'landscape' for money laundering risk"), 66-70 (noting increases in financial crime and AML risks and listing related enforcement actions); Ex. 4, OCC National Risk Committee, Semiannual Risk Perspective, at 2 (Spring 2023) (observing a "noted increase in financial crimes, especially check fraud and Bank Secrecy Act/anti-money laundering (BSA/AML) risks in traditional banking products and services").

[7] 12 C.F.R. § 261.2(b)(1) (CSI "includes information that is or was created or obtained in furtherance of the [FRB]'s supervisory, investigatory, or enforcement activities . . . relating to any supervised financial institution, and any information derived from or related to such information"); 12 C.F.R. §§ 4.32(b), 4.36(b), (d) (prohibiting disclosure of "record[s] created or obtained . . . [b]y the OCC in connection with the OCC's performance of its responsibilities," including "supervisory correspondence").

criminal and civil sanctions, including imprisonment and fines.[8]   The results of prior OCC examinations of TD, including as to AML, accordingly are not disclosed.

The Individual Defendants:  Bharat Masrani was TD's President and CEO and served on its Board from 2014 to January 31, 2025.  ¶28.  Kelvin Vi Luan Tran has been TD's CFO since 2021 and became Group Head in March 2023.  ¶30.  Ajai K. Bambawale has been TD's Group Head and Chief Risk Officer since 2018.  ¶25.  Leovigildo Salom has been Head of U.S. Retail for TD Group, and President, CEO, and a director of both TDBUSH and TDBNA since January 1, 2022.  ¶29.  The CAC also names as individual defendants Michael Bowman, whom Plaintiffs allege was Global Head of AML Compliance for TD from 2019 to November 2023, and Mia Levine, whom they allege was the BSA Officer and Head of U.S. AML in the Global AML function at TD Bank Group from May 2019 to May 2023.  ¶¶26-27.[9]

## B.    TD Pursues the FH Transaction Until the Parties Mutually Agree To Terminate the Merger Agreement

On February 28, 2022, TD announced that it had agreed to acquire First Horizon Corporation ("FH").  ¶¶5, 82.  As with all bank mergers, the transaction required extensive regulatory approvals, including from the FRB, OCC, and various Canadian and U.S. state banking regulators.  The Merger Agreement conditioned closing on receiving such approvals and required closing to occur by February 27, 2023 (unless extended by three months).  ¶82.  On March 21, 2022, TD and TDBUSH filed applications for regulatory approval from the FRB and OCC.  ¶86.

Throughout the process, TD disclosed to investors the transaction's status, including regarding regulatory approvals.  For example, on December 1, 2022, during TD's Q4 2022

---

[8] *See, e.g.*, FRB Bank Holding Co. Supervision Manual § 1065.0.2 ("Any person who discloses or uses CSI except as expressly permitted by the appropriate federal banking agency . . . may be subject to the criminal penalties provided in 18 U.S.C. § 641."); 18 U.S.C. § 641 (providing for fines and up to ten years in prison).

[9] The "Individual Defendants" as referenced herein refers to Masrani, Tran, Bambawale, and Salom.  Individual defendants Bowman and Levine are filing separate motions to dismiss the CAC.

Earnings Call, Masrani stated that TD was "currently planning to close the transaction in the first half of fiscal 2023, subject to customary closing conditions," but that TD did not "control the timing of all the regulatory approvals[.]"[10] On February 9, 2023, with regulatory clearance not yet obtained, TD and FH announced their mutual agreement to extend the outside closing date to May 27, 2023, as provided in the Merger Agreement. ¶98.

During TD's Q1 2023 Earnings Call on March 2, 2023, Masrani stated that since February 9, 2023, "we've come to believe that the deal is not expected to receive regulatory approval in time to close the transaction by that date," and that he could not speculate on when regulatory approval might be given. ¶100. When asked by an analyst whether there were concerns of a supervisory issue in the U.S., Masrani stated (consistent with federal law) that he could not "comment on our confidential discussions with our regulators," which he noted "is an area that no bank ventures into," but added that "we continue to work with our regulators as part of our application process."[11] Masrani further noted that TD remained "fully committed to the transaction" and that the TD and FH teams continued to work on and "ha[d] made progress on integration plans."[12] Masrani updated shareholders on April 20, 2023, that "our belief is that we will not be able to get approvals by the merger expiry date of May 27," and that "[w]e have opened discussions with First Horizon about a possible extension, and we will update our shareholders when we can."[13]

---

[10] Ex. 5, 4Q22 Earnings Transcript, at 4, 9 (Dec. 1, 2022).

[11] Ex. 6, 1Q23 Earnings Transcript, at 11 (Mar. 2, 2023).

[12] *Id.* at 3.

[13] Ex. 7, TD 2023 Annual Meeting Transcript at 6, 25 (Apr. 20, 2023). A May 4, 2023 *WSJ* article reported that according to FH CEO Bryan Jordan, "TD and First Horizon didn't discuss extending the timeline for the deal, lowering the price, or changing its structure." ¶268; Ex. 8. Jordan's actual statement was that "[a]t no time did we discuss any changes in price or any other changes to the structure of the deal." Ex. 9, FH Investor Call Transcript, at 3 (May 4, 2023).

About two months later, on May 4, 2023, TD issued a press release stating that, after TD had "informed First Horizon that TD does not have a timetable for regulatory approvals to be obtained for reasons unrelated to First Horizon," TD and FH had mutually agreed to terminate the Merger Agreement "[b]ecause there is uncertainty as to when and if these regulatory approvals can be obtained." ¶106.  TD agreed to pay $25 million in reimbursement to FH (as required under the Merger Agreement)[14] and to make a further payment of $200 million to FH in connection with the termination of the $13.4 billion proposed transaction. ¶217.

A May 8, 2023 *WSJ* article citing anonymous "people familiar with the matter" subsequently stated that "reluctance by the [OCC and FRB] to give TD a clean bill of health on its anti-money-laundering practices proved to be the biggest obstacle" to regulatory approval of the FH Transaction.[15]  Nothing in the OCC and FRB Orders subsequently issued in October 2024 suggest in any way that TD was told in May 2023 that regulatory approval would not be granted for the FH Transaction due to AML issues.

### C.    TD Discloses It Is Subject to AML Investigations and Further Discloses Substantial Reserves as the Investigations Progress

On August 24, 2023, TD released its Q3 2023 quarterly report, in which it disclosed that it was the subject of multiple separate investigations into its BSA/AML compliance program and had been "responding to formal and informal inquiries from regulatory authorities and law enforcement" concerning TD's AML program "including in connection with an investigation by the United States Department of Justice." ¶115.  TD further stated that while the investigations'

---

[14] Ex. 10, Merger Agreement § 8.2(g).

[15] Ex. 11, *WSJ* Article (May 8, 2023).

ultimate outcomes were unknown at the time, it "anticipate[d] monetary and/or non-monetary penalties to be imposed."[16]  *Id.*

Following this disclosure, in response to analysts' questions, Masrani stated that TD was "pursuing efforts to enhance [its] U.S. AML compliance program" and that while TD "ha[d] a strong and disciplined risk management culture," it was "focused on continuously improving our programs."  ¶116.  Masrani also repeatedly explained (again consistent with federal law) that TD could not comment on ongoing discussions with regulators, noting that "I can't comment on our ongoing discussions with our regulators," that as to "amounts and all that, I really can't comment on that" but "when it is appropriate, we will certainly let you know what it has cost or not cost us."[17]  *Id*.  In response to a follow up question, Masrani again explained, "I don't think . . . it's appropriate for me to comment on our ongoing discussions with our regulators because that would be going into that territory if I started predicting things for you.  So I think best is what we've said in our disclosure, we are working hard to enhance our programs."[18]

As the investigations progressed, TD provided investors with updates, within its ability to do so under regulatory confidentiality obligations.  For example, at TD's April 2024 Annual Meeting, Masrani noted that TD was "in discussions with our regulators" and that its "AML program was not where it needed to be and we are addressing it," noting that "given the confidential nature of regulatory discussions," he could not "provide additional detail or speculate on timing or announcements."[19]

---

[16] TD's Q3 2023 quarterly report also disclosed a marginal increase in TD's estimate of the range of its reasonably possible losses ("RPL") for its ongoing legal and regulatory actions, from a range of $0–approximately $1.26 billion (as of October 31, 2022) to $0–$1.29 billion.  Ex. 12, 3Q23 Quarterly Report, at 79 (Aug. 24, 2023).

[17] Ex. 13, 3Q23 Earnings Transcript, at 9 (Aug. 24, 2023).  CSI, which cannot be disclosed without the regulators' permission, includes communications, records and information concerning regulatory investigations.  *See supra* n.7.

[18] Ex. 13, 3Q23 Earnings Transcript, at 9 (Aug. 24, 2023).

[19] Ex. 14, 2024 Annual Meeting Transcript, at 6 (Apr. 18, 2024).

