# EXHIBIT 10

EX-2.1 2 afy2021xexh21xtdmergeragmt.htm EX-2.1

# AGREEMENT AND PLAN OF MERGER

by and among

## FIRST HORIZON CORPORATION,

## THE TORONTO-DOMINION BANK,

## TD BANK US HOLDING COMPANY

and

## FALCON HOLDINGS ACQUISITION CO.

---

Dated as of February 27, 2022

AGREEMENT AND PLAN OF MERGER

AGREEMENT AND PLAN OF MERGER, dated as of February 27, 2022 (this "Agreement"), by and among The Toronto-Dominion Bank, a Canadian chartered bank ("Parent"), First Horizon Corporation, a Tennessee corporation ("Company"), and TD Bank US Holding Company, a Delaware corporation and an indirect, wholly owned subsidiary of Parent ("Holdco") and Falcon Holdings Acquisition Co., a Delaware corporation and a direct subsidiary of Holdco ("Merger Sub" and together with Parent and Holdco, "Parent Parties").

RECITALS

A.    The Boards of Directors of each of Parent, Holdco, Merger Sub and Company have determined that it is in the best interests of their respective companies and, in the case of Holdco, Merger Sub and Company, their shareholders, to consummate the strategic business combination transaction provided for in this Agreement, pursuant to which Merger Sub will, subject to the terms and conditions set forth herein, merge with and into Company (the "Merger"), so that Company is the surviving corporation in the Merger (hereinafter sometimes referred to in such capacity as the "Surviving Corporation"), and, following the Merger as set forth herein, the Surviving Corporation may, at Parent's election and subject to the terms and conditions set forth herein, merge with and into Holdco (the "Second Step Merger"), so that Holdco is the surviving corporation in the Second Step Merger;

B.    In furtherance thereof, the respective Boards of Directors of Parent, Holdco, Merger Sub and Company have approved the Merger and adopted this Agreement and Company has resolved to submit this Agreement to its shareholders for approval and to recommend that its shareholders approve this Agreement;

C.    At a date and time following the Closing as determined by Parent, First Horizon Bank, a Tennessee state-chartered bank and wholly owned subsidiary of Company ("Company Bank") will, subject to the terms and conditions set forth herein and in the Bank Merger Agreement, merge with and into TD Bank, National Association, a national banking association and wholly owned subsidiary of Holdco ("Parent Bank" and such merger, the "Bank Merger" and together with the Merger and the Second Step Merger, the "Mergers"), so that Parent Bank is the surviving bank in the Bank Merger (hereinafter sometimes referred to in such capacity as the "Surviving Bank");

D.    As an inducement to and condition of Company's willingness to enter into this agreement, concurrently with the entry of the parties into this Agreement, Parent and Company have entered into a Securities Purchase Agreement (the "Series G Convertible Preferred Stock Purchase Agreement"), pursuant to which Parent is acquiring $493,569,450 aggregate liquidation preference (such payment, the "Series G Convertible Preferred Stock Payment") of Company's Perpetual Convertible Preferred Stock, Series G (the "Series G Convertible Preferred Stock"); and

E.    In this Agreement, the parties desire to make certain representations, warranties and agreements in connection with the Merger and also to prescribe certain conditions to the Merger.

1

the course of their due diligence investigation of Company, the negotiation of this Agreement or in the course of the transactions contemplated hereby.

(b)        Company acknowledges and agrees that neither Parent nor any other person on behalf of Parent has made or is making, and Company has not relied upon, any express or implied representation or warranty other than those contained in Article IV.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PARENT PARTIES

