**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

JAMES TIESSEN, Individually and on Behalf of All Others Similarly Situated,

               Plaintiff,

v.

THE TORONTO-DOMINION BANK, TD BANK, N.A., TD BANK US HOLDING COMPANY, AJAI K. BAMBAWALE, MICHAEL BOWMAN, MIA LEVINE, BHARAT MASRANI, LEOVIGILDO SALOM, and KELVIN VI LUAN TRAN,

               Defendants.

---

Case No. 1:24-CV-8032 (AS)

**CLASS ACTION**

**JURY TRIAL DEMANDED**

 

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  STATEMENT OF FACTS ...................................................................................... 6

III. ARGUMENT........................................................................................................ 12

    A.   THE COMPLAINT ALLEGES ACTIONABLE FALSE AND
        MISLEADING STATEMENTS AND OMISSIONS ........................................... 12

        1.   Defendants' Misstatement and Omissions Concerning TD's Criminally
            Deficient AML Are Actionable .......................................................... 12

        2.   Defendants' Arguments Fail ................................................................. 18

            a)   Plaintiffs Adequately Allege Falsity (Statements 1-5, 12-23, 26, 27,
               28) ........................................................................................... 18

            b)   The Challenged Statements are Not "Too General" to be Actionable
               (Statements 4, 5, 10, 11, 22-25, 27-31) ......................................... 21

            c)   Defendants' "Opinion" Statements Are Actionable ...................................... 24

            d)   Defendants' Half-Truths Are Not Forward-Looking Statements ................ 26

    B.   PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER..................... 27

        1.   Defendants Knew or Were Reckless in Not Knowing that the FCP Caused
            Material Deficiencies During the Class Period................................................. 28

        2.   Plaintiffs Allege Motive................................................................................. 36

        3.   Corporate Scienter ...................................................................................... 37

        4.   Defendants' Puzzle Pleading Argument Fails .................................................... 39

        5.   Defendants' Non-Fraudulent Inference Is Less Compelling .............................. 39

    C.   PLAINTIFFS ADEQUATELY PLEAD SCHEME LIABILITY ........................... 41

    D.   PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION ............................. 41

    E.   PLAINTIFFS ADEQUATELY ALLEGE CONTROL PERSON
        LIABILITY.............................................................................................. 46

IV.  CONCLUSION................................................................................................... 47

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Axsome Therapeutics, Inc. Sec. Litig.*,
  2025 WL 965265 (S.D.N.Y. Mar. 31, 2025) ............................................................32

*In re Banco Bradesco S.A. Sec. Litig.*,
  277 F. Supp. 3d 600 (S.D.N.Y. 2017)......................................................................28

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010).......................................................................21

*In re BHP Billiton Ltd. Sec. Litig.*,
  276 F. Supp. 3d 65 (S.D.N.Y. 2017)........................................................................23

*In re BISYS Sec. Litig.*,
  397 F.Supp.2d 430 (S.D.N.Y. 2005)........................................................................35

*In re CarLotz, Inc. Sec. Litig.*,
  2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024) .........................................................43

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  750 F.3d 227 (2d Cir. 2014)....................................................................................46

*Castillo v. Dean Witter Discover & Co.*,
  1998 WL 342050 (S.D.N.Y. June 25, 1998) ...........................................................43

*In re CCIV / Lucid Motors Sec. Litig.*,
  110 F.4th 1181 (9th Cir. 2024) ...............................................................................21

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
  2018 WL 2382600 (S.D.N.Y. May 24, 2018) .........................................................32

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012)..................................................................27, 39

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014)....................................................................................23

*Davidoff v. Farina*,
  2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005)........................................................43

*In re Deutsche Bank Aktiengesellschaft Sec. Litig*,
  2017 WL 4049253 (S.D.N.Y. June 28, 2017) .........................................................18

*Dietrich v. Bauer*,
    126 F. Supp. 2d 759 (S.D.N.Y. 2001)......................................................................47

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005).................................................................................................5, 42

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009).........................................................................................28

*In re Eletrobras Sec. Litig.*,
    245 F. Supp. 3d 450 (S.D.N.Y. 2017)...........................................................................41

*In re Estée Lauder Co., Inc. Sec. Litig.*,
    2025 WL 965686 (S.D.N.Y. Mar. 31, 2025) ................................................... *passim*

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)...........................................................................42

*Karimi v. Deutsche Bank Aktiengesellschaft*,
    607 F. Supp. 3d 381 (S.D.N.Y. 2022)............................................................... *passim*

*Kempen Int'l Funds v. Syneos Health, Inc.*,
    2025 WL 949576 (S.D.N.Y. Mar. 28, 2025) ............................................................39

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005).................................................................................43, 46

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
    797 F.3d 160 (2d Cir. 2015)..........................................................................................42

*Lozada v. TaskUs, Inc.*,
    710 F. Supp. 3d 283 (S.D.N.Y. 2024)............................................................... *passim*

*In re Lululemon Sec. Litig.*,
    14 F. Supp. 3d 553 (S.D.N.Y. 2014)..............................................................................31

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
    26 F. Supp. 3d 278 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015)........................40

*Malin v. XL Cap. Ltd.*,
    499 F. Supp. 2d 117 (D. Conn. 2007)............................................................................35

*McIntire v. China MediaExpress Holdings, Inc.*,
    927 F. Supp. 2d 105 (S.D.N.Y. 2013)............................................................................41

*Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*,
    54 F.4th 82 (2d Cir. 2022) ............................................................................................21

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014).................................................................................... *passim*

*Monroe Cnty. Emps' Ret. Sys. v. YPF Sociedad Anonima*,
  15 F. Supp. 3d 336 (S.D.N.Y. 2014)..................................................................................45

*N. Collier Fire Control v. MDC Partners, Inc.*,
  2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)....................................................................40

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) .........................................................................................35

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)...............................................................................................36

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
  367 F. Supp. 3d 16 (S.D.N.Y. 2019)..................................................................................35

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
  575 U.S. 175 (2015)...........................................................................................................25

*In re Omnicom Grp., Inc. Sec. Litig.*,
  597 F.3d 501 (2d Cir. 2010)...............................................................................................45

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) .................................................................................................41

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of
  Com.*,
  694 F. Supp. 2d 287 (S.D.N.Y. 2010)................................................................................41

*Plumbers & Steamfitters Loc. 773 Pension Fund v. Danske Bank*,
  2020 WL 4937461 (S.D.N.Y. Aug. 24, 2020).....................................................................23

*In re Salix Pharm., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016).....................................................................35

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
  732 F. Supp. 3d 300 (S.D.N.Y. 2024).................................................................30, 34, 36, 42

*Santa Fe Indus., Inc. v. Green*,
  430 U.S. 462 (1977)...........................................................................................................31

*Set Capital LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021).................................................................................................27

*Shenk v. Karmazin*,
  867 F. Supp. 2d 379 (S.D.N.Y. 2011).................................................................................35

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)........................................................................23

*Skiadas v. Acer Therapeutics Inc.*,
2020 WL 3268495 (S.D.N.Y. June 16, 2020) ........................................................................37

*Slayton v. Am. Express Co.*,
604 F.3d 758 (2d Cir. 2010)...................................................................................................27

*Speakes v. Taro Pharm. Indus., Ltd.*,
2018 WL 4572987 (S.D.N.Y. Sept. 24, 2018)........................................................................33

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
2024 WL 456745 (S.D.N.Y. Feb. 5, 2024)...........................................................16, 21, 25, 27

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
531 F.3d 190 (2d Cir. 2008)...................................................................................................38

*In re Telefonaktiebolaget LM Ericsson Sec. Litig.*,
675 F. Supp. 3d 273 (E.D.N.Y. 2023), *aff'd*, 2024 WL 4023842 (2d Cir. Sept.
3, 2024) ..................................................................................................................................23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)................................................................................................................27

*In re Teva Sec. Litig.*,
671 F. Supp. 3d 147 (D. Conn. 2023).....................................................................................38

*Tongue v. Sanofi*,
816 F.3d 199 (2d Cir. 2016)...................................................................................................24

*In re Tronox, Inc. Sec. Litig.*,
769 F. Supp. 2d 202 (S.D.N.Y. 2011).....................................................................................47

*In re Turquoise Hill Res. Ltd. Sec. Litig.*,
625 F. Supp. 3d 164 (S.D.N.Y. 2022).....................................................................................32

*In re Veon Sec. Litig.*,
2025 WL 66444 (S.D.N.Y. Jan. 10, 2025) .............................................................................45

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)........................................................................................... *passim*

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
2017 WL 66281 (N.D. Cal. Jan. 4, 2017)...............................................................................32

*In re Y-mAbs Therapeutics, Inc. Sec. Litig.*,
2024 WL 451691 (S.D.N.Y. Feb. 5, 2024).............................................................................43

## I.    PRELIMINARY STATEMENT

The Bank Secrecy Act's ("BSA") mandated transactional and anti-money laundering ("AML") controls are the cornerstone of global banking.[1]  For years, TD suffered from criminally deficient AML controls resulting from Defendants' deliberate scheme to deprive funding and prioritize profits over banking safety.  This case arises from Defendants' consistent and repeated outright falsehoods and half-truths that concealed decade-long "knowing" and "willful" AML violations, resulting in an unprecedented guilty plea for money laundering.

From the outset of the Class Period, Defendants' AML Statement fraudulently claimed that the "Global AML Program is *routinely evaluated, updated and enhanced* in order to reflect changes to TD's business activities, as well as applicable supervisory standards and legal requirements."  CEO Masrani and CFO Tran signed TD's Annual Reports assuring shareholders "*money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated*."  And Defendant Salom, TD's Group Head of U.S. Retail and also President, CEO, and Board member of U.S. subsidiaries TDBUSH and TDBNA gave similar reassurance that "comprehensive anti-money laundering and sanctions programs [] are *reasonably designed to ensure compliance with the Bank Secrecy Act*" and "*are currently designed to meet the five pillars requirements*."

The truth was far different.  It is undisputed that Defendants "vastly underinvested in [] AML compliance efforts, with TD Bank knowingly spending an order of magnitude less than its peers" and, for over a decade, "consistently chose to address" the "host of significant AML

---

[1] Capitalized terms not defined herein have the meanings in the Complaint.  (ECF 70.)  Paragraph and section citations are to the Complaint.  Emphasis is added and citations and quotations are omitted unless otherwise stated.  "Ex. __" citations are to exhibits filed herewith.  "Defs. Ex. __" citations are to Defendants' exhibits filed with their Opening Brief ("Brief" or "Br.").  "Statement __" refers to Defendants' numbering in ECF 73-2, replicated in Exhibit B.

compliance issues" "in the least costly way possible, even if it meant ignoring failures and refusing to meaningfully remediate issues and prevent recurrences."  Also indisputable is that "senior executive leadership and boards of directors" of TD, TDBNA, and TDBUSH were informed, but never addressed these AML deficiencies and "failed to effectively or substantively adapt [TD's] transaction monitoring system."

Each Defendant had a direct, personal role—spanning over a decade—in concealing the known truth from shareholders.  No later than early 2013, Masrani (then CEO of TDBNA) faced regulatory orders that laid out a "pattern" of "willful" BSA violations, and personally executed a consent order requiring remediation.  But as he ascended to TD's global CEO in 2014, Masrani did the opposite.  He imposed the secret Flat Cost Paradigm ("FCP")—the "clear directive" coming "straight from the top" that TD would not make the investment necessary to remediate known and longstanding AML failures.  As a result, Defendants boasted "industry-leading operating efficiency" while padding TD's performance by secretly eliminating spending necessary for effective AML.

