**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| JAMES TIESSEN, Individually and on Behalf of All Others Similarly Situated,<br><br>                Plaintiff,<br>v.<br><br>THE TORONTO-DOMINION BANK, TD BANK, N.A., TD BANK US HOLDING COMPANY, AJAI K. BAMBAWALE, MICHAEL BOWMAN, MIA LEVINE, BHARAT MASRANI, LEOVIGILDO SALOM, and KELVIN VI LUAN TRAN,<br><br>                Defendants. | Case No. 1:24-CV-8032 (AS)<br><br>**CLASS ACTION**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**<u>DEFENDANT BOWMAN'S AND DEFENDANT LEVINE'S MOTIONS TO DISMISS</u>**

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ..................................................................................... 1

II.     PLAINTIFFS ADEQUATELY PLEAD SCHEME LIABILITY ...................................... 3

III.    CONCLUSION........................................................................................................ 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017)........................................................................5

*In re Enron Corp. Sec.*,
  529 F. Supp. 2d 644 (S.D. Tex. 2006) ....................................................................10

*In re FirstEnergy Corp.*,
  2022 WL 681320 (S.D. Ohio Mar. 7, 2022)..............................................................5

*In re Grupo Televisa Sec. Litig.*,
  368 F. Supp. 3d 711 (S.D.N.Y. 2019)......................................................................10

*Lorenzo v. SEC*,
  587 U.S. 71 (2019).....................................................................................................5

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
  277 F.Supp.3d 500 (S.D.N.Y. 2017).......................................................................10

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
  11 F.4th 90 (2d Cir. 2021) .........................................................................................3

*In re Scholastic Corp. Sec. Litig.*,
  252 F.3d 63 (2d Cir. 2001)......................................................................................10

*SEC v. Rio Tinto*,
  41 F.4th 47 (2d Cir. 2022) .........................................................................................4

*U.S. Sec. & Exch. Comm'n v. Mintz*,
  723 F. Supp. 3d 386 (D.N.J. 2024) ...........................................................................4

## I.    PRELIMINARY STATEMENT[1]

For years, both before and during the Class Period, Defendants Bowman, Levine, Salom, TDBNA, and TDBUSH (the "Scheme Defendants"), perpetrated a scheme to deprive funding to TD's Global AML Program and prioritize profits over banking safety.  As a result of this scheme, TDBNA and TDBUSH admitted to "willfully fail[ing] to remediate persistent, pervasive, and known deficiencies in its AML," and "willfully fail[ing] to file accurate CTRs related" to known AML criminal activity.  (Defs. Exs. 27 at 37 & 39 of 70; 28 at 36 & 38 of 69.)

These deficiencies stemmed from Defendants' efforts to enforce the "Flat Cost Paradigm" ("FCP").  Defendant Masrani implemented the FCP after becoming TD CEO at the end of 2014 and set expectations that TD's AML budget would not increase year over year.  ¶¶61-62.  As a result, Defendants deliberately withheld investments in TD's Global AML Program that were necessary to prevent and remediate long-standing AML deficiencies.  ¶62.  This allowed Defendants to boast "industry-leading operating efficiency" while they padded TD's performance by secretly eliminating funding necessary for a legally-compliant AML program.  ¶66.

Defendants personally enforced the FCP mandate.  Salom oversaw and enforced the FCP, scrutinizing AML budgets, and pushed for more ways to cut costs based on the FCP.  ¶170.  Levine

---

[1] Capitalized terms not defined herein have the meanings in the Complaint.  (ECF 70.)  Paragraph and section citations are to the Complaint.  Emphasis is added and citations and quotations are omitted unless otherwise stated. "Defs. Ex. __" citations are to Defendants' exhibits filed with their Opening Brief. (*See* ECF 73.)

The Complaint does not allege that Defendants Bowman and Levine are liable for making false and misleading statements and omissions under Rule 10b-5(b).  This brief therefore only addresses their arguments concerning scheme liability under Rule 10b-5(a) and (c), though Plaintiffs reserve all rights concerning any future claims that may be brought in this action.  Furthermore, per ECF 67, Plaintiffs are entitled to file three separate briefs in opposition to the separate motions filed by (i) Defendants TD, TDBUSH, TDBNA, Masrani, Salom, Tran, and Bambawale ("Br."), (ii) Defendant Bowman ("Bowman Br."), and (iii) Defendant Levine ("Levine Br.").  However, because all Defendants make arguments concerning Plaintiffs' scheme liability claim, Plaintiffs address the scheme liability arguments in-full in this brief, instead of burdening the Court with three separate briefs addressing the same interrelated issues.

