UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PEDRO GONZALEZ, JOEL KOPSTEIN, and EDWARD PATTERSON, individually and on behalf of all others similarly situated,

Plaintiffs,

-against-

THE TORONTO-DOMINION BANK et al.,

Defendants.

24-cv-8032 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

Federal law requires banks to have controls in place to detect and prevent money laundering. If a bank doesn't have an adequate anti-money-laundering (AML) compliance program, it can face regulatory enforcement, substantial civil penalties, and, in sufficiently serious cases, criminal liability. Toronto-Dominion Bank (TD) learned this lesson the hard way. After years of underinvestment in its AML systems, TD's attempt to acquire First Horizon Bank brought its AML problems under heightened federal scrutiny. That scrutiny ultimately revealed long-running and pervasive deficiencies in TD's AML program—including that its automated monitoring system failed to monitor the vast majority of transactions flowing through the bank. When all was said and done, TD's U.S. banking operation pleaded guilty to federal crimes and TD agreed to pay more than $3 billion in penalties. As a result, TD's stock price plummeted.

This securities class action followed. The plaintiffs allege that while problems were mounting behind the scenes, TD and several of its executives made public statements that gave investors a materially misleading picture of the bank's AML program and the risks it posed. Defendants have moved to dismiss. Dkt. 71. For the reasons below, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I. Federal law requires banks to have robust AML compliance systems

Banks are the first line of defense against criminals who use the financial system to conceal the sources of illegally obtained funds. Dkt. 70, Consol. Am. Compl. (CAC) ¶ 39. The Bank Secrecy Act, 31 U.S.C. § 5311 et seq., and its implementing regulations require banks to maintain AML programs with internal controls, designated compliance personnel, employee training, independent testing, and ongoing customer due diligence. CAC ¶¶ 40–41. For a large bank like TD, that means using a transaction-monitoring system to flag suspicious activity for review and, when appropriate, reporting to regulators. *Id.* ¶¶ 42–43.

TD is a Canadian banking company whose shares trade on the New York Stock Exchange. *Id.* ¶ 19. Its subsidiary TD Bank, N.A. ("TDBNA") is one of the ten largest U.S. banks, with more than 1,100 locations. *Id.* ¶ 20. TD Bank US Holding Company ("TDBUSH") is that subsidiary's direct parent. *Id.* ¶ 21. Responsibility for TD's AML program ran through six individuals, who, along with the three corporate entities, are defendants in this case. Bharat Masrani was TD's president and CEO, and Kelvin Vi Luan Tran was its chief financial officer. *Id.* ¶¶ 28, 30. Leovigildo Salom headed TD's U.S. retail business and served as president and CEO of both TDBNA and TDBUSH. *Id.* ¶ 29. Michael Bowman, TD's chief AML officer, led the global AML compliance department and reported to chief risk officer Ajai Bambawale, who in turn reported to Masrani. *Id.* ¶¶ 25–26, 50. Mia Levine, the Bank Secrecy Act officer responsible for U.S. AML operations, reported to Bowman. *Id.* ¶ 27.

TD repeatedly assured investors that its AML program met the applicable requirements and that the bank was investing in keeping it that way. Its public AML Statement described requirements for customer due diligence, "[o]ngoing monitoring to detect and report suspicious transactions or activities," and regulatory reporting. *Id.* ¶ 245. TD also said that the program was "routinely evaluated, updated and enhanced" to reflect changes in its business activities and legal obligations. *Id.* ¶ 248. Its executives reinforced that message. Masrani described enhancing the bank's controls as "an ongoing exercise at TD," while Salom said that investments in a "strong control platform" were "the first things that we lean into." *Id.* ¶ 81.

## II. TD's AML program had major issues

According to Gonzalez's[1] complaint, the truth was far from that. Behind the scenes, TD was severely underinvesting in AML compliance. Specifically, at Masrani's direction, TD implemented what it called the "Flat Cost Paradigm" beginning in 2014. *Id.* ¶ 62. Under this initiative, AML budgets were not to increase year over year, even as TD's revenue grew. *Id.* By fiscal year 2021, spending on U.S. AML operations was lower than it had been in 2018, even though the U.S. bank's profits had increased approximately 26%. *Id.* ¶ 63. Bowman and Levine touted their ability to keep costs flat, and critical monitoring projects were postponed or canceled. *Id.* ¶¶ 64–65.

Unsurprisingly, TD's AML program suffered. In 2013, 2015, and 2018, regulators identified weaknesses in TD's transaction monitoring, but the bank left them unresolved. *Id.* ¶¶ 54–56. From at least 2014 through late 2022, TDBNA added no new monitoring scenarios—the criteria used to flag suspicious transactions—and made no substantive changes to the existing ones. *Id.* ¶ 70. TD also removed scenarios to reduce the number of alerts and the cost of reviewing them. *Id.* ¶ 72. While employees and outside consultants raised concerns, their warnings fell on deaf ears. *Id.* ¶¶ 136(c), 137(d). Between January 2018 and April 2024, TD's automated AML system failed to monitor 92% of all transactions, totaling more than $18.3 trillion in unmonitored transaction value. *Id.* ¶ 68.

[1] James Tiessen filed this action, but the Court denied his motion to serve as lead plaintiff and appointed Pedro Gonzalez instead. *See* Dkt. 20. The Clerk of Court is respectfully directed to amend the caption to identify as plaintiffs Gonzalez, Joel Kopstein, and Edward Patterson. CAC ¶¶ 16–18.

These gaps had consequences. TD failed to file required reports as money-laundering networks moved hundreds of millions of dollars through its accounts. *See, e.g.*, *id.* ¶¶ 202–204 (describing scheme in which funds were deposited into U.S. TD accounts and withdrawn in cash at ATMs in Colombia); *id.* ¶¶ 76, 205 (describing an infamous criminal's use of TD accounts to launder money); *id.* ¶ 206 (describing money-laundering organization that moved approximately $123 million through five shell-company accounts without TD filing a report until alerted by law enforcement). One money launderer alone moved more than half a billion dollars for drug dealers and other criminals, later telling investigators that TD "had by far the most permissive policies and procedures." *Id.* ¶ 76.