On April 30, 2024, TD announced that it was taking an "initial" provision of $450 million in connection with its discussions with "one of its U.S. regulators, related to previously disclosed regulatory and law enforcement investigations into TD's U.S. [BSA/AML] program."[20] TD's also disclosed that (i) it was in discussions with three U.S. regulators and DOJ, (ii) the "initial" provision did not reflect the final aggregate penalty amount; and (iii) that TD "anticipat[ed] additional monetary penalties."[21] TD further acknowledged that its AML program "was insufficient to effectively monitor, detect, report, and respond to suspicious activity" and work was underway to remedy the deficiencies.[22]

Following this disclosure, analysts noted in late April and early May 2024 that they anticipated that "total penalties will be substantial," that the total cost and time to satisfy regulators that AML deficiencies have been cured is "something we may only know with the passage of time,"[23] and that "a worst-case scenario has become more likely" that "[g]rowth in the U.S. will likely be constrained and the timeline for a fix is extended by several years."[24]

On May 2, 2024, the *WSJ* published an article, again based on anonymous source reporting from "people familiar with the matter," asserting that DOJ's investigation into TD's AML program "focuse[d] on how Chinese crime groups and drug traffickers used the Canadian lender to launder money from U.S. fentanyl sales."[25] ¶304. The article did not indicate that any of its anonymous sources were affiliated with TD. The next day, TD issued a press release in which Masrani emphasized that he "regret[ted] that there were serious instances where the Bank's AML program

---

[20] Ex. 15, TD Press Release, "TD Takes an Initial Provision Related to BSA/AML Matters" (Apr. 30, 2024).

[21] *Id.*

[22] *Id.*

[23] Ex. 16, CIBC Analyst Report (Apr. 30, 2024).

[24] Ex. 17, Jefferies Analyst Report (May 6, 2024).

[25] Ex. 18, *WSJ* Article (May 2, 2024).

fell short and did not effectively monitor, detect, report or respond," noted that this shortfall was "unacceptable and not in line with our values" and detailed certain remedial actions TD was taking, including that "[a] comprehensive overhaul of TD's U.S. and global AML program is well underway" and "TD has already invested over $500 million in program remediation and platform enhancements."[26]

On August 21, 2024, as the investigations progressed further, TD issued a press release stating that it was continuing to pursue of a global resolution of AML investigations by its U.S. prudential regulators, FinCEN, and DOJ.[27]  TD also disclosed that, "[i]n anticipation of a global resolution, which will include monetary and non-monetary penalties," it was taking a "further provision of $2.6 billion" (bringing the total provision to $3 billion), and that it expected to finalize a global resolution by the end of 2024.[28]  During an investor call the next day, in response to an analyst's question about potential nonmonetary penalties, Masrani stated, "I can't speculate. We're in the middle of our negotiations. We are making progress and it's not appropriate to speculate what the final deal would be."[29]

### D.    TD Discloses a Global Resolution to the AML Investigations

On October 10, 2024, TD issued a press release disclosing it had reached a global resolution of the separate investigations into its AML program by the OCC, the FRB, FinCEN, and DOJ.

---

[26] Ex. 19, TD Press Release, "TD Addresses Media Reports About Its AML Program" (May 3, 2024).

[27] Ex. 20, TD Press Release, "TD Bank Provides Update on U.S. AML Matters" (Aug. 21, 2024).

[28] *Id.*

[29] Ex. 21, 3Q24 Earnings Transcript, at 10 (Aug. 22, 2024).

¶133.  The terms of the global resolution included an aggregate $3.09 billion penalty (consistent with TD's previously disclosed aggregate provisions), and non-monetary penalties, as follows:

- OCC:  $450 million penalty and an "asset cap."[30]

- FRB:  $123.5 million penalty.[31]

- FinCEN:  $1.3 billion penalty (with credits for DOJ and OCC penalties).[32]

- DOJ:  $1.89 billion penalty (with credit for FRB penalty).[33]

The resolution of the DOJ investigation included Pleas by TDBNA and TDBUSH, but not TD or any individual.  TDBNA and TDBUSH each pleaded guilty to conspiring to (1) fail to maintain an adequate AML program, (2) fail to file accurate currency transaction reports, and (3) launder monetary instruments.  ¶¶20-21.  The Pleas specifically noted that, while TDBNA and TDBUSH agreed and stipulated to the facts as at the time of their pleas, certain facts were "based on information obtained from third parties by the United States through its investigation and described to [TDBNA and TDBUSH]."[34]  The Pleas included no statements or findings of any kind as to when Masrani, Tran, Salom and Bambawale or other highly senior officers of TDBNA, TDBUSH, or TD learned of the issues identified in the Pleas.  The Orders resolving the investigations by the OCC, the FRB, and FinCEN also did not include an agreement to and stipulation of facts, or any indication as to when TD was told that the regulators had identified significant AML deficiencies in TD's AML Program.

---

[30] Ex. 22, TD Press Release, "TD Bank Group Announces Resolution of AML Investigations" (Oct. 10, 2024); Ex. 23, OCC Orders, art. VI (No. AA-ENF-2024-77) and art. III (No. AA-ENF-2024-78).

[31] Ex. 24, FRB Order ¶13.

[32] Ex. 25, FinCEN Order, at 67.

[33] Ex. 26, DOJ Press Release (Oct. 10, 2024).

[34] Ex. 27, TDBNA Plea, Statement of Facts, at 1; Ex. 28, TDBUSH Plea, Statement of Facts, at 1.

**APPLICABLE HEIGHTENED PLEADING STANDARDS**

Plaintiffs assert claims under Sections 10(b) and 20(a) of the Exchange Act.  To state a claim under Section 10(b), a plaintiff must sufficiently plead: "(i) a material misrepresentation or omission by the defendant; (ii) scienter; (iii) a connection between the misrepresentation or omission and the purchase or sale of a security; (iv) reliance upon the misrepresentation or omission; (v) economic loss; and (vi) loss causation."  *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *11 (S.D.N.Y. Mar. 24, 2023).[35]  Plaintiffs' allegations not only must be plausible, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), but must also satisfy the heightened pleading requirements of the PSLRA and Rule 9(b) by stating with particularity the circumstances constituting the alleged fraud, *Citigroup*, 2023 WL 2632258, at *11.  As such, the CAC must "(i) specify the statements that the plaintiff contends were fraudulent, (ii) identify the speaker, (iii) state where and when the statements were made, and (iv) explain why the statements were fraudulent."  *Id.*  Additional detailed and onerous pleading requirements apply as to falsity and scienter, as well as to control person liability under Section 20(a), as discussed below.

**ARGUMENT**

I.    **Plaintiffs Fail To Plead Any Actionable False or Misleading Statements**

"To adequately allege a material misrepresentation, a plaintiff must allege particularized facts showing that the statement was false at the time it was made."  *In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, 2024 WL 451691, at *5 (S.D.N.Y. Feb. 5, 2024) (Subramanian, J.).  "And since there is no affirmative duty to disclose all material information, an omission is actionable only if disclosure was necessary to make . . . statements made, in the light of the circumstances under which they were made, not misleading."  *Id.*

---

[35] Unless otherwise noted, internal citations and quotation marks are omitted.

By means of impermissible "puzzle-pleading,"[36] Plaintiffs purport to challenge largely duplicative statements across six categories. ¶240. Deploying *nearly 25 pages* of block quotations (¶¶240-91), the CAC focuses on statements about (i) TD's AML program,[37] (ii) TD's AML program in connection with the FH Transaction, (ii) the delay in obtaining regulatory approval of the FH Transaction, (iii) the regulatory investigations of TD's AML program, (iv) TD's governance and risk management practices, and (v) TD's internal and disclosure controls. ¶240. Dismissal is required as to every such statement, because in each case Plaintiffs fail to plead the requisite particularized facts showing falsity and, in some cases, for the additional reason that the statement is non-actionable as a matter of law. For the Court's convenience, Defendants have listed in Exhibit B each of the allegedly misleading statements.[38]

### A.   Plaintiffs Fail Adequately To Plead That Statements About TD's AML Program Were Actionably False or Misleading

***Accurate Statements of Historical Fact.***   Most of the challenged statements in this category are generalized descriptions of the structure and governance of the AML program as to which Plaintiffs fail to allege *any* facts showing how they were actually false or misleading when made. *See* ¶¶243-54; Ex. B, statements 1-5. For instance, Plaintiffs do not offer any factual allegations that (i) the "TD AML Statements" generally explaining that "TD's Global AML

---

[36] Contrary to the Court's admonitions in other matters, Plaintiffs "block quote multiple statements at a time," and address falsity using a "sprawling multi-page and multi-part paragraph" structure. *Kempen*, 2025 WL 949576, at *1-2 (S.D.N.Y. Mar. 28, 2025); *Kempen*, 2024 WL 1805011. Plaintiffs then set forth thirteen paragraphs and sub-paragraphs of generalized purported factual allegations (¶241(a)-(j)), which they subsequently broadly reference for each category in addition to multi-part "additional [alleged] reasons." *See, e.g.*, ¶249.

[37] As part of this category, Plaintiffs allege that such statements "concealed that Defendants . . . adhered to the Flat Cost Paradigm," which "froze TD's budget for AML compliance." ¶¶240(a), 7. Plaintiffs do not allege, however, that Defendants made any false or misleading statements about TD's budget for AML compliance and whether or not it was growing. Plaintiffs invoke the "Flat Cost Paradigm" solely in connection with the AML deficiencies.

[38] For brevity, Defendants use "Ex. B, statement [#]" to refer to each of the allegedly misleading statements reproduced from the CAC in Exhibit B. Exhibit B does not separately set forth any arguments but merely provides in chart form the statements alleged to be misleading as categorized in the CAC and as to which arguments are set forth below.