Except (i) as disclosed in the disclosure schedule delivered by Parent Parties to Company prior to the execution hereof (the "Parent Disclosure Schedule") (it being understood that (a) no item is required to be set forth as an exception to a representation or warranty if its absence would not result in the related representation or warranty being deemed untrue or incorrect, (b) the mere inclusion of an item in the Parent Disclosure Schedule as an exception to a representation or warranty shall not be deemed an admission by Parent Parties that such item represents a material exception or fact, event or circumstance or that such item would reasonably be expected to result in a Material Adverse Effect and (c) any disclosures made with respect to a section of this Article IV shall be deemed to qualify (1) any other section of this Article IV specifically referenced or cross-referenced and (2) other sections of this Article IV to the extent it is reasonably apparent on its face (notwithstanding the absence of a specific cross reference) from a reading of the disclosure that such disclosure applies to such other sections or (ii) as disclosed in reports filed with or furnished to the SEC by Parent since January 1, 2020 and prior to the date hereof (but disregarding risk factor disclosures contained under the heading "Risk Factors," or disclosures of risks set forth in any "forward-looking statements" disclaimer or any other statements that are similarly non-specific or cautionary, predictive or forward-looking in nature), Parent Parties hereby represent and warrant to Company as follows:

Section 4.1        Corporate Organization. Parent is duly organized, validly existing and in good standing as a Schedule I bank under the Bank Act (Canada), is a bank holding company duly registered under the BHC Act and has elected to be treated as a financial holding company under the BHC Act. Holdco is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Each Parent Party has the corporate power and authority to own, lease or operate all of its properties and assets and to carry on its business as it is now being conducted in all material respects. Each Parent Party is duly licensed or qualified to do business and in good standing in each jurisdiction in which the nature of the business conducted by it or the character or location of the properties and assets owned, leased or operated by it makes such licensing, qualification or standing necessary, except where the failure to be so licensed or qualified or to be in good standing would not, either individually or in the aggregate, have a Material Adverse Effect on Parent. A true and complete copy of Parent's,

35

Holdco's, TDGUS' and Merger Sub's Constituent Documents, as in effect as of the date of this Agreement, have been previously been made available by Parent to Company.

Section 4.2     Capitalization. The authorized capital of Parent consists of an unlimited number of common shares and an unlimited number of Class A first preferred shares.

Section 4.3     Authority; No Violation.

(a)     Each Parent Party has full corporate power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the Merger have been duly and validly approved by the Board of Directors of each Parent Party. The Board of Directors of each Parent Party has determined that the Merger, on the terms and conditions set forth in this Agreement, is in the best interests of such company and its shareholders, has adopted and approved this Agreement and Holdco has directed that this Agreement be submitted to its sole stockholder for approval and has adopted a resolution of the foregoing effect. Except for such stockholder approval, no other corporate proceedings on the part of any Parent Party are necessary to approve this Agreement or to consummate the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by each Parent Party and (assuming due authorization, execution and delivery by Company) constitutes a valid and binding obligation of each Parent Party, enforceable against such Parent Party in accordance with its terms (except in all cases as such enforceability may be limited by the Enforceability Exceptions).

(b)     Neither the execution and delivery of this Agreement by each Parent Party, nor the consummation by each Parent Party of the transactions contemplated hereby (including the Merger, the Second Step Merger and the Bank Merger), nor compliance by each Parent Party with any of the terms or provisions hereof, will (i) violate any provision of the organizational documents of any Parent Party, as applicable or (ii) assuming that the consents and approvals referred to in Section 4.4 are duly obtained, (x) violate any law, statute, code, ordinance, rule, regulation, judgment, order, writ, decree or injunction applicable to any Parent Parties or any of their Subsidiaries or any of their respective properties or assets or (y) violate, conflict with, result in a breach of any provision of or the loss of any benefit under, constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, result in the termination of or a right of termination or cancellation under, accelerate the performance required by, or result in the creation of any Lien upon any of the respective properties or assets of any Parent Party or any of their Subsidiaries under, any of the terms, conditions or provisions of any note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which any Parent Party or any of their Subsidiaries is a party, or by which they or any of their respective properties or assets may be bound, except (in the case of clauses (x) and (y) above) for such violations, conflicts, breaches, defaults, terminations, cancellations, accelerations or creations that either individually or in the aggregate would not have a Material Adverse Effect on Parent.