Masrani, Tran, and Salom presided over the elaborate annual budgeting process that enforced the FCP.  Proposed budgets that included any increase in spending for AML improvements were sent back for revision, with business units sometimes forced to *decrease* annual AML expense.  Every year, months of meetings culminated with Masrani and his fellow TD Board members personally approving the FCP-constrained budget.  Adherence to the FCP was the metric against which TD executives' performance was rated.

As a result, TD had wholly deficient—if not non-existent—AML safeguards.  For example, Defendants:

- failed to monitor 92% of all transactions, which corresponded to over 14.6 billion unmonitored transactions and over $18.3 trillion in unmonitored transaction value;

- systematically violated the BSA by failing to file SARs and CTRs to evade transaction reporting requirements; and

- ignored OCC directives to enhance transaction monitoring and improve AML technology.

Criminals took note, and TD soon became the bank of choice for terrorists, drug dealers, and human traffickers to carry out illicit activities unimpeded by the transaction monitoring, suspicious activity reporting, and other scrutiny required by federal law.

Amid their scheme, and to further their growth aspirations, on February 28, 2022 (the start of the Class Period), Defendants announced TD's $13.4 billion acquisition of First Horizon Corporation (the "FH Acquisition")—its largest acquisition ever.  Set to close within a year, Defendants touted that the FH Acquisition would make it the sixth-largest retail bank in the U.S. with about $614 billion in assets, operating in 22 states.

But by November 2022—unknown to shareholders—Masrani, Salom, and other TD senior executives were directly informed that the OCC and Federal Reserve had found such significant failures in TD's AML practices that the DOJ had launched a formal criminal investigation into the Global AML Program.

Nonetheless, Defendants doubled down on their fraudulent statements to shareholders. They continued to claim TD's compliance with AML requirements, touted specific diligence and monitoring procedures supposedly in place, and claimed the Global AML Program had "adequate resources" and was "routinely evaluated [and] updated."  Meanwhile, though TD twice delayed

the closing date for the FH Acquisition, Defendants fraudulently reassured shareholders, "we are confident we'll get the closing." On December 1, 2022, Masrani denied the suggestion that regulators "are [] taking a closer look at anything." That was outright false: Masrani knew TD was under a DOJ criminal investigation for AML violations.

Finally, after the close of trading on October 9, 2024, TD Bank became the largest bank in U.S. history to plead guilty to BSA violations, the first bank in U.S. history to plead guilty to conspiracy to commit money laundering and failing to maintain an adequate AML program, and paid over $3 billion in penalties.

In seeking dismissal, Defendants disregard Plaintiffs' allegations and resort to scattershot arguments that, when stripped of their rhetoric, raise improper factual disputes and reinvent U.S. securities laws.

As to falsity, Defendants' misstatements unfolded in a variety of different, yet wholly consistent falsehoods that all concealed TD's AML failures. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016). Notably, Defendants do not, and cannot, dispute the facts uncovered in the Complaint and admitted in the Guilty Pleas. Instead, they advance weak legal arguments, claiming that their statements were inactionable opinions, vague generalities, or forward looking. But under controlling law, "once a [defendant] speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014). Despite dozens of misstatements, nowhere did Defendants reveal the truth that TD, including:

- Since 2014, the FCP directed TD to not remediate known BSA violations, and prevented necessary AML investment as TD's business grew.

- By November 2022, Masrani, Salom, and other senior executives knew that the OCC and Federal Reserve had identified significant AML deficiencies, and

4

DOJ had launched a formal investigation into the Global AML Program for violations of federal law.

- With pending criminal and regulatory investigations, prospects for regulatory approval of the FH Acquisition evaporated. Despite Defendants' statements to the contrary, "TD and First Horizon didn't discuss extending the timeline for the deal," as First Horizon's CEO later confirmed to *WSJ*.

- TD's Global AML Program "willfully" violated the BSA, with "staggering" and "long-term, pervasive, systemic deficiencies" "spann[ing] all pillars of TD Bank's AML program."

Likewise, Plaintiffs allege a strong inference of scienter. Specifically, Defendants personally established and carried out the FCP to deprive critical funding from AML controls. Moreover, Defendants TDBNA and TDBUSH admitted that, for years, federal regulators and third-party consultants had identified the "transaction monitoring program as an area of concern" and "the senior executive leadership and boards of directors of TDBNA, TDBUSH, TDGUS, and TD Bank Group [which include, among others, Defendants Masrani and Salom] were made aware of certain of the concerns identified by these regulators and auditors." Still Defendants "willfully failed to remediate persistent, pervasive, and known deficiencies in its AML." Defendants do not grapple with these particularized allegations.

Finally, as to loss causation, Defendants try to invent a non-existent pleading standard contrary to Supreme Court and Second Circuit precedent. All that is required to plead loss causation is "*some indication* of the loss and the causal connection." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The Complaint readily meets this standard. In any event, Defendants only challenge four of six disclosures, thereby conceding May 8, 2023 and August 24,

5

2023 as well-pleaded corrective events.  As to the remaining four disclosures, Defendants' arguments are premature and wrong: they ignore the actual content of the disclosures and misrepresent select portions to advance an impermissible fact-intensive truth-on-the-market defense.

For all the reasons stated herein, Defendants' motions should be denied.

## II.    STATEMENT OF FACTS

**BSA and TD Global AML Program**:  TD is subject to extensive statutory and regulatory AML requirements, designed to detect and prevent terrorists, drug dealers, human traffickers, and other criminals from financing their illicit activities.  ¶39.  Foundational among these is the BSA, which requires, *inter alia*, banks to maintain records of transactions, file suspicious transactions reports, and develop and implement an effective AML program.  ¶¶40-43.

To appear in compliance with these requirements, TD purported to have in place a "Global AML Program" applied enterprise-wide across the global bank, including TDBUSH and TDBNA.  ¶¶44, 50-51.  The Global AML Program was operated by TD's GAML Department, led by Defendant Bowman (Chief AML Officer), and directly overseen and monitored by TD Board members serving on the Board's Audit Committee.  ¶¶45-49, 50-51.

**Before the Class Period, Defendants Personally Knew of TDBNA's AML Deficiencies**: Prior to becoming TD's CEO, Masrani served for seven years as CEO of TDBNA, the bank's U.S. subsidiary.  ¶188.  During his tenure, TDBNA was repeatedly cited by U.S. regulators for willful AML violations.  ¶¶193-97.  For example, in 2013, the OCC and FinCEN assessed a $37.5 million civil penalty and determined that TDBNA willfully violated BSA reporting requirements by failing to detect and adequately report suspicious activities; failed to implement proper transaction monitoring; and had inadequate policies, procedures, and training.  (¶¶195-96; Ex. 1; Ex. 2.)

Masrani *personally* signed the OCC order finding that TDBNA's AML failures were part of a pattern of misconduct in violation of the BSA. (Ex. 1; *see* ¶¶54, 196.)

**CEO Masrani Implemented the Secret FCP**: As Masrani ascended to global CEO in late 2014, he imposed the FCP to flatten expenses and boost profits. ¶164. The FCP prohibited any increase in AML compliance spending, even as the business boomed and AML needs increased. ¶¶164, 166-67; *see* ¶136(d), (e).

The FCP annual planning was kicked off each April or May when the Enterprise Decision Support ("EDS") group sent an email to financial executives that copied Defendant CFO Tran (and, before that CFO Ahmed). ¶¶163, 168. The email attached the EDS Guidance Document, which carried a "clear directive" coming "straight from the top" conveying the direction and priorities of the CEO and CFO. ¶¶163, 164. That directive was zero expense growth. ¶¶164-65. Defendants' directive drove conflicts across the organization, as executives struggled to comply with the mandate. ¶165. Indeed, every EVP-level executive's performance review evaluated whether they met FCP cost mandates. ¶164.

The FCP and budgeting process was long, difficult, and time intensive, ¶171, with many meetings and discussions involving TDBNA's senior leadership. ¶170. Around August each year, this stage of the process culminated with Defendant Salom presiding over a video conference call with his direct reports and the business finance leadership of each business. ¶170. Salom scrutinized the budgets he was presented and specifically cut costs on the basis of the FCP. ¶170. Once Salom approved the TDBNA budget, the budget was presented to TD's Board of Directors, including CEO Masrani, in approximately October of each year. ¶171.

Annually, senior TD executives objected during FCP budget meetings that the Company needed to invest more in compliance, risk management, and implement proper controls. ¶167.

7

These objections were overruled due to the FCP, and if finance leaders did not produce budgets with zero expense growth, they were "forced to go back" and meet the target.  ¶167.

**The FCP Eviscerated TD's Already Deficient AML Controls**:  As a result of the FCP, TD "vastly underinvested in its AML compliance efforts," resulting "in a willfully deficient AML program" that violated federal law and facilitated vast unlawful conduct.  ¶62.

Specifically, known AML violations worsened.  ¶¶53-59.  For instance, even though a 2012 risk assessment revealed TDBNA was not monitoring domestic ACH transactions, all proposals to fix it were rejected through at least October 2023.  ¶69.  And TDBNA failed to properly monitor "high-risk" transactions in direct violation of the BSA, even after the OCC instructed TDBNA to enhance such controls in 2015.  ¶¶55, 73.  This led to TD processing over \$3 million, in 2019, for a World Trade Center bombing co-conspirator without categorizing the customer as "high-risk," performing enhanced due diligence, or filing a timely SAR.  ¶137(g)(i).

New AML risks also went unremediated.  By 2017 and 2018, TD began offering new digital banking person-to-person ("P2P") platforms like Zelle and Venmo to customers, but TD's leadership refused to allocate the resources required to implement transaction monitoring or address AML risks.  ¶¶75, 166.  In 2018, the OCC deemed TDBNA's planning, delivery, and execution of AML technology and solutions insufficient.  ¶56.

Several third-party consultants also informed Defendants that TD's AML was deficient.  ¶58.  For instance, in 2018 one consultant found TD's AML under pressure from increased volume and regulatory requirements, yet Defendants did nothing to remediate.  *Id.*  In 2019, another consultant identified "sub-optimal" transaction monitoring, "outdated parameters," and an inability to focus on high-risk transactions.  *Id.*  In 2021, a third consultant identified numerous limitations in the Global AML Program's transaction monitoring.  *Id.*

**TD's AML Was Criminally Deficient During the Class Period**:  During the Class Period, Defendants effectively stopped threshold testing on TD's scenarios and ***intentionally reduced*** alerts for large cash activity to lower costs.  ¶72; *see* ¶¶55-57.  As late as 2024, TD still lacked a unified AML system due to an absence of resources, systems technology or staffing necessary to make the required updates.  ¶196; ¶¶152-54, 156-60.

For example, TD sought to implement the Oracle system to track AML investigations and facilitate AML processes in the U.S., but the system lacked these capabilities and never functioned properly.  ¶153.  TDBNA AML staff tasked with implementation were "overworked" and "having a hard time doing all the work that was required."  ¶154.  Simply, Defendants never allocated the staffing, systems, or technology necessary to update outdated AML procedures.  *Id.*

Defendants' FCP and resulting underinvestment in remediating known AML violations, left TDBNA with a 6-month backlog in reviewing potentially suspicious and illegal activity by 2024.  ¶156.  Thousands of suspicious transactions piled up, but TD "did not have adequate AML processes" to keep up.  ¶156.  Without a unified AML system, employees had to access between seven and ten systems with conflicting and incomplete information to process a single suspicious transaction, including SA, Ovation, Fidelity, and Lexis Nexis.  ¶¶157, 159.  Investigative work was lost due to system crashes, sometimes shutting down the effort for the rest of the workday.  ¶158.  Investigators often could "not get more than two" investigations complete per day, and received considerable pressure from supervisors to "just push them out" and clear suspicious activity alerts, even if not completely vetted.  ¶160.