1

and Bowman likewise touted their ability to operate within the "flat cost paradigm without compromising risk appetite" and achieve the FCP within TD's Global AML Program.  Bowman even brazenly referred to TD's "historical underspend" on compliance in an email to a senior TD executive responsible for AML budgeting.  ¶65.

The FCP was disastrous for TD.  As a result of the Scheme Defendants' willful refusal to build TD's AML capabilities, existing AML violations worsened.  For instance, even though a 2012 risk assessment revealed TDBNA was not monitoring domestic Automatic Clearing House ("ACH") transactions, all proposals to fix it were rejected through at least October 2023.  ¶69. More than that, Defendants actually implemented new, illegal AML cost-cutting, effectively stopped conducting threshold testing on TD's scenarios, *intentionally reduced* alerts for large cash activity, and removed high-risk countries from TD's monitoring system, all in order to lower costs. ¶¶57, 72, 73.  And as the Complaint alleges, former TD employees confirmed that the AML systems remained ineffective through the end of the Class Period.  ¶¶151-61.  The result was staggering: between January 1, 2018, and April 12, 2024, TD's automated monitoring system failed to capture *92% of all transactions*—amounting to more than *14.6 billion unmonitored transactions* with a value of *over $18.3 trillion* that were all outside the bank's AML oversight. ¶68.

Defendants knew that this willful disregard for compliance was creating material deficiencies.  Defendants TDBUSH and TDBNA admitted that Bowman and Levine "knew there were long-term, pervasive, and systemic deficiencies in the Defendants' U.S. AML policies, procedures, and controls."  (Defs. Exs. 27 at 38 of 70; 28 at 37 of 69.)  More specifically, as senior AML officials, Bowman and Levine were routinely alerted to specific AML issues that were left unremediated.  For example, in 2019, Bowman and Levine were both alerted to a scheme whereby

2

criminals were laundering money through deposits in U.S. TD branches that they withdrew in cash from ATMs in Colombia. This was ignored. ¶¶202-04. Throughout 2020, Levine regularly received reports highlighting the suspicious activity of a money launderer named David Sze. Again, nothing was done. ¶205. And Salom, as a member of TDBUSH's and TDBNA's boards, was informed of, but never addressed, the AML deficiencies and "failed to effectively or substantively adapt [TD's] transaction monitoring system." ¶176.

Defendants nevertheless continued their scheme and even took further steps to conceal TD's AML deficiencies from regulators and investors. For instance, in July 2021, AML executives led by Bowman and Levine lied to OCC examiners by indicating that enhancements to the transaction monitoring program were underway when they were not. ¶239.

This scheme necessarily resulted in deceiving investors. For one thing, it made Defendants' misstatements and omissions inevitable. If Defendants told the truth about the AML deficiencies, then they would no longer be able to maintain the FCP's underinvestment or substantially increased profits. Moreover, the scheme was inherently deceptive, as it misled investors about the costs necessary to deploy a compliant AML program and, by suppressing AML issues and lying to regulators, manipulated the public perception of the AML program's purported success.

In light of these facts, Defendants' arguments fail and the motion to dismiss should be denied.

## II.  PLAINTIFFS ADEQUATELY PLEAD SCHEME LIABILITY

"To state a scheme liability claim, a plaintiff must show: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021).

3

Here, Plaintiffs allege that, separate from the false and misleading statements and omissions, Defendants engaged in a scheme to (i) willfully withhold the investments necessary for a compliant AML program, and (ii) conceal the true state of TD's deficient Global AML Program from regulators.  ¶¶231-39.  Specifically, Defendants perpetrated this scheme by, among other things:

- Engaging in an admitted criminal conspiracy knowing and intending to allow the AML program to go underfunded, ignoring known deficiencies, and not filing CTRs with government authorities.  ¶¶232-233.