## III. A failed merger brings TD's AML issues to light

But problems like that don't stay under wraps forever. In TD's case, its attempt to acquire First Horizon Bank brought its AML program under heightened scrutiny. On February 28, 2022, TD announced the $13.4 billion deal, which would make it the sixth-largest retail bank in the United States. *Id.* ¶ 82. Approval depended on the Federal Reserve and the Office of the Comptroller of the Currency (OCC), which scrutinized TD's AML controls. *Id.* ¶¶ 83, 93. Leovigildo Salom, president and CEO of TD's U.S. bank and holding company, certified merger applications describing "comprehensive anti-money laundering and sanctions programs." *Id.* ¶¶ 29, 86.

The regulatory review told a different story. By October 2022, an OCC examination had revealed serious AML deficiencies. *Id.* ¶ 93. The next month, TD's senior executives learned that the Justice Department had launched a formal investigation. *Id.* As the deal slowed down, investors started to have questions. But TD brushed their concerns aside. On December 1, 2022, Masrani said that TD remained confident it would close within its announced timeline. *Id.* ¶ 95. Asked whether regulators were "taking a closer look at anything," he responded, "No, I'm not aware of anything of the sort you're mentioning." *Id.* ¶ 96. Plaintiffs allege that TD and Masrani already knew the AML failures jeopardized regulatory approval of the merger. *Id.* ¶¶ 9(d), 93, 104.

In February 2023, the parties extended the closing deadline to late May. *Id.* ¶ 98. By March, Masrani acknowledged that approval was not expected by May, but said TD was discussing another extension. *Id.* ¶ 100. He repeated that assurance at the April shareholders' meeting. *Id.* ¶ 105. On May 4, however, the parties terminated the agreement, citing uncertainty about regulatory approval. *Id.* ¶ 106. First Horizon's CEO said they had not discussed extending the timeline. *Id.* ¶ 105. Four days later, The Wall Street Journal reported that TD's AML practices had been the biggest obstacle to approval. *Id.* ¶ 108. TD's share price fell 1.8%. *Id.* ¶ 109.

The rest of the story emerged in pieces. In August 2023, TD publicly confirmed the AML investigations, including the Justice Department's probe, and warned of penalties. *Id.* ¶ 115. In May 2024, The Wall Street Journal tied the probe to the laundering of illicit drug proceeds. *Id.* ¶ 123. Even then, TD characterized the problems as "some procedural weaknesses in the U.S." that criminals had exploited. *Id.* ¶ 128. By August, TD had set aside another $2.6 billion for expected fines and reported its first loss in more than two decades. *Id.* ¶ 130. Its shares fell after each of these disclosures. *Id.* ¶ 115, 124, 130.

After trading closed on October 9, 2024, The Wall Street Journal reported that TD's U.S. operations would plead guilty to criminal charges and face billions in penalties. *Id.* ¶ 132. The next day, the guilty pleas and enforcement actions were announced. *Id.* ¶¶ 133–134. TDBNA became the largest bank in U.S. history to plead guilty to Bank Secrecy Act program failures. *Id.* ¶ 134. TD agreed to pay $3.09 billion in penalties, submit to independent monitoring, and accept an asset cap on its U.S. banking subsidiaries. *Id.* ¶¶ 20–21, 133–134. On October 10, TD's shares fell another 6.4%, wiping out billions in market value. *Id.* ¶ 314.

## LEGAL STANDARDS

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements" of the Private Securities Litigation Reform Act of 1995 (PSLRA) and Federal Rule of Civil Procedure 9(b). *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015). "As relevant here, the PSLRA specifically requires a complaint to demonstrate that the defendant made misleading statements and omissions of a material fact, and acted with the required state of mind." *Id.* at 305 (cleaned up). As usual, the Court accepts the complaint's factual allegations as true. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). But those allegations must be pleaded with particularity.

For the misleading-statement element, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Blanford*, 794 F.3d at 305 (citation omitted); *see also* 15 U.S.C. § 78u-4(b)(1)–(2). "[D]raw[ing] all reasonable inferences in the plaintiff's favor," the complaint must plausibly allege that the statements were materially misleading. *Blanford*, 794 F.3d at 307 (citation omitted).

On the scienter element, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To decide whether an inference is "strong," the Court "must consider the complaint in its entirety" and "must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

## DISCUSSION

### I. Many of the alleged statements are actionably misleading

Plaintiffs base their securities fraud claims on 39 total statements in five categories.[2] As an initial matter, defendants argue that plaintiffs engage in impermissible "puzzle pleading," by block quoting statements and listing their scienter allegations separately, without cross-referencing specific statements. Dkt. 72 at 13, 24–25 (citing *Kempen Int'l Funds v. Syneos Health, Inc.*, 2024 WL

[2] The complaint uses six categories, but the parties' briefing combines the first two categories into one, and the Court does the same. The Court references the individual statements using the numbers assigned by defendants' chart, Dkt. 73-2.

1805011, at *1–2 (S.D.N.Y. Apr. 25, 2024)). The Court disagrees. Unlike in *Kempen*, plaintiffs' complaint separately identifies each of the challenged statements and explains why each is allegedly false or misleading. The fact that generalized scienter allegations also appear elsewhere in the complaint does not make the pleading unintelligible.

### A. Statements about TD's AML program

The first category comprises statements about TD's AML practices. The first four are taken from TD's "Statement on Anti-Money Laundering, Anti-Terrorist Financing and Sanctions," which it posted on its website from 2022 through 2024 and included in its Forms 6-K. CAC ¶¶ 244–48. Across three versions of the Statement, TD represented that its Global AML Program required, among other things, documented compliance policies and procedures, customer identification and due diligence, ongoing monitoring and reporting of suspicious activity, regulatory reporting, risk assessments, and independent testing of AML controls. *Id.* ¶¶ 245–47. TD also said that its AML program was "routinely evaluated, updated and enhanced." *Id.* ¶ 248. The fifth statement comes from TD's Forms 40-F for 2022 and 2023, where the bank said that its Global AML team was responsible for oversight "so that . . . money laundering, terrorist financing, economic sanctions, and bribery and corruption risks are appropriately identified and mitigated." *Id.* ¶ 250.