Program and supporting policies set out requirements that include" a variety of listed items (¶¶244-47, Ex. B, statement 1) and that the program "is routinely evaluated, updated and enhanced" (¶248, Ex. B, statement 4), or (ii) the statements that "GAML is responsible for oversight of TD's regulatory compliance" with AML and related other areas, for the purpose of "appropriately identif[ying] and mitigat[ing]" such risks (¶¶250-51, Ex. B, statement 5), were false. Although Plaintiffs incant generally that there were deficiencies in the AML program throughout the class period (¶¶243-54), such generalities do not provide the required particularized allegations. Plaintiffs fail entirely to plead facts showing what specific AML program deficiencies existed at the time of each statement and how exactly they rendered each such general statements false. *Y-mAbs*, 2024 WL 451691, at *5; *see also, e.g.*, *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, 2017 WL 4049253, at *6 (S.D.N.Y. June 28, 2017) (holding that statements were not adequately alleged to be false where plaintiffs failed to plead facts with particularity showing that defendant banks "did not . . . review or strengthen [their] compliance and AML programs, [or] that [they] did not frequently review [their] AML goals"), *aff'd sub nom. Sfiraiala v. Deutsche Bank Aktiengesellschaft*, 729 F. App'x 55 (2d Cir. 2018).

   ***Nonactionable Statements.*** Courts consistently find general statements like those alleged in the AML category (Ex. B, statements 4-5) nonactionable. *See, e.g., Plumbers & Steamfitters Loc. 773 Pension Fund v. Danske Bank*, 2020 WL 4937461, at *7 (S.D.N.Y. Aug. 24, 2020) (holding "[p]laintiffs cannot base a claim of securities fraud" on allegations that a bank's "corporate governance and compliance statements were false and misleading" due to undisclosed presence of AML deficiencies because "[a]ll of these statements are inactionable generalizations"), *aff'd*, 11 F.4th 90 (2d Cir. 2021); *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 290-91 (E.D.N.Y. 2023) (collecting cases holding general policy and compliance-related

14

statements unactionable), *aff'd sub nom. Bos. Ret. Sys. v. Telefonaktiebolaget LM Ericsson*, 2024 WL 4023842 (2d Cir. Sept. 3, 2024).[39]   That is because, under Second Circuit precedent, Section 10(b) is limited to statements that are "sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome." *UBS AG*, 752 F.3d at 185; *see also infra* Sections I.B.1 and I.C.

   ***Statements of Opinion/Belief.***   The other challenged statements in this category are plainly statements of *opinion and belief—e.g.*, statements that the Audit Committee, as of February 2023 and 2024, was "satisfied" that it "fulfilled its responsibilities for [the fiscal year]," which included "overseeing . . . the effectiveness of . . . compliance and anti-money laundering" (¶¶252-53; *see* Ex. B, statements 6-7).   *See, e.g.*, *Tongue v. Sanofi*, 816 F.3d 199, 211-213 (2d Cir. 2016) (statements that company was "satisfied" were opinions and generalized statements of subjective optimism).   Because they are opinion statements, Plaintiffs were required to—but did not—plead factual allegations with particularity that (i) the Audit Committee "[did] not hold the belief professed," (ii) "the facts supplied in support of" the Committee's belief that it had fulfilled its responsibilities "[were] untrue," or (iii) known information was omitted concerning the bases for the Audit Committee's belief that "ma[de] the statement misleading to a reasonable investor." *Frankfurt-Trust*, 336 F. Supp. 3d at 217.   Instead of pleading this, Plaintiffs simply cite deficiencies in the AML program (¶¶243-54), which falls well short of the mark.

---

[39] *See also In re Liberty Tax, Inc. Sec. Litig.*, 828 F. App'x 747, 750–51 (2d Cir. 2020) (statement that compliance task force was "very successful" nonactionable).

**B.      Plaintiffs Fail Adequately To Plead That Statements In Connection With The FH Transaction Were Actionably False or Misleading**

**1.      Statements About TD's AML Program In Connection With FH Transaction**

Again, Plaintiffs impermissibly rely on general statements about the AML program, this time in the regulatory approval applications for the FH Transaction.  ¶¶255, 240(b).  Plaintiffs do not adequately plead that these statements were actionably false, let alone that the person who certified the applications (Salom) had actual "knowledge" at the time that they were false and therefore that this certification that the applications contained *no* misstatements was, itself, actionably false.

*Nonactionable Statements.*   The general statements at issue—*e.g.*, that TDBNA and TD "ha[d] qualified, dedicated personnel who are responsible for administering [AML] programs" and that TDGUS's "AML Program aligns with enterprise AML policies so that . . . risks are appropriately identified and mitigated" (¶255; *see also* Ex. B, statements 10-11)—are the kind of general statements that the Second Circuit has repeatedly instructed are *not* actionable under Section 10(b).[40]  *See supra* Section I.A; *see also, e.g., ECA, Loc. 134 IBEW Joint Pension Td. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 205-206 (2d Cir. 2009) (holding that defendant's statements that it "set the standard for best practices in risk management techniques" and had "highly disciplined" "risk management processes" were "too general to cause a reasonable investor

---

[40] The challenged statement in the Merger Agreement that TD and its subsidiaries "established and maintain a system of internal controls designed to ensure compliance" with "reporting requirements of applicable [AML] laws" (¶257; *see also* Ex. B, statement 11) fails for an additional independent reason.  The statement was a commercial representation made *to FH*, not to TD investors, was expressly qualified by materiality, and the Merger Agreement expressly contemplated that the representation may fail, including by assigning transactional rights *to FH* in that event. *E.g.*, Ex. 10, Merger Agreement §§ 4.7(b) (containing materiality qualifier), 7.3(a) (conditioning FH's obligation to close on representation being accurate), 8.1(d) (authorizing FH to terminate the Merger Agreement upon the representation's failure).  *See Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 86-89 (2d Cir. 2022) (statements in merger context about merger counterparty not actionable); *In re CCIV/Lucid Motors Sec. Litig.*, 110 F.4th 1181, 1185 (9th Cir. 2024) (same); *see also, e.g., UBS AG*, 752 F.3d at 183 (as a general matter, compliance statements nonactionable).

to rely upon them"); *Deutsche Bank*, 2017 WL 4049253, at *6 & n.4 (holding statements that the bank "was geared to strict conformity with the law and has been achieving good results for years" and "committed to ensuring the robust risk management of financial crime" were "aspirational statements that do not give rise to a securities violation," despite existence of AML issues); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 632–33 (S.D.N.Y. 2005) (rejecting claim that bank "misrepresented itself as an institution of integrity with sound risk-management procedures" because the alleged misstatements were "generalizations regarding integrity, fiscal discipline and risk management" and accordingly nonactionable).

*Accurate Statements of Historical Fact and Statements of Belief.* Further, even if the foregoing statements within the March 21, 2022 OCC and FRB Bank Merger Applications were actionable, Plaintiffs have not even attempted to plead facts with particularity showing that when Salom stated that to the "best of [his] knowledge" the applications contained no misrepresentations, his statement was false *at that time* because he purportedly had actual knowledge *then* that they did contain misrepresentations. Ex. B, statements 8-9; *see Rombach v. Chang*, 355 F.3d 164, 172 (2d Cir. 2004) (to be actionable, statement must be false when made). Nor do Plaintiffs allege that Salom did not hold this belief at the time he made the certifications. *Frankfurt-Trust*, 336 F. Supp. 3d at 217.

### 2.    Statements About FH Closing Delay

Plaintiffs also fail adequately to allege that statements about the delay in the FH Transaction were false or misleading, for multiple reasons.

*Statements of Opinion/Belief and Accurate Statements of Fact.* Many of these statements were obvious statements of opinion or belief (*e.g.*, "we are *confident*", "we've *come to believe*"). *See* ¶¶240(c), 258-59, 261, 262-63, 265-67 (emphases added); *see also* Ex. B, statements 12-17, 19-21. Plaintiffs again fail to meet applicable pleading requirements as to such statements by

17

Masrani.  *See Frankfurt-Trust*, 336 F. Supp. 3d at 217.  Plaintiffs do not plausibly allege that Masrani did not hold those opinions/beliefs or that the facts he referenced in connection with them were untrue—and Plaintiffs do not dispute that TD and FH were continuing to work toward the merger and undertaking integration steps and that TD and FH extended the proposed closing date to May 27, 2023.  ¶¶240(c), 258-59, 261, 262-63, 265-67.[41]

As for Plaintiffs' contention that TD had *not* initiated discussions with FH about a potential further extension (¶268; Ex. B, statements 18-20), it is based solely on a *WSJ* article which indisputably misquotes a statement made by FH CEO Bryan Jordan in a May 4, 2023 conference.  *See* ¶268 (alleging the *WSJ* reported on May 4, 2023 that, according to Jordan, "TD and First Horizon didn't discuss extending the timeline for the deal, lowering the price, or changing its structure."); Ex. 9, FH Investor Call Transcript, at 3 (May 4, 2023) (Jordan's actual statement was: "At no time did we discuss any changes in price or any other changes to the structure of the deal.").  Accordingly, Plaintiffs fail to point to any well-pleaded factual allegations that the disclosed facts in these statements were untrue, which dooms Plaintiffs' claim.  *See Frankfurt-Trust*, 336 F. Supp. 3d at 217.

Plaintiffs' core contention that these statements about the closing delay were misleading because they purportedly "concealed regulators' unwillingness to approve the FH [Transaction] as a result of the willful deficiencies in TD's AML Program that precluded approval of the FH [Transaction]" (¶¶240(c), 264) is wholly unsupported.  Plaintiffs provide *zero* factual allegations that, at the time of any of these challenged statements, Defendants had been informed that the regulators would not approve the FH Transaction.  *See, e.g.*, *Y-mAbs*, 2024 WL 451691, at *9

---

[41] Similarly, Plaintiffs provide no factual allegation supporting their contention that, when asked by an analyst whether regulators were "taking a closer look at anything" and TD was accordingly "*anticipating having to make any adjustments to [its] product lineup or [its] fee schedule in advance of the close*," Masrani's response that he was "not aware of anything of the sort you're mentioning" (¶259; Ex. B, statement 12) was false or misleading.