Section 4.4     Consents and Approvals. Except for (a) the filing of the applications, filings or notices to or with the Governmental Entities, Regulatory Agencies and SROs listed in Annex A and approval of or non-objection to such applications, filings and notices, (b) the filing with the SEC of the Proxy Statement, and (c) the filing of the Certificates of Merger with the Tennessee Secretary pursuant to the TBCA and Delaware Secretary pursuant

to the DGCL, no consents or approvals of or filings or registrations with any Governmental Entity are necessary in connection with (i) the execution and delivery by each of Parent Party of this Agreement or (ii) the consummation by each Parent Party of the Merger, the Second Step Merger and the other transactions contemplated hereby (including the Bank Merger). As of the date hereof, Parent Parties have no knowledge of any reason related to Parent or its Subsidiaries why the necessary regulatory approvals and consents will not be received to permit consummation of the Mergers on a timely basis (including any reason why the relevant statutory factors related to such approvals and consents will not be satisfied).

Section 4.5    Broker's Fees. None of Parent, Holdco or any of their respective Subsidiaries, nor any of their respective officers or directors, has employed any broker, finder or financial advisor or incurred any liability for any broker's fees, commissions or finder's fees in connection with the Merger or related transactions contemplated by this Agreement, other than J.P. Morgan Securities LLC.

Section 4.6    Legal and Regulatory Proceedings.

(a)    Except as would not reasonably be expected to, either individually or in the aggregate, have a Material Adverse Effect on Parent, neither Parent, Holdco nor any of their Subsidiaries is a party to any, and there are no outstanding or pending or, to the knowledge of Parent, threatened, legal, administrative, arbitral or other proceedings, claims, actions or governmental or regulatory investigations of any nature against Parent, Holdco or any of their Subsidiaries or any of their current or former directors or executive officers or challenging the validity or propriety of the transactions contemplated by this Agreement.

(b)    Except as would not reasonably be expected to, either individually or in the aggregate, have a Material Adverse Effect on Parent, there is no injunction, order, judgment, decree, or regulatory restriction imposed upon Parent, Holdco, any of their Subsidiaries or their assets.

Section 4.7    Compliance with Applicable Law.

(a)    Parent, Holdco and each of their Subsidiaries hold, and have at all times since January 1, 2020, held, all licenses, registrations, franchises, certificates, variances, permits charters and authorizations necessary for the lawful conduct of their respective businesses and ownership of their respective properties, rights and assets under and pursuant to each (and have paid all fees and assessments due and payable in connection therewith), except where neither the cost of failure to hold nor the cost of obtaining and holding such license, registration, franchise, certificate, variance, permit, charter or authorization (nor the failure to pay any fees or assessments) would, either individually or in the aggregate, have a Material Adverse Effect on Parent, and, to the knowledge of Parent, no suspension or cancellation of any such necessary license, registration, franchise, certificate, variance, permit, charter or authorization is threatened.

(b)    Except as would not, either individually or in the aggregate, have a Material Adverse Effect on Parent, Parent, Holdco and each of their Subsidiaries have complied with and are not in default or violation under any applicable law, statute, order, rule, regulation, policy and/or guideline of any Governmental Entity relating to Parent, Holdco or any of their Subsidiaries, including (i) all applicable laws and regulations (and publicly posted policies)

37

relating to the privacy and security of Personal Data and (ii) the USA PATRIOT Act, the Bank Secrecy Act, the Equal Credit Opportunity Act and Regulation B, the Fair Housing Act, the Community Reinvestment Act, the Fair Credit Reporting Act, the Truth in Lending Act and Regulation Z, the Home Mortgage Disclosure Act, the Fair Debt Collection Practices Act, the Electronic Fund Transfer Act, the Dodd-Frank Wall Street Reform and Consumer Protection Act, any regulations promulgated by the Consumer Financial Protection Bureau, the Interagency Policy Statement on Retail Sales of Nondeposit Investment Products, the SAFE Mortgage Licensing Act of 2008, the Real Estate Settlement Procedures Act and Regulation X, Title V of the Gramm-Leach-Bliley Act, any and all sanctions or regulations enforced by the Office of Foreign Assets Control of the United States Department of Treasury and any other law, policy or guideline relating to bank secrecy, discriminatory lending, financing or leasing practices, consumer protection, money laundering prevention, foreign assets control, U.S. sanctions laws and regulations, Sections 23A and 23B of the Federal Reserve Act, the Sarbanes-Oxley Act, the Flood Disaster Protection Act of 1973 (as amended) and the National Flood Insurance Act of 1968 and the implementing regulations thereunder, the CARES Act, Pandemic Measures and all agency requirements relating to the origination, sale and servicing of mortgage and consumer loans. Parent, Holdco and their Subsidiaries have established and maintain a system of internal controls designed to ensure compliance by Parent, Holdco and their Subsidiaries with applicable financial recordkeeping and reporting requirements of applicable money laundering prevention laws in jurisdictions where Parent, Holdco and their Subsidiaries conduct business.