Even when TD's SVP for Financial Crimes and Fraud Management objected, year after year, that compliance staffing and controls were inadequate, the response from senior leadership was the same: hold the line on costs.  ¶167.  In budget meetings, Salom personally demanded that

9

TD's CFO of Digital, Payments & Enterprise Innovation make additional cuts to the TDBNA budget to adhere to the FCP.  ¶¶162, 170.  To cover their tracks, Defendants suppressed reports of criminal money laundering by TDBNA clients, willfully failed to file SARs and CTRs relied on by law enforcement, and even lied to the OCC that TD was conducting scenario-based monitoring of Zelle activity when it was not.  ¶¶67-77, 237-39.

The result of this misconduct was staggering: between January 1, 2018, and April 12, 2024, TD's automated monitoring system failed to capture *92% of all transactions*—amounting to more than *14.6 billion unmonitored transactions* and *over $18.3 trillion* left outside the bank's AML oversight.  ¶¶68, 136(g).

**Outwardly, Defendants Painted the Opposite Picture for Shareholders**:  Before and during the Class Period, TD repeatedly touted its compliance with the BSA and robust requirements in TD's Global AML Program.  ¶¶78-106.  For example:

- TD, TDBNA, TDBUSH, Masrani, Salom, and Tran all claimed that TD "appropriately identified and mitigated" money laundering risks, ¶¶250, 255-56, and TD claimed that its Global AML Program "is routinely evaluated, updated and enhanced," and contained specific procedures regarding due diligence, record-keeping, detecting and reporting suspicious transactions, risk assessment, and independent testing, ¶¶244-49;

- TD and TDBUSH claimed they "have complied with … the Bank Secrecy Act," ¶257; and

- TD, Masrani, and Tran claimed that the Audit Committee received updates "that there are adequate resources with experience and knowledge" in AML, ¶¶252-54.

**Defendants Leverage the FCP's Boosted Profits to Push U.S. Expansion**:  Capitalizing on the FCP flattening expenses and boosting profits, at the start of the Class Period, on February 28, 2022, TD announced the $13.4 billion FH Acquisition, which would have made TD the sixth-largest U.S. bank.  ¶¶5, 82, 235.  To obtain regulatory approvals required to consummate the deal, TD, TDBUSH, TDBNA, and Salom misrepresented that TD and its subsidiaries "***have complied with … the Bank Secrecy Act***," and explained how the Global AML Program was designed to "meet the five pillars requirements," the BSA's core requirements for AML programs.  ¶¶86, 255.

**Defendants Conceal That Federal Regulators and Law Enforcement Were Investigating Defendants' Criminal Activities**:  In late 2022, the OCC completed a confidential review that found serious deficiencies in TD's Global AML Program.  ¶93.  By November 2022, Masrani, Salom, and other senior executives were informed that the OCC and Federal Reserve had found such significant AML failures that the DOJ had launched a formal investigation into the Global AML Program.  ¶198.

Instead of disclosing these facts, TD's leadership deceived shareholders.  ¶¶94-106.  For example, with the FH Acquisition closing twice delayed, Defendants fraudulently reassured shareholders, "we are confident we'll get closing" and were in "discussions with First Horizon about a potential additional extension."  ¶¶95-100; *see also* ¶¶101-03.  When asked whether the delay in closing the FH deal was the result of regulators' scrutiny, Masrani falsely stated, "No, I'm not aware of anything."  ¶¶96-97.

In April 2023, just two weeks before the acquisition collapsed, Masrani, Tran, and Salom used the Company's Annual Meeting to secure millions in compensation by touting the acquisition's progress — citing ongoing "discussions" with First Horizon that, as First Horizon's own CEO later confirmed in *WSJ*, never happened.  ¶¶214-15; *see* ¶¶105; 265-68.

11

**Truth Revealed**:  Through a series of partial and incomplete revelations beginning on May 8, 2023, the truth concerning Defendants' scheme began to be revealed.  (*See, infra* III.D.) Finally, on October 10, 2024, Defendants admitted the truth: that since Masrani's tenure began in 2014, Defendants had willfully violated the BSA and conspired to commit money laundering — the first such plea by a U.S. bank in history.  ¶¶132-38.  TD was forced to pay $3.09 billion, including a $1.3 billion fine, the "largest penalty against a depository institution in U.S. Treasury and FinCEN history."  ¶¶133-34.  The Guilty Pleas also imposed an asset cap and installed an independent compliance monitor for three years.  ¶133.

## III.    ARGUMENT

### A.    THE COMPLAINT ALLEGES ACTIONABLE FALSE AND MISLEADING STATEMENTS AND OMISSIONS

A statement is actionable under Rule 10b-5 when it is "either untrue outright or misleading by virtue of what it omits to state."  *Vivendi*, 838 F.3d at 239.  The test "is not whether the statement is misleading in and of itself, but whether the defendants' representations, ***taken together and in context***, would have misled a reasonable investor."  *Id.* at 250 (emphasis in original).

#### 1.    Defendants' Misstatement and Omissions Concerning TD's Criminally Deficient AML Are Actionable

From the outset of the Class Period, Defendants "disseminat[ed] a network of interrelated lies, each one slightly distinct from the other, but all collectively aimed at perpetuating a broader, material lie," *id* at 250, namely that TD's Global AML Program was not wholly inadequate.  It is well-settled that "[e]ven when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth."  *Jinkosolar*, 761 F.3d at 250.  In particular, Defendants' statements touting compliance efforts "gave comfort to investors that reasonably effective steps were being taken to comply with applicable []

regulations." *Id.* at 251; *see In re Estée Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *2 (S.D.N.Y. Mar. 31, 2025). The truth was the complete opposite.

**Global AML Program (VIII.A & VIII.B)**:   Throughout the Class Period, Defendants repeatedly touted the Global AML Program through, *inter alia*, TD's AML Statement on TD's website and included in TD's Forms 6-K. ¶¶244-48. The AML Statement fraudulently stated, for example, that:

> The Global AML Program is routinely evaluated, updated and enhanced in order to reflect changes to TD's business activities, as well as applicable supervisory standards and legal requirements. (¶248, Statement 4.)

CEO Masrani and CFO Tran, in TD's Annual Reports for 2022 and 2023 filed with the SEC, also claimed:

> GAML is responsible for oversight of TD's regulatory compliance with [AML] … regulatory compliance and broader prudential risk management across the Bank in alignment with enterprise AML policies ***so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated***. (¶250, Statement 5.)

Similarly, Salom, TD's Group Head of U.S. Retail and President, CEO, and Board member of TDBNA and TDBUSH, executed the Bank Merger Applications, certifying:

> TDBNA … ha[s] comprehensive anti-money laundering and sanctions programs that are ***reasonably designed to ensure compliance with the Bank Secrecy Act*** …, and all applicable regulations and regulatory guidance, as well as compliance with requirements administered by [OFAC]. In addition, each bank has ***qualified, dedicated personnel*** who are responsible for administering such programs…. ***Both programs are currently designed to meet the five pillars requirements***….
>
> The AML Program aligns with enterprise AML policies so that the money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are ***appropriately identified and mitigated***. (¶255, Statement 10.)

Defendants cannot dispute the falsity of these statements. ¶135. Among other things, TDBNA and TDBUSH admitted that "senior executives" enforced the FCP and repeatedly and willfully prioritized the "customer experience" over AML compliance, ¶136(d); that TD "willfully failed to remediate persistent, pervasive, and known deficiencies in its AML" at least from 2014 through 2022 (Defs. Ex. 27 at 37 of 70; 28 at 36 of 69) resulting in the failure to monitor 92% of all transactions, ¶136(f), (g); and that TD "willfully failed to file accurate CTRs related" to known AML schemes with the purpose to evade transaction reporting requirements (Defs. Exs. 27 at 39 of 70; 28 at 38 of 69; ¶136(h).) These facts were corroborated by FE-3, who, among other things, stated that necessary compliance improvements were intentionally disregarded in favor of enforcing the FCP budget mandate. ¶¶166-67. These facts were concealed.[2]

**Delay In Closing FH Acquisition (VIII.C)**: Defendants also concealed from shareholders that the FH Acquisition was delayed (and ultimately terminated) due to AML deficiencies. For example, on December 1, 2022, before the regulatory and criminal probes were revealed, an analyst expressly asked "[w]hat's prompting the delay" in closing the deal, ¶258, and whether regulators "are [] taking a closer look at anything." Masrani responded: "***No, I'm not aware of anything of the sort you're mentioning***." (¶259, Statement 13.)

These statements not only concealed the truth but were also outright false. Among other things, at least a month earlier, senior executives were directly informed that the OCC and Federal Reserve had found such significant failures in TD's AML practices that the DOJ had already

---

[2] Defendants' other statements in these two categories also concealed the truth. *See, e.g.*, TD AML Statement: TD's Global AML Program was "[i]n accordance with legislative, regulatory and procedural requirements…." (¶245, Statement 1); "The Global AML Program is routinely evaluated, updated and enhanced…." (¶248, Statement 4); TD and its subsidiaries "have complied with … the [BSA]…. [A]nd have established and maintain a system of internal controls designed to ensure compliance…. [with] applicable money laundering prevention laws…." (¶257, Statement 11).

14

launched a formal investigation into the Global AML Program for violations of federal law, scuttling any hopes of regulatory approval. ¶¶93, 198.[3]

Masrani lied again on April 20, 2023, falsely assuring investors in response to an analyst's question that, despite the known regulatory hurdles, "we've initiated extension arrangements or negotiations with FHN, yes." (¶266, Statement 18.) Again, this was outright untrue. As later reported by *WSJ*, according to First Horizon CEO Bryan Jordan, "TD and First Horizon didn't discuss extending the timeline for the deal." ¶268.

**Investigation of the Global AML Program (VIII.D)**: As analysts began to seek clarity around the initial revelations of government probes, Defendants continued to conceal the truth. For example, Salom falsely explained:

> [E]very year, we have a ***very disciplined process***. We sit down and we look at the ***opportunities that we want to fund***…. Obviously, first and foremost is ***ensuring that we've got a strong control platform to be able to operate***. And so those are ***the first things that we lean into to make sure that those investments are addressed***. (¶27, Statement 25.)

But far from ensuring investments in a strong control platform, the FCP accomplished the opposite: it eliminated investment on AML controls necessary to operate the bank. ¶¶136(d), 164. Salom personally enforced this directive from Masrani and Tran, annually rejected increased spending on AML, and created the final budget that Masrani and the rest of TD's Board then reviewed and approved. ¶¶167, 170-71. Defendants never disclosed the FCP or its damaging impact.

---

[3] Defendants continued to conceal the investigations' impact on the FH Acquisition. *See, e.g.*, Joint Press Release: "continue to make significant progress in planning for the closing…." (¶261, Statement 14.)

As further news broke around the AML probes, Defendants sought to minimize the impact. For example, Chief Risk Officer Bambawale stated:

> [W]e always endeavor to be best-in-class in every risk area…. But really, *if I go right to the root cause* of what happened, there were *some procedural weaknesses in the U.S.* that caused bad actors to exploit us.
>
> *And we were also disappointed that some of our colleagues didn't follow our code of ethics*.… *This is not a problem here at the enterprise level*. (¶279, Statement 31.)