- Implementing the FCP, a Company-wide mandate, driven by Defendant Masrani and faithfully implemented by Defendants Salom, Bowman, and Levine, that withheld necessary investments from AML compliance and deceived investors into thinking that the AML program was operating efficiently.  ¶¶234-35.

- Willfully reducing the scope of transactions that TD monitored and suppressing known instances of compliance failures to reduce the perception that TD suffered AML failures.  ¶¶236-37.

- Willfully failing to file CTRs, which impeded law enforcement's ability to identify and prevent money laundering.  ¶238.

- Lying to OCC examiners about transaction monitoring enhancements that were never actually implemented.  ¶239.

The above-cited misconduct more than establishes the "something extra"—beyond misstatements and omissions alone—sufficient to state a claim for scheme liability.  *SEC v. Rio Tinto plc*, 41 F.4th 47, 54 (2d Cir. 2022); *see also U.S. Sec. & Exch. Comm'n v. Mintz*, 723 F.

Supp. 3d 386, 407 (D.N.J. 2024) (deceptive acts include repeated circumvention of regulations and efforts to conceal Defendants' scheme) (*citing Lorenzo v. SEC*, 587 U.S. 71, 79 (2019) (observing that the words "device," "scheme" and "artifice" in Rule 10b-5 "capture a wide range of conduct")); *In re FirstEnergy Corp.*, 2022 WL 681320, at \*28 (S.D. Ohio Mar. 7, 2022) ("FirstEnergy's own officers committed fraudulent acts that created misleading information about the nature and propriety of the Company's political activity, and later culminated in HB6.").

What is more, Plaintiffs allege reliance because Defendants' "participation in this deceptive scheme made it 'necessary or inevitable' that falsehoods on the part of [the Speaker Defendants] would result." *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 472 (S.D.N.Y. 2017). More specifically, because the FCP mandated that TD underinvest in AML, the Speaker Defendants' false and misleading statements were inevitable—they either told the truth, in which case the scheme would unravel and they would be forced to incur the cost of long-neglected AML investments, or they proliferated false and misleading statements about AML compliance to inflate profits through fraudulently lowering operating costs. *See Eletrobras Sec. Litig.*, 245 F. Supp. at 472 (finding reliance where false statements denying bribery scheme were necessary and inevitable result of bribery scheme).

Defendants Salom, TDBNA, and TDBUSH do not challenge Defendants' deceptive acts except to argue that the FCP is just "an internal budget freeze" and therefore not "'inherently deceptive' to investors." (Br. 36 n.50.)  But as pled in detail and set out in the Guilty Pleas and by FE-3, the FCP was a decade-long budget mandate to deliberately underinvest in AML compliance and ignore known deficiencies in favor of reducing costs, and thereby "artificially inflate the Company's operating income and profits because it was not spending the money necessary for a compliant AML program."  ¶¶1, 164, 233(d) & (e), 234-35.

5

Defendant Bowman remarkably argues that Plaintiffs fail to plead that he engaged in any manipulative or deceptive act in furtherance of any scheme to defraud. (Bowman Br. 6.) Not so. Plaintiffs allege numerous acts that Bowman took in furtherance of the scheme, including:

- As admitted, between January 2014 and October 2023 (including part of the Class Period), Bowman "knew there were long-term, pervasive, and systemic deficiencies in the Defendants' U.S. AML policies, procedures, and controls." (Defs. Exs. 27 at 38 of 70; 28 at 37 of 69).

- Bowman admittedly touted his ability to operate within the "flat cost paradigm without compromising risk appetite" and achieve the FCP within the Global AML Program. ¶65. Bowman even brazenly referred to TD's "historical underspend" on compliance in an email to a senior TD executive responsible for AML budgeting. *Id.*

- In 2019, after being warned that the review of potential suspicious activity was not "adequately resourced/managed," Bowman ordered that his team "identify opportunities to scale back review or investigative rigor" and reduce analyst time to investigate potentially suspicious activity, instead of remediating the underlying issue. ¶137(d).