Defendants argue that TD *did* have an AML program (even if it had a bad one), so these statements are true. But the statements go further and make specific representations about TD's AML program that are contradicted by plaintiffs' allegations—including that TD's automated system failed to monitor 92% of transactions, that TD added no new monitoring scenarios from at least 2014 through late 2022, and that it introduced new products without addressing their associated AML risks. *Id.* ¶¶ 68, 70, 74–75. So these statements are not like the "general declarations about the importance of acting lawfully and with integrity" held inactionable in *Singh v. Cigna Corporation*, 918 F.3d 57, 63 (2d Cir. 2019). Rather, they resemble the statements in *Meyer v. JinkoSolar Holdings Co.*, 761 F.3d 245 (2d Cir. 2014), which "gave comfort to investors that reasonably effective steps were being taken to comply with applicable . . . regulations." *Id.* at 251. These statements are also all specific enough to be actionable.

Statements 6 and 7 likewise survive. Those statements represented that TD's Audit Committee was "satisfied that it has fulfilled its responsibilities" and "[r]eceived updates" to "satisfy itself that there are adequate resources" for the bank's oversight functions. CAC ¶¶ 252–53. These are statements of opinion, but even opinion statements can be misleading if they are not sincerely held or omit material facts about their basis. *See Tongue v. Sanofi*, 816 F.3d 199, 209–10 (2d Cir. 2016). Here, plaintiffs allege that in 2019, Levine presented the Audit Committee with an assessment identifying a "lack of sufficiently dedicated and capable resources across all streams of work." CAC ¶ 179. The committee also allegedly received regular reports showing that the AML program was ineffective, lacked adequate resources, and failed to comply with the law. *Id.* ¶ 181. And it approved the AML department's annual budget under the Flat Cost Paradigm, which restricted hiring, staffing, and technology improvements. *Id.* ¶ 62. Taken together, these allegations plausibly

suggest that the committee was not really "satisfied" that there were adequate resources and was omitting known resource constraints that undermined its assessments.

Statements 8 through 11 were made in connection with the First Horizon acquisition. For example, the merger applications sent to the Federal Reserve and OCC stated that TDBNA had "comprehensive anti-money laundering and sanctions programs that are reasonably designed to ensure compliance with the Bank Secrecy Act." *Id.* ¶ 255. Salom signed certifications that this statement was true. *Id.* Similarly, the merger agreement stated that TD and its subsidiaries had complied with the Bank Secrecy Act. *Id.* ¶ 257. These statements are contradicted by the above allegations as well as the guilty pleas themselves, which admitted that "senior executives" enforced the Flat Cost Paradigm and "willfully failed to remediate persistent, pervasive, and known deficiencies in its AML" at least from 2014 through 2022, in violation of the Bank Secrecy Act. Dkt. 73-29 at 2, 4; Dkt. 73-30 at 2, 4.

Defendants also argue in a footnote that the statement in the merger agreement is not actionable since it was made to its merger counterparty First Horizon, not to investors. *See* Dkt. 72 at 16. But the authority defendants cite in support of this argument is weak and contradicted by other authority. *See Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82, 86–89 (2d Cir. 2022) (merely holding that purchasers of the *acquirer's* stock could not sue the *target* over statements the target made about itself, because the plaintiffs had not bought or sold the securities "about which" the statements were made); *see also In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 299–300 (S.D.N.Y. 2010) (treating merger-agreement representations as actionable notwithstanding their contractual setting). The merger agreement here was publicly filed with the SEC, and a reasonable investor could have relied on the representations it contained about TD's compliance systems. So statements 8 through 11 will proceed.

### B. Statements about the delay and anticipated closing of the First Horizon merger

The next group of statements are assurances, primarily from Masrani, regarding the delays in closing the First Horizon merger. Statements 12 and 13 are answers Masrani gave during TD's 4Q22 earnings call. Asked what was prompting the delay, Masrani said that TD did not control the timing of regulatory approvals but remained "confident" that the merger would close within the announced timeline. CAC ¶ 258. When the analyst followed up by asking whether regulators were "taking a closer look at anything," Masrani responded, "No, I'm not aware of anything of the sort you're mentioning." *Id.* ¶ 259. Read together, these statements suggested that the delay was a result of the ordinary regulatory process. But plaintiffs allege that by November 2022, regulators had met repeatedly with TD's senior executives about serious AML deficiencies and had informed them of a DOJ investigation that threatened approval of the merger. *Id.* ¶¶ 93, 198, 260. In other words, Masrani knew that officials *were* taking a closer look at something, and he knew that the delays were not just normal regulatory delay. "[T]aken together and in context," his statements "would have misled a reasonable investor." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016).

Statements 14 through 16 are different. TD said in a 1Q23 press release that the companies remained "fully committed" to the merger and were making progress in planning for their integration. CAC ¶ 261. Masrani similarly expressed enthusiasm and described ongoing integration work in the bank's 1Q23 earnings call. *Id.* ¶ 263. Plaintiffs do not allege facts showing that the companies lacked that commitment or were not doing the work described. *See In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, 2024 WL 451691, at *9 (S.D.N.Y. Feb. 5, 2024) ("Absent any clearer conflict between the [regulators'] feedback and Defendants' statements, opinions expressing optimism that [next steps were] 'progressing well' or that Defendants were 'hopeful' or 'confident' are not actionable under section 10(b)." (citation omitted)).