("[a]bsent any clearer conflict between the [regulators'] feedback and Defendants' statements, opinions expressing optimism that [next steps were] "progressing well" or that Defendants were "hopeful" or "confident" are not actionable under section 10(b)").  Further, Plaintiffs' allegation that, by November 2022, TD's senior executives had been "directly informed that the OCC and Federal Reserve had found . . . significant failures in TD's AML practices" is based solely on an unattributed statement in a January 8, 2024 two-page article by *Capitol Forum* which is not supported by the Orders or the Pleas.  ¶¶260-61, 264.  Neither the article nor the CAC offers anything to suggest that the unidentified sources are reliable, *or even whether they worked at TD*. A court would not credit a "confidential witness" assertion with no indicia of reliability (*Frankfurt-Trust*, 336 F. Supp. 3d at 223), and there is no *more* reason to credit the unsourced statement here (if anything, there is even less reason, as the purported source is even further removed from plaintiffs and based on multiple levels of hearsay).

 ***Forward-Looking Statements.***  The challenged statements concerning the future timeline of any potential regulatory approval for the FH Transaction (Ex. B, statements 12-15) are also forward-looking statements protected by the PSLRA "statutory safe harbor."  *Y-mAbs*, 2024 WL 451691, at *6.  "A defendant is not liable if the forward-looking statement is identified and accompanied by meaningful cautionary language *or* is immaterial *or* the plaintiff fails to prove that it was made with actual knowledge that it was false or misleading."  *Id*. (emphases in original). As to the challenged statements at issue (*See* Ex. B, statements 12-15), Plaintiffs do not even attempt to adequately plead that Masrani or TD had "actual knowledge" that the statements were false or misleading at the time they were made, as required to evade the safe harbor.

19

    **C.**    **Plaintiffs Fail Adequately To Plead That Statements About Investigations of the AML Program Were Actionably False or Misleading**

The challenged statements related to regulators' investigations of the AML program are facially nonactionable and/or not adequately pleaded to be false or misleading.

***Nonactionable Statements.***  *First*, these statements include textbook examples of general statements that no reasonable investor would rely upon and are therefore nonactionable.  *See* Ex. B, statements 22-25, 27-31 (*e.g.*, TD is "working hard to enhance our programs" (statement 23), "as we hear improvements from others, including our regulators, what the industry is doing, we want to keep up with it and where appropriate, be ahead of it" (statement 28)); *see, e.g.*, *UBS AG*, 752 F.3d at 183; *see also supra* Section I.A.[42]

***Risk Disclosures.***  *Second*, Plaintiffs also challenge risk disclosures in TD's 2022 and 2023 40-F filings about potential materially adverse regulatory consequences if TD were determined to be non-compliant with AML regulations.  *See* Ex. B, statements 22, 27.  Plaintiffs provide no well-pleaded factual support that these risks had already materialized at the time these statements were made as of October 31, 2022 and October 31, 2023.  It is settled law in the Second Circuit that "[d]isclosure is not a rite of confession" and thus that "companies do not have a duty to disclose uncharged, unadjudicated wrongdoing," *UBS AG*, 752 F.3d at 184; *see also In re Barclays Bank PLC Sec. Litig.*, 756 F. App'x 41, 51 (2d Cir. 2018) (no duty to disclose a "regulator's expressions of concerns").

Having disclosed in August 2023 (¶301) that it was subject to multiple investigations and anticipated penalties, TD was not obligated to predict the outcome of the investigations.  *See, e.g.*,

---

[42] Again, should any of the statements in this category be found potentially actionable, Plaintiffs have not adequately pleaded that any such statements were false or misleading.  Plaintiffs have not provided factual allegations showing, for example, that during the period of the challenged statements—from December 2022 through 2024—TD was *not* working to fix AML issues.

*UBS AG*, 752 F.3d at 184.  Plaintiffs' reference to the subsequent entry of the Plea and Orders in October 2024 (¶¶240(d), 269, 275) is an attempt to allege "fraud by hindsight," which is impermissible because defendants "need not be clairvoyant." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000); *see also Acito v. IMCERA Grp. Inc.*, 47 F.3d 47, 53 (2d Cir. 1995) (no duty to predict adverse outcome); *In re Express Scripts Hldgs. Co. Sec. Litig.*, 773 F. App'x 9, 14 (2d Cir. 2019) (no duty to disclose "the uncertain state of the negotiations").  Further, Plaintiffs' contention that "by at least November 2022, Defendants had been made aware that the regulators . . . found significant lapses in TD's programs and that TD would face significant penalties" is based on one article and is unsupported by adequate factual allegations.[43]  ¶240(d).

*Statements of Opinion/Belief.*  *Third*, Plaintiffs challenge a statement of belief by Bambawale about "the root cause of what happened" (¶279; Ex. B, statement 31) but Plaintiffs provide no factual allegation that Bambawale did not believe what he said at the time and, in any event, the AML deficiencies identified in the Pleas and Orders do not contradict these statements. *See, e.g.*, *Frankfurt-Trust*, 336 F. Supp. 3d at 217; *Y-mAbs*, 2024 WL 451691, at *6.[44]

**D.      Plaintiffs Fail Adequately To Plead That Statements About TD's U.S. Retail and Corporate Accomplishments Were Actionably False or Misleading**

*Nonactionable and/or Forward-Looking Statements.*  Plaintiffs also seek to stretch their claims to encompass general statements concerning TD's U.S. retail and corporate accomplishments (¶¶240(2), 280-83), but they too are exactly the kind of statements that are

---

[43] *See supra* at 19 concerning the January 2024 *Capitol Forum* article, as to which no basis of reliability is alleged. Further, even that sole purported source does not contend that TD was told in November 2022 that it would face significant penalties for AML deficiencies.

[44] As for Plaintiffs' repackaging here of their allegations concerning the non-execution of the FH Transaction:  Their claim that Salom's statement in September 2023 that TD decided to "walk away" from the transaction because TD "just did not have regulatory certainty with regards to time" was somehow misleading is based on the wholly conclusory contention that regulators had already rejected the FH Transaction at that time because of AML issues. ¶274; Ex. B, statement 26.

considered nonmaterial, and nonactionable, by the Second Circuit (Ex. B, statements 32-35), and some of them are forward-looking statements as to which Plaintiffs do not plead around their safe-harbor protection (Ex. B, statements 34-35).  *E.g.*, Ex. B, statement 34 ("Corporate segment **will also maintain its focus** on . . ."), 35 ("U.S. Retail **will . . . continu[e] to invest strategically . . .**"); *see also supra*, Sections I.A-I.B.   Even if these statements were deemed to be potentially actionable, Plaintiffs do not allege that any were actually false when made.  *See supra*, Section I.A.

### E.    Plaintiffs Fail Adequately To Plead That Statements About TD's Internal and Disclosure Controls Were Actionably False or Misleading

Moving even further afield from their central theory, Plaintiffs allege that statements about TD's (i) internal financial reporting controls and (ii) disclosure controls were false or misleading. ¶¶240(f), 284-91.  These claims also fail.

*Statements of Opinion/Belief.*  Plaintiffs' claims concerning SOX certifications fail. ¶287; *see also* Ex. B, statement 36.   These are paradigmatic opinion statements, which "contain an important qualification that the certifying officer's statements are true based on his or her knowledge" (*Citigroup Sec. Litig.*, 2023 WL 2632258, at *19), and the CAC provides no particularized factual allegations that Masrani and Tran knew in 2022 and 2023—at the time they signed their certifications—of deficiencies in TD's internal controls.   The subsequent identification of AML deficiencies (¶291) is insufficient to show otherwise.  *See, e.g., Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 134 (E.D.N.Y. 2020) ("Plaintiffs fail to allege that . . . SOX certifications were materially false or misleading simply because a weakness in [the company's internal controls over financial reporting] was later discovered.").

*Statements of Opinion/Belief and Accurate Statements of Historical Fact.*  As to the statements that management performed evaluations as to TD's internal financial reporting controls and disclosure controls and concluded at that time that they were effective (Ex. B, statements

37-39), Plaintiffs offer no factual allegations that these evaluations were not performed or that management did not come to such conclusions and beliefs at the time. *See, e.g.*, *Damri v. LivePerson, Inc.*, 2025 WL 863322, at *19-20 (S.D.N.Y. Mar. 19, 2025) (dismissing claims as to statements about allegedly deficient internal controls for failure to allege contemporaneous falsity). Also, Plaintiffs offer no factual allegations whatsoever indicating that the statements describing the Board's oversight responsibilities in connection with TD's internal controls and compliance were false or misleading.

## II.      Plaintiffs Fail To Plead a Strong Inference of Scienter

Even if Plaintiffs could make the necessary showing that any challenged statements were actionably false or misleading, Plaintiffs fail to plead the required strong inference of scienter.

To adequately plead scienter—*i.e.*, the "intent to deceive . . . or defraud" investors— Plaintiffs must plead, as to each Defendant, "facts to show either (1) that defendant[] had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *JP Morgan*, 553 F.3d at 198. As to the latter, Plaintiffs must allege particularized facts establishing "that [1] specific contradictory information was available to the defendants [2] at the same time they made their misleading statements."[45] *In re PXRE Grp., Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009). "[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309.