(c)    Parent Bank has, and at all times during the past three (3) years has had, a Community Reinvestment Act rating no lower than "Outstanding".

(d)    As of the date hereof, there is no dispute or other proceeding pending between Parent or Parent Bank or any of their Subsidiaries and any community groups relating to Parent or Parent Bank, and, to the knowledge of Parent, no such dispute or other proceeding has been threatened, in each case, that could reasonably be expected to materially delay the receipt of, or impair the ability to obtain, all of the Requisite Regulatory Approvals.

(e)    None of Parent, Holdco, or any of their Subsidiaries, or to the knowledge of Parent, any director, officer, employee, agent or other person acting on behalf of Parent, Holdco or any of their Subsidiaries has, directly or indirectly, (i) used any funds of Parent, Holdco or any of their Subsidiaries for unlawful contributions, unlawful gifts, unlawful entertainment or other expenses relating to political activity, (ii) made any unlawful payment to foreign or domestic governmental officials or employees or to foreign or domestic political parties or campaigns from funds of Parent, Holdco or any of their Subsidiaries, (iii) violated any provision that would result in the violation of the Foreign Corrupt Practices Act of 1977, as amended, or any similar law, (iv) established or maintained any unlawful fund of monies or other assets of Parent, Holdco or any of their Subsidiaries, (v) made any fraudulent entry on the books or records of Parent, Holdco or any of their Subsidiaries or (vi) made any unlawful bribe, unlawful rebate, unlawful payoff, unlawful influence payment, unlawful kickback or other unlawful payment to any person, private or public, regardless of form, whether in money, property or services, to obtain favorable treatment in securing business, to obtain special concessions for Parent, Holdco or any of their Subsidiaries, to pay for favorable treatment for business secured or to pay for special concessions already obtained for Parent, Holdco or any of their Subsidiaries, or is currently subject to any United States sanctions administered by the

38

Office of Foreign Assets Control of the United States Treasury Department, except, in each case, as would not, either individually or in the aggregate, have a Material Adverse Effect on Parent.

(f)      As of the date hereof, each of TDGUS and Parent Bank is "well-capitalized" (as such term is defined in the relevant regulation of the institution's primary federal regulator) and, as of the date hereof, to the knowledge of Parent, neither Parent nor any of its Subsidiaries is aware of any fact, event or circumstance that would result in TDGUS and Parent Bank not being "well-capitalized" within one year from the date of this Agreement.

Section 4.8    Actions by Regulatory Agencies. Subject to Section 9.14, neither Parent, Holdco nor any of their Subsidiaries is subject to any cease-and-desist or other order or enforcement action issued by, or is a party to any written agreement, consent agreement or memorandum of understanding with, or is a party to any commitment letter or similar undertaking to, or is subject to any order or directive by, or has been ordered to pay any civil money penalty by, or has been since January 1, 2020, a recipient of any supervisory letter from, or since January 1, 2020, has adopted any policies, procedures or board resolutions at the request or suggestion of, any Regulatory Agency or other Governmental Entity that currently restricts in any material respect or would reasonably be expected to restrict in any material respect the conduct of its business or that in any material manner relates to its capital adequacy, its ability to pay dividends, its credit or risk management policies, its management, its business or its ability to consummate the transactions contemplated hereby in a timely manner (each, whether or not set forth in the Parent Disclosure Schedule, a "Parent Regulatory Agreement"), nor has Parent, Holdco or any of their Subsidiaries been advised in writing, or to Parent's knowledge, orally, since January 1, 2020, by any Regulatory Agency or other Governmental Entity that it is considering issuing, initiating, ordering or requesting any such Parent Regulatory Agreement.