As was ultimately revealed, TD's failures were not limited to some narrow "procedural weakness." Defendants *failed to monitor 92% of all transactions* and over $18.3 trillion in unmonitored transaction value. ¶¶7(b), 136(g). Defendants added P2P services—like Zelle and Venmo—without transaction monitoring or other basic AML infrastructure because the increased cost was forbidden by Masrani's and Tran's FCP. ¶¶7, 136, 165-66. Defendants ignored OCC directives to enhance transaction monitoring and improve AML technology as well as findings of fundamental weaknesses in the Global AML Program by third-party consultants. ¶¶53-59.[4]

**Accomplishments in Managing Risk (VIII.E)**: In TD's Forms 40-F in 2022 and 2023, Defendants Masrani and Tran falsely indicated that TD's "*keys to profitability continue to be … managing risk prudently*" (¶281, Statement 32) and that TD "will … maintain its *focus on development and implementation of … regulatory controls*" (¶281, Statement 34).

---

[4] Defendants' other statements likewise concealed the truth behind the government investigations. For example, Masrani and Tran signed a Form 40-F stating that "it is *possible* that ... the Bank may not be able to develop or enhance" effective controls and that regulators "*could* require the Bank to take further actions" which "*may* expose the Bank to litigation, enforcement and reputational risk" (¶269, Statement 22). Those risks had materialized at the time of the statements and therefore Defendants "ha[d] a duty to say so." *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *2 (S.D.N.Y. Feb. 5, 2024). Similarly, Salom stated that the FH Acquisition terminated because TD made a voluntary decision to "walk away," and that the DOJ and regulatory investigations were an entirely "separate" matter (¶274, Statement 26); and Masrani stated that in just "one instance," or in an "unfortunate" few "instances, [TD's] program fell short" (¶278, Statement 30). None of this was true.

16

These statements were false and misleading. Far from managing risk prudently or focusing on implementing regulatory controls, Masrani and Tran were doing the opposite, implementing the FCP, which knowingly sacrificed prudent risk management in favor of limiting costs, ¶136(d). As a result, TD willfully failed to implement the necessary regulatory controls necessary to appropriately monitor transactions with growing risk profiles. ¶136(f).

**Internal and Disclosure Controls (VIII.F)**: Defendants Masrani and Tran each certified pursuant to SOX that TD's internal and disclosure controls were effective. Specifically, for example, that they had:

> Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ***ensure that material information relating to the issuer, including its consolidated subsidiaries, is made known to us by others within those entities***…. (¶287, Statement 36.)

In truth, management controls and oversight were effectively non-existent. Throughout the Class Period, Defendants willfully violated the BSA, including by consistently failing to file SARs and CTRs for the purpose of evading transaction reporting requirements. ¶¶57, 59, 76-77, 137(e)-(g), 156-60.

*            *            *

This "network of interrelated lies, each one slightly distinct from the other, [were] all collectively aimed at perpetuating a broader, material lie." *Vivendi,* 838 F.3d at 250. That is, having chosen to tout TD's Global AML Program, Defendants' concealment that it was willfully and criminally deficient is actionable. *See Jinkosolar*, 761 F.3d at 251; *Karimi v. Deutsche Bank Aktiengesellschaft*, 607 F. Supp. 3d 381, 393 (S.D.N.Y. 2022) (actionable where "descriptions of the processes by which [it] … compl[ies] with its legal AML & KYC obligations" omitted that bank did not apply those policies to high-net-worth clients).

17

### 2.    Defendants' Arguments Fail

#### a)    Plaintiffs Adequately Allege Falsity (Statements 1-5, 12-23, 26, 27, 28)

Defendants indicate that they intended to challenge the adequacy of falsity allegations for nearly all Statements.  Each challenge fails.

*First*, Defendants make no "effort at developed argumentation," and this challenge is thus "deemed waived."  *Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 307 (S.D.N.Y. 2024); *see also* Ex. B.  Indeed, Defendants do not even address the reasons for falsity plainly set out in Complaint Section VIII (*see* ¶241 and following each alleged misstatement).  For example, Defendants argue in conclusory fashion that Plaintiffs do not allege how Statements 1-5 were false or misleading. (Br. 13-14.)  But, as stated above, the Complaint details known, pervasive deficiencies in TD's Global AML Program that contradict the representations that TD's Global AML Program, *inter alia*, was "routinely evaluated, updated and enhanced in order to reflect changes to TD's business activities," and requires "[o]ngoing monitoring to detect and report suspicious transactions and activities."  ¶¶136(d), (f), (g); 152-54; 156-60; 196-97.  Defendants do not address these allegations, which more than sufficiently allege falsity.  *See Karimi*, 607 F. Supp. 3d at 393.

Defendants' case *In re Deutsche Bank Aktiengesellschaft Sec. Litig*, 2017 WL 4049253 (S.D.N.Y. June 28, 2017), is not to the contrary.  There, Judge Torres dismissed statements that the bank "continued to strengthen [the] control environment," "frequently review[e]d AML … goals," and "established an Anti Financial Crime Committee," reasoning that the statements "may be true despite the existence of [a money laundering] scheme."  *Id*. at *6.  Here, as the Complaint details—and Defendants admitted— far from "routinely evaluat[ing], updat[ing] and enhanc[ing]" AML or "appropriately identif[ying] and mitigat[ing]" AML risk, under the FCP, Defendants

willfully failed to substantively update the Global AML Program's transaction monitoring which allowed 92% of all transactions to go unmonitored.  *See, e.g.*, ¶¶136(d), (f), (g).

**Second**, Defendants raise factual disputes that are both improper because Plaintiffs' allegations must be accepted as true, *see Estée Lauder*, 2025 WL 965686, at *2, and wrong.

   i.   In a footnote, Defendants argue that Statement 13 was not false or misleading because the statement was about adjustments to TD's product lineup.  (Br. 18 n.41 (mistakenly calling it "Statement 12").)  Wrong.  Masrani is asked if the regulators are "taking a closer look at anything" and responds that he is "not aware of anything."  ¶¶96, 259. Masrani's response was reported by analysts to mean "that the regulatory approval process was moving forward as expected." ¶97.  This was false and misleading because, at that time, Masrani knew that regulators would not approve the FH Acquisition.  ¶¶93, 198.[5]

   ii.   The *WSJ* article reporting that "TD and First Horizon didn't discuss extending the timeline for the deal" evidences falsity for Statements 17-21.  ¶¶265-67.  Defendants argue it is a "misquote" from a First Horizon investor call that same day.  (Br. 17-18.) But the *WSJ* article does not purport to quote an investor call—indeed, other remarks attributed to FH's CEO in the article do not appear in the investor call transcript either. (*Compare* Defs. Ex. 8 (*WSJ* article) *with* Defs. Ex. 9 (FH investor transcript).)

---

[5] For a similar reason, Defendants' challenge to Statement 26 in a throwaway footnote (Br. 21 n.44) fails.  There, Salom misled investors about the reason for terminating the FH Acquisition which regulators rejected for the same willful and longstanding AML failures that the DOJ and regulators were investigating.  ¶274; *see also* ¶¶136(d)-(h), 175-79.

iii. Defendants speculate about the reliability of the sources in *Capitol Forum*'s report that, by November 2022, TD's senior executives[6] were directly informed that the OCC and Federal Reserve had found significant failures in TD's AML practices. (¶¶93, 260-61, 264; *see* Br. 19.)  But Defendants provide no basis for the challenge, and the *Capitol Forum* report is consistent with Plaintiffs' other allegations that the OCC is required to report AML deficiencies directly to TDBNA's senior management and Board of Directors, ¶186, as well as the regulatory review coinciding with the 2022 FH Acquisition, ¶¶82, 176-79, and the severity of the issues later revealed in the Guilty Pleas and Enforcement Orders, ¶¶136-38.

*Third*, Defendants purport to challenge the falsity of the investigation statements (Complaint VIII.D)  by arguing that Plaintiffs did not plead that "TD was *not* working to fix AML issues" during the Class Period.  (Br. 20 & n.42 (emphasis in original).)  Apart from being nonresponsive to the statements in this category, this is, in fact, exactly what Plaintiffs allege. Under the FCP, Defendants deliberately withheld resources needed to comply with regulatory requirements and "willfully failed to remediate persistent, pervasive, and known deficiencies in its AML," which former employees confirm persisted throughout 2024. (¶¶273, 276; Defs. Exs. 27 at 37 of 70; 28 at 36 of 69).

*Fourth*, Defendants argue that Plaintiffs do not allege that the risks highlighted in Statements 22 and 27 had already materialized "as of October 31, 2022 and October 31, 2023," asserting that "TD was not obligated to predict the outcome of the investigations."  (Br. 20-21.) Statements 22 and 27 were, in fact, filed with the SEC on ***December 1, 2022 and November 30,***

---

[6] As detailed in the Complaint, these executives included Defendant TDBNA's Board, which included Salom as well as members of TD's Board on which Masrani also sat at the time.  ¶¶28, 186, 230.

20

*2023* and misrepresented that it was merely "***possible** that*" "the Bank ***may not*** be able to develop or enhance" the systems necessary for compliance and that "regulators … ***could*** challenge the Bank's compliance." ¶¶269, 275.  By that time, Defendants had deliberately "ignor[ed] failures and refus[ed] to meaningfully remediate issues and prevent recurrences," ¶241(f); regulators and consultants had already repeatedly found AML compliance seriously deficient, ¶241(g), and by at least November 2022, Defendants knew that the DOJ had launched a formal investigation into the Global AML Program, ¶93.  *See Co-Diagnostics*, 2024 WL 456745, at *2. ("If the 'risk' has already happened or is then happening, the company has a duty to say so. Omitting that information makes the statements misleading.").

> **b)** **The Challenged Statements are Not "Too General" to be Actionable (Statements 4, 5, 10, 11, 22-25, 27-31)**

Defendants argue that certain statements are "too general" to be actionable and no reasonable investor would rely upon them.  (Br. 16 (Statements 4, 5, 10, 11); Br. 20 (Statements 22-25, 27-31); Br. 21-22 (Statements 32-35).) [7]   Most are "perfunctory" with no "effort at

---

[7] Defendants separately argue that Statement 11 is not actionable because it "was a commercial representation made *to FH*, not to TD investors, was expressly qualified by materiality, and the Merger Agreement expressly contemplated that the representation may fail."  (Br. 16 n.40.)  But TD, TDBUSH, and Salom made this statement in the Merger Agreement (Defs. Ex. 10 at 7 & 14 of 14), which they knew needed regulatory approval and would be publicly disseminated to investors.  TD, TDBNA, and TDBUSH, made "public disclosure of" the Merger Agreement and therefore were "required to consider whether additional disclosure is necessary … so that such information is not misleading," and "cannot avoid this disclosure obligation simply because the information published was contained in an agreement or other document not prepared as a disclosure document." *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 298 (S.D.N.Y. 2010) (merger agreement actionable, as a "reasonable investor would have understood the Merger agreement to constitute a statement of fact").  Defendants' cases do not apply because plaintiffs there "did not purchase the securities about which misstatements were made, so they did not have standing to sue under Section 10(b)." *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 89 (2d Cir. 2022); *see In re CCIV / Lucid Motors Sec. Litig.*, 110 F.4th 1181, 1185-87 (9th Cir. 2024) (same).

developed argumentation" and thus "deemed waived." *TaskUs*, 710 F. Supp. 3d at 307 (*See also* Exhibit B.)  Second Circuit law also contradicts Defendants' argument because the challenged statements give "comfort to investors that reasonably effective steps were being taken to comply with applicable" regulations when they were not. *Jinkosolar*, 761 F.3d at 251.  In *Jinkosolar*, defendants claimed to have "installed pollution abatement equipment at [] facilities to process, reduce, treat, and where feasible, recycle the waste materials before disposal" and had "environmental teams at each of [its] manufacturing facilities" on duty 24 hours a day "to monitor waste treatment and ensure that [these] waste emissions comply with [Chinese law]."  *Id*. at 247. The Court held that these statements were actionable misrepresentations "if in fact the equipment and 24–hour team were then failing to prevent substantial violations of the Chinese regulations," as was alleged to be the case.  *Id*. at 251.