- In September 2019, a presentation concerning the Colombian Typology scheme was provided to the GAML Senior Executive Team, which was led by Bowman (who regularly updated the TD, TDBNA, and TDBUSH boards on AML compliance matters) and included Levine, but it was ignored. ¶¶180, 203-04.

- Bowman, as TD's Global Head of AML Compliance, was directly responsible for the day-to-day management of TD's Global AML Program and was aware

of and failed to remediate the long-standing deficiencies that persisted before and during the Class Period, as alleged in the Complaint.  ¶227.

- As admitted in the Guilty Pleas, GAML executives—which include Defendant Bowman—removed numerous countries from TD's monitoring system, and admittedly approved only those changes that would reduce alerts and reduce costs.  ¶236.

- AML executives, which given their positions included Defendants Bowman and Levine, lied to OCC examiners by indicating that enhancements to the transaction monitoring program were underway, and told examiners in July 2021 that TD was conducting scenario based monitoring of Zelle activity when it was not.  ¶239.

Defendant Levine likewise ignores the allegations in the Complaint by arguing that Plaintiffs do not allege that she committed a deceptive act because (1) her alleged conduct took place before the Class Period (Levine Br. 6), and (2) the alleged scheme is the same deception underlying the misstatements and omissions claim (Levine Br. 7).  Again, this is wrong.  Plaintiffs allege the following, among other things:

- As admitted, between January 2014 and October 2023 (including part of the Class Period), Levine "knew there were long-term, pervasive, and systemic deficiencies in the Defendants' U.S. AML policies, procedures, and controls." (Defs. Exs. 27 at 38 of 70; 28 at 37 of 69.)

- In August 2019, several US-AML and GAML executives, including Levine, met to discuss the fiscal year 2020 budget and identified several transaction

7

monitoring projects to postpone, referring to them as "opportunities to reduce expenses for 2020/Opportunity to push out to future years." ¶64.

- Levine admittedly touted her ability to operate within the "flat cost paradigm without compromising risk appetite" and achieve the FCP within the Global AML Program. ¶65.

- Levine, as BSA Officer and Head of U.S. AML, failed to seek sufficient resources across budget, personnel, and technology. ¶137(b).

- Levine reported to the boards of TDBUSH and TDBNA (which included Defendant Salom and TD Board members Alan MacGibbon, Amy Brinkley, and Mary Winston) and the AML Oversight Committee that the Global AML Program had significant backlogs and therefore was unable to timely monitor transactions. ¶178.

- In 2019, Levine "presented to the Audit Committee an AML Technology Portfolio Readiness Assessment, which found that given a 'reliance on a limited pool of people, leadership, and infrastructure to support the full portfolio of work'" at the Bank, there was a "'lack of sufficiently dedicated and capable resources across all streams of work'" as well as a "'historical siloed portfolio management approach.'" ¶179.

- TDBNA and TDBUSH admitted in the Guilty Pleas that Levine and her direct reports discussed potential changes to retail policies and procedures with business-side personnel. However, Defendants abandoned these changes due to the potential impact on the "customer experience" and the associated increased staffing requirements and costs. ¶204.

8

- Throughout 2020, Levine regularly received reports of official bank check activity by a criminal named David Sze that highlighted substantial outliers. As admitted in the Guilty Pleas, the reports did not initiate any additional investigation concerning Sze's activities. ¶205.

- AML executives, which given their positions included Defendants Bowman and Levine, lied to OCC examiners by indicating that enhancements to the transaction monitoring program were underway, and told examiners in July 2021 that TD was conducting scenario based monitoring of Zelle activity when it was not. ¶239.

That some of this conduct occurred before the Class Period is immaterial. (Levine Br. 6; Bowman Br. 7 n. 3.) For one thing, TDBNA and TDBUSH admitted that Levine and Bowman knew of TD's deficiencies during the Class Period, but did nothing. (Defs. Exs. 27 at 38 of 70; 28 at 37 of 69.) Moreover, this was a decade-long conspiracy to underinvest in AML compliance and conceal the "serious and longstanding deficiencies" that TDBUSH and TDBNA admitted existed before and during the Class Period, from January 2014 to at least October 2023. ¶¶135-36. FinCEN found similar issues persisting until at least May 9, 2024. (Defs. Ex. 25 at 2.)