In statement 15, made during that same 1Q23 earnings call, Masrani expressly acknowledged that TD no longer expected approval in time to close by May 27. CAC ¶ 262. Plaintiffs object to his accompanying statement that regulatory approval was outside TD's control—because, they say, TD controlled the AML deficiencies impeding approval. *Id.* ¶ 264. But control over the underlying deficiencies is different from control over the regulators' decision. And at that point, it's not as if TD could snap its fingers, overhaul its AML program, and save the merger. So Masrani's statement that regulatory approval was outside TD's control was true, and in context, not a statement that TD bore no responsibility for the delay. Plaintiffs therefore have not adequately alleged that statements 14 through 16 were false or misleading.

Statements 17 through 21, however, can go forward. Five times during the April 2023 shareholder meeting, Masrani stated that TD had initiated discussions with First Horizon to extend the closing deadline again. *Id.* ¶¶ 265–67. But as plaintiffs allege, The Wall Street Journal later reported that this was untrue because according to First Horizon CEO Bryan Jordan, "TD and First Horizon didn't discuss extending the timeline for the deal." *Id.* ¶ 268. Defendants argue that The Wall Street Journal got this wrong, but that sort of factual dispute cannot be resolved at this stage, where plaintiffs' allegations must be taken as true.

### C. Statements about the AML investigations and remediation

TD's executives also made various statements to investors about the ongoing AML investigations in the leadup to the guilty pleas. Statements 23 through 25 were made by Masrani and Salom during TD's 3Q23 earnings call. Earlier that day, TD had publicly confirmed that its AML program was under investigation, including by the DOJ, and that it anticipated monetary or nonmonetary penalties. *Id.* ¶ 115. Asked about resolving the compliance issues, Masrani said that TD was "working hard to enhance our programs," explaining that "[t]hat is the TD way" and that the bank learned from internal monitoring and engagement with regulators. *Id.* ¶ 270. He added that improving controls was "an ongoing exercise at TD," rather than something the bank invested in only when "a particular event takes place." *Id.* ¶ 271. Salom likewise said that maintaining "a strong control platform" came "first and foremost" in TD's annual investment process. *Id.* ¶ 272. In context, these statements painted a picture of a bank that had consistently invested in improving its AML systems and was continuing that work in response to the investigations. But plaintiffs allege that TD had

explicitly deprioritized AML spending and refused to improve its systems for years. *Id.* ¶¶ 62–65, 70, 273. Those allegations plausibly render these statements misleading.

Statement 26 was made by Salom in response to a question from an analyst at a September 2023 conference. The analyst asked whether "the reason that you couldn't close First Horizon" was because of "regulatory concerns about AML." *Id.* ¶ 274. Salom responded that he wanted to "separate the 2 items," because TD's "decision to walk away from First Horizon was really predicated on the fact that we just did not have regulatory certainty with regards to time." Whereas "[s]eparately, last quarter, we did make a disclosure saying that we are in discussions with both the DOJ and our regulators about a specific matter at hand." *Id.* This answer—which expressly "separate[d]" TD's AML issues from the failed merger—was misleading in light of plaintiffs' allegations that the AML issues were the precise reason the merger was unable to close.

Statements 28 through 30, by contrast, are not adequately pleaded to be false or misleading. Masrani acknowledged during the 1Q24 earnings call that "we know what the issues are" and described TD's efforts "to improve and enhance our processes." *Id.* ¶ 277. He also conceded that "our program fell short," adding that "we know what those shortcomings are" and "we are fixing them." *Id.* ¶ 278. By the time of these statements in 2024, TD had publicly disclosed the AML investigations and warned that it expected penalties. *Id.* ¶ 115. In context, these statements acknowledged deficiencies in TD's AML program and described its current efforts to address them. Masrani's statement that "we want to keep up with" improvements in control infrastructure likewise expressed a goal, rather than an assurance that TD's existing controls were adequate. *Id.* ¶ 276; *see City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) (holding statements that were "explicitly aspirational, with qualifiers such as 'aims to,' 'wants to,' and 'should'" were inactionable). Plaintiffs' allegations about TD's historical AML deficiencies do not establish that the remedial efforts described were not underway or that Masrani's acknowledgment of the program's shortcomings was misleading. CAC ¶¶ 276–78.

Statement 31 came on the same call, when Bambawale was asked whether the AML failures were "primarily a U.S. . . . issue" or "a systemic issue at the bank." *Id.* ¶ 279; Dkt. 73-2 at 18. In response, Bambawale chalked up the AML failures to "some procedural weaknesses in the U.S.," but assured the analyst that it was "specific to the U.S." and "not a problem here at the enterprise level." CAC ¶ 279. However, plaintiffs allege that the failures stemmed from Masrani's enterprise-wide directive to hold costs flat, which restricted the global AML department's spending on staffing, technology, and monitoring improvements. *Id.* ¶¶ 62–65, 163–64. In plaintiffs' telling, the problem reached TD's central budgeting and management decisions, beyond procedural weaknesses confined to its U.S. operations. Taking these allegations as true, Bambawale's statement was misleading because it severely downplayed the scope and severity of TD's AML issues.

The final statements in this category, statements 22 and 27, are "risk factor" disclosures in TD's 2022 and 2023 Form 40-F filings. These disclosures stated that TD "may not be able to develop or enhance" the systems necessary to comply with regulatory requirements "in advance of their effective dates," and that it was "possible that" regulators "could challenge the Bank's compliance." *Id.* ¶¶ 269, 275. Defendants argue that these statements are not misleading because

plaintiffs fail to allege that these risks had already materialized when the statements were made. The Court disagrees. While defendants "need not be clairvoyant," *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000), plaintiffs allege that regulators had repeatedly identified AML deficiencies and, by November 2022, had directly informed TD's senior executives of serious compliance failures and a DOJ investigation. CAC ¶¶ 54–56, 93, 269. By the 2023 filing, TD's own annual assessment had rated its enterprise AML program "unsatisfactory." *Id.* ¶ 275. Yet these disclosures described inadequate compliance systems and regulatory challenges as possibilities that "may" or "could" arise. And although TD had disclosed the fact of the investigations by the 2023 filing, that did not convey the extent of the exposure. Plaintiffs adequately allege that these statements are misleading. *See Rombach v. Chang,* 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired."); *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *2 (S.D.N.Y. Feb. 5, 2024) ("If the 'risk' has already happened or is then happening, the company has a duty to say so.").