The PSLRA requires plaintiffs to provide *more than* "a factual basis for [their] scienter allegations." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). A plaintiff

---

[45] For the forward-looking statements that Plaintiffs allege were misstatements, the pleading standard, which Plaintiffs fail to meet, is even higher—Plaintiffs must plead particularized facts showing "knowing falsity." *Y-mAbs*, 2024 WL 451691, at *6.

must plead facts *with particularity* that raise "a *strong* inference" of scienter. *Id.* (emphasis added). This inference "must be *more than merely reasonable*." *Id.* at 324 (emphasis added). It must be "cogent and at least as compelling as any opposing inference one could draw from" the well-pleaded facts alleged. *Id.* Generally, the way to show a strong inference of scienter as to a corporate defendant is "to impute it from an individual defendant who made the challenged misstatement." *Jackson v. Abernathy*, 960 F.3d 94, 98 (2d Cir. 2020).

### A.    Plaintiffs Engage in Impermissible Puzzle-Pleading

Plaintiffs' scienter allegations suffer from a threshold defect: in the sections of the CAC containing scienter allegations, Plaintiffs do not bother to cross-reference any of the challenged statements, which they identify only in a separate section of the CAC. *See* ¶¶240-91. As such, it is impossible to tell from Plaintiffs' scienter allegations which Individual Defendant was supposedly the "maker" of the statement, let alone whether that Defendant knew or had access to facts contrary to the statement at the time they made it. Under Second Circuit law, this pleading deficiency is fatal—and all the more so here, where Plaintiffs seek to impute the Individual Defendants' scienter to the entity Defendants—because without providing the requisite "connective tissue between [the defendants] and the alleged misstatement," a court can "only guess what role those employees played in crafting or reviewing challenged statements and whether it would otherwise be fair to charge the Corporate Defendants with their knowledge." *Abernathy*, 960 F.3d at 99.[46]

Plaintiffs are forcing the Court to hunt for alleged "contrary facts" of which the Defendant at issue allegedly had knowledge or access to at the time the Defendant purportedly made the

---

[46] A complaint must always identify the individual responsible for each fraudulent statement, except in "exceedingly rare instances," where "a statement may be so dramatic that collective corporate scienter may be inferred." *Id.* at 98-99. Plaintiffs do not plead a collective scienter theory, and, in any event, do not make particularized allegations showing that this is one of the "exceedingly rare instances" in which it would apply.

statement.    Exacerbating the burden of this exercise are the sheer length of the CAC (300+ paragraphs), the number of defendants (9) and many additional referenced non-parties, the length of the class period (2+ years), the overall time period covered by Plaintiffs' allegations (almost two decades), and the number of scienter allegations and discrete challenged statements.    *See Kempen*, 2024 WL 1805011, at *1–2 (referring to similar factors as a reason the plaintiff's similar pleading deficiencies "can't be easily overlooked").

In *Kempen*, this Court dismissed two successive complaints on the basis of puzzle-pleading.    *Kempen*, 2024 WL 1805011; *Kempen*, 2025 WL 949576.    Each time, the Court instructed the *Kempen* plaintiffs to structure their amended complaint to make clear, as to each challenged statement, the "contrary facts" that rendered the statement false, *and* the basis for inferring that the defendant who made the statement possessed knowledge of, or access to those same alleged contrary facts.    *Kempen*, 2024 WL 1805011; *see also Kempen*, 2025 WL 949576, at *1 (faulting plaintiffs for failing to "address each statement on its own terms, explaining why that statement was false or misleading when made ***and why defendants knew or should have known that***") (emphasis added); *see also id*. at **2-3 ("prohibited 'puzzle pleading' . . . prevent[s] the Court from 'meaningfully evaluat[ing] whether . . . ***there is a strong inference that [defendants] acted with scienter***") (emphasis added)).

The CAC does not come close to following this pleading structure as to any Individual Defendant.    Indeed, the scienter pleading defects here are even more pronounced than those in *Kempen*.    The *Kempen* plaintiffs at least inserted in their scienter allegations a number of references to the specific alleged misstatements at issue there.    *See, e.g.,* Am. Compl. ¶¶257-62, *Kempen*, No. 1:23-cv-08848-AS (ECF No. 35) (S.D.N.Y. filed Oct. 8, 2023).    The scienter sections of the CAC contain no such references.

25

### B.       Plaintiffs Plead No Cognizable Motive for Defendants to Commit Fraud

Plaintiffs make no serious attempt to plead motive.  The sole explicit reference to "motive" in the 300+ paragraph CAC is the rote allegation that Defendants were "*motivat[ed]* to conceal the truth" because of TD's "aggressive pursuit of U.S. expansion by acquisition of smaller regional banks," including via the FH Transaction.  ¶5 (emphasis added).  This allegation is wholly inadequate because it does not show, as required to plead motive, any "*concrete and personal benefit* to the individual defendants resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (emphasis added).  The CAC also contains a heading that reads, "Individual Defendants' Increased Compensation Tied to Securing the FH Transaction Supports a Strong Inference of Scienter."  ¶¶214-16.  But in support of that broad assertion, Plaintiffs offer only a handful of factual allegations that, on their face, are limited to compensation issues "[s]pecifically . . . with respect to Defendant Masrani," *i.e.*, they do not apply to any other "Individual Defendants."  ¶215.  Even those allegations—regarding Masrani's purported receipt of additional compensation in part due to the FH Transaction—fail, as a matter of Second Circuit law.  "[A]n allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers." *Kalnit*, 264 F.3d at 140; *see also JP Morgan*, 553 F.3d at 200-01.

### C.       Plaintiffs Do Not Plead Conscious Misbehavior or Recklessness

"Where motive is not apparent . . . [a plaintiff must] plead scienter by identifying circumstances indicating conscious behavior by the defendant, [and] *the strength of the circumstantial allegations must be correspondingly greater*." *Kalnit*, 264 F.3d at 142 (emphasis added).  Thus, without showing motive, a plaintiff's "uphill battle to plead a strong inference of scienter becomes that much steeper." *City of N. Miami Beach Police Officers' and Firefighters' Ret. Plan v. Nat'l Gen. Hldgs. Corp.*, 2021 WL 212337, at *11 (S.D.N.Y. Jan. 21, 2021).

26

Plaintiffs do not come close to meeting their heightened burden as to conscious misbehavior or recklessness.  They attempt to do so in a throw-everything-against-the-wall tactic, pleading nine categories of scienter allegations,[47] but these all suffer from multiple common and dispositive defects, as well as other specific deficiencies; whether considered individually or collectively, they fail to raise the requisite strong inference of scienter.

*First*, as discussed above, none of Plaintiffs' categories of scienter allegations establish, as to any particular challenged statement, each Individual Defendant who was a "maker" of the statement and who allegedly had the requisite scienter as to that statement.

*Second*, as to each challenged statement, Plaintiffs must—but fail to—plead particularized facts establishing "what *specific* contradictory information the *makers of the statements* had and the connection (*temporal* or otherwise) between *that information and the statements at issue*."[48] *In re Turquoise Hill Res. Ltd. Sec. Litig.,* 625 F. Supp. 3d 164, 238 (S.D.N.Y. 2022) (internal citations omitted; emphasis added); *see also, e.g., Abernathy*, 960 F.3d at 99 ("[W]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information."); *C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *7 (S.D.N.Y. Dec. 13, 2013) ("plaintiffs fail to tie any of the specific report[s] or information to the particular

---

[47] Plaintiffs' first category of scienter allegations relates to certain "former employees" (¶¶150-71), and Plaintiffs then make eight categories of "Additional Allegations of Scienter."  ¶¶173-223 (categories A through H).

[48] Plaintiffs cite cost management efforts at TD (referred to in the Pleas as a "flat cost paradigm") as further evidence of securities fraud, but this misses the mark.  *First*, as Plaintiffs acknowledge, the very Pleas on which the CAC relies specifically state that members of TD's AML unit indicated they were "ab[le] to operate within the flat cost paradigm without compromising risk appetite."  ¶65; Ex. 27, TDBNA Plea, Statement of Facts ¶42; Ex. 28, TDBUSH Plea, Statement of Facts ¶42.  These statements in the Pleas on their face negate scienter.  *Cf. Abernathy*, 960 F.3d at 99 (affirming denial of leave to replead as futile where proposed amended complaint did not make "particularized allegations that senior officers ignored . . . employees' warnings" that "could demonstrate that those [senior] officers acted fraudulently").  *Second*, the Pleas fundamentally describe an operational shortcoming.  Such shortcomings are not securities fraud.  *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 562 (S.D.N.Y. 2014) ("This narrative requires the Court to stretch allegations of, at most, corporate mismanagement into actionable federal securities fraud.  This is not the law."); *see also Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479 (1977).

statements made"), *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir. 2015).

Plaintiffs generally do not even attempt to "specifically identify" *any* relevant "reports or statements" as to which Plaintiffs show specific Defendants had knowledge or access *as of the relevant time*. *Abernathy*, 960 F.3d at 99; *Foley v. Transocean Ltd.*, 861 F. Supp. 2d 197, 213 (S.D.N.Y. 2012). Even in the rare instances in which Plaintiffs do attempt to plead this, Plaintiffs fail to specify: (a) which individual defendant had access to the report or statement, (b) what the challenged statement at issue was, and (c) what "contrary facts" the statements or reports contained, and how or why they were contrary to the challenged statement at issue. *See, e.g., Turquoise,* 625 F. Supp. 3d at 237 ("Plaintiffs fail to specify *exactly* how said information [about a large budget increase] contradicted Defendants' public statements, *as is required to show scienter*" (emphasis added)).[49]

The Pleas, on which Plaintiffs heavily rely, cannot supply the necessary particularized factual allegations. They were entered by just two of the nine defendants, both entities (TDBNA and TDBUSH) whose scienter, if any, would have to be imputed from Individual Defendants. ¶21. The CAC does not and cannot show: (a) that the Pleas identify which person was the "maker" of any of the challenged statements (which the Pleas do not reference); and (b) that the Pleas establish, as to any of the challenged statements, that any Individual Defendant—at the specific time any challenged statement was made—had knowledge of or recklessly disregarded facts establishing that the statement was false or misleading.