Section 4.9    Parent Information. The information relating to Parent and its Subsidiaries that is provided by Parent or its representatives for inclusion in (a) the Proxy Statement, on the date it (or any amendment or supplement thereto) is first mailed to holders of Company Common Stock or at the time of the Company Meeting, (b) the documents and financial statements of Parent incorporated by reference in the Proxy Statement or any amendment or supplement thereto or (c) any other document filed with any other Regulatory Agency in connection herewith, will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances in which they are made, not misleading. The portions of the Proxy Statement relating to Parent and its Subsidiaries and other portions within the reasonable control of Parent will comply in all material respects with the provisions of the Exchange Act and the rules and regulations thereunder. Notwithstanding the foregoing, no representation or warranty is made by Parent with respect to statements made or incorporated by reference therein based on information provided or supplied by or on behalf of Company or its Subsidiaries for inclusion in the Proxy Statement.

Section 4.10    Availability of Funds. As of the date of this Agreement, Parent has sufficient funds or access thereto, and Parent will at the Closing have immediately available funds in cash, to pay when due all amounts payable by it hereunder and to fulfill its obligations hereunder. Parent acknowledges that the obligations of Parent under this Agreement are not contingent upon or subject to any conditions regarding Parent's, its Affiliates', or any other

39

Person's ability to obtain financing or otherwise to raise capital for the consummation of the Transactions, including the payment of the Merger Consideration.

Section 4.11    No Other Representations or Warranties.

(a)     Except for the representations and warranties made by each Parent Party in this Article IV, no Parent Party nor any other person makes any express or implied representation or warranty with respect to Parent Parties, their respective Subsidiaries, or their respective businesses, operations, assets, liabilities, conditions (financial or otherwise) or prospects, and each Parent Party hereby disclaims any such other representations or warranties and Company acknowledges the same. In particular, without limiting the foregoing disclaimer, no Parent Party nor any other person makes or has made any representation or warranty to Company or any of its affiliates or representatives with respect to (i) any financial projection, forecast, estimate, budget or prospective information relating to Parent, any of its Subsidiaries or their respective businesses or (ii) except for the representations and warranties made by Parent Parties in this Article IV, any oral or written information presented to Company or any of its affiliates or representatives in the course of their due diligence investigation of Parent Parties, the negotiation of this Agreement or in the course of the transactions contemplated hereby.

(b)     Each Parent Party acknowledges and agrees that neither Company nor any other person has made or is making, and Parent and Holdco have not relied on, any express or implied representation or warranty other than those contained in Article III.

**ARTICLE V**

**COVENANTS RELATING TO CONDUCT OF BUSINESS**

Section 5.1    Conduct of Business Prior to the Effective Time. During the period from the date of this Agreement to the Effective Time or earlier termination of this Agreement, except as (i) expressly contemplated or permitted by this Agreement (including as set forth in the Company Disclosure Schedule), (ii) required by law, (iii) may be necessary or commercially reasonable in response to a Pandemic or Pandemic Measures, subject to Company providing Parent with advance notice in respect of any such action (unless it is not reasonably practicable under the circumstances to provide such prior notice, in which case Company shall provide notice to Parent as soon as reasonably practicable) or (iv) consented to in writing by Parent (such consent not to be unreasonably withheld, conditioned or delayed), Company shall, and shall cause each of its Subsidiaries to, (A) conduct its business in the ordinary course in all material respects and (B) use reasonable best efforts to maintain and preserve intact its business organization, employees and advantageous business relationships.