The same is true here.  Defendants gave "comfort to investors that reasonably effective steps were being taken to comply with applicable" regulations, *see id*, by claiming the Global AML Program was evolving with TD's rapidly growing business in compliance with the BSA and Federal regulations.  (*See e.g.*, ¶248, Statement 4 (Global AML Program "is routinely evaluated, updated and enhanced in order to reflect changes to TD's business activities, as well as applicable supervisory standards and legal requirements.").)  Defendants also described granular steps taken to comply with AML requirements.  (*See e.g.*, ¶255, Statement 10 ("Each bank has qualified, dedicated personnel who are responsible for administering such programs.  During the due diligence process, the AML team members from TD used a risk based approach to review and

---

Defendants' other arguments ask the Court to improperly and prematurely interpret the Merger Agreement—even as Defendants' exhibit excludes some of the very sections they cite.

assess key risks related to AML. Both programs are currently designed to meet the five pillars requirements.").)

As noted above, these assurances regarding compliance were indisputably untrue (*see supra* III.A.I), and are thus actionable. *See Jinkosolar*, 761 F.3d at 251; *Karimi*, 607 F. Supp. 3d at 393; *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018) (statements in code of conduct, including "[c]onfidential and anonymous mechanisms for reporting concerns are available," were "directly contravened by allegations" of culture of harassment and retaliation). That Defendants repeated these assurances throughout the Class Period, further reinforces their materiality. *Jinkosolar*, 761 F.3d at 251; *see also In re BHP Billiton Ltd. Sec. Litig.*, 276 F. Supp. 3d 65, 80 (S.D.N.Y. 2017) ("defendants allegedly made these representations [] over and over and over" such that they put the topic at issue and the Court "cannot say that, as a matter of law, investors would not find these representations material").

Defendants can only rely on inapplicable cases where courts dismiss generic aspirations of compliance. (Br. 14-17.) None of these cases involve repeated and explicit representations of specific measures put in place to ensure legal compliance. *See, e.g.*, *In re Telefonaktiebolaget LM Ericsson Sec. Litig.*, 675 F. Supp. 3d 273, 290 (E.D.N.Y. 2023), *aff'd*, 2024 WL 4023842 (2d Cir. Sept. 3, 2024) (statements that merely "note the existence of 'internal rules' meant to 'ensure compliance with legal and regulatory requirements,'" with no specific compliance efforts or standards); *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (statements about compliance were explicitly aspirational and came with qualifiers, like "wants to" and "aims to").[8]

---

[8] Defendants also cite *Plumbers & Steamfitters Loc. 773 Pension Fund v. Danske Bank*, 2020 WL 4937461, at *7 (S.D.N.Y. Aug. 24, 2020). But this unreported decision has no analysis as to how the challenged statements are "inactionable generalizations" and fails to address the Second Circuit's

### c) Defendants' "Opinion" Statements Are Actionable

Opinions are actionable if (i) the speaker did not subjectively believe the opinion; (ii) the opinion contained one or more embedded factual statements that was false; or (iii) the statement failed to provide critical context, meaning that the speaker implied he or she had a reasonable basis for the opinion but in fact did not." *Estée Lauder*, 2025 WL 965686, at *7.

Here, Defendants argue that Statements 6-9, 12-17, 19-21, 31, 36-38 are nonactionable "opinions." This argument fails for three reasons.[9]

***First***, all these statements, if even opinions, are nonetheless actionable because the speakers (TD, TDBNA, Masrani, Salom, Tran, and Bambawale) "failed to provide critical context, meaning that the speaker implied he or she had a reasonable basis for the opinion but in fact did not," *Estée Lauder*, 2025 WL 965686, at *7. Like the half-truth analysis above, Defendants knew the true state of TD's AML program, its criminal violations of the BSA, and its impact on the FH Acquisition at the time they made these statements. (*Supra*, III.A.1.) For example, Masrani, Tran, and Salom ordered and enforced the FCP. ¶¶164, 168, 170-71. And Masrani and Salom knew as TD and TDBNA and TDBUSH Board members, respectively, that TD's failures had persisted, ¶¶44, 178, 186, 219, 229, 230, and that, by November 2022, regulatory investigations precluded the FH Acquisition, ¶93.[10]

---

binding decision in *Jinkosolar*, unlike the later reported decision in *Karimi*, which closely analyzed the issue and upheld statements similar to those alleged here. *See Karimi*, 607 F. Supp. 3d at 393.

[9] While Defendants seem to assert that Statements 13, 14, and 16 are opinions, their Brief articulates no supporting argument. (Br. 17-18.) As such, the argument is waived. *TaskUs*, 710 F. Supp. 3d at 307.

[10] By contrast, the statements Defendants cite in *Tongue v. Sanofi* contained no concrete representations of performance, did not contradict information known at the time, and consisted simply of interim FDA feedback that "would have ***potentially*** undermined Defendants' optimistic projections." 816 F.3d 199,

***Second***, Statements 6, 12, 14-17, 19-21, and 31 are actionable because they either are not opinions or contained "embedded factual statements that [were] false." *Estée Lauder*, 2025 WL 965686, at *7. Each is a "determinate, verifiable statement" and thus they are not "opinions." *Co-Diagnostics*, 2024 WL 456745, at *3. *See, e.g.*, Statement 6(b), ¶252 (factual representation that the Audit Committee "[o]versaw the execution and ongoing effectiveness of the [Global AML Program]"); Statement 12, ¶258 ("we don't control the timing of all the regulatory approvals"); Statement 14, ¶261 ("TD and First Horizon … continue to make significant progress in planning for the closing and the integration of the companies"); Statement 15, ¶262 ("regulatory approval is not within the bank's control"); Statement 16, ¶263 (entire statement); Statement 17, ¶265 ("We have opened discussions with First Horizon about a possible extension."); Statement 19, ¶267 ("we've initiated negotiations to extend our agreement with FHN"); Statement 20, ¶267 ("we have initiated extension negotiations with First Horizon to extend that date"); Statement 21, ¶267 ("we are into extension discussions with First Horizon"); Statement 31, ¶279 (contrary to Br. 21, the "root cause" of the AML issue and whether there is an AML problem "at the enterprise level" are verifiable).

***Third***, even to the extent they might be opinions, these sixteen Statements all survive dismissal because they were not honestly held by TD, TDBNA, Masrani, Salom, Tran, or Bambawale, respectively. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015); *Estée Lauder*, 2025 WL 965686, at *7. Each Defendant knew that TD's Global AML Program suffered long-standing deficiencies and that the FCP precluded sufficient investment, as set forth. *See, infra*, III.B.1.

---

211-213 (2d Cir. 2016). Further, unlike *Sanofi*, Defendants here fail to point to any "context" or "customs and practices of the relevant industry" that render the purported opinion statements not misleading. *Id.* at 211.

### d) Defendants' Half-Truths Are Not Forward-Looking Statements

Defendants can avoid liability for a forward-looking statement only if (i) it is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially"; (ii) Defendants did not make it with "actual knowledge" it is false; and (iii) it does not contain a misrepresentations "of present fact." *Estée Lauder*, 2025 WL 965686, at *6.

Here, Defendants argue that Statements 12-15 and 34-35 are nonactionable forward-looking statements. Both arguments fail.

*First*, Defendants argue that Statements 12-15 are forward-looking because they "concern[] the future timeline of … regulatory approval for the FH [Acquisition]" and "Plaintiffs do not even attempt to adequately plead that Masrani or TD had 'actual knowledge' that the statements were false or misleading." (Br. 19.) They are wrong. None are forward-looking statements, and Defendants point to no text in those Statements that makes them so, nor do they identify accompanying meaningful cautionary statements. Moreover, as discussed above, these four Statements are updates to shareholders about the *present* status of regulatory approval for the FH Acquisition (*see, e.g.*, ¶¶259, 262 ("No, I'm not aware of anything"; "Regulatory approval is not within the bank's control")) and Masrani and TD knew at least by November 2022 that approval was being held up by regulators. *See Estée Lauder*, 2025 WL 965686, at *6-7 (the "safe harbor does not protect statements which are misleading about historical and present facts").

*Second*, Defendants' claim that Statements 34 and 35 are nonactionable "forward-looking statements" because they include the word "will." (Br. 22.) But by using the phrase "will also *maintain*" and "will *maintain*," they are representations about the "historical and present" approach to regulatory compliance. *Estée Lauder*, 2025 WL 965686, at *6-7. Separately,

26

Defendants' challenge fails because they do not carry their "burden of demonstrating that they are protected by the meaningful cautionary language." *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010). And, in any event, Plaintiffs allege actual knowledge of falsity and untrue implied factual assertions, because TD, Masrani, and Tran had direct knowledge of the FCP scheme and AML non-compliance. ¶¶165, 168, 171, 176; *see Co-Diagnostics*, 2024 WL 456745, at *3 (cautionary language "cannot be meaningful" where "risk had already become reality" and thus language was "misleading in light of historical fact").

### B. PLAINTIFFS ALLEGE A STRONG INFERENCE OF SCIENTER

Scienter requires allegations of (i) "strong circumstantial evidence of conscious misbehavior or recklessness," or (ii) "motive and opportunity to commit fraud." *Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 78 (2d Cir. 2021).

In assessing scienter, "courts must ... accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007). Scienter allegations must be viewed holistically; the question is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). The inference of scienter "need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* at 324. Instead, it is "strong" when it is as plausible as any other inference. *Id.* Thus, "at the motion to dismiss stage, a tie on scienter goes to the plaintiff." *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012).

27

1.    **Defendants Knew or Were Reckless in Not Knowing that the FCP Caused Material Deficiencies During the Class Period**

The Second Circuit has held that scienter is established when a plaintiff shows a defendant "engaged in deliberately illegal behavior," "knew facts or had access to information suggesting that their public statements were not accurate," or "failed to check information they had a duty to monitor." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009); *see also Karimi*, 607 F. Supp. 3d at 397–99 (plaintiffs adequately alleged CEO's scienter for deficient AML practices without motive and opportunity allegations); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 666 (S.D.N.Y. 2017) (allegation that managing officer "was knowingly involved in the scheme to bribe [auditor]" constitutes "deliberately illegal behavior" and is adequate "to allege a strong inference of scienter").

***Defendants' Knowledge***. The Complaint sets out in detail that Defendants knew or were reckless in not knowing of the deficiencies in the Global AML Program at the time they made the actionable statements.  (Section VI.A.)

For instance, TD disseminated its AML Statement stating that the Global AML Program is "routinely evaluated, updated and enhanced," ¶248, and Masrani and Tran executed the Annual Report stating that AML risks are "appropriately identified and mitigated," ¶250, knowing Defendants had directed the implementation of the FCP.  Specifically:

- Masrani ordered the FCP as official TD corporate policy governing all budgeting and financial planning upon becoming CEO in 2014.  ¶¶163-64 (FE-3).

- Masrani's and Tran's "clear directive" "straight from the top" to budget zero expense growth were conveyed to TD executives through the FCP and EDS

28

Guidance Document. ¶¶163-165 (FE-3). Tran was copied on those communications. ¶168 (FE-3).