FE-1 and FE-2 further confirmed that these issues persisted throughout 2024. FE-1 was hired as a consultant beginning in February 2024 and reported that, at that time, TD had outdated AML Procedures that had not been updated for a significant period of time. ¶¶151-52. Likewise, FE-2 was hired in March 2024 to work through thousands of back-logged cases of potentially illegal and suspicious activity. ¶¶155-56. FE-2 further reported that TD did not have a unified AML system, which made identification and remediation of back-logged cases nearly impossible. ¶¶156-57.

Defendants Levine and Bowman cannot escape liability for knowing and deceptive conduct that fueled a years-long fraud just because some of that conduct occurred before the Class Period. *See In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 706-07 (S.D. Tex. 2006) (adopting the view that "[i]f prior fraudulent activity, from which the making of that false statement flowed as a natural consequence is not covered [by the statute], large swaths of fraudulent activity could go unremedied" and the earlier "schemers would be insulated from liability as a matter of law"); *see also In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) (relying on pre-class period data and confirming that "[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant").

Defendants' reliance on *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F.Supp.3d 500, 518 (S.D.N.Y. 2017) is therefore misplaced because, there, the alleged fraud was not about the underlying deceptive conduct, which had no connection to the purchase or sale of securities.  In contrast, Defendants' scheme here was engineered as part of the criminal conspiracy to mislead regulators and shareholders about the state of TD's Global AML Program and was inextricably intertwined with Defendants' false statements and omissions.

Finally, Defendants argue that Plaintiffs fail to plead scienter.  (Br. 37.)  But "[e]ngaging in deliberately illegal behavior, as well as admitting that there are material weaknesses in internal reporting, is probative of scienter."  *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 722 (S.D.N.Y. 2019).  Here, TDBNA and TDBUSH admitted to "willfully fail[ing] to remediate persistent, pervasive, and known deficiencies in its AML," and "willfully fail[ing] to file accurate CTRs related" to known AML schemes.  (Defs. Exs. 27 at 37 & 39 of 70; 28 at 36 & 38 of 69.)  This conduct was effectuated in part by Defendants Bowman and Levine, who their employers TDBNA and TDBUSH admitted "knew [about] long-term, pervasive, and systemic deficiencies

in the Defendants' U.S. AML policies, procedures, and controls," (Defs. Exs. 27 at 38 of 70; 28 at 37 of 69), and Defendant Salom, who the Guilty Pleas admit was informed of these concerns in his role as TDBNA and TDBUSH Board member and who FE-3 makes clear willfully implemented the FCP to the detriment of the Global AML Program's capabilities. ¶¶167-71.  This is sufficient to allege scienter.

## III.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety. Should the Court grant dismissal in whole or in part, Plaintiffs respectfully request leave to amend.

Dated: July 29, 2025                              Respectfully submitted,

**BLEICHMAR FONTI & AULD LLP**

 /s/ Joseph A. Fonti
Joseph A. Fonti
Benjamin F. Burry
George N. Bauer
F. William Green

300 Park Avenue, Suite 1301
New York, New York 10022
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jfonti@bfalaw.com
bburry@bfalaw.com
gbauer@bfalaw.com
wgreen@bfalaw.com

Adam C. McCall
1330 Broadway, Suite 630
Oakland, CA 94612
Telephone: (212) 789-2303
Facsimile: (212) 205-3960
amccall@bfalaw.com

*Counsel for Lead Plaintiff Pedro Gonzalez,
Named Plaintiffs Joel Kopstein and Edward
Patterson, and Lead Counsel for the Putative
Class*

12

**CERTIFICATION OF WORD COUNT**

I hereby certify pursuant to Southern District of New York Local Rule 7.1(a) and Section 8(C) of this Court's Individual Practices in Civil Cases, that the foregoing memorandum of law contains 2,927 words, exclusive of the caption page, table of contents, table of authorities, signature block, and this certification page, and accordingly complies with applicable word limitations as set forth in the Court's May 20, 2025 Order (ECF No. 67).  In preparing this certification, I have relied on the word count of the word processing software used to prepare this memorandum.

Executed this 29th day of July 2025.

/s/ Joseph A. Fonti
Joseph A. Fonti