### D. Statements about U.S. retail and corporate risk management and investment

None of the statements in this next category are actionable.

In TD's Forms 40-F for the years 2022 and 2023, the bank identified "managing risk prudently" as a key to profitability, described its work "executing on enterprise and regulatory initiatives," and said that it would maintain its focus on regulatory controls and "invest strategically to support business growth." CAC ¶¶ 281–82. None of these statements say anything about AML, much less describe particular AML controls or represent that those controls were effective. Instead, these were broad statements about TD's business priorities and approach to risk management. Such assurances are "too general to cause a reasonable investor to rely upon them." *Singh*, 918 F.3d at 63 (quotation omitted). As the Second Circuit explained in *Singh*, actionable descriptions of compliance efforts are "far more detailed" than generic assertions about policies and resources. *Id.* Statements 32 through 35 therefore cannot support plaintiffs' claims.

### E. Statements about internal and disclosure controls

The statements in the final category are also not actionable. In statement 36, Masrani and Tran certified that they had designed controls to provide reasonable assurance about "the reliability of financial reporting" and the preparation of financial statements. CAC ¶ 287. They also certified that they had designed disclosure controls to ensure that material information about TD and its subsidiaries was "made known to us by others within those entities," and that they had evaluated those controls. *Id.* Statements 37 and 38 reported management's conclusions that TD's internal controls over financial reporting and its disclosure controls were effective as of October 31, 2022, and October 31, 2023, respectively. *Id.* ¶¶ 288–89.

Plaintiffs principally challenge these statements by pointing to TD's inadequate transaction monitoring, underinvestment in AML compliance, and failure to address known deficiencies. *Id.* ¶ 291. But controls over financial reporting serve a different function from AML controls, and

plaintiffs never explain how the AML failures undermined the reliability of TD's financial reporting. As for the disclosure-control statements, plaintiffs' own allegations undermine their argument here. Plaintiffs repeatedly allege that senior management received information about the AML failures but turned a blind eye, which is consistent with the certification that controls were designed to bring material information to management's attention. *Id.* ¶¶ 93, 198, 287. The problem wasn't that Masrani and Tran were kept out of the loop—the problem was that they didn't do anything to fix known problems.

Finally, Statement 39 comes from the board's charter and describes its responsibility for "[o]verseeing and monitoring" internal controls and overseeing adherence to legal and regulatory requirements. *Id.* ¶ 290. It does not represent that those controls were effective or that the board was doing a good job in its oversight. Allegations that the board failed to discharge its responsibilities do not render the description of those responsibilities false. Statements 36 through 39 therefore cannot support plaintiffs' claims.

## II. Plaintiffs have pleaded a strong inference of scienter as to the actionable statements

To plead a "strong inference" of scienter under the PSLRA, plaintiffs must allege particularized "facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). The inquiry is holistic; courts must consider "the cumulative effect of the circumstantial allegations of intent together with the pleaded facts relating to motive and opportunity." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 138 (2d Cir. 2021). To decide whether an inference is "strong," the Court "must consider the complaint in its entirety" and "must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 322–23. A "complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

The Court will analyze scienter as to Masrani, Tran, Salom, and Bambawale, plus the corporate defendants. However, the Court will skip over Bowman and Levine for now, because, as discussed below, neither of them are alleged to be the "makers" of any challenged statements—so plaintiffs have no Rule 10b-5(b) claim against either of them. *See Fezzani v. Bear, Stearns & Co. Inc.*, 716 F.3d 18, 25 (2d Cir. 2013) ("[O]nly the person who communicates the misrepresentation is liable in private actions under Section 10(b).").

### A. Motive and opportunity

No one disputes that the individual defendants, who were executives at TD, had the opportunity to defraud. *See Van Dongen v. CNinsure Inc.*, 951 F. Supp. 2d 457, 468 (S.D.N.Y. 2013) ("The opportunity to commit fraud is generally assumed where the defendant is a corporation or corporate officer."). But when it comes to motive, plaintiffs' evidence is weaker.

Plaintiffs' primary motive evidence is alleged compensation for Masrani, Tran, and Salom tied to the First Horizon acquisition. Masrani, for example, was paid an additional $1,964,000 in compensation above his target for 2022, and his total direct compensation target was increased to $15,000,000 for 2023. CAC ¶ 215. One "[k]ey highlight[]" justifying this compensation bump was the First Horizon acquisition. *Id.* While this is some evidence of motive, it is weak since the acquisition was just one of various highlights justifying the bump in compensation. As for Tran and Salom, the allegations are even weaker. The complaint contains no details besides saying that they "successfully convinced TD's shareholders to approve millions of dollars in additional compensation for their purported success in securing the" First Horizon acquisition. *Id.* ¶ 214.

Plaintiffs also point out that all three executives' compensation packages were slashed in the wake of the AML failures coming to light. Masrani's 2024 compensation, for example, was cut by a whopping 89%. *Id.* ¶ 143. The complaint also alleges "dramatic" reductions in compensation for Tran and Salom, but it does not say by how much. *Id.* ¶ 220. TD attributed these reductions to "the seriousness of the U.S. AML failures, the associated costs to the Bank, and the limitations imposed on the U.S. retail business." *Id.* ¶ 143. While defendants argue that *reductions* in salary cannot support a finding of motive, the Court disagrees. The magnitude of these cuts, and TD's express attribution of them to the AML failures, support an inference that the executives had a substantial financial incentive to keep those failures concealed. *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 318 (S.D.N.Y. 2024) (noting that "[a]s issues began to emerge, Dentsply's board reduced cash and stock bonuses, costing Casey $4.9 million and Gomez $2.5 million," and finding this indicative of motive). Once again, the allegations here are stronger as to Masrani, given the detailed allegations, but they offer some evidence for motive as to Tran and Salom as well.