---

[49] For example, Plaintiffs allege that Tran was copied on emails attaching "EDS Guidance Documents" (¶¶163-64), but do not explain what "facts" in these documents were purportedly "contrary" to the only challenged statements they allege Tran made—SOX certifications for TD's 2022 and 2023 Forms 40-F (*see, e.g.*, ¶¶284-91).

*Third*, Plaintiffs' categories of scienter allegations for the most part engage in impermissible "group pleading." The Second Circuit has instructed that, "[i]n a case involving multiple defendants, plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; *guilt by association is impermissible*." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009) (emphasis added). Plaintiffs' nine categories of scienter allegations are replete with textbook examples of group pleading, including numerous references to "Defendants" and "TD Bank Group." *See, e.g.*, ¶¶155-230.

*Fourth*, Plaintiffs' categories of scienter allegations contain countless allegations regarding what certain entities—*e.g.*, TD, TDBNA, TDGUS, TDBUSH , and TD Bank Group—supposedly stated, knew, had access to, admitted, or pleaded guilty to. *See, e.g.*, ¶¶146, 173, 206, 217, 238. These allegations are essentially irrelevant to establishing the key predicates of scienter. To determine whether an entity possessed scienter imputed from an individual, or whether the individual themself possessed scienter, what matters are the alleged misstatements the *individual* made (if any), the contrary facts (if any) that the *individual* had knowledge of or access to, and *when* the *individual* had knowledge or access. *See, e.g.*, *Abernathy*, 960 F.3d at 98.

Apart from suffering from the above general pleading deficiencies, Plaintiffs' categories of scienter allegations suffer from multiple category-specific pleading deficiencies, of which the following are a few examples among many:

***Masrani's Role and Admission of "Responsibility."*** Plaintiffs make strained scienter allegations about Masrani that serve to highlight the absence of any well-pleaded basis for inferring scienter as to him. Weaponizing a sincere acceptance of responsibility for a regulatory outcome, not a securities fraud, Plaintiffs overreach by suggesting that Masrani's statement that AML deficiencies "took place on my watch as CEO, and I take full responsibility" somehow (a)

29

was an admission of willful misconduct that (b) supports an inference that he intended to deceive or defraud investors. ¶192. This construction of Masrani's statement is not plausible. Plaintiffs also quote two broad, general statements that Masrani made in 2023 about the "U.S. AML compliance program," yet Plaintiffs do not include either statement in their list of "actionable false and misleading statements and omissions." ¶189. This pair of *un*challenged statements have no discernible relevance to whether Masrani made any *challenged* statements with scienter, and Plaintiffs do not even bother to cross-reference any challenged statements in discussing Masrani. Plaintiffs also recite the positions that Masrani held at TD and TDBNA from 2005 through 2013, and assert that AML deficiencies existed at TDBNA during that time, but that was almost a decade before the putative class period, and Plaintiffs acknowledge that "Masrani left TDBNA in June 2013," long before the AML deficiencies at issue in this case occurred. ¶188.

*FH Transaction Allegations.* Plaintiffs' allegations regarding the FH Transaction do not contribute to, but actually undermine any inference of scienter—indeed, they raise a cogent and compelling *non*-fraudulent inference, for reasons discussed below. *See infra*, Section II.D. Plaintiffs also make certain FH-related allegations that are impermissibly speculative—for instance, unable to plead facts with particularity showing the reason for the alleged $200 million payment to FH (¶¶217-18), Plaintiffs speculate that the payment related to a need to "avoid or resolve claims threatened by First Horizon." ¶217. It is settled that the requisite "strong" inference of scienter must be based on *facts* pleaded with particularity, not speculation or guesswork. *Kalnit*, 264 F.3d at 140.

*Resignations, Terminations, and Compensation Cuts.* Plaintiffs claim that resignations, terminations, and compensation cuts occurred because of "*willful*" wrongdoing with regard to the AML program, but Plaintiffs fail to plead facts with particularity supporting that assertion. ¶¶219-

20 (emphasis added).  Moreover, resignations and terminations (which are hardly surprising in the context of a corporate guilty plea) can contribute to an inference of scienter only when a plaintiff links them through well-pleaded facts *to the securities fraud at issue*.  Plaintiffs have failed to do so.  Nor have Plaintiffs even attempted to explain how resignations and terminations supposedly relating to AML program deficiencies would contribute to an inference that the individuals at issue, much less the Individual Defendants, had an intent to deceive or defraud investors.  Plaintiffs' inconclusive allegations cannot support an inference of scienter.  *See, e.g.*, *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 446-47 (S.D.N.Y. 2005) ("[T]here are any number of reasons that an executive might resign, most of which are not related to fraud."); *see also, e.g., Malin v. XL Cap. Ltd.*, 499 F. Supp. 2d 117, 127, 162 (D. Conn. 2007) ("[I]t is more likely that [the individual at issue] were terminated and resigned as a result of company mismanagement, not securities fraud."), *aff'd*, 312 F. App'x 400 (2d Cir. 2009).

*Core Operations.*  Plaintiffs make a weak attempt to use the "core operations" doctrine to raise an inference of scienter as to all Defendants.  *See* ¶¶221-23.  Plaintiffs' suggestion that a compliance program—*e.g.*, TDBNA's AML program—is a "core operation," is unsupported by case law or common sense.  The same is also true of Plaintiffs' suggestion that a company, *e.g.*, TDBNA, can itself be a core operation of a company.  In any event, even if credited, Plaintiffs' core operation allegations cannot, without more, support the requisite inference, as to the challenged statements, that the Individual Defendant who made them knew or had access to contrary facts at the time they were made.  *See Novak*, 216 F.3d at 309.

*Former Employee Allegations.*  Plaintiffs make unavailing allegations regarding three unidentified former employees ("confidential witnesses" or "CWs"), none of whom is alleged to have ever communicated with any of the Individual Defendants.  ¶¶150-71.  Plaintiffs' CW

31

allegations do not support a showing, as to any Individual Defendant, that they "actually possessed the knowledge highlighting the falsity of [challenged] statements" that they made. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011) (rejecting CW allegations on that basis, among others).  At most, Plaintiffs' CW allegations imply that one or more of the Individual Defendants might have been aware that TD's AML programs faced technical challenges or were behind in reviewing transactions, or would have or should have been aware of these issues.  ¶¶150-71.  These allegations contribute nothing to the requisite "strong" inference of scienter as to any Defendant. *See, e.g.*, *Glaser*, 772 F. Supp. 2d at 589-90.

### D.    The Non-Fraudulent Inference is Far More Compelling

Where a "plausible, nonculpable explanation[]" is more likely than fraud, a plaintiff has failed to establish scienter.  *Tellabs,* 551 U.S. at 324; *see also Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap.*, 531 F.3d 190, 194 (2d Cir. 2008).  Viewing the record before this Court "holistically," there are "plausible, nonculpable explanations" far more likely than that Defendants engaged in the alleged fraud throughout the class period, with no apparent motive at all for doing so.  *Tellabs*, 551 U.S. at 310 ("While omissions and ambiguities count against inferring scienter, the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.").

Even accepting all the well-pleaded facts as true, they suggest that Defendants were in a constant game of "catch up"—as they gradually learned of the company's emerging problems and engaged in evolving efforts to investigate and address them, they learned of yet more, including from third parties as expressly set forth in the Plea.  *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 297-99 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).  The CAC, and documents incorporated by reference or which can be judicially noticed, support a reasonable inference that through overlapping investigations by multiple regulators and the DOJ,

new information came to light about the problem incrementally through a process which was iterative, and to which Defendants reacted by taking the necessary time to look into, analyze, and—when appropriate and permissible—disclose developments, even as they were limited, by regulatory confidentiality obligations and other government authorities' expectations, in what they could disclose to the market before the investigations were resolved. *E.g.*, ¶¶301, 307 (alleging disclosures of the increasing severity of AML problems over the course of more than a year); Ex. 15, TD Press Release (Apr. 30, 2024).

Although it became clear that there were substantial deficiencies in TD's AML program, hindsight allegations are insufficient to support a strong inference of scienter. *See, e.g., North Collier Fire Control v. MDC Partners, Inc.*, 2016 WL 5794774, at *21 (S.D.N.Y. Sept. 30, 2024) (later determination of impropriety did not support inference of earlier scienter). Similarly, Plaintiffs' hindsight critique of Defendants' actions suggesting that improvements should have been implemented more swiftly or broadly does not create an inference of scienter. *See Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) ("That [defendants] chose an incremental measured response, while erroneous in hindsight, is as plausible an explanation for the losses as an inference of fraud."). Similarly, if Plaintiffs mean to allege that Defendants would have learned the truth if only they had performed sufficient reviews or engaged in additional oversight sooner, that has been "repeatedly rejected as insufficient to allege knowledge or conscious recklessness to support a strong inference of scienter," much less is it sufficient to give rise to a "strong" inference of scienter in the face of competing non-culpable inferences. *McIntire v. China MediaExpress Hldgs, Inc*., 927 F. Supp. 2d 105, 127-28 (S.D.N.Y. 2013).