Section 5.2    Company Forbearances. During the period from the date of this Agreement to the Effective Time or earlier termination of this Agreement, except as set forth in the Company Disclosure Schedule, as expressly contemplated or permitted by this Agreement or as required by law, Company shall not, and shall not permit any of its Subsidiaries to, without

40

# ARTICLE VIII

## TERMINATION AND AMENDMENT

Section 8.1    Termination. This Agreement may be terminated at any time prior to the Effective Time, whether before or after receipt of the Requisite Company Vote:

(a)    by mutual written consent of Parent and Company;

(b)    by either Parent or Company if any Governmental Entity that must grant a Requisite Regulatory Approval has denied approval of the Merger, the Second Step Merger or the Bank Merger and such denial has become final and nonappealable or any Governmental Entity of competent jurisdiction shall have issued a final and nonappealable order, injunction, decree or other legal restraint or prohibition permanently enjoining or otherwise prohibiting or making illegal the consummation of the Merger, the Second Step Merger or the Bank Merger, unless the failure to obtain a Requisite Regulatory Approval shall be due to the failure of the party seeking to terminate this Agreement to perform or observe the obligations, covenants and agreements of such party set forth herein;

(c)    by either Parent or Company if the Merger shall not have been consummated on or before the twelve (12) month anniversary of the date of this Agreement (the "Termination Date"), unless the failure of the Closing to occur by such date shall be due to the failure of the party seeking to terminate this Agreement to perform or observe the obligations, covenants and agreements of such party set forth herein; provided, that, at the option of either party (if such party would be permitted to terminate this Agreement pursuant to this Section 8.1(c)), the Termination Date may be extended, by giving written notice to the other party, for one three (3)-month period if the Requisite Regulatory Approvals have not yet been obtained;

(d)    by either Parent or Company (provided, that the terminating party is not then in material breach of any representation, warranty, obligation, covenant or other agreement contained herein) if there shall have been a breach of any of the obligations, covenants or agreements or any of the representations or warranties (or any such representation or warranty shall cease to be true) set forth in this Agreement on the part of Company, in the case of a termination by Parent, or Parent, in the case of a termination by Company, which breach or failure to be true, either individually or in the aggregate with all other breaches by such party (or failures of such representations or warranties to be true), would constitute, if occurring or continuing on the Closing Date, the failure of a condition set forth in Section 7.2, in the case of a termination by Parent, or Section 7.3, in the case of a termination by Company, and which is not cured within forty-five (45) days following written notice to Company, in the case of a termination by Parent, or Parent, in the case of a termination by Company, or by its nature or timing cannot be cured during such period (or such fewer days as remain prior to the Termination Date);

(e)    by Parent, if (i) Company or the Board of Directors of Company shall have made a Recommendation Change or (ii) Company or the Board of Directors of Company shall have willfully breached its obligations under Section 6.3 or Section 6.12 in any material respect;

61

(f)       by either Company or Parent, if the Requisite Company Vote shall not have been obtained upon a vote thereon taken at the Company Meeting (including any adjournment or postponement thereof); or

(g)       prior to the time the Requisite Company Vote is obtained, by Company in order to enter into an Alternative Acquisition Agreement with respect to a Superior Proposal if the Board of Directors of Company authorizes Company to enter into an Alternative Acquisition Agreement in response to a Superior Proposal, to the extent permitted by and in accordance with Section 6.3; provided, that concurrently with such termination, Company pays, or causes to be paid, to Parent, in immediately available funds the Termination Fee pursuant to Section 8.2.

(h)       (i) by the Company, if Parent shall not have paid to the Company the Series G Convertible Preferred Stock Payment within five (5) business days of the date the Articles of Amendment (as defined in the Series G Convertible Preferred Stock Purchase Agreement) have become effective, with the filing thereof accepted by the Secretary of State of the State of Tennessee or (ii) by Parent, if the Company has not filed the Articles of Amendment (as defined in the Series G Convertible Preferred Stock Purchase Agreement) with the Secretary of State of the State of Tennessee (and such filing has not become effective) within five (5) business days of the date hereof, in each case pursuant to the Series G Convertible Preferred Stock Purchase Agreement.

The party desiring to terminate this Agreement pursuant to this Section 8.1 (other than clause (a)) shall give written notice of such termination to the other party in accordance with Section 9.5, specifying the provision or provisions hereof pursuant to which such termination is effected.

Section 8.2     Effect of Termination.