- Masrani and the entire board approved the FCP prohibiting any increase in AML spending annually. ¶171 (FE-3).

Similarly, at the time Salom told analysts about TD's supposed "disciplined process" of investing in AML, ¶272, he oversaw and enforced the FCP for years, ¶170 (FE-3). Salom received the EDS Guidance Document. ¶168 (FE-3). He presided over an annual video conference call with his direct reports and the business finance leadership of each business, in which he scrutinized the budgets presented for compliance with the FCP and pushed for more ways to cut costs based on the FCP. ¶¶170-71 (FE-3). Complaints from executives that the necessary investment in AML were not being made were dismissed outright. ¶167 (FE-3).

Furthermore, Defendants knew about the pervasive AML deficiencies. Leading into the Class Period, Defendant Levine reported to the TDBUSH and TDBNA boards (which included Defendant Salom) that the Global AML Program had significant backlogs, was unable to timely monitor transactions, and that the Global AML Program was not on target to update its transaction monitoring program, yet the Board failed to act. ¶¶178-79. And for 11 years, regulators, auditors, and third-party consultants "repeatedly identified TDBNA's transaction monitoring program as an area of concern" and "[t]he senior executive leadership and *boards of directors of TDBNA, TDBUSH, TDGUS, and TD Bank Group*"—*which included Masrani and Salom* were informed, but never addressed the AML deficiencies and "failed to effectively or substantively adapt its transaction monitoring system." ¶¶9, 176, 241(g).[11]

---

[11] Indeed, the Guilty Pleas reinforce this inference as to Salom because TDBNA and TDBUSH admitted that an "individual within high-level personnel of the organization participated in, condoned,

Meanwhile, Bambawale knew that TD's failures did not merely reflect "*some* procedural weaknesses" and were "a problem [] at the enterprise level," ¶279, because as TD's Chief Risk Officer, he received regular reports from AML leadership, including from his direct report and co-conspirator Bowman, ¶¶25, 49-50, 221, and was designated by TD to speak on behalf of the Company on the "root cause" of the AML problems and scope of the deficiencies, ¶¶128, 212.

Critically, Defendants do not even address the substance of this direct evidence, and thus concede the issue. *See TaskUs*, 710 F. Supp. 3d at 307 (by not addressing issue in opening brief, defendants "waived any argument at the motion to dismiss stage"); *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 314 (S.D.N.Y. 2024) ("Defendants forfeited (for this motion) the argument … by failing to raise it until their reply brief.").

Instead, without support, Defendants argue that the Guilty Pleas cannot support scienter because they were "entered by just two of the nine defendants, both entities (TDBNA and TDBUSH) whose scienter, if any, would have to be imputed from Individual Defendants." (Br. 28.) But this misses the point. For starters, Defendants completely ignore evidence of scienter that is *not* from the Guilty Pleas. (*See, e.g.*, ¶¶163-71 (FE-3); ¶¶178-79; Exs. 1, 2.). What's more, the relevance of the admissions is that TDBNA and TDBUSH have not only admitted their own scienter (which Defendants concede), but they also admit the knowledge, and at minimum recklessness, of Individual Defendants Masrani and Salom, who were on the boards of TD, TDBNA, and TDBUSH and were informed of these deficiencies, ¶¶9, 176, and Bowman and

---

or was willingly ignorant of the offense," which was defined therein to include, among other things, directors and executive officers. ¶175.

Levine, who reported directly to Salom and were identified in the Guilty Pleas as "Individual-1" and "Individual-2," respectively.  ¶¶26, 27.[12]

**_Former Employees_**.  Defendants make the well-worn argument that the three FEs, ¶¶150-171, do not support scienter because "none … have ever communicated with any of the Individual Defendants" and only "imply that one or more of the Individual Defendants might have been aware that TD's AML programs faced technical challenges or were behind in reviewing transactions." (Br. 31-32.)  This sidesteps the substance of the allegations and is wrong.

FE-3 **_did_** have extensive direct communications with TD's C-Suite executives, **_including with Defendants Tran and Salom personally_**, and confirms that Defendants Masrani, Tran, and Salom, as well as TD's Board, oversaw and enforced compliance with the FCP across TD globally. ¶¶162-71.  For example, FE-3 received an annual email copying Tran that set the "clear directive" enforcing the FCP, ¶168, and attended a video meeting where "Salom scrutinized the budgeting for compliance with the [FCP]," ¶170.

In any case, as CFO, Digital, Payments & Enterprise Innovation and member of TD's corporate finance team for over two decades, FE-3 "had responsibility for managing annual budgeting, forecasting, planning, and day-to-day financials," ¶162.  The relevant information made

---

[12] Defendants' two additional throwaway arguments also fail.  (Br. 27 n.48.)  First, Bowman's and Levine's self-assessments touting "their abilities to operate within the '[FCP] without compromising risk appetite'" and "historic underspend" does not negate scienter.  Instead, it reinforces scienter because Bowman and Levine were acting at Salom's direction, ¶¶26-27, 50-52, 180, who assessed their performance for compliance with the FCP, ¶164.  Second, Defendants' cases where shareholders baselessly second-guess legitimate and ordinary business decisions are irrelevant.  (Br. 27 n.48 (citing *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 562, 581 (S.D.N.Y. 2014) (allegation that defendants should have performed additional tests "for every shipment" made "little sense" and did not create "an inference of intent to deceive"); *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 467, 474 (1977) (no Section 10(b) claim where shareholders concede "there was no 'omission' or 'misstatement'" and merely argue for a different "fair market value" of acquired company)).)  By contrast, the decade-long criminal conspiracy Defendants orchestrated to boost TD's profits by laundering money for terrorists, human traffickers, and the fentanyl dealers was no mere "operational shortcoming."

31

available to, and received from, senior executives detailed by FE-3 is sufficient to raise a strong inference of scienter even if FE-3 "lacked direct contact with the Individual Defendants." *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *10 (S.D.N.Y. May 24, 2018).[13]

***Masrani's Lead Role***.   Masrani had a lead role on AML issues, spoke frequently about TD's Global AML Program, engaged directly with regulators on the issue, and admitted personal responsibility for AML failures.  ¶¶188-192.  Defendants do not dispute these facts.  Instead, they focus on three incorrect tangential points, without any supporting legal authority.

***First***, AML deficiencies at TDBNA during Masrani's 2005-2013 tenure as CEO are relevant.  (Br. 30.)  Masrani personally executed a consent order for "willful" BSA violations on transaction monitoring and suspicious activity reporting.  (Ex. 1; ¶54.)   These are the same longstanding deficiencies identified a decade later in the 2024 Guilty Pleas and Enforcement Orders.  ¶188.  As CEO of TDBNA, Masrani promised remediation.  ¶188.  Instead, as CEO of TD, Masrani mandated the FCP.  ¶¶62, 196.  *See In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 243-44 (S.D.N.Y. 2022) (awareness of problems over a year prior to the Class Period supports inference of scienter).

***Second***, Masrani's subsequent admissions of responsibility bearing on the "requirements" and "deficien[cy]" (Br. 29) of TD's Global AML Program support an inference of scienter.  ¶192; *In re Axsome Therapeutics, Inc. Sec. Litig.*, 2025 WL 965265, at *5, *10 (S.D.N.Y. Mar. 31, 2025); *see also In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 2017 WL 66281, at *15 (N.D. Cal. Jan. 4, 2017) ("apologies" by former CEO along with resignations, firings, and suspensions of senior executives is "sufficient to strongly indicate scienter").

---

[13] Defendants' do not challenge the knowledge of FE-1 or FE-2 as to the state of TD's AML deficiencies in 2024.  ¶¶151-61.

***Third***, Masrani spoke frequently about AML issues and TD's Global AML Program, including at least six times between August 2023 and September 2024.  ¶¶81, 116, 120-21, 126-28, 189, 191-92, 270-71, 273, 276-78.  That not all of these are "*challenged* statements," (Br. 30), is irrelevant to the well-established principle that when a Defendant speaks in detail on a topic it supports scienter.  *Estée Lauder*, 2025 WL 965686, at *9 (inferring CEO and CFO scienter where both "previously made public statements about the importance of" the issue); *Speakes v. Taro Pharm. Indus., Ltd.*, 2018 WL 4572987, at *9 (S.D.N.Y. Sept. 24, 2018) (inferring CEO and CFO's scienter of alleged price fixing where they "sp[oke] specifically to pricing issues on earnings calls").

***History of Global AML Deficiencies***.  Before and during the Class Period, Defendants were repeatedly warned and sanctioned by regulators about the very compliance issues that caused shareholders' losses in this case.  ¶¶194-199.  This includes, among other things:

- deficiencies in AML monitoring raised by the OCC and Canadian regulators in 2010 and 2011, ¶194;

- penalties in 2013 for failure to identify suspicious activity and file SARs, ¶195;

- notifications from the OCC in 2013 and 2015 that TD needed to develop and enhance transaction monitoring policies and procedures, ¶¶196-197;

- in or around 2019, TDBNA learned of, and extensively reported internally about, criminals laundering money by depositing cash at TD locations and withdrawing the cash from ATMs in Columbia, ¶¶202-04;

- in 2020, TD generated reports about the activity of David Sze, who was eventually arrested and pleaded guilty to criminal charges, but did not engage in any further investigation, ¶205;

- between 2021 and 2023, TD became aware of shell companies moving approximately $123 million in illicit funds through TDBNA but never filed a SAR, ¶206; and

Defendants were also aware in 2018 of other U.S. banks facing sanctions but nevertheless stopped conducting threshold testing for certain suspicious activity due to costs, ¶¶208-09.

Defendants' knowledge of these long-standing deficiencies supports a strong inference of scienter, and, notably, Defendants do not argue otherwise.

**_FH Acquisition_**. The FH Acquisition further supports a strong inference of scienter because: (i) the FH Acquisition was highly significant to TD and Defendants knew of regulatory scrutiny regarding TD's Global AML Program in connection with the merger; (ii) the Individual Defendants' increased compensation was tied to securing the FH Acquisition; and (iii) TD was forced to  pay $200 million to First Horizon after the failure of the FH Acquisition.  ¶¶210-218.

Defendants do not even respond to (and thus concede) the first two points.  *See TaskUs*, 710 F. Supp. 3d 283 at 307; *Dentsply*, 732 F. Supp. 3d at 314.  As to the third point, Defendants do not deny TD's $200 million payout to First Horizon was for Defendants' breach of representations and warranties in the Merger Agreement concerning "compli[ance] with … the Bank Secrecy Act" and other AML requirements.  Instead, Defendants make only a passing remark that this allegation is "impermissibly speculative." (Br. 30.).  But they offer no support and proffer no other plausible explanation—let alone one that is cogent and compelling—for a $200 million payment not otherwise required by the Merger Agreement.  *Dentsply*, 732 F. Supp. 3d at 322 (finding scienter where no cogent or compelling competing inference).