Plaintiffs do not even argue motive as to Bambawale. This is not dispositive as to scienter, but it does mean that "the circumstantial evidence of conscious misbehavior must be correspondingly greater and show highly unreasonable behavior or that which evinces an extreme departure from the standards of ordinary care." *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 355 (2d Cir. 2022) (cleaned up); *see also Tellabs*, 551 U.S. at 325 (holding that "the absence of a motive allegation is not fatal").

In sum, plaintiffs' motive evidence is moderate as to Masrani, weak as to Tran and Salom, and nonexistent as to Bambawale.

### B. Conscious misbehavior and recklessness

Plaintiffs more than make up for the weakness of their motive evidence, though, with evidence of conscious misbehavior and recklessness.

Start with the Flat Cost Paradigm. That policy was Masrani's brainchild, CAC ¶ 62, and a former high-ranking employee described the policy as a "clear directive" coming "straight from the top"—specifically from Masrani and Tran. *Id.* ¶¶ 164–65; *see In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 764–65 (S.D.N.Y. 2017) (finding scienter adequately pleaded where defendants were "directly involved" in the underlying scheme and therefore knew that related public

statements were misleading). Tran was copied on the annual budgeting directives, and he and Masrani reviewed the consolidated financial plan with TD's board. CAC ¶¶ 168, 171. Salom likewise personally enforced the policy. As president and CEO of TDBNA, he scrutinized proposed budgets for compliance and pressed the former employee and colleagues to make additional cuts. *Id.* ¶¶ 29, 170.

Defendants were also made aware of the consequences of those constraints. According to the same former employee referenced above, growth in digital payments increased operating expenses, leaving insufficient room under the Flat Cost Paradigm to fund transaction monitoring and other compliance measures. *Id.* ¶ 166. A different high-ranking employee objected during annual budgeting meetings that risk and compliance functions needed additional investment—but these objections were overruled due to the Flat Cost Paradigm, and finance leaders whose budgets exceeded the expense-growth limit were "forced to go back" and revise them. *Id.* ¶ 167. The boards of TDBUSH and TDBNA (which included Salom) also received reports describing significant monitoring backlogs, delayed system upgrades, and inadequate staffing and resources. *Id.* ¶¶ 29, 174, 176, 178–79; *see Novak*, 216 F.3d at 308 (explaining that recklessness may be established through defendants' "knowledge of facts or access to information contradicting their public statements"). And Masrani's familiarity with AML issues at TD is bolstered by the fact that he spoke frequently about AML issues and TD's Global AML Program, including at least six times between August 2023 and September 2024. CAC ¶¶ 81, 116, 120–21, 126–28, 189, 191–92, 270–71, 273, 276–78; *see City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (treating the specificity of executives' public statements as "strong circumstantial evidence" that they received "specific information" about the subject).

The guilty pleas are also significant. As recounted in the complaint, TDBNA and TDBUSH admitted that "high-level executives" and "senior executive management" knew of "long-term, pervasive, systemic deficiencies" in the AML program. CAC ¶ 136(a). Senior executives nevertheless enforced the Flat Cost Paradigm and repeatedly prioritized the "customer experience" over AML compliance. *Id.* ¶ 136(d). The pleas also acknowledged that senior leadership and the boards had been informed of concerns raised by regulators, internal auditors, and outside consultants. *Id.* ¶ 176. Those admissions do not by themselves establish any particular executive's scienter as to a securities disclosure, but they do increase the strength of the scienter inference. *See Braskem*, 246 F. Supp. 3d at 749 n.3 (considering corporate guilty pleas as admissions consistent with the alleged scheme). Adding up all of the allegations above, plaintiffs have pleaded a strong inference of scienter as to Masrani, Tran, and Salom.

The scope of the inquiry as to Bambawale is narrower, because only a single challenged statement is attributed to him: the one where he blamed the "root cause" of AML failures on "some procedural weaknesses in the U.S." and assured investors that the problem was "not . . . at the enterprise level." CAC ¶ 279. That means his scienter need only be assessed with respect to that specific statement. Plaintiffs allege that as TD's chief risk officer, Bambawale received regular AML updates through the bank's reporting structure and direct contact with AML leadership. *Id.* ¶¶ 9(c), 25. Bowman, who led the global AML department and oversaw its budgeting and strategic

planning, reported directly to him. *Id.* ¶¶ 50–51. Bambawale also represented (in this statement) that he could speak to the "root cause" and scope of AML problems. These allegations are sufficient to support a strong inference that Bambawale was at least reckless in downplaying the AML issues and assuring investors that the problems were confined to U.S. procedures.

Finally, plaintiffs allege a strong inference of corporate scienter. Besides arguing that the individual defendants' lack of scienter forecloses a finding of corporate scienter, defendants do not raise an independent challenge to the corporate entities' scienter, and for good reason. The above allegations, as well as the guilty pleas by TDBNA and TDBUSH, are more than "sufficient to create a strong inference either (1) that someone whose intent could be imputed to the corporation acted with the requisite scienter or (2) that the statements would have been approved by corporate officials sufficiently knowledgeable about the company to know that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (cleaned up).

Defendants contend that there are "plausible, nonculpable explanations," *Tellabs*, 551 U.S. at 324, for defendants' statements that are "far more compelling" than an inference of fraud, Dkt. 72 at 32. Namely, defendants argue that plaintiffs' allegations merely suggest that "Defendants were in a constant game of 'catch up,'" and that "they gradually learned of the company's emerging problems and engaged in evolving efforts to investigate and address them." Dkt. 72 at 32. While discovery may bear that story out, the Court disagrees that it is a compelling inference at this stage, where plaintiffs' allegations must be taken as true. For the reasons described above, plaintiffs' allegations give rise to a strong inference that Masrani, Tran, Salom, Bambawale, and the corporate defendants were at least reckless as to the misrepresentations they made.