The absence of a plausible personal or corporate benefit from the point of view of the Individual Defendants as a group weighs strongly against finding some strong inference of securities fraud here.  As Plaintiffs themselves allege, Defendants were "aware[] of regulatory scrutiny of other banks' AML Programs."  ¶¶208-09 (and heading).  That awareness would have led them to understand—to the extent they had knowledge, as alleged, of serious AML problems— that it ultimately would be against their interests to perpetuate those problems which could potentially lead to significant repercussions.  The notion that Defendants intentionally perpetrated a decade-long effort to defraud investors without motive in these circumstances is fundamentally illogical and "does not resonate in common experience."  *Nguyen v. Endologix, Inc*., 962 F.3d 405, 415 (9th Cir. 2020); *see also Tellabs*, 551 U.S. at 325 (noting that "significance . . . can be ascribed to" the "lack" of an alleged motive).

The Pleas, upon which Plaintiffs heavily rely, do not, viewed in the context of the "entirety of the [CAC]," raise a "cogent and compelling" inference that any Individual Defendant had the specific intent to "deceive or defraud" investors.  *Tellabs*, 551 U.S. at 324-25.  The Pleas relate to offenses having nothing to do with securities, much less securities *fraud*.  The Second Circuit has cautioned against inferring an individual's intention to commit securities fraud (scienter) from conduct not relating to securities or the investors in a company's stock.  *Abernathy*, 960 F.3d at 98 n.2; *see also JP Morgan Chase*., 553 F.3d at 198.  Indeed, the Second Circuit has instructed that an intent to defraud a company's *investors* cannot be established even by a conclusive finding (not present here) that the company intentionally *defrauded consumers*.  *Abernathy*, 960 F.3d at 98 n.2. The Second Circuit reasoned that "it is not at all apparent that [] individuals whose states of mind are relevant to prove corporate scienter in the context of a consumer fraud action are the same individuals whose states of mind are relevant in the context of a securities fraud action."  *Id.*; *see*

34

*also JP Morgan Chase*, 553 F.3d at 198 ("[T]he facts alleged must support an inference of an intent to defraud the plaintiffs rather than some other group.").

As for the FH Transaction, on which Plaintiffs also heavily rely to seek to support scienter, Plaintiffs' own allegations demonstrate a *non*-culpable inference is by far more "cogent and compelling." *Tellabs*, 551 U.S. at 324; ¶¶210-18. Plaintiffs plead that, in connection with the proposed merger, it was "well-known" that the Federal Reserve and OCC would focus very closely on the AML program, examining it for "serious deficiencies," and that unresolved problems would "preclude the FH [Transaction]." ¶213. But if, as Plaintiffs allege, Defendants intended to defraud investors by concealing those serious AML program deficiencies and were aware of the high risk those issues would come to light and doom the merger, it is not plausible that Defendants would have plunged ahead with the FH Transaction regardless. Thus, Plaintiffs' allegations about FH confirm that a "plausible, nonculpable explanation[]" is more likely than fraud.

At bottom, Plaintiffs' central theory is that the Individual Defendants did not disclose enough about the investigations, the AML issues they revealed, or their likely consequences early enough, and instead fraudulently concealed these facts until announcing the final terms of the resolutions. But the CAC's timeline of alleged facts and of disclosures over the course of more than a year of the increasing severity of the investigations undermines this theory at every turn and is far more consistent with the Individual Defendants disclosing what they could, when they could, as they learned additional facts through evolving investigations and as constrained by regulatory confidentiality requirements. *See, e.g.*, 12 C.F.R. §§ 261.2(b)(1), 4.32(b), 4.36(b), (d).

35

### III.    Plaintiffs Fail To Adequately Plead Scheme Liability

Plaintiffs' purported scheme-liability claim should be rejected because it suffers from glaring, independently-fatal pleading deficiencies.[50]  ¶¶231-39.

***Plaintiffs Do Not Plead Reliance***.  "To state a scheme liability, a plaintiff must show . . . reliance."  *CarLotz*, 2024 WL 3924708, at *2.  Reliance is an "essential element of the § 10(b) private cause of action," including one premised on scheme liability, because it ensures that "for liability to arise, the 'requisite causal connection between a defendant's misrepresentation and a plaintiff's injury' exists."  *Stoneridge Inv. Partners, LLC v. Sci.Atlanta*, 552 U.S. 148, 159 (2008).

Plaintiffs allege that Defendants engaged in six types of allegedly deceptive acts in furtherance of their purported scheme.[51]  As to none of these acts do Plaintiffs even attempt to allege reliance, much less do Plaintiffs "show" it through well-pleaded factual allegations.  *CarLotz*, 2024 WL 3924708, at *2.  Plaintiffs do not even use the word "rely," "reliance," or any variant thereof, in their scheme-liability allegations.  ¶¶231-39.

Indeed, Plaintiffs make only one reliance allegation anywhere the CAC—that they are entitled to a "presumption of reliance on Defendants' material misrepresentations and omissions [to investors] pursuant to the fraud-on-the-market doctrine."  ¶318.  But this alleged misrepresentation-specific reliance obviously cannot satisfy Plaintiffs' pleading burden as to the

---

[50] In addition to failing to plead reliance or scienter, as shown below, Plaintiffs do not (and cannot) plead that all of the alleged acts in furtherance of the purported scheme (¶232) were "inherently deceptive" to investors.  *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 3924708, at *5 (S.D.N.Y. Aug. 23, 2024) (Subramanian, J.).  For instance, Plaintiffs' suggestion that the purported "Flat Cost Paradigm," which Plaintiffs describe as an internal budget freeze (¶234), was "inherently deceptive" to investors utterly defies common sense.

[51] In summary, these types of alleged acts are: (a) engaging in an "undisclosed conspiracy" and related acts (¶¶232-33), (b) "implement[ing] the Flat Cost Paradigm" (¶¶234-35), (c) "minimiz[ing] . . . transaction monitoring," (¶236), (d) "suppress[ing] known AML risks" (¶237), (d) "fail[ing] to file SARs and CTRs" (¶238), and "mislead[ing] regulators" (¶239).  Plaintiffs separately allege that Defendants disseminated misstatements to investors, although Plaintiffs do not plead this alleged "dissemination" was "[i]n furtherance of th[e] scheme to defraud" (¶232), nor otherwise plead a "dissemination" theory of scheme liability, *i.e.*, Plaintiffs do not plead with particularity, as they must, which statements were disseminated, by who, and when.  *CarLotz*, 2024 WL 3924708, at *4.  Moreover, as shown above, Plaintiffs do not plead any underlying actionably false or misleading statements.  *See* Section I, *supra*.

six types of deceptive acts that form the basis for Plaintiffs' scheme-liability claim. And Plaintiffs cannot otherwise base their scheme-liability claim on allegations concerning Defendants' alleged misstatements because that amounts to impermissibly "repackaging" their misrepresentations claim as a scheme-liability claim. *CarLotz*, 2024 WL 3924708, at *4.

For Plaintiffs to plead reliance as to the six types of acts at issue (all of which amount to alleged "undisclosed deceptive or manipulative conduct"), they would have to show that these acts made it "necessary or inevitable" that the Defendants would make all of their alleged misstatements. *Turquoise*, 625 F. Supp. 3d at 254; *see also Pac. Inv. Mgmt. Co. LLC v. Mayer Brown LLP*, 603 F.3d 144, 156, 160 (2d Cir. 2010). Plaintiffs have not alleged this even in *conclusory* fashion, much less plausibly alleged it with the requisite specificity.

***Plaintiffs Do Not Plead Scienter***. Plaintiffs' scheme liability claim also fails because Plaintiffs fail to muster any well-pleaded allegations of scienter. As this Court has held, a plaintiff must "state with particularity facts giving rise to a strong inference" of scienter "*with respect to each act or omission*" allegedly committed in furtherance of a purported scheme. *CarLotz*, 2024 WL 3924708, at *5 (emphasis in original). Plaintiffs do not satisfy this burden, as to *any* Defendant, as to *any* allegedly deceptive act. Plaintiffs make only general and conclusory assertions of intent—*e.g.*, that Defendants "knowingly and recklessly engaged in [the acts]"—that do not even specifically relate to an intent to *defraud investors*."[52]  ¶231. Indeed, Plaintiffs generally fail to plead any allegations showing what any Defendant's intent was as to any specific act, and in a few instances, Plaintiffs' allegations show that Defendants' intent was *not* to deceive investors, but to accomplish something else—*e.g.*, Plaintiffs allege that the so-called "Flat Cost Paradigm" was implemented "in order to keep costs down." ¶234.

---

[52] Plaintiffs fail to plead scienter as to Defendants' alleged misstatements for the reasons set forth in Section II, *supra*.

37

In sum, given the CAC's multiple pleading deficiencies, Plaintiffs' scheme-liability claim fails.

## IV.    Plaintiffs Fail To Plead Loss Causation

Plaintiffs' loss causation allegations, which are based on six alleged "corrective disclosures," all suffer from at least one common fatal pleading defect, and most of the alleged corrective disclosures suffer from additional specific pleading defects.

All of Plaintiffs' corrective disclosure allegations fail to specify *which* purported corrective disclosures "reveal[ed] to the market the falsity" of *which* specific challenged statement. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir. 2005).  Plaintiffs apparently do not mean to plead, nor could they, that *every* purported corrective disclosure demonstrated the falsity of *every one* of the multitude of challenged statements (which would not be a plausible, well-pleaded theory for many reasons, among them that some challenged statements were allegedly made *after* certain corrective disclosures).  Yet Plaintiffs have left the Court to guess, or hunt through its hundreds of paragraphs, to determine which challenged statement(s), if any, purportedly correspond to each purported corrective disclosure.