(a)       In the event of termination of this Agreement by either Parent or Company as provided in Section 8.1, this Agreement shall forthwith become void and have no effect, and none of Parent, Holdco, Company, any of their respective Subsidiaries or any of the officers or directors of any of them shall have any liability of any nature whatsoever hereunder, or in connection with the transactions contemplated hereby, except that (i) Section 6.2(b) (*Confidentiality*), Section 6.14 (*Public Announcements*), this Section 8.2 and Article IX (other than Section 9.12) shall survive any termination of this Agreement and (ii) notwithstanding anything to the contrary contained in this Agreement, neither Parent nor Company shall be relieved or released from any liabilities or damages arising out of its fraud or its willful and material breach of any provision of this Agreement. "Willful and material breach" shall mean a material breach of, or material failure to perform any of the covenants or other agreements contained in, this Agreement that is a consequence of an act or failure to act by the breaching or non-performing party with actual knowledge that such party's act or failure to act would, or would reasonably be expected to, result in or constitute such breach of or such failure of performance under this Agreement.

(b)       In the event that after the date of this Agreement and prior to the termination of this Agreement, a *bona fide* Acquisition Proposal shall have been communicated to or otherwise made known to the Board of Directors of Company or senior management of Company or shall have been made directly to the shareholders of Company or any person shall

62

have publicly announced (and not withdrawn at least two (2) business days prior to the Company Meeting) an Acquisition Proposal, in each case, with respect to Company, and (A)(x) thereafter this Agreement is terminated by either Parent or Company pursuant to Section 8.1(c) without the Requisite Company Vote having been obtained (and all other conditions set forth in Section 7.1 and Section 7.3 were satisfied or were capable of being satisfied prior to such termination) or (y) thereafter this Agreement is terminated by Parent pursuant to Section 8.1(d) as a result of a willful and material breach or (z) thereafter this Agreement is terminated by Company or Parent pursuant to Section 8.1(f) and (B) prior to the date that is twelve (12) months after the date of such termination, Company enters into a definitive agreement or consummates a transaction with respect to an Acquisition Proposal (whether or not the same Acquisition Proposal as that referred to above), then Company shall, on the earlier of the date it enters into such definitive agreement and the date of consummation of such transaction, pay Parent, by wire transfer of same-day funds, a fee equal to $435,500,000 (the "Termination Fee"); provided, the Termination Fee shall be reduced by an amount equal to the difference between (1) the aggregate proceeds to be received (upon consummation of a Superior Proposal) by Parent with respect to the shares of Company Common Stock resulting from the conversion of the Series G Convertible Preferred Stock held by Parent and (2) $493,569,450; provided, further that for purposes of this Section 8.2(b), all references in the definition of Acquisition Proposal to "twenty-five percent (25%)" shall instead refer to "fifty percent (50%)".

(c)     In the event that this Agreement is terminated by Parent pursuant to Section 8.1(e), then Company shall pay Parent, by wire transfer of same-day funds, the Termination Fee within two (2) business days of the date of termination.

(d)     In the event that this Agreement is terminated by Company pursuant to Section 8.1(g), then Company shall pay Parent, by wire transfer of same-day funds, the Termination Fee concurrently with such termination.

(e)     Notwithstanding anything to the contrary in this Agreement, but without limiting the right of any party to recover liabilities or damages arising out of the other party's fraud or willful and material breach of any provision of this Agreement, in no event shall Company be required to pay the Termination Fee more than once. The payment of the Termination Fee as set forth above shall be consideration for the disposition by Parent of its rights under this Agreement

(f)     If this Agreement is terminated (1) by Company or Parent pursuant to Section 8.1(b) in the event of any final nonappealable order, injunction, decree or other legal restraint relating to Company or its affiliates and not a Requisite Regulatory Approval; (2) by Company or Parent pursuant to Section 8.1(f) or (3) by Parent pursuant to Section 8.1(h), then no later than two (2) business days after submission of documentation therefor, Company shall pay Parent an amount equal to $25,000,000 to reimburse Parent and its affiliates for fees and expenses (including all fees and expenses of counsel, accountants, investment banking firms and other financial advisors, experts and consultants) incurred or accrued in connection with or related to the transactions contemplated by this Agreement. Any expense reimbursement paid by Company shall be credited against (and therefore reduce the amount of) any Termination Fee that is payable by Company in connection with such termination or that subsequently becomes payable.