34

***Terminations and Compensation Cuts***.  During the government's investigation and as Defendants' fraud came to light, senior TD officials responsible for AML compliance across the global enterprise were terminated or forced to resign.  This includes, but is not limited to, Masrani, former CFO Ahmed, Alan MacGibbon (Chair of TD's Audit Committee), numerous other TD directors, two TD Chief Compliance Officers, TD's Global Head of AML Operations, and Defendants Levine (former BSA Officer) and Bowman (former Chief AML Officer).  ¶142.  Just as important, senior executive compensation was slashed, with TD admitting that the "reductions reflect the seriousness of the U.S. AML failures."   ¶143.   The timing and circumstances surrounding these resignations and compensation cuts strengthens scienter, as these individuals were closely related to the underlying fraudulent conduct.  *See New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14, n.3 (2d Cir. 2011); *In re Salix Pharm., Ltd.*, 2016 WL 1629341, *15 (S.D.N.Y. Apr. 22, 2016) ("independent facts indicate that the resignation was somehow tied to the fraud").[14]

***Core Business Segment***.  The operations of TD's U.S. Retail Segment were critical to TD's success and accounted for 32% and 52% of TD's global net income in 2022 and 2023, respectively.  ¶¶221-23.  The inference of scienter is therefore strengthened given that Defendants' statements "contradicted reasonably available data" and "concerned major transactions or touched upon the heart of their companies' businesses."  *Shenk v. Karmazin*, 867 F. Supp. 2d 379, 387 (S.D.N.Y. 2011); *see also Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*, 367 F. Supp. 3d 16, 37-38 (S.D.N.Y. 2019) (scienter inference "buttressed" by core operations allegations where

---

[14] Defendants' cases are inapposite.  They rely on *In re BISYS Sec. Litig.*, where "documents that plaintiffs themselves cite in the Complaint suggest that [CFO] resigned to accept another opportunity and [CEO] resigned for health reasons."  397 F.Supp.2d 430, 446 (S.D.N.Y. 2005).  And in *Malin v. XL Cap. Ltd.*, there were no allegations linking the resignations to the fraud.  499 F. Supp. 2d 117, 162 (D. Conn. 2007).

segment generated 35% of revenues).  Defendants' perfunctory response appealing to "case law or common sense," without identifying anything that supports their argument (Br. 31) waives any such challenge, *TaskUs*, 710 F. Supp. 3d at 307.

### 2.    Plaintiffs Allege Motive

Motive exists when "concrete benefits [] could be realized by one or more of the false statements and wrongful nondisclosures alleged."  *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).

Masrani, Tran, and Salom had powerful personal motive because they were paid millions of dollars in additional compensation specifically tied to the FH Acquisition—the "strategic transaction[]" that, "once closed, will add scale, new capabilities, talented colleagues, and over one million customers and clients to the bank."  ¶215.  For example, on this basis, Masrani was paid an additional $1,964,000 for 2022 and his total direct compensation target was increased to $15,000,000 for 2023.  *Id.*  Moreover, following the Guilty Pleas, TD slashed Individual Defendants' compensation specifically because of "the seriousness of the U.S. AML failures." ¶143.  Masrani's 2024 compensation was slashed by 89%, or $8.2 million; Tran and Salom also saw their compensation cut drastically.  ¶¶143, 220.  This "direct link between the compensation package and the fraudulent statements," particularly the substantial magnitude of the compensation—which for Masrani alone totaled more than $10 million—and Defendants' "motiv[e] to sweep issues under the rug," is probative of scienter.  *Dentsply*, 732 F. Supp. 3d at 318.  Accordingly, this was no mere generalized desire to "maintain or increase executive compensation … imputed to all corporate officers," as Defendants suggest.  (Br. 26.)

Defendants claim that if they were "aware of the high risk" that AML issues would "come to light and doom the merger, it is not plausible that Defendants would have plunged ahead with the FH Transaction." (Br. 35.)  But this generalized explanation would immunize all fraudsters by

deeming all uncovered fraud implausible.  Defendants "rationally (though recklessly) gambled that the [regulators] would ultimately approve [the transaction]" and "viewing the totality" of the allegations, "the inference that Defendants had an intent to defraud is at least as compelling as any alternative inference."  *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 3268495, at *11-12 (S.D.N.Y. June 16, 2020).

### 3.    Corporate Scienter

These allegations, when taken holistically, are "sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Estée Lauder*, 2025 WL 965686, at *9.  Indeed, Defendants do not directly challenge the corporate scienter of Defendants TD, TDBNA, and TDBUSH.  Nor can they.

For starters, TDBNA and TDBUSH admitted to "willfully fail[ing] to remediate persistent, pervasive, and known deficiencies in its AML," and "willfully fail[ing] to file accurate CTRs related" to known AML schemes.  (Defs. Exs. 27 at 37 & 39 of 70; 28 at 36 & 38 of 69.)  These acts were committed or known by individuals sufficiently senior that their knowledge can be imputed to TDBNA and TDBUSH, including Salom, who was responsible for reviewing and implementing the FCP, ¶¶170-71, and, as a member of the TDBNA and TDBUSH boards, was informed during the Class Period of TD's global AML deficiencies but never addressed them.  ¶¶9, 176.

The corporate scienter of TD is likewise established via the knowing and reckless conduct of the following senior individuals:

- Masrani implemented the FCP in order to knowingly constrain the AML budget, ¶163-64; as a member of TD's board of directors, was informed during

37

the Class Period of, but never addressed, the TD's global AML deficiencies ¶¶9, 176; and by virtue of the Global AML Program's structure, received regular reports from TD's Audit Committee and AML leadership, ¶¶9(c), 49, 180.

- Defendant Salom, TD's Group Head, U.S. Retail, had scienter for the reasons stated above. *Supra* III.B.1-2.

- Defendant Bambawale, TD's Group Head and Chief Risk Officer, received regular reports from AML leadership. ¶¶25, 49-50.

- Defendants Bowman, TD's Global Head of AML Compliance, and Levine (Head of US AML in the Global AML function), knowingly implemented the FCP's "historical underspend," ¶65, and, as admitted, "knew there were long-term, pervasive, and systemic deficiencies in the Defendants' U.S. AML policies, procedures, and controls." (Defs. Exs. 27 at 38 of 70; 28 at 37 of 69.)

- TD's Board of Directors, including Alan MacGibbon, Amy Brinkley, and Mary Winston, were informed during the Class Period of, but never addressed, TD's global AML deficiencies. ¶¶9, 176.

In addition, contrary to Defendants' arguments, it is "possible to raise the required inference [of scienter] with regard to a corporate defendant without doing so with regard to a specific individual defendant." *In re Teva Sec. Litig.*, 671 F. Supp. 3d 147, 214–15 (D. Conn. 2023) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). Here, as outlined above, Plaintiffs have alleged widespread knowledge of a years-long scheme concerning one of TD's most critical business units. Together, these allegations are more than sufficient to establish TD's scienter. *See Teva*, 671 F. Supp. 3d at 215

38

(finding corporate scienter for a "massive multi-year, multi-pronged company-wide scheme to push opioids for off-label use" that was alleged to have been "pushed by Teva's management").

### 4.    Defendants' Puzzle Pleading Argument Fails

Defendants claim that the scienter allegations are an "impermissible puzzle pleading" because, apparently, "it is impossible to tell" which Defendant is "the 'maker'" of the challenged statements or "whether that Defendant knew or had access to facts contrary to the statement at the time they made it." (Br. 24, 27.) Defendants' sole authority for that contention is this Court's decision in *Kempen Int'l Funds v. Syneos Health, Inc.*, 2025 WL 949576, at *1 (S.D.N.Y. Mar. 28, 2025). But, unlike here, the *Kempen* plaintiff challenged "over a hundred" statements, and "d[id]n't address each statement separately" or "engage with the substance of any specific statement." 2025 WL 949576, at *1-2. Here, each of the 39 challenged statements are set out and discussed separately in Section VIII of the Complaint, and the fact that Plaintiffs also set out additional reasons for scienter in Section VI is not grounds for dismissal.[15]

### 5.    Defendants' Non-Fraudulent Inference Is Less Compelling

Defendants propose that the more plausible interpretation of the alleged facts is that "Defendants were in a constant game of 'catch up'" and that they were "constrained by regulatory confidentiality requirements" from disclosing the truth. (Br. 32, 35.) But this absurd explanation ignores the entire Complaint. *See also Lockheed Martin*, 875 F. Supp. 2d at 372 ("a tie on scienter goes to the plaintiff").

Far from "later learn[ing] of" the AML deficiencies, Defendants created them and then ignored them. Masrani implemented the FCP in 2014, which was thereafter adhered to by Tran,

---

[15] For the avoidance of doubt, Plaintiffs have described the "maker" of each challenged statement in their accompanying chart filed as Ex. B and submitted in response to Defendants' Ex. B.

Salom, Bowman, Levine, and other senior executives, and which deliberately underinvested in AML compliance. ¶¶62, 241(f). Defendants "ignore[d] known deficiencies in favor of reducing costs" throughout the Class Period, and thereby "artificially inflate[d] the Company's operating income and profits because it was not spending the money necessary for a compliant AML program." ¶¶1, 233(d)-(e), 234-35.

Defendants do not (and cannot) present any plausible date *when* they could have "learned of" the deliberate deficiencies in the Global AML Program (Br. 32) that avoids liability here. Not only did Defendants continue to make false statements throughout 2024 (*see* ¶276 (February 29, 2024), ¶252 (April 18, 2024), ¶¶278-79 (May 23, 2024)), they continued to publish the TD AML Statement on TD's website through the end of the Class Period. Moreover, Defendants were not constrained by "confidentiality requirements," and indeed repeatedly discussed the investigations publicly. *See, e.g.*, ¶¶258-59, 269, 270-72, 274, 276-79. Having chosen to do so, they were obligated to do so truthfully. *Jinkosolar,* 761 F.3d at 250. They did not. *See, e.g.*, ¶274 (Salom: FH Acquisition termination was "separate" from the DOJ and regulatory investigations), ¶278; (Masrani: Limiting the failures to just "one instance" where TD's "program fell short").

Nor does this case present "fraud-by-hindsight." (Br. 32-33.) Unlike the cases Defendants cite, the fraud here was contemporaneously known. (*See supra*, III.B.1.) *See In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 296-99 (S.D.N.Y. 2014), *aff'd*, 616 F. App'x 442 (2d Cir. 2015) ("[t]here is no allegation that [the new accounting firm] discovered any additional control weaknesses that [defendant] had not previously reported"); *N. Collier Fire Control v. MDC Partners, Inc.*, 2016 WL 5794774, at *21 (S.D.N.Y. Sept. 30, 2016) (rejecting "fraud by hindsight" because fact that "expense reimbursements [] were later deemed improper" does not establish that "individuals who approved the reimbursements must have known that they

40

were improper"); *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) (bank "could not have been expected to anticipate the [U.S. subprime mortgage] crisis with the accuracy [p]laintiff enjoys in hindsight").[16]

## C.    PLAINTIFFS ADEQUATELY PLEAD SCHEME LIABILITY

"To state a scheme liability claim, a plaintiff must show: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). Here, Defendants Bowman, Levine, Salom, TDBNA, and TDBUSH (together, the "Scheme Defendants") engaged in a scheme to withhold the investment necessary for a compliant AML program and conceal the true state of TD's deficient Global AML Program. ¶¶231-39. Plaintiffs also plead reliance because Defendants' "participation in this deceptive scheme made it 'necessary or inevitable' that falsehoods on the part of [the Speaker Defendants] would result." *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 472 (S.D.N.Y. 2017). Had the Speaker Defendants truthfully disclosed the state of TD's AML program, the scheme would have unraveled. And Defendants admissions of the scheme more that adequately support scienter.[17]

## D.    PLAINTIFFS ADEQUATELY PLEAD LOSS CAUSATION

Loss causation is the "causal link" between the alleged misrepresentations and the economic harm plaintiffs suffered. *Vivendi*, 838 F.3d at 260. Loss causation is subject to

---

[16] Nor is *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 127-28 (S.D.N.Y. 2013) applicable because Plaintiffs' theory here is not that "Defendants would have learned the truth if only they had performed sufficient reviews or engaged in additional oversight sooner." (Br. 33.)