### III. Plaintiffs have pleaded loss causation for the actionable statements

Plaintiffs also plausibly allege loss causation. "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted). To show loss causation, plaintiffs must allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* at 173. "Of course, if the loss was caused by an intervening event, . . . the chain of causation will not have been established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003). So at this stage, plaintiffs' "burden is not a heavy one." *Loreley Fin.*, 797 F.3d at 187. All that is required is "some indication of the loss and the causal connection." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

As an initial matter, the Court rejects defendants' argument that plaintiffs must match each of the corrective disclosures to the specific misstatements that they cured. While plaintiffs must plausibly connect their losses to the alleged misrepresentations, the cases defendants cite do not require the complaint to include a statement-by-statement accounting of which disclosure corrected which misrepresentation. *See, e.g.*, *Lentell*, 396 F.3d at 174–75 & n.4 (dismissing where plaintiffs made

"no allegation that the market reacted negatively to a corrective disclosure regarding the falsity of [defendant's recommendations] and no allegation that [defendant] misstated or omitted risks that did lead to the loss"); *In re Y-mAbs Therapeutics, Inc. Sec. Litig.*, 2024 WL 451691, at *14 (holding loss causation adequately pleaded because an FDA briefing document revealed warnings that contradicted the actionable statements); *In re CarLotz, Inc. Sec. Litig.*, 2024 WL 1348749, at *18 (S.D.N.Y. Mar. 29, 2024) (holding loss causation adequately pleaded by connecting corrective disclosures to categories of misstatements).

Beyond that, defendants challenge four of plaintiffs' six alleged corrective disclosures. First, on May 25, 2023, TD disclosed "reasonably possible losses" of $1.27 billion, along with a vague statement that the bank was "involved in various legal and regulatory actions." CAC ¶ 298. TD's share price fell 4.39%. *Id.* ¶ 299. Analysts at Bank of America commented that TD's management "appears [to have] underestimated the impact on expenses due to potential compliance related investments that may be necessary in order to resolve regulatory issues in the U.S." *Id.* ¶ 300.

Defendants point out that this disclosure didn't say anything explicit about an AML investigation. And they also argue that the $1.27 billion in possible losses was just a minor increase over the $1.26 billion disclosed the year before. Plaintiffs, meanwhile, counter that the $1.26 billion earmarked in 2022 was for something entirely different that had already been resolved at the time of the 2023 report—so the $1.27 billion (and associated share price drop) was attributable to the AML investigation. This is a dispute better suited for discovery. The fact that Bank of America analysts interpreted this disclosure as related to "compliance related . . . regulatory issues in the U.S." that TD's management had "underestimated" is sufficient to show "some indication of the loss and the causal connection." *Broudo*, 544 U.S. at 347.

The final three corrective disclosures are simpler. On May 2, 2024, The Wall Street Journal published an article entitled, "TD Bank Probe Tied to Laundering of Illicit Fentanyl Profits; The Canadian bank is contending with three other U.S. probes into its anti-money-laundering controls." CAC ¶ 123. The article gave new details about the scope of TD's AML issues and the DOJ's investigation. *Id.* TD's share price fell 5.89%. *Id.* ¶ 305. Then on August 22, 2024, TD announced that it suffered its first loss in over two decades and set aside an extra $2.6 billion to cover fines from regulators. *Id.* ¶ 307. TD's share price fell 2.19%. *Id.* ¶ 308. Finally, on October 9, 2024, The Wall Street Journal reported that TD would plead guilty to criminal charges for AML violations and face $3 billion in penalties, and that the OCC was expected to impose an asset cap that would bar TD's growth in the U.S. *Id.* ¶ 311. The next day, TD disclosed the guilty pleas, and its share price dropped another 6.4%. *Id.* ¶¶ 312, 314.

Defendants argue that the articles only provided "further details" about the probes and that market participants had long known that TD faced "potential penalties" in the billions. Dkt. 72 at 40–41. These arguments are unpersuasive. Plaintiffs allege significant new details emerging via each of these three disclosures. And each one is clearly tied to remedying the alleged misstatements by revealing the extent to which TD's deficient AML controls had facilitated money laundering and the resulting consequences—contrary to defendants' assurances about the adequacy of TD's AML program and their efforts to downplay its problems. The fact that investors already knew of

the investigations and the possibility of substantial penalties does not mean they knew the scope of the underlying failures or the consequences TD would ultimately face.

## IV. Plaintiffs' scheme liability claim may go forward, including against Levine and Bowman

Plaintiffs also assert a claim under Rule 10b-5(a) and (c), which require a plaintiff to show: "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). This sort of claim requires a plaintiff to allege "something *beyond* misstatements and omissions," which are covered by subsection (b). *SEC v. Rio Tinto PLC*, 41 F.4th 47, 49 (2d Cir. 2022). Scheme liability claims are premised on "deceptive *conduct*." *Plumber & Steamfitters*, 11 F.4th at 105 (emphasis added).

Here, most of plaintiffs' purported scheme allegations describe defendants' decisions to let TD's AML program deteriorate: imposing the Flat Cost Paradigm, limiting transaction monitoring, declining to address known risks, and failing to file required reports. CAC ¶¶ 232–38. That conduct may violate the Bank Secrecy Act, and it may render defendants' assurances about AML compliance misleading. But it's not clear that any of that conduct is, by itself, deceptive. "[A]n act must be 'inherently deceptive' to give rise to scheme liability." *In re CarLotz*, 2024 WL 3924708, at *5 (quoting *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 253 (S.D.N.Y. 2022)). This requirement is important to preserving the distinction between misstatement and scheme liability. *See Rio Tinto PLC*, 41 F.4th at 54–55. Without it, virtually every misstatement claim would also support liability under Rule 10b-5(a) and (c), because plaintiffs could simply point to the underlying conduct defendants were lying about.

But even assuming that this conduct does qualify as deceptive, plaintiffs fail to plead reliance on these underlying decisions. Plaintiffs do not allege that these internal decisions were communicated to investors, and reliance on defendants' public assurances does not, without more, establish reliance on the underlying conduct. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159–61 (2008). Plaintiffs argue that defendants' misdeeds made the misstatements which they did rely on "necessary or inevitable," drawing on language from *Stoneridge*. *See id.* at 161. But there is a difference between alleging that conduct inexorably led to misleading information reaching investors and alleging that conduct gave defendants a reason to lie about what they had done. The former is sufficient to plead a scheme liability claim; the latter is not.