Plaintiffs' loss causation allegations should be rejected on this basis alone.  Apart from overburdening the Court in the manner described, courts have held that pleading loss causation in such broad strokes is impermissible, and, indeed, the PSLRA itself indicates a plaintiff must separately plead loss causation as to *each* alleged "act or omission of the defendant." 15 U.S.C. § 78u–4(b)(4) (referring to each "act or omission").  Consistent with that, courts—including this one—have analyzed corrective disclosures with a focus on particular statements. *See, e.g.*, *Castillo v. Dean Witter Discover & Co.*, 1998 WL 342050, at *5 (S.D.N.Y. June 25, 1998) ("The PSLRA requires plaintiffs to link each act or omission of the defendant to the plaintiffs' alleged losses"); *Y-mAbs*, 2024 WL 451691, at *14 (analyzing whether plaintiffs pleaded that "each [challenged]

38

statement" was corrected by the alleged corrective disclosures); *see also, e.g., In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *10 (S.D.N.Y. Mar. 29, 2024); *Davidoff v. Farina*, 2005 WL 2030501, at *15-16 (S.D.N.Y. Aug. 22, 2005).

There is a further reason Plaintiffs' broad-brush approach fails. The Second Circuit has instructed that if a court determines that the nexus between a corrective disclosure and the specific challenged statement at issue is "attenuated," a fraud claim cannot be made out. *Lentell,* 396 F.3d at 174. Needless to say, a court cannot make that assessment without knowing *which* challenged statement the disclosure purportedly corrects.

Separate and apart from this general pleading deficiency, the purported corrective disclosures published on May 25, 2023, May 2, 2024, August 22, 2024, and October 10, 2024 suffer from additional, incurable deficiencies.

***Alleged Corrective Disclosure on May 25, 2023.*** Plaintiffs' allegation that TD's disclosure in its Form 6-K on May 25, 2023 of "reasonably possible losses ('RPL') of $1.27 billion" was a "corrective disclosure" is undercut by the disclosure itself. ¶298. TD merely disclosed a marginal increase of *less than one percent* of the high-end of the RPL range "from zero to approximately $1.26 billion" as of October 31, 2022 to "zero to approximately $1.27 billion" as of April 30, 2023. Ex. 29, 2Q23 Quarterly Report, at 78 (May 25, 2023). Even more importantly, to the extent that Plaintiffs are asserting (although they do not specify) that the challenged statements at issue related to investigations of the AML program, Plaintiffs fail to cite any of the required "facts" showing any connection between those statements and the RPL disclosure. *Lentell*, 396 F.3d at 175 ("To plead loss causation, the complaints must allege facts"). Indeed, there is a mismatch between the May 25, 2023 disclosure about the $1.27 billion RPL and the challenged statements seemingly at issue, as none of those statements refers or even relates to that RPL. Further, disclosures

39

referenced in the CAC itself reflect that separate reserves add up to the final penalties for the AML investigation,[53] which further belies Plaintiffs' suggestion (in addition to the absence of any pleaded factual support) that the RPL that was marginally increased on May 25, 2023 was connected to AML issues.

***Alleged Corrective Disclosure on May 2, 2024.***  On May 2, 2024, the *WSJ* published an article purporting to "provid[e] ***further details*** about the probes" and "highlighted that the DOJ investigation into TD's AML compliance focused on how Chinese crime groups and drug traffickers used the Canadian lender to launder money from U.S. fentanyl sales."  ¶304 (emphasis added).  But the probes by then had long been known to the market, and TD had not made any prior contrary public statements regarding the points referenced in the article about Chinese criminals or drug traffickers.  "Even if this disclosure expose[d] additional details . . . [,] it does not expose new concealed information."  *In re Veon Ltd. Sec. Litig.*, 2025 WL 66444, at \*6 (S.D.N.Y. Jan. 10, 2025).  At most, the alleged stock price decline on May 2 reflects the market's reaction to news indicating the materialization of known risks of regulatory action.  *See Monroe Cnty. Emps' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 344, 358 (S.D.N.Y. 2014); *see also In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513-14 (2d Cir. 2010) (rejecting loss causation theory based on materialization of known risks).

***Alleged Corrective Disclosure on August 22, 2024.***  On August 22, 2024, "TD reported its first loss in over two decades after setting aside an extra $2.6 billion to cover expected fines."

---

[53] Plaintiffs allege that on August 22, 2024, TD announced that it had "set[] aside an *extra* $2.6 billion to cover expected fines from the regulators."  ¶307 (emphasis added).  That was in addition to "an initial provision of [CAD]$615 million (US$450 million)" TD had taken earlier "in connection with its discussions with one of its U.S. regulators related to [the AML-related investigations]."  Ex. 30, 3Q24 Quarterly Report, at 79 (Aug. 22, 2024).  In other words, through reserves separate from the $1.27 billion RPL, TD had expressly set aside $3.05 billion specifically for the AML-related fines, which corresponded approximately to the "total of $3.09 billion in fines and penalties" that it paid.  ¶133.

¶307.  Plaintiffs' own allegations belie their assertion that TD's stock price dropped "[o]n the news that TD's AML deficiencies were so severe that TD would be required to set aside several billion dollars to pay penalties," because Plaintiffs themselves acknowledge that market participants had long known that TD faced potential penalties of that size.  *See* ¶308.  Indeed, well over three months earlier, market participants were already speculating that TD might face large fines, with analysts opining that a "total penalty amount of $2 bln [wa]s realistic."  *Id.*  Once again, the stock price decline at issue, at most, reflects the market's reaction to news indicating the materialization of known risks.  *See YPF*, 15 F. Supp. 3d at 344, 358.

***Alleged Corrective Disclosure on October 9, 2024.***  On October 9, 2024, the *WSJ* reported that two TD entities would plead guilty to criminal conduct relating to their AML programs, and the following day TD and regulators published press releases disclosing the Pleas.  ¶¶311-12.  Plaintiffs nowhere specifically plead that the fact of certain TD entities pleading guilty was previously concealed in a way that rendered earlier statements misleading, and therefore that the disclosure "reveal[ed] to the market the falsity" of any alleged prior misstatement.  *Lentell*, 396 F.3d at 175 n.4.  As for the disclosure of the amount of the penalties, by October 9, 2024, the contours of the Pleas had long been known and anticipated by market participants.  Well over a month earlier, for example, the market had absorbed that "TD's AML deficiencies were so severe that TD would be required to set aside several billion dollars to pay penalties and remediate the issue" (¶308) and analysts had even predicted "regulator-imposed limitations on [TD's] business activities" (¶306).

## V.    Plaintiffs Fail To Plead Control Person Liability Under Section 20(a)

Plaintiffs' Section 20(a) claim fails at the outset because, as demonstrated above, the CAC does not adequately allege a primary violation of Section 10(b).  Where a plaintiff "fails to allege any primary violation . . . it cannot establish control person liability."  *ATSI*, 493 F.3d at 108.

41

Plaintiffs' Section 20(a) claim also independently fails because the CAC fails to plead that any Individual Defendant controlled a primary violator or culpably participated in an alleged primary violation, as required to state a Section 20(a) claim. *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998). "Actual control is essential to control person liability," and "culpable participation" requires particularized allegations of at least recklessness. *In re Alstom S.A. Sec. Litig.*, 406 F. Supp. 2d 433, 486, 491 (S.D.N.Y. 2005). But the CAC offers nothing beyond rote allegations that the undifferentiated Individual Defendants, as "senior corporate officers" of the undifferentiated "TD Corporate Defendants" must have controlled and culpably participated in the alleged primary violations. ¶¶336-42. This is insufficient. *See, e.g.*, *Alstom*, 406 F. Supp. 2d at 487 (simply pleading "officer or director status" does not satisfy the "decidedly fact-based determination" of control under Section 20(a)). Even setting aside this fatal pleading infirmity, it is not plausible that the TD Group-level Individual Defendants—such as Masrani, TD Group's CEO—actually controlled or culpably participated in violations based on conduct that occurred at subsidiaries three levels removed from TD itself.[54]

## CONCLUSION

For the foregoing reasons, the CAC should be dismissed with prejudice.

---

[54] Ex. 1, 2024 Annual Report, at 96 (showing indirect subsidiary relationship between TD and TDBNA).

Dated: May 30, 2025                                    Respectfully submitted,


                                                       By:  */s/ Adam S. Hakki*
                                                       Adam S. Hakki (Lead Trial Counsel)
                                                       Agnès Dunogué
                                                       Jeffrey D. Hoschander
                                                       **ALLEN OVERY SHEARMAN STERLING US LLP**
                                                       599 Lexington Avenue
                                                       New York, NY 10022
                                                       Tel.: (212) 848-4000
                                                       adam.hakki@aoshearman.com
                                                       agnes.dunogue@aoshearman.com
                                                       jeff.hoschander@aoshearman.com

                                                       *Attorneys for Defendants The Toronto-Dominion*
                                                       *Bank, TD Bank, N.A., TD Bank US Holding*
                                                       *Company, Ajai K. Bambawale, Bharat Masrani,*
                                                       *Leovigildo Salom, and Kelvin Vi Luan Tran*

**CERTIFICATION OF WORD COUNT**

I hereby certify pursuant to Southern District of New York Local Rule 7.1(a) and Section 8(C) of this Court's Individual Practices in Civil Cases, that the foregoing memorandum of law contains 13,999 words, inclusive of point headings and footnotes and exclusive of pages containing the caption, table of contents, table of authorities, table of abbreviations, and any required certificates, and accordingly complies with applicable word limitations as set forth in the Court's May 20, 2025 Order (ECF No. 67).  In preparing this certification, I have relied on the word count of the word processing software used to prepare this memorandum.


Dated:  May 30, 2025                    By:    _____
        New York, New York                            Agnès Dunogué