(g)      If this Agreement is terminated (1) by Company or Parent pursuant to Section 8.1(b) in the event of failure to receive a Requisite Regulatory Approval or any final nonappealable order, injunction, decree or other legal restraint that relates to a Requisite Regulatory Approval; (2) by Company or Parent pursuant to Section 8.1(c) at a time when the closing conditions in Section 7.1(b) and/or Section 7.1(c) (to the extent any such order, injunction, decree, law, statute, rule or regulation relates to a Requisite Regulatory Approval) have not been satisfied; provided, that if a breach of this Agreement by Company led to either of such conditions not being satisfied, then Parent shall have no reimbursement obligations under this clause (g); or (3) by Company pursuant to Section 8.1(h), then no later than two (2) business days after submission of documentation therefor, Parent shall pay Company an amount equal to $25,000,000 to reimburse Company and its affiliates for fees and expenses (including all fees and expenses of counsel, accountants, investment banking firms and other financial advisors, experts and consultants) incurred or accrued in connection with or related to the transactions contemplated by this Agreement.

(h)      Each of Parent and Company acknowledges that the agreements contained in this Section 8.2 are an integral part of the transactions contemplated by this Agreement, and that, without these agreements, the other party would not enter into this Agreement; accordingly, if Company fails promptly to pay the Termination Fee (or if Company or Parent fail to pay any expense reimbursement) due pursuant to this Section 8.2, and, in order to obtain such payment, the other party commences a suit which results in a judgment for the first party to pay the Termination Fee, expense reimbursement or any portion thereof, as applicable, such first party shall pay the costs and expenses of such other party (including reasonable attorneys' fees and expenses) in connection with such suit. In addition, such first party shall pay interest on such overdue amounts at a rate per annum equal to the "prime rate" published in the Wall Street Journal on the date on which such payment was required to be made for the period commencing as of the date that such overdue amount was originally required to be paid and ending on the date that such overdue amount is actually paid in full. The Termination Fee (and any related amounts payable by Company pursuant to this Section 8.2(h)), except in the case of fraud, shall be the sole remedy of Parent in the event of a termination of this Agreement in accordance with this Article VIII pursuant to which the Termination Fee is payable by Company.

## ARTICLE IX

## GENERAL PROVISIONS

Section 9.1    Amendment. Subject to compliance with applicable law, this Agreement may be amended by the parties hereto at any time before or after the receipt of the Requisite Company Vote; provided, however, that after receipt of the Requisite Company Vote, there may not be, without further approval of the shareholders of Company any amendment of this Agreement that requires such further approval under applicable law. This Agreement may not be amended, modified or supplemented in any manner, whether by course of conduct or otherwise, except by an instrument in writing signed on behalf of each of the parties hereto.

Section 9.2    Extension; Waiver. At any time prior to the Effective Time, each of the parties hereto may, to the extent legally allowed, (a) extend the time for the performance of any of the obligations or other acts of the other parties hereto, (b) waive any inaccuracies in the representations and warranties of the other parties contained in this Agreement or in any

64

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized as of the date first above written.

FIRST HORIZON CORPORATION

By: /s/ D. Bryan Jordan
Name: D. Bryan Jordan
Title: President and Chief Executive Officer

THE TORONTO-DOMINION BANK

By: /s/ Barbara Hooper
Name: Barbara Hooper
Title: Senior Executive Vice President –
Treasury, Corporate Development,
Strategic Sourcing & Real Estate

TD BANK US HOLDING COMPANY

By: /s/ Leo Salom
Name: Leo Salom
Title: President and CEO

FALCON HOLDINGS ACQUISITION CO.

By: /s/ Barbara Hooper
Name: Barbara Hooper
Title: Secretary

[*Signature Page to Agreement and Plan of Merger*]