[17] Further support for the scheme liability claim is presented in Plaintiffs' Memorandum of Law in Opposition to Defendants Bowman's and Levine's motions to dismiss.

Rule 8(a)'s notice pleading standard and Plaintiffs' "burden is not a heavy one." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015). All that is required is "***some indication*** of the loss and the causal connection." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Plaintiffs need only allege that "the subject" of the misstatements "was the cause of the actual loss suffered," *Vivendi*, 838 F.3d at 261, which plaintiffs may plead as a "series of events," that (i) "constructively" disclose the relevant truth or (ii) were a foreseeable "materialization of the risk" concealed by the fraud. *Vivendi*, 838 F.3d at 262.

Here, Plaintiffs allege how Defendants' false and misleading statements and omissions concerning TD's Global AML Program caused shareholders' losses when the foreseeable concealed risks materialized and the truth was revealed. ¶¶295, 298, 301, 304, 307, 311-13. After each partial revelation, TD's share price fell and commentators attributed the loss to the disclosures. ¶¶296-97, 299-300, 302-03, 305-06, 308-10, 314-15. The Complaint more than satisfies the pleading standard. *See Dentsply*, 732 F. Supp. 3d at 324-25; *see also Estée Lauder*, 2025 WL 965686, at *11 ("The accompanying stock price drops … make[] even more plausible that defendants' [misstatements and omissions] lie[] behind plaintiffs' loss.").

In response, Defendants advance an unprecedented standard: that Plaintiffs must "specify *which* purported corrective disclosures 'reveal[ed] to the market the falsity' of *which* specific challenged statement." (Br. 38 (emphasis in original).) There is no such requirement that "a corrective disclosure be a 'mirror image' tantamount to a confession of fraud." *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 202 (S.D.N.Y. 2010). That is particularly true here, where Defendants "disseminat[ed] a network of interrelated lies, each one slightly distinct from the other, but all collectively aimed at perpetuating a broader, material lie." *Vivendi*, 838 F.3d. at 250.

42

No court has applied Defendants' argument, and they cite none. In *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 177 (2d Cir. 2005), the Second Circuit affirmed Plaintiffs' position that "a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Id.* at 175 (emphasis in original). Importantly, in *Lentell*, plaintiffs conceded that falsity was not revealed until **after** the alleged corrective disclosures. *Id.* n.4. In *Davidoff v. Farina*, the court found for each of the three categories of alleged misstatements, respectively, that: (i) "plaintiffs conceded at oral argument that 'there is no loss causation'"; (ii) plaintiffs did not attempt to plead loss causation at all; and (iii) the alleged corrective disclosure was actually "a denial" of the alleged improper activity. 2005 WL 2030501, at *15-16 (S.D.N.Y. Aug. 22, 2005). And in *Castillo v. Dean Witter Discover & Co.*, the court rejected plaintiffs' argument that "they need not plead loss causation." 1998 WL 342050, at *5 (S.D.N.Y. June 25, 1998).

Remarkably, Defendants' remaining two decisions support the adequacy of Plaintiffs' allegations by **denying** dismissal on loss causation grounds. *See In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, 2024 WL 451691, at *14 (S.D.N.Y. Feb. 5, 2024) (loss causation challenge "falls flat" where "each statement appears to contradict" alleged corrective disclosure); *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *10, *18 (S.D.N.Y. Mar. 29, 2024) (loss causation pled where disclosures "plausibly revealed" concealed information).

Defendants try to dispute the merits of four—out of six—specific disclosures.[18] Their arguments fail.

---

[18] Defendants do not challenge and thus concede loss causation related to the May 8, 2023 and August 24, 2023 disclosures.

*May 25, 2023*.  TD disclosed a reasonably possible loss ("RPL") of $1.27 billion.  ¶299.  A Bank of America analyst report stated "Mgmt. appears [to have] underestimated the impact on expenses due to potential compliance related investments that may be necessary in order to resolve regulatory issues in the U.S.," and other analysts lowered their price targets.  ¶300.  TD's share price fell 4.39%.  ¶299.

Defendants ignore these facts, and instead misleadingly claim that the reported RPL only increased from prior estimates of $1.26 billion to $1.27.  (Br. 39.)  In fact, the $1.26 billion previously reported RPL concerned an entirely different matter—the unrelated "Stanford Litigation"—that was wiped away before this disclosure.  (Defs. Ex. 29 at 3 of 3.).  Whereas, as Bank of America confirmed, the entirely new RPL recorded on May 25, 2023 disclosed for the first time a significant cost arising from U.S. regulators' concern over AML.

*May 2, 2024*.  In an article entitled "TD Bank Probe Tied to Laundering of Illicit Fentanyl Profits," the *WSJ* reported that TD was contending with three other U.S. probes, ¶123, and that the DOJ was focused on how Chinese gangsters used TD to launder $653 million from U.S. fentanyl sales.  ¶304.  National Bank of Canada reduced its price target on TD stock by almost 9%, placed "greater weight on worst-case scenarios for the stock," raised the specter of a "larger than expected fine" and "regulator-impos[ed] limitations on [TD's] business activities," and estimated a "total penalty amount of $2 bln [as] realistic."  ¶306.  TD's share price fell 5.89%.  ¶305.

Defendants respond with an improper factual assertion that investigations of TD had "long been known to the market" and did not "expose new concealed information."  (Br. 40.)  But a "truth on the market" defense is an "inappropriate basis for dismissal on the pleadings."  *Karimi*, 607 F. Supp. 3d at 394.  In raising this improper factual dispute, Defendants ignore that the *WSJ* article states that "the focus on money laundering related to illegal drug sales ***hasn't been***

*previously reported*." (Defs. Ex. 18 at 3 of 6.) Moreover, while the DOJ's probe was public, Defendants downplayed the seriousness of the issues, ¶¶116-17, and concealed the existence of three other probes and TD's involvement with Chinese gangsters and Mexican cartels trafficking fentanyl. ¶123. These new facts undercut Defendants prior assurances of "manageable" probes that would not "impact [the] core numbers."[19] ¶117.

*August 22, 2024*. TD announced that it suffered its first loss in over two decades and set aside an extra $2.6 billion to cover fines from regulators. ¶307. TD's share price fell 2.19%. ¶308.

Defendants again raise a fact-intensive "truth on the market" argument that "market participants had long known that TD faced potential penalties" of over $2 billion. (Br. 41.) Defendants ignore that this was the first loss since TD was forced to abandon the FCP. ¶307. They also ignore the analysts' reactions to the revelations: TD "[s]tock reacted negatively" to the news and the "messaging [] during the earnings call was not confidence inducing as investors try to handicap the *eventual impact from the US AML issue*," (Bank of America); "*[n]ot the end of TD's AML issues*," (Scotiabank); "[a]nti-money laundering losses continue to stack up" as the "anti-money laundering provisioning … increase was *more than we expected*," (Morningstar); "TD's AML tidbits leave investors hungry for more" and "[f]urther *clarity required on non-monetary penalties*," (Canaccord Genuity). ¶¶309-10.

---

[19] Defendants' cases are irrelevant. *See In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 513-14 (2d Cir. 2010) (summary judgment decision based on expert evidence that specific earlier disclosures revealed the relevant facts); *Monroe Cnty. Emps' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 344, 357-58 (S.D.N.Y. 2014) (defendants identified "extensive media coverage about the risk" that severed the link between defendants' misconduct and plaintiffs' economic harm); *In re Veon Sec. Litig.*, 2025 WL 66444, at *6 (S.D.N.Y. Jan. 10, 2025) (plaintiffs alleged a corrective disclosure that revealed "the same" bribery information as two prior corrective disclosures).

**October 9-10, 2024**.  After the close of trading on October 9, 2024, the *WSJ* reported that TD would plead guilty to criminal charges for AML violations and face $3 billion in penalties, and that the OCC was expected to impose an asset cap that would bar TD's growth in the U.S.  ¶311. The next day, TD disclosed it had entered the Guilty Pleas and Enforcement Orders.  ¶312.  TD's share price dropped another 6.4%.  ¶314.

Improperly arguing "truth on the market" again, Defendants contend that "the contours of the Pleas had long been known and anticipated by market participants."  (Br. 41.)  Not so.  For one, Defendants ignore completely the new revelations from the Enforcement Orders.  *See, e.g.*, ¶¶137-38.  But even the Pleas revealed far more than TD's earlier disclosures on the subject, including that Defendants admitted to willful misconduct.  *See, e.g.*, ¶136 (that the FCP prevents investments in AML, TD failed to monitor 92% of all transactions, and the boards of directors were aware of deficiencies but never mitigated them); ¶314-15 (analyst shocked by the "unprecedented nature of the crime and regulatory penalties" and this "worst-case scenario" development).  Defendants also misstate the law, arguing that disclosures did not "'reveal to the market the falsity' of any alleged prior misstatement."  (Br. 41 (quoting *Lentell*).)  Again, however, *Lentell* does not impose such a mirror-image standard.  Rather, loss causation is sufficiently pled through constructive disclosure of the fraud."  *Vivendi*, 838 F.3d at 262.  Courts routinely sustain loss causation allegations where concealed violations lead to adverse regulatory consequences. *See, e.g., Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC,* 750 F.3d 227, 233-34 (2d Cir. 2014) (loss causation based on disclosure of settlements with DOJ, CFTC, and UK regulators).

### E.    PLAINTIFFS ADEQUATELY ALLEGE CONTROL PERSON LIABILITY

Because Plaintiffs adequately plead a predicate 10(b) violation, the Section 20(a) claims should be sustained.  Additionally, each Individual Defendant controlled a primary violator as they

possessed the "ability to direct the actions of the controlled person," *Dietrich v. Bauer*, 126 F. Supp. 2d 759, 765 (S.D.N.Y. 2001), and Plaintiffs allege Masrani, Bambawale, Tran, and Salom had binding authority over TD, TDBNA, and TDBUSH—including the authority to make, and omit, statements. ¶¶225-26. In any case, this is a "fact-intensive inquiry, and generally should not be resolved on a motion to dismiss." *In re Tronox, Inc. Sec. Litig.*, 769 F. Supp. 2d 202, 207-08, 220 (S.D.N.Y. 2011).

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. Should the Court grant dismissal in whole or in part, Plaintiffs respectfully request leave to amend.

Dated: July 29, 2025

Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

 /s/ Joseph A. Fonti
Joseph A. Fonti
Benjamin F. Burry
George N. Bauer
F. William Green

300 Park Avenue, Suite 1301
New York, New York 10022
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com
bburry@bfalaw.com
gbauer@bfalaw.com
wgreen@bfalaw.com

Adam C. McCall
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone: (212) 789-2303
Facsimile: (212) 205-3960
amccall@bfalaw.com

*Counsel for Lead Plaintiff Pedro Gonzalez, Named Plaintiffs Joel Kopstein and Edward Patterson, and Lead Counsel for the Putative Class*

48

**CERTIFICATION OF WORD COUNT**

I hereby certify pursuant to Southern District of New York Local Rule 7.1(a) and Section 8(C) of this Court's Individual Practices in Civil Cases, that the foregoing memorandum of law contains 13,998 words, exclusive of the caption page, table of contents, table of authorities, signature block, and this certification page, and accordingly complies with applicable word limitations as set forth in the Court's May 20, 2025 Order (ECF No. 67). In preparing this certification, I have relied on the word count of the word processing software used to prepare this memorandum.

Executed this 29th day of July 2025.

/s/ Joseph A. Fonti
Joseph A. Fonti