Consider a hypothetical. An automobile manufacturer decides it wants to save some money by cutting back on the safety tests it runs. That might be negligent, but it's not deceptive, and no investors have been misled yet. So there's no securities fraud—at least so far.

Predictably, though, the company doesn't want investors to know about this new initiative, so it lies, telling investors in its annual 10-K that its safety program is as robust as ever. Now we've got securities fraud—more specifically, a Rule 10b-5(b) claim based on the company's misleading

statements. What we don't have yet is a scheme liability claim, because the company hasn't committed any deceptive *acts* that investors have relied on. Just the misstatements. And the company's negligent conduct didn't make its later misstatements "necessary or inevitable."

But the next quarter rolls around, and it's time for third-party inspectors to come by the factory. If the inspectors saw that the testing floor hadn't been used in months, the jig would be up. So the company puts on a sham safety test, falsifies test results, and the inspectors issue the company's cars A+ safety ratings. *Now* we're in the realm of scheme liability. The company's deceptive conduct (fooling the inspectors) made it inevitable that misleading statements (the A+ safety ratings) would reach investors, who would rely on them.

*Dentsply* is illustrative. There, the "plaintiffs ha[d] evidence that defendants . . . lied to their auditor" and "as a direct result of that conduct, [the company's] financial statements (which plaintiffs relied on) painted an overly rosy picture of its financial wellbeing." *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2026 WL 2621082, at *18 (S.D.N.Y. Sept. 4, 2026). In a case like that, scheme liability plays an important role, because investors can't bring a Rule 10b-5(b) claim against the innocent party (the safety inspector, auditor, etc.) who issued the misleading public statement. A scheme liability claim allows investors to hold the company liable for its deceptive conduct that *led to* the misleading public statement.

While most of plaintiffs' allegations don't describe any such scheme, paragraph 239 does. It alleges that defendants concealed TD's AML deficiencies during OCC examinations in 2017, 2018, 2019, and 2021 by misleading examiners about planned monitoring enhancements and falsely telling them in July 2021 that TD was monitoring Zelle activity. CAC ¶ 239. Like the deception of the auditors in *Dentsply* or the inspectors in the hypothetical, these acts allegedly corrupted the independent scrutiny that could have exposed the truth. The alleged object was to conceal TD's deficiencies "from the government and the public." *Id.*

Those allegations supply enough particularity to survive, including against Bowman and Levine. A plaintiff must identify "what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Plumber & Steamfitters*, 11 F.4th at 105 (quotation omitted). Paragraph 239 identifies the examinations, the substance of the lies, and the AML executives responsible, expressly including Bowman and Levine. It's true that their participation is alleged inferentially, "given their positions." CAC ¶ 239. But that allegation must be read alongside the complaint's description of Bowman's oversight of AML technology and U.S. operations, Levine's management of U.S. AML compliance, and both defendants' knowledge of the deficiencies they allegedly concealed. *See id.* ¶¶ 51–52, 137. Taken together, those allegations sufficiently identify their participation in the scheme at this stage.[3]

[3] Only the scheme liability claim survives against Bowman and Levine. Neither is alleged to be the maker of a challenged statement, and plaintiffs expressly acknowledge that they do not pursue liability against either under Rule 10b-5(b). Dkt. 86 at 1 n.1. Plaintiffs also fail to respond to Bowman's and Levine's arguments for dismissal of the Section 20(a) claims against them, meaning those claims are abandoned. *See*

Defendants may renew their arguments at summary judgment. And plaintiffs should keep in mind the limits of the claim that survives. They will need evidence of defendants' participation in deceptive conduct and the connection between that conduct and the misleading information on which investors relied. Evidence that defendants underfunded TD's AML program or violated the Bank Secrecy Act will not, by itself, suffice.

## V. Plaintiffs have pleaded control-person liability

"Section 20(a) of the Exchange Act provides that individual executives, as 'controlling person[s]' of a company, are secondarily liable for their company's violations of the Exchange Act." *Blanford*, 794 F.3d at 305 (quoting 15 U.S.C. § 78t(a)). "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007).

Defendants' arguments here are largely derivative of their arguments above. As explained, plaintiffs have adequately alleged primary violations of Section 10(b) based on certain statements by defendants. And the complaint alleges that the relevant individual defendants were senior decisionmakers with authority over the TD entities that made those statements, including authority over the challenged disclosures. The same allegations discussed above also support a plausible inference that those defendants knew of, or had access to, the facts that allegedly rendered the statements misleading. Thus, at the pleading stage, plaintiffs have adequately alleged that defendants culpably participated in the alleged fraud. *See In re Sanofi-Aventis Sec. Litig.*, 774 F. Supp. 2d 549, 572 (S.D.N.Y. 2011). So defendants' motion to dismiss the Section 20(a) claims is denied to the extent those claims are based on statements the Court has held actionable.

## CONCLUSION

For these reasons, the motion to dismiss is GRANTED IN PART and DENIED IN PART. The motion is granted with respect to statements 14–16, 28–30, and 32–39. The motion is otherwise denied. The stay on discovery is lifted. The parties should meet and confer and, on or before October 27, 2026, jointly propose a case management plan addressing a schedule for discovery, class certification, and summary judgment.

---

*Maroney v. Woodstream Corp.*, 695 F. Supp. 3d 448, 468 (S.D.N.Y. 2023) ("In the Second Circuit, a plaintiff's failure to respond to contentions raised in a motion to dismiss constitutes an abandonment of those claims and necessitates their dismissal." (cleaned up)).

The Clerk of Court is directed to terminate Dkt. 71.

SO ORDERED.

Dated: October 13, 2026
New York, New York

ARUN SUBRAMANIAN
United States